**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **ZENERGY BRANDS, INC., *et al.*,**[1] | § | **Case No. 19-42886** |
| | § | |
| **Debtors.** | § | **(Joint Administration Requested)** |

**DECLARATION OF JOSHUA CAMPBELL IN SUPPORT**
**OF CHAPTER 11 PETITIONS AND FIRST-DAY MOTIONS**

I, Joshua Campbell, do hereby declare, under penalty of perjury, that:

1.      I am the President and Director ("<u>President</u>") of Zenergy Brands, Inc. ("<u>Zenergy</u> <u>Brands</u>" and together with NAUP Brokerage, LLC, Zenergy Labs, LLC, Zenergy Power & Gas, Inc., and Enertrade Electric, LLC, Zenergy & Associates, Inc., and Zen Technologies, Inc. collectively, the "<u>Company</u>" or "<u>Debtors</u>").  I have served in that role since October 19, 2019.  I have been employed by Zenergy Brands since 2017.  Since that time, I have held various titles and assumed many responsibilities, including handling or overseeing financial modeling, liquidity management and general day-to-day operations.  As a result, I am generally familiar with the Debtors' day-to-day operations, businesses, financial affairs, books and records, and restructuring efforts. I am above 18 years of age and, in my opinion, competent to testify. I am authorized to submit this Declaration on the Debtors' behalf.

2.      Prior to my time at Zenergy Brands, I spent over fifteen years in the technology and service-delivery sector.  I was the Director of Network Services of Stream Energy.  In this position,

---

[1] The Debtors in the above-captioned chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Zenergy Brands, Inc. (1686); NAUP Brokerage, LLC (7899); Zenergy Labs, LLC (8045); Zenergy Power & Gas, Inc. (1963); Enertrade Electric, LLC (8649); Zenergy & Associates, Inc. (4022); and Zen Technologies, Inc. (7309).  The above-captioned Debtors' mailing address is 5700 Granite Pkwy, #200, Plano, TX 75024.

I oversaw network services related to the sale of energy services. I also provided consulting services relating to operations and technology.  I have also served as the Director of Operations for US First Energy and as the Senior IT Manager for USA Environment.  As the Senior IT Manager, I oversaw the IT budget for a multistate company and assisted the executive team on its day-to-day responsibilities.

3.      I submit this Declaration to provide an overview of the Company, its businesses, and the Chapter 11 Cases (as defined below), as well as to support the Debtors' chapter 11 petitions and the First Day Motions (as defined below). Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge of the Company's operations and finances, information learned from my review of relevant documents, information supplied to me by other employees of the Company and the Company's advisors, or my opinion based on my experience concerning the Company's operations and financial condition. I am authorized to submit this declaration on behalf of the Debtors, and, if called to testify, I could and would testify competently to the facts set forth herein.

4.      I have been involved in the Debtors' restructuring process (the "Restructuring Process"), including, without limitation, (a) participating in the development, negotiation, and implementation of various strategic alternatives for restructuring, reducing, or modifying the Debtors' indebtedness, (b) managing professionals engaged by the Debtors in connection with the Restructuring Process, and (c) supervising the preparation of documentation needed to implement the Restructuring Process since on or around August 25, 2019.

5.      On October 24, 2019, (the "Petition Date"), the Debtors filed voluntary petitions (the "Petitions") for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), commencing the above-captioned cases (collectively, the

"Chapter 11 Case(s)"), in an effort to preserve and maximize the value of their Chapter 11 estates (collectively, the "Estates").

6.      The Debtors intend to operate their businesses and to manage their properties as debtors-in-possession under §§ 1107(a) and 1108 of the Bankruptcy Code.

7.      The Debtors have requested certain relief in "first day" applications and motions filed with the Court (singularly, "First-Day Motion," collectively, the "First-Day Motions")[2] to minimize potential adverse impacts of the bankruptcy filings and to maximize the value of their Estates. I submit this Declaration to assist the Court and parties-in-interest in understanding the circumstances that led to the commencement of the Chapter 11 Case and in support of the Debtors' voluntary petitions and First-Day Motions.

8.      Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge, my discussions with members of the Debtors' management teams and other personnel, my knowledge and review of relevant documents, including the Debtors' books and records, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition. If called on to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

9.      I am familiar with the contents of each First-Day Motion (including the exhibits) and the facts set forth therein are true and correct to the best of my knowledge. The relief sought in each First-Day Motion will provide an orderly transition of the Debtors into these Chapter 11 Cases and ultimately permit the Debtors to maximize recoveries for all parties-in-interest. Further, I believe the relief sought in the First-Day Motions is in each case narrowly tailored and necessary

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the applicable First-Day Motion.

to achieve the goals identified above, and, accordingly, best serves the interests of the Debtors' estates and stakeholders.

## I.      OVERVIEW OF THE DEBTORS' BUSINESSES AND HISTORY

### A.      The Debtors' Businesses

10.      Zenergy Brands is a next-generation energy and technology company engaged in the business of selling energy-conservation products and services to commercial, industrial, and municipal customers. Zenergy Brands is a business-to-business company, whose business platform is a combined offering of energy services and smart controls. Zenergy Brands offers a unique value proposition to commercial, industrial, and municipal customers whereby it offers a means to reduce their utility expenses anywhere from 20% up to 60% through energy-efficient and smart-control products and services. Zenergy Brands is a public company, fully reporting to the SEC and currently trading on the OTCQB.

11.      Zenergy Brands was incorporated in Nevada on May 28, 1999, as Paragon Polaris Strategies.com, Inc. In May 2010, Paragon Polaris merged with Texas Hill Country Barbecue, Inc., and on June 2, 2010, changed its name to Texas Hill Country Barbecue, Inc. On August 21, 2010, Texas Hill Country Barbecue filed its Initial Company Information and Disclosure Statement with the OTC Markets and changed its name to Texas Hill Country Barbecue, Inc. and stock-trading symbol to "THCB." In March 2013, Texas Hill Country Barbecue changed its name to South American Properties with the new stock symbol of "SAMP." In October 2014, South American Properties changed its name to USA Restaurant Funding, Inc. along with its trading symbol to "USAR." On March 24, 2016, USA Restaurant Funding, Inc. changed its name to The Chron Organization, Inc. and its stock trading symbol to "CHRO." Effective December 1, 2017, the company changed its name to Zenergy Brands, Inc. and its stock trading symbol changed to "ZNGY."

4

### B.    The Zero-Cost Program

12.    The foundation of Zenergy Brands business is its "Zero-Cost Program." This is a turnkey solution that enables its target customers to upgrade their older, inefficient equipment and assets, allowing for installation of energy-efficient retrofits such as HVAC and refrigeration motor controllers, load-factor improvement technologies, building-envelope-based technologies, weatherization-based technologies, smart controls, and LED lighting, all at no up-front cost to its customers.

13.    The Zero-Cost Program is facilitated through an industry-standard agreement referred to as a Managed Energy Services Agreement ("MESA"). Under a MESA, Zenergy is obligated to develop, arrange financing for, install, and maintain all energy-efficiency measures and equipment installed by Zenergy Brands. Zenergy Brands will retain ownership of all installed equipment. The minimum term of the MESA is five years with an expected average of seven years. Under the terms of the MESA, Zenergy Brands' customers are obligated to pay Zenergy Brands a portion of their savings in utility costs following the installation of Zenergy Brand's equipment; these are referred to as "Service Payments." Service Payments are fixed payments made on a monthly basis over the term of the agreement from the customer to Zenergy Brands. These payments scale down over the term of the MESA, allowing the customer to reap more and more of the dollar savings from the respective utility company each year.

14.    Effectuating a successful MESA requires Zenergy Brands to implement a credit review and standard underwriting procedures. This process includes, without limitation, the following: standard credit screening provided by credit reporting agencies (i.e. Experian), business profile reports from Dun & Bradstreet, review of trade credit and references, confirmation that client has been in operation for greater than 10 years, and Zenergy Brand's proprietary review and assessment of historical accounting records and industry landscape.

C.       **The Debtors' Corporate Structure**

15.      The chart on the following page illustrates the Debtors' basic organizational structure in summary form:

**CORPORATE STRUCTURE**





**Zenergy Brands:**
Class A Common:  5,513,577,153
Class A Preferred:  600,000
Class B:  10,000,000

### (1) **Zenergy Brands, Inc.**

16.     Zenergy Brands is a Nevada corporation that is publicly traded on the OTCQB. Zenergy Brands has issued two classes of common stock, Class A Common Stock and Class B Common Stock, and one class of Preferred Series A stock.  Class A Common Stock is publicly traded, and there are currently 5,513,577,153 shares outstanding. Class B Common Stock may be owned by Alex Rodriguez, Zenergy Brands' former chief executive officer, and is held as collateral by TCA Global Credit Master Fund, LP ("TCA Global"), the Debtors' first-lien secured lender, or an affiliate of TCA Global. There are 10,000,000 outstanding shares of Class B Common Stock. The Debtors have 600,000 outstanding Preferred Series A shares.  Each share of the Class A Common Stock has one vote per share, and each share of the Class B Common Stock has 500 votes per share.

17.     I serve as a current director on the board of directors for Zenergy Brands alongside Ryan Samuel. I also serve as the chief executive officer and chief operating officer. Zenergy Brands holds an interest in several subsidiaries that were acquired or formed to accomplish its overarching goal of selling energy-conservation products and services to commercial, industrial, and municipal customers.

### (2) ***Enertrade and Zenergy Power & Gas, Inc.***

18.     On April 3, 2018, Zenergy Power & Gas, Inc. ("ZPGI"), a Texas corporation formerly known as Zen Energy Inc., and a direct subsidiary of Zenergy Brands, consummated the purchase of 87.37% of the issued and outstanding equity interests of Enertrade Electric, LLC, a Texas limited liability company ("Enertrade"), a retail electric provider.  Free and Free Enterprises

8

LLC owns a 10.0% interest in both ZPGI and Enertrade.  ZPGI currently holds 77.37% ownership of Enertrade.

19.     Following the acquisition, Zenergy Brands determined that the sellers of Enertrade made material misrepresentations and attempted to address and repair certain issues within Enertrade. Zenergy Brands ultimately concluded that it was in its best interest to cease its retail-electric operations. In doing so, Zenergy Brands was able to avoid a mass customer-transition event, which the Texas Public Utility Commission regards as a negative event. Had the Zenergy Brand's winding down of the Enertrade operation consisted of a mass customer-transition event to the provider of last resort, then such an event would have prevented Zenergy Brands from ever acquiring a license as a retail-energy provider in Texas, as well as other deregulated energy markets.

### (3)     *Zenergy Labs, LLC*

20.     Zenergy Labs, LLC ("Zenergy Labs") is a Texas limited liability company of which Zenergy Brands holds an 85% ownership interest. Djailson Belieny, Jr. owns the remaining 15% ownership interest in Zenergy Labs. Zenergy Labs develops proprietary software used by Zenergy Brands in its operations and to analyze the Zero-Cost Program. Zenergy Labs is exploring the lease of its software and software development to third-parties.

### (4)     *NAUP Brokerage, LLC*

21.     NAUP Brokerage, LLC ("NAUP") specializes in brokering of electricity and natural gas for commercial, industrial, and municipal end-use customers. Zenergy Brands owns 80% of the ownership interests in NAUP. NAUP Investments, LLC, a Texas limited liability company, owns the remaining 20% ownership interests in NAUP.

**(5)** ***Zenergy Associates, Inc.***

22. Zenergy & Associates, Inc. ("ZAI") is a wholly-owned subsidiary of Zenergy Brands that was formed to expand Zenergy Brand's sales through direct sales.

**(6)** ***Zen Technologies, Inc.***

23. Zen Technologies, Inc. ("Zen Technologies") is a wholly-owned subsidiary of Zenergy Brands that was formed to focus on smart controls and alarm licenses. As of the Petition Date Zen Technologies is not actively engaged in any activity.

**D. Debt Structure[3]**

24. As of the Petition Date, the Debtors are obligors (either as borrower or guarantor) on a principal amount of prepetition funded indebtedness totaling approximately $8,178,215[4] as summarized below:

| Debt Instrument | Outstanding Principal Amount |
|---|---|
| **Secured Debt** | |
| TCA Senior Security Facility Convertible Notes | $2,622,468 |
| **Total Secured Debt** | **$2,622,468** |
| | |
| **Unsecured Debt** | |
| TCA Investment Banking Services Agreement | $3,000,000 |
| Byron Young | $260,000 |
| Mick Zeigler | $400,000 |
| Ashley Steffan | $100,000 |
| Collision Capital | $50,000 |
| Bellridge Capital | $269,500 |
| Actus | $82,432 |
| MorningView | $39,983 |
| 2 Plus 2 | $37,233 |
| Vista | $96,520 |

---

[3] The following summary is qualified in its entirety by reference to the operative documents, agreements, schedules, and exhibits. In the event of inconsistency between this summary (including the defined terms therein), the source documents shall control and govern.

[44] TCA Capital International Group or TCA Global asserts a $3.0 mm claim against the Debtors under that certain Investment Banking Services Agreement dated August 22, 2018. The Debtors dispute that any amount is owed to TCA Global under that certain Investment Banking Services Agreement.

| Debt Instrument | Outstanding Principal Amount |
|---|---|
| EMA Financial | $78,401 |
| RB Capital | $1,092,500 |
| Powerup Lending | $73,325 |
| Greentree | $75,000 |
| K Club – Sraffan, Kildare, Ireland | $25,000 |
| Partner and Friends | $40,000 |
| Free & Free | $600,000 |
| TCN Holdings, LLC | $1,150,000 |
| NAUP Note | $165,000 |
| Trade Vendor Debt | $920,853 |
| **Total Unsecured Debt** | **$5,555,747** |
|  |  |
| **Total Funded Debt** | **$8,178,215** |

### (1)      The TCA Global Secured Debt

25.      TCA Global is the Debtors' senior secured lender. The Debtors began their relationship with TCA Global in or around August 2018, when the Debtors into that certain Investment Banking Services Agreement dated August 22, 2018 (the "Services Agreement"). The Debtors subsequently entered into a series of loans, as described herein and set forth in the chart below. As of the date hereof, Zenergy Brands has issued senior secured debt to TCA Global in the approximate aggregate principal amount of $2,622,468. An accounting of that debt and a short inventory of the documents that evidence that debt follow.

| Date Advanced | Loan Principal Amount |
|---|---|
| December 24, 2018 | $1,600,000 |
| March 29, 2019 | $347,463.41 |
| May 9, 2019 | $68,000 |
| May 22, 2019 | $63,175 |
| June 19, 2019 | $100,000 |
| July 3, 2019 | $34,175 |
| July 12, 2019 | $34,175 |
| July 18, 2019 | $66,700 |
| August 19, 2019 | $17,740 |
| August 28, 2019 | $122,690 |
| September 18, 2019 | $25,000 |
| September 30, 2019 | $68,350 |
| October 10, 2019 | $75,000 |
| **Total** | **$2,622,468.41** |

(a)     **Securities Purchase Agreement, Debenture, and TCA Security Agreement dated December 24, 2018**

26.     On or around December 24, 2018, Zenergy Brands executed the following documents with TCA Global:

- that certain Securities Purchase Agreement, dated December 24, 2018 (the "Securities Purchase Agreement or SPA").[5]

- that certain Senior Secured, Convertible, Redeemable Debenture in the principal amount of $1,750,000, dated December 24, 2018.

- that certain Senior Secured, Convertible, Redeemable Debenture (Fee Debenture) in the principal amount of $16,000, maturing December 24, 2020, dated December 24, 2018.

- that certain Senior Secured, Convertible, Redeemable Debenture (Fee Debenture) in the principal amount of $16,000, maturing June 24, 2021, dated December 24, 2018.

- that certain Security Agreement in favor of TCA Global dated December 24, 2018.

---

[5] The SPA required a $1,750,000 purchase of securities.  But it appears that the Debtors received only $1,600,000.

12

**(b)     TCA Promissory Notes**

27.     Following entry into the TCA Security Agreement, the Debtors determined that they required additional capital to continue to run their business.  The Debtors entered into a series of promissory notes and security agreements related to that determination, as set forth in the above chart.

**(c)     The TCA Senior Secured Revolving Credit Facility**

28.     Zenergy Brands is the primary obligor under that certain Senior Secured Revolving Credit Facility Agreement by and among Zenergy Brands, Inc., Zenergy Energy Services, LLC and TCA Special Situations Credit Strategies ICAV dated September 26, 2019, (the "Revolving Credit Facility"). Zen Technologies, ZPGI, NAUP, Zenergy Labs, Enertrade and ZAI are guarantors under the Revolving Credit Facility. The Revolving Credit Facility has a revolving credit limit in the maximum amount of $5,000,000.  As of the date hereof, the TCA Global has not advanced any money under the Revolving Credit Facility and has stated that it will not do so absent the initiation of these bankruptcy cases. Under the Revolving Credit Facility, TCA Global has instituted a lock-box account and applies payments received by the Debtors to outstanding amounts owed under the above-noted loan documents. This provides no liquidity to the Debtors for operations.

**(2)     Unsecured Promissory Notes**

29.     For Zenergy Brands to effectively market, sell, and implement MESAs, it must utilize third-party financing entities to provide project and strategic financing toward fulfilling its working capital requirements to acquire and install the equipment required under the MESA.

30.     As of the Petition Date, the Debtors are obligors (either as borrower or guarantor) on a principal amount of prepetition unsecured promissory notes totaling approximately $4,634,894 (the "**Unsecured Promissory Notes**") as set forth below. The majority of the

Unsecured Promissory Notes are convertible promissory notes that have various maturity dates and grant the holder the option to convert the Unsecured Promissory Note into Zenergy Brand's Class A Common Stock according to the terms of the respective debt instrument. The Debtors are in default under certain of the Unsecured Promissory Notes.

| Unsecured Promissory Notes | Outstanding Principal Amount |
|---|---|
| Byron Young | $260,000 |
| Mick Zeigler | $400,000 |
| Ashley Steffan | $100,000 |
| Collision Capital | $50,000 |
| Bellridge Capital | $269,500 |
| Actus | $82,432 |
| MorningView | $39,983 |
| 2 Plus 2 | $37,233 |
| Vista | $96,520 |
| EMA Financial | $78,401 |
| RB Capital | $1,092,500 |
| Powerup Lending | $73,325 |
| Greentree | $75,000 |
| K Club – Sraffan, Kildare, Ireland | $25,000 |
| Partner and Friends | $40,000 |
| Free & Free | $600,000 |
| NAUP Note | $165,000 |
| TCN Promissory Note | 1,150,000 |
| **Total Notes** | **$4,634,894** |

### (3)    TCN Promissory Note

31.    In conjunction with ZPGI's acquisition of Enertrade, on April 3, 2018, ZPGI issued an unsecured Promissory Note to Luccirelli & Gomez LLC and TCN Holdings, LLC in the amount of $1,150,000 (the "TCN Note"). The TCN Note is interest free and the principal balance was due and owed in full on November 2, 2018.

### (4)    NAUP Investments Promissory Note

32.    In conjunction with Zenergy Brand's acquisition of NAUP on June 1, 2017, Zenergy Brands issued an unsecured Promissory Note to NAUP Investments, LLC in the amount

of $165,000 (the "<u>NAUP Note</u>"). The principal balance was due and owed in full on November 2, 2018.

(5)     **Trade Vendor Debt**

33.     The Debtors rely on vendors to provide goods and services necessary for the Debtors to provide goods and services to their customers. As of the Petition Date, the Debtors estimate that they cumulatively owe approximately $920,853 to trade vendors.

E.     **Events Leading to the Debtors' Bankruptcy Filing**

(1)     **Financial Struggles**

34.     The Debtors commenced selling retail smart-home technologies in 2016 and shifted focus utilizing their smart controls platform for commercial customers in early 2017. In focusing on commercial customers, the Debtors relied heavily on third-party financing entities to provide project and strategic financing.

35.     The Debtors also expanded rapidly by entering into different segments of the deregulated energy market by acquiring Enertrade and entering into the retail electricity provider market. While the Debtors were able to attract customers and were successfully entering into MESAs with customers, the Debtors did not receive returns on entering the retail electricity provider market. Furthermore, the Debtors' total debt load and servicing costs eroded their ability to market and expand their customer base. Under these conditions, the Debtors did not have sufficient capital to maintain and grow their businesses and they began to fall behind on their obligations to creditors in 2018-2019.

(2)     **The Debtors' Financial Statements**

36.     Zenergy Brands is a public company and is required to comply with the rules and regulations set forth by the United States Securities and Exchange Commission ("<u>SEC</u>") and the Securities Exchange Act of 1934. This includes filing necessary disclosures with the SEC. On

July 22, 2019, the Debtors became aware that Evans & Knauth, LLP ("E&K"), its prior independent registered public accounting firm, was not registered with the Public Company Accounting Oversight Board ("PCAOB"). As a result, Zenergy Brands dismissed E&K and concluded that the Debtors' previously issued financial statements for the year ended December 31, 2018 and the quarters ended June 30, 2018, September 30, 2018, and March 31, 2019, which were audited and reviewed by E&K, respectively, could no longer be relied upon, because such financial statements were not audited or reviewed by a PCAOB registered auditing firm in accordance with SEC rules. Thus, Zenergy Brands will be filing amended financial statements for the time periods at issue. Zenergy Brands has not yet filed amended financial statements for the periods in time at issue.

37.     The Debtors have diligently evaluated, in consultation with their professionals, a number of options to address the Debtors' current financial issues. The Debtors intend to use these Chapter 11 Cases to effectuate a value-maximizing transaction.

38.     The Debtors have commenced these Chapter 11 Cases to fully implement their restructuring effort. The Debtors believe that the Chapter 11 process will allow for a proper balance of (a) their capital structure and ongoing sales with (b) the expected demand for energy efficiency and conservation, and (c) provide a forum for a process that will benefit the Debtors' estates and creditors.

## FIRST-DAY MOTIONS

39.     Below is a brief discussion of the Debtors' First-Day Motions and an explanation of why such motions are critical to the success of the Chapter 11 Cases.  More detailed descriptions of the facts pertaining to the Debtors' operations and the bases for the requested relief in each motion can be found in the respective First-Day Motion.

16

40.     As described more fully below, the relief requested in the First-Day Motions was carefully tailored by the Debtors, in consultation with their professionals, to ensure that the Debtors' immediate operational needs are met, and that the Debtors will suffer no immediate and irreparable harm. At all times, the Debtors' management and professionals will remain cognizant of the limitations imposed on debtors-in-possession; and, in light of those limitations, the Debtors narrowed the relief requested at the outset of the Chapter 11 Cases to only issues that require urgent relief to sustain the Debtors' operations.

## II.     ADMINISTRATIVE AND PROCEDURAL MOTIONS

### A.     Request for Emergency Consideration of Certain "First-Day" Matters

41.     The Debtors have asked to have the First-Day Motions heard on an emergency basis, and I believe that such relief is necessary and appropriate on an immediate basis. If such relief is not granted immediately, the Debtors risk substantial disruption to their ongoing operations, which could result in immediate and irreparable harm to the Debtors and the Estates and creditors of the Estates. The need for this emergency hearing was not caused by any lack of due diligence or any act or failure to act by the Debtors but by the circumstances of these Chapter 11 Cases.

### B.     Motion for Joint Administration

42.     I believe that many of the motions, applications, hearings, and orders that will arise in these Chapter 11 Cases may jointly affect each Debtor.  Under the circumstances, the Debtors believe the interest of the Debtors, their estates, their creditors and other parties-in-interest would be best served by joint administration of these Chapter 11 Cases for procedural purposes only. I understand and believe that joint administration of these Chapter 11 Cases will ease the administrative burden on the Court and all parties in interest, and will protect creditors of the respective estates against potential conflicts of interest. For these reasons, the Debtors submit, and

I believe, that the relief requested in this motion is in the best interests of the Debtors, their estates and their creditors; therefore, it should be approved.

      **C.**      **Motion for Entry of an Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs.**

43.      By this motion (the "Extension Motion"), the Debtors seek entry of an order extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements") by 14 days, for a total of 28 days from the Petition Date, through and including November 21, 2019, without prejudice to the Debtors' ability to request additional extensions for cause shown.

44.      To prepare their Schedules and Statements, the Debtors will have to compile information from books, records, and documents relating to hundreds of claims, assets, and contracts. Accordingly, collection of the necessary information will require a significant expenditure of time and effort on the part of the Debtors and their independent contractors. Additionally, because invoices related to prepetition goods and services have not yet been received and entered into the Debtors' accounting system, it may be some time before the Debtors have access to all of the information required to prepare the Schedules and Statements.

45.      In the days leading up to the Petition Date, the Debtors' primary focus has been preparing for the Chapter 11 Cases. I believe that focusing the attention of key personnel on critical operational and chapter 11 compliance issues during the early days of these Chapter 11 Cases will facilitate the Debtors' smooth transition into chapter 11, thereby maximizing value for their estates, their creditors, and other parties in interest.

### III.   OPERATIONAL MOTIONS

### A.   Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition (A) Contractor Fees, Salaries, Other Compensation, and Reimbursable Expenses, (B) Continue Prepaid Card Program, and (II) Granting Related Relief

46.     By this motion (the "Contractor Motion"), the Debtors seek an order (I) authorizing the Debtors to (a) pay prepetition contractor fees, salaries, other compensation, and reimbursable expenses and (b) continue prepaid card program and (II) granting related relief.  The Debtors' success in their restructuring efforts will be highly dependent on the continued support and performance of its workforce.

47.     The Debtors' exclusively utilize independent contractors to perform revenue-generating and administrative services. The independent contractors perform a wide variety of functions critical to the Debtors' operations, the administration of these Chapter 11 Cases, and the Debtors' successful reorganization. I believe that their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency. In many instances, the Debtors' independent contractors include highly-trained personnel who are not easily replaced.  I believe that without the continued, uninterrupted services of their independent contractors, the Debtors' reorganization efforts likely will be jeopardized.

48.     The Debtors primarily operate their business through the services of nine contractors that receive 1099 payments (the "Contractors"). The vast majority of the Contractors rely exclusively on their compensation and benefits to pay their daily living expenses and provide for their households.  The Contractors (and their families) would be exposed to significant financial hardship if the Debtors are not permitted to ensure uninterrupted payment of compensation (including obligations related to benefits).

49.     On average, the Debtors incur approximately $16,260 per week in collective compensation and fees owed to Contractors (the "Contractor Fees").  The Debtors pay the Contractors on the first and fifteenth of each month.  The period covered for each remittance does not cover the approximate 15-day period.  For example, in October 2019, the amount paid on October 15, 2019, covers the time period from October 1, 2019 through October 9, 2019.  The amount paid on November 1, 2019 covers the time period from October 10, 2019 through October 24, 2019.  The Contractor Fees are paid directly from the Debtors' operating account maintained by Zenergy Brands (Acct. No. *0282).

50.     Because the Contractors are paid in arrears, they will be owed accrued but unpaid Contractor Compensation as of the Petition Date. Contractor Compensation also may be due and owing as of the Petition Date because of, among other things, potential discrepancies between the amounts paid and the amounts that a Contractor believes should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Contractor.

51.     As of the Petition Date, the Debtors believe that approximately $69,250.00 in Contractor Compensation will become due and owing within the first 21 days of these Chapter 11 Cases, which reflects prepetition Contractor Fees in the approximate amount of $55,400.00.

52.     Notwithstanding this fact, the Company does not believe it owes any Contractor any unpaid Contractor Compensation in excess of the $13,650 cap imposed by section 507(a)(4) of the Bankruptcy Code.

### (1)     Contractor Business Expenses

53.     In the ordinary course of business, the Debtors reimburse Contractors for business expenses and other qualifying expenses incurred in carrying out their responsibilities, including, without limitation, expenses for business-related travel and meal expenses and other qualifying expenses (collectively, the "Reimbursable Expenses").  For example, the Debtors rely on Contractors

to travel or incur expenses related to the performance of audits and other services. Contractors pay for incurred Reimbursable Expenses by using either a personal credit card or cash. Contractors then submit receipts to request reimbursement in accordance with internal policies and procedures. Without continued reimbursement of the Reimbursable Expenses, Contractors relying on these benefits would be saddled with additional costs, causing personal financial hardship. The Debtors estimate that they incur approximately $5,000 per month in Reimbursable Expenses, which vary between $1 and $10,000 per month – with the biggest driver being the number of audits performed, the duration of each audit, and the travel costs to perform the audit.

54.     As of the Petition Date, I believe that the Debtors have approximately $750.90 of Reimbursable Expenses.  However, due to the timing of when Contractors submit expense reimbursements, it is difficult for the Debtors to precisely estimate the amount of prepetition Expense Reimbursements outstanding as of the Petition Date.  As a result, the relief sought is precautionary in that it asks the Court to approve the payment of $3,750 in Reimbursable Expenses.

### (2)     Prepaid Card Program

55.     The Debtors maintain two prepaid expense cards (together, the "Prepaid Cards") utilized by the Debtors to pay expenses in the ordinary course of business. The Prepaid Cards are provided by PEX. I hold one of the Prepaid Cards (the "Campbell Card"), and the other is maintained for the benefit of other Debtor expenses (the "Company Card"). The Debtors spend approximately $15,000 per month on the Prepaid Cards to pay for various operating expenses. For example, the Debtors use the Prepaid Cards to pay for general operating expenses, including, but not limited to, business development expenses, marketing expenses, Office365 subscription fees, Adobe fees, and Amazon Web Services fees. Certain of these expenses are on autopay to avoid business disruption.  All of these fees are paid primarily by Mr. Campbell's Prepaid Card.

56.     The Debtors fund the Prepaid Cards on an *ad hoc* basis from the Debtors' main operating bank account. The funds are transferred from the Debtors' main operating bank account to an account held at PEX (the "<u>PEX Account</u>") for the Debtors' benefit. The Debtors then transfer funds from the PEX Account to the Campbell Card or Company Card, as needed. As of the Petition Date, the Debtors maintain approximately $5,600 in the PEX Account, $194.80 on the Campbell Card, and $600 on the Company Card.

57.     As the Prepaid Cards are not credit cards, the Debtors do not owe any prepetition amounts on account of the Prepaid Cards. However, the Debtors may have certain prepetition fees owed to PEX for the use of the Prepaid Cards through PEX's system. The Debtors' estimate that the amount of these fees is insignificant.  I believe that maintaining the Prepaid Cards is necessary for the successful administration of the Chapter 11 Cases.

(3)     <b><u>Honoring Prepetition Checks and Electronic Transfers</u></b>

58.     Debtors request that, to the extent of funds on deposit, all applicable banks and other financial institutions shall be authorized, but not directed, to receive, process, honor, and pay all checks presented for payment and honor all funds transfer requests made by the Contractors, whether such checks were presented or fund-transfer requests were submitted before or after the Petition Date.

(4)     <b><u>Summary</u></b>

59.     To maintain the Debtors' operations and preserve the value of the Estates, I believe that it is essential that the Debtors continue to operate in the ordinary course of business. To achieve that result, the Debtors must retain the uninterrupted service and loyalty of its lifeline, which is made up of the Contractors that serve as its workforce. I believe that payment of the Contractor Compensation is essential to this goal.

**B.      Motion for Orders (I) Authorizing the Debtors to (A) Maintain Existing Insurance Programs and Existing Insurance Premium Financing Agreement, (B) Satisfy All Prepetition Obligations Related to that Insurance Coverage in the Ordinary Course of Business, and (C) Renew, Supplement, or Enter Into New Insurance Coverage in the Ordinary Course of Business and (II) Granting Related Relief Under BLR 9013-1(A)**

60.      By this motion (the "<u>Insurance Motion</u>"), the Debtors seek an order (i) authorizing, but not directing, the Debtors to (a) maintain the Debtors' existing Insurance Policies and Premium Financing Agreements on an uninterrupted basis in accordance with their historical practices, (b) satisfy payment of prepetition obligations related to that insurance coverage in the ordinary course of business, (c) renew, supplement or enter into new insurance coverage in the ordinary course of business, and (ii) granting such other and further relief as is requested herein or as the Court otherwise deems necessary or appropriate.

61.      In the ordinary course of their business the Debtors maintain approximately three (3) insurance policies providing coverage for, among other things, directors and officers liability, errors and omissions, and commercial umbrella liability (collectively, the "<u>Insurance Policies,</u>" and with all premiums and other obligations related thereto, including any broker or advisor fees, taxes, other fees, and deductibles, collectively, the "<u>Insurance Obligations</u>") through several different third-party insurance carriers (collectively, the "<u>Insurance Carriers</u>"). A detailed list of the Insurance Policies and Insurance Carriers is listed on <u>Exhibit C</u> to the Insurance Motion. To the best of my knowledge, the Debtors do not owe any prepetition amounts, including deductibles, on account of the Insurance Programs.

62.      The aggregate annual premium for the Insurance Policies is approximately $58,723.00, not including applicable taxes and surcharges, deductibles, broker and consulting fees, and commissions. The Insurance Policies generally are one year in length and renew at various times throughout the year.

63.    Some of the premiums with respect to the Insurance Policies are financed pursuant to a commercial premium financing agreement (the "Premium Financing Agreements") with First Insurance Funding a Wintrust Company ("First Insurance"), a true and correct copy of which is attached as Exhibit D to the Insurance Motion. The total annual obligation for the Premium Financing Agreement is approximately $54,523.00, which is paid with approximately $6,921.52 as a down payment and then ten monthly payments of approximately $4,917.53.  To the best of my knowledge, as of the Petition Date, the Debtors are current under the terms of the Premium Financing Agreement.

### (1)    Insurance Policies

64.    The insurance programs protect the Debtors and their personnel against various risks that may arise in the course of the Debtors' business.

65.    To protect the Debtors against such risks, it is my understanding that the Debtors' Insurance Policies include the following types of coverage:

- **General Liability Policy** – The Insurance Policies include a general liability policy and provide coverage for claims relating to, among other things, personal injury, bodily injury, property damage and umbrella excess liability.

- **Directors and Officer Policy** – In the ordinary course of their business, the Debtors maintain a Directors and Officers policy (the "D&O Policy") which provides liability coverage for breach of duty by officers or directors.

- **Errors and Omissions Policy** – In the ordinary course of their business, the Debtors maintain an Errors and Omissions policy (the "E&O Policy") which provides liability coverage for errors and omissions and cyber insurance

66.    Absent payments by the Debtors for the purpose of funding the Insurance Obligations, the Insurance Policies and the Premium Financing Agreement will not be funded and the Debtors' coverage under the Insurance Policies can be voided. Disruption of the Debtors'

insurance coverage will expose the Debtors to serious risks, including possibly (a) incurring direct liability for the payment of claims that otherwise would have been payable by the Insurance Carriers under the Insurance Policies, (b) incurring material costs and other losses that otherwise would have been reimbursed by the Insurance Carriers under the Insurance Policies, (c) being unable to obtain similar types of insurance coverage, and (d) incurring higher costs for re-establishing lapsed policies or obtaining new equivalent coverage.

67.     The different categories of Insurance Obligations include (a) fixed-rate premiums based on a rate established by each Insurance Carrier, which are generally payable on an annual basis, some of which are financed through the Premium Financing Agreement, (b) deductibles and other fees related to the Insurance Programs, (c) payments to insurance agents and brokers who assist with the procurement and negotiation of the Insurance Programs, and (d) monthly payments in the approximate amount of $4,917.53, which the Debtors make pursuant to the Premium Financing Agreement.  The Debtors also paid approximately $6,921.52 as a down payment on the Premium Financing Agreement

68.     I believe that preserving the Debtors Insurance Policies and maintaining the Debtors Insurance Obligations is essential to the Debtors' ongoing operations and to the success of their reorganization. The Debtors inability to continue their Insurance Policies would likely negatively impact the Debtors' operations and seriously jeopardize the Debtors' reorganization efforts.

**C.     Motion for Orders (I) Authorizing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief**

69.     By this motion (the "Taxes Motion"), the Debtors request an Order authorizing, but not directing, the Debtors to pay certain unpaid taxes and fees in the ordinary course of business, whether arising prepetition or post-petition.

70.     In the ordinary course of their business, the Debtors collect, withhold, and incur sales, use, excise, income, withholding, franchise, severance, and property taxes, as well as other business, environmental, and regulatory fees (collectively, the "Taxes and Fees"). The Debtors remit the Taxes and Fees to various federal, state, and local governments, including taxing and licensing authorities (collectively, the "Authorities"). A schedule identifying the Authorities is attached to the Tax Motion as Exhibit A. Taxes and Fees are remitted and paid by the Debtors through checks and electronic funds transfers that are processed through their banks and other financial institutions.

71.     It is my understanding that the Debtors pay the Taxes and Fees to the Authorities on a periodic basis, remitting them monthly, quarterly, semiannually, or annually depending on the nature and incurrence of a particular Tax or Fee. It is my belief that the Debtors are substantially current with respect to their payment of Taxes and Fees. However, the debtors may have Taxes and Fees that (a) accrue or are incurred postpetition; (b) accrued or were incurred prepetition but were not paid prepetition, or were paid in an amount less than actually owed; (c)  paid prepetition by the Debtors were lost or otherwise not received in full by any of the Authorities; or (d) incurred for prepetition periods may become due after the commencement of these Chapter 11 Cases.

72.     The Debtors' 2018 Annual Federal Tax return, Form 1120, is due on October 15, 2019. The Debtors do expect to pay federal income tax for 2018.  Additionally, as of the Petition Date, the Debtors estimate that they will owe up to $12,000 in franchise taxes to Texas Comptroller for all of the Debtors as well as $1,500 to the Nevada Secretary of State for Zenergy Brands, Inc.'s annual business license. The Debtors also pay certain late filing and related fees in the amount of $500.

73.     I believe that failing to pay the Taxes and Fees could materially disrupt the Debtors'

business operations. ***First***, failing to pay certain of the Taxes and Fees, particularly franchise taxes,

likely would cause the Debtors to lose their ability to conduct business in certain jurisdictions.

***Second***, the Authorities could initiate audits, suspend operations, file liens, or seek to lift the

automatic stay, which would unnecessarily divert the Debtors' attention from the reorganization

process. ***Third***, failing to pay Taxes and Fees potentially could subject certain of the Debtors'

directors and officers to claims of personal liability, which likely would distract those key persons

from their duties related to the Debtors' restructuring. ***Fourth***, unpaid Taxes and Fees may result

in penalties, the accrual of interest, or both, which could negatively impact the Debtors' businesses

or the reorganization process. Moreover, the Debtors collect and hold certain outstanding tax

liabilities in trust for the benefit of the applicable Authorities, and these funds may not constitute

property of the Debtors' estates. In addition, certain unpaid Taxes and Fees will need to be paid as

part of a plan of reorganization in these cases.

74.     Therefore, I believe that approval of the Taxes Motion is necessary for the Debtors'

successful reorganization.

**D.     Motion for Entry of Order (I) Allowing Debtors to Temporarily Use Their Existing Bank Accounts (II) Granting a 45 Day Extension for Debtors to Comply With The Operating Guidelines and Reporting Requirements for Debtors In Possession and (III) Granting Related Relief**

75.     By this motion (the "<u>Cash Management Motion</u>"), the Debtors seek entry of an

order (a) authorizing the Debtors to (i) temporarily maintain their existing bank accounts,

including honoring certain prepetition obligations related thereto; (ii) allowing the Debtors 45 days

to open new bank accounts to comply with the *Operating Guidelines and Reporting Requirements*

*for Debtors in Possession and Trustees* (the "<u>U.S. Trustee Operating Guidelines</u>"); and (iii)

granting related relief.

76.     The Debtors have an established cash management system that they utilize to collect, manage, and disburse funds used in the Debtors' operations in the ordinary course of business.

### (1)     Bank Accounts

77.     In the ordinary course of business, the Debtors maintain separate bank accounts at Texas Security Bank ("TSB") and Bank of America ("BofA" and collectively, with TSB, the "Banks").  Cash from customers is deposited into these accounts and all disbursements are made out these accounts.

78.     The Debtors accounts (the "Bank Accounts") are as follows:

| Debtor | Last 4 Digits of Account No. | Description |
|---|---|---|
| Zenergy Brands, Inc. | *0282 | Operating Account from which Zenergy Brands's operating costs, including payroll, are made. |
| NAUP Brokerage, LLC | *0042 | Suppliers deposit commission checks into this account, and commissions to channel partners are paid out of this account. |
| Zenergy Brands, Inc. | *0067 | Zenergy Brands's customers wire or ACH their payments into this dominion-of-funds account, which is swept at the end of each day into the lockbox account of the Debtors' secured lender. |
| Zenergy Labs, LLC | *0075 | Clients of Zenergy Labs deposit funds into this account, and Zenergy Labs's costs are paid from this account. |
| Zen Technologies, Inc. | *0778 | This account is not in use and will be closed. |
| Zenergy & Associates, Inc. | *0794 | This account is not in use and will be closed. |
| Zenergy Power & Gas, Inc. | *0786 | This account is not in use and will be closed. |
| NAUP Brokerage, LLC | *5443 | This account is not in use and will be closed. |

79.     The Banks are Federal Deposit Insurance Company ("FDIC") insured banks, and I understand that the Bank Accounts currently comply with section 345 (b) of the Bankruptcy Code.

80.     The Debtors pay the Banks monthly fees (collectively, the "Bank Fees") in connection with the Bank Accounts. The Bank Fees vary in amount.  But they are estimated to be approximately $1,000 a month.

Plans for Full Compliance with the U.S. Trustee Operating Guidelines

81.     The U.S. Trustee Operating Guidelines generally require chapter 11 debtors to, among other things, deposit all estate funds into an account with an approved depository ("Approved Depository") that has agreed to comply with certain requirements set by the U.S. Trustee for handling bankruptcy estate funds.

82.     BofA is currently an Approved Depository.  But TSB is not. The Debtors intend to close their TSB accounts and open debtor-in-possession accounts with Regions Bank. As it will take some time to close eight (8) Bank Accounts and open new ones, I understand that the Debtors seek authority to operate their Bank Accounts for 45-days following entry of the Proposed Order, without the need to comply with the requirements in the U.S. Trustee Operating Guidelines pertaining to bank accounts.

(2)     <strong>The Debtors' Existing Business Forms</strong>

83.     The Debtors utilize certain limited preprinted correspondence and business forms, such as letterhead and checks (collectively, the "Business Forms"), in the ordinary course of their businesses. The Debtors also maintain books and records to document, among other things, their profits and expenses. To minimize unnecessary additional expenses to their estates, the Debtors request that the Court authorize their continued use of their Business Forms to the limited extent they are preprinted and in existence before the Petition Date, without reference to the Debtors' status as debtors in possession for the next 45 days, rather than requiring the Debtors to incur the

expense and delay associated with ordering entirely new forms as required by the U.S. Trustee Operating Guidelines.

84.     I believe that maintaining the existing Bank Accounts, subject to the closure of the TSB accounts, is essential to the Debtors' ongoing operations and restructuring efforts.  To ensure the Debtors are compliant with the U.S. Trustee Operating Guidelines, as set forth in the Cash Management Motion, a 45-day exemption from these requirements for the Bank Accounts nevertheless should be permitted pursuant to section 363(c)(1) of the Bankruptcy Code. A 45-day exemption from the U.S. Trustee Operating Guidelines requirements for the Bank Accounts will also facilitate the Debtors' transition into chapter 11 by, among other things, avoiding administrative inefficiencies and expenses associated with disrupting this system and minimizing delays in the payment of postpetition obligations.

85.     Accordingly, the Debtors request that the Court authorize the Debtors to continue using the Bank Accounts for the next 45 days to facilitate the Debtors' transition into chapter 11. Specifically, the Debtors request that the Court authorize the Banks to continue to maintain, service, and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course of business. The Debtors further request that the Court authorize and direct the Banks to receive, process, honor, and pay any and all checks, wire transfers, credit card, ACH payments and other instructions, and drafts payable through, or drawn or directed on, such Bank Accounts after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto, irrespective of whether such checks, drafts, wires, credit card, or ACH payments are dated prior to or subsequent to the Petition Date.

86.     The Debtors also request that, to the extent the Banks honor a prepetition check or other item drawn on any Bank Account that is the subject of this Motion, either at the direction of

the Debtors or in a good-faith belief that the Court has authorized such prepetition check or item to be honored, the Banks will not be deemed to be liable to the Debtors or to their estates on account of such prepetition check or other item honored postpetition. Such relief is reasonable and appropriate because the Banks are not in a position to independently verify or audit whether the Debtors may pay a particular item in accordance with a Court order or otherwise.

87.     Finally, the Debtors request that the Court authorize the Debtors to continue to pay the Bank Fees, including any prepetition Bank Fees, and further authorize the Banks to charge back returned items to the Bank Accounts, whether such items are dated prior to, on, or subsequent to the Petition Date, in the ordinary course of business.

88.     In addition, to avoid disruption and unnecessary expense, the Debtors request that they be authorized to continue to use their Business Forms, substantially in the forms existing immediately before the Petition Date, without reference to their status as debtors in possession. The Debtors submit that, given the limited nature of the preprinted Business Forms, parties in interest will not be prejudiced if the Debtors are authorized to continue to use their Business Forms substantially in the forms existing immediately before the Petition Date.  Parties doing business with the Debtors undoubtedly will be aware of their status as debtors in possession and, thus, changing forms such as letterhead would impose an unnecessary additional expense on the Debtors' estates.

89.     I believe that the relief requested in the Cash Management Motion is necessary for the Debtors' ongoing business operations and reorganization.

**E.     Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Post-Petition Financing, Granting Senior Postpetition Security Interests and According Superiority Administrative Expense Status Pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code; (II) Authorizing the use of Cash Collateral; (III) Granting Adequate**

**Protection; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief (the "<u>DIP-Financing Motion</u>")**

90.     By the DIP-Financing Motion, the Debtors request entry of an interim financing order in the form attached as <u>Exhibit A</u> to the DIP-Financing Motion (the "<u>Interim Financing Order</u>") and a final financing order (the "<u>Final Financing Order</u>") (together, the "<u>Interim and Final Financing Orders</u>") approving authorization for the Debtors to obtain post-petition financing pursuant to a senior secured debtor-in-possession revolving credit facility in an aggregate principal amount of up to $5,000,000 (the "<u>DIP Facility</u>") with an initial draw of $1,800,000 as may be increased from time to time pursuant to the terms and conditions of the Interim Financing Order and that certain Senior Secured Revolving Credit Facility Agreement, substantially in the form attached hereto as <u>Exhibit B</u> (the "<u>DIP Credit Agreement</u>" and together with the Interim Financing Order, any Final Financing Order and any related agreements, documents, certificates, instruments, exhibits and schedules delivered or executed from time to time in connection therewith, as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, collectively, the "<u>DIP Documents</u>"), by and among (x) Zenergy Brands, Inc. as Borrower (the "<u>Borrower</u>"), (y) Zen Technologies, Inc, Zenergy Power & Gas, Inc., NAUP Brokerage, LLC, Zenergy Labs, LLC, and Zenergy & Associates, Inc., as guarantors (collectively, the "<u>Guarantors</u>"), and (z) TCA Special Situations Credit Strategies ICAV, as lender (the "<u>Lender</u>"); and (B) incur the "Obligations" under the DIP Credit Agreement (such Obligations, as provided for and defined in the DIP Credit Agreement, shall be referred to as the "<u>DIP Obligations</u>").

## (1)     <u>Prepetition Obligations and Liens</u>

91.     As of the Petition Date, the Debtor has outstanding senior secured debt evidenced by (i) that certain Securities Purchase Agreement, dated December 24, 2018 (the "<u>Prepetition</u>

Senior SPA"), (ii) that certain Senior Secured, Convertible, Redeemable Debenture in the principal amount of $1,750,000, dated December 24, 2018, (iii) that certain Senior Secured, Convertible, Redeemable Debenture (Fee Debenture) in the principal amount of $16,000, maturing December 24, 2020, dated December 24, 2018, (iv) that certain Senior Secured, Convertible, Redeemable Debenture (Fee Debenture) in the principal amount of $16,000, maturing June 24, 2021, dated December 24, 2018, (v) that certain Promissory Note, dated October 10, 2019 (together, as amended, modified and supplemented from time to time, the "Prepetition Senior Debentures" and together with all related documents, guaranties and agreements, the "Prepetition Senior Debenture Documents"), by and among (a) the Debtor, (b) the  Guarantors, (c) Alex Rodriguez, and (d) the Prepetition Senior Creditor.

92.     As set forth above, as of the Petition Date, the aggregate outstanding principal amount owed by the Debtor under the Prepetition Senior Debenture Documents was not less than $2,622,468.41 (the "Prepetition Credit Loan") (together with any interest, fees (including, without limitation, any early termination and prepayment fees), costs and other charges or amounts paid, incurred or accrued prior to the Petition Date in accordance with the Prepetition Senior Debenture Documents, and further including all "Obligations" as described in the Prepetition Senior SPA, and all interest, fees, costs and other charges allowable under Section 506(b) of the Bankruptcy Code, the "Prepetition Senior Obligations"). As more fully set forth in the Prepetition Senior Debenture Documents, prior to the Petition Date, the Debtor, the Guarantors and Alex Rodriguez granted first-priority security interests in and liens on any and all property, of any kind or description, tangible or intangible, real, personal or mixed, wheresoever located and whether then existing or thereafter arising or acquired, including, without limitation, the Collateral (as that term is identified in the Security Agreement, dated December 24, 2018)  (collectively, the "Prepetition

Collateral"), to the Prepetition Senior Creditor (collectively, the "Prepetition Senior Liens") to secure repayment of the Prepetition Senior Obligations.  A chart of the date and amount of the Prepetition Credit Loan is set forth above.

### (2) Immediate Need for Financing

93.     I believe that the Debtors' ability to obtain access to liquidity is critical to fund their operations and these Chapter 11 Cases. I analyzed the Debtors' cash needs and determined that use of Cash Collateral, alone, was insufficient for the Debtors to operate their business, and that additional funding was necessary. For example, additional financing is necessary to: (a) fund working-capital requirements and other operational expenses in connection with the ordinary course operation of the Debtors' business; (b) send a strong market signal that the Case is well-funded; (c) provide a stable platform for the Debtors' business; (d) fund the Debtors' pursuit of a value-maximizing restructuring or transaction for the benefit of their stakeholders; and (e) satisfy the administrative expenses to be incurred.

94.     The Debtors business requires upfront capital funding to obtain MESAs, which are the life-blood of the company. Without access to liquidity, the Debtors are unable to continue pursuing and obtaining MESAs, which are necessary to continue operations. Further, customers may seek other alternative products and services, and vendors and suppliers may refuse to do business with the Debtors if there exists a market perception that the Case is not well-funded and the Debtors cannot effectuate fulfill their existing MESAs. Therefore, I believe that the Debtors require immediate access to liquidity to stave off what would be substantial damage to their operations.

### (3)   Process to Obtain DIP Financing

95.     Recognizing a financing need, the Debtors sought funding from a variety of financial institutions, lenders, and the Debtors' incumbent secured lender. In this process, the Debtors solicited a number of potential lenders. None of these lenders was willing to provide financing.

96.     The Debtors sought potential lenders based on a number of factors, including, among other things, their ability to complete diligence quickly and willingness to lend based on the Debtors current capital structure.  Ultimately, the Debtors determined that debtor-in-possession financing was only viable from their Prepetition Senior Creditor.

97.     The Debtors have engaged in arms'-length negotiations with the Lender regarding the terms of the DIP Facility. The DIP Facility will allow the Debtors to continue to operate in the Case while undertaking the process for a value maximizing restructuring or transaction for their estates.  The proposed DIP Facility represents a negotiated resolution with the Prepetition Senior Creditor and Lender that will allow the Debtors to continue to use Cash Collateral and to gain the additional financing necessary to operate in the Case. Thus, the Debtors determined that the proposed DIP Facility provides the best path forward for the Debtors under the circumstances to both fund the Case while providing the flexibility necessary for the Debtors to maximize value for all stakeholders.

### (4)   Proposed DIP Financing

98.     As described above, the Debtors are seeking authorization for to enter into the DIP Facility and obtain post-petition financing pursuant to a senior secured debtor-in-possession revolving credit facility in an aggregate principal amount of up to $5,000,000 with an initial draw

of $1,800,000 as may be increased from time to time pursuant to the terms and conditions of the Interim Financing Order and the DIP Facility.

**(5)**     **The Debtors' Decision to Enter into DIP Financing**

99.     The Debtors conducted arms-length, and good-faith negotiations with the Lender. The Debtors believe the negotiations have resulted in the best terms the Debtors have been offered under the circumstances, and that the proposed financing addresses the Debtors' reasonably-foreseeable liquidity needs.

100.     In making its decision to seek financing from the Lender, the Debtors and their advisors considered many factors, including the following. ***First***, the Prepetition Senior Creditor appeared to already hold secured first-priority liens on a substantial portion of the Debtors' assets. ***Second***, the Lender's preexisting knowledge of the Debtors' business and the Prepetition Collateral provide significant benefits, including the speed with which the Lenders are able to close. ***Third***, the Debtors' inability to obtain alternative postpetition financing proposals from other lenders on an unsecured, administrative, or subordinated basis.

101.     Moreover, I believe that the total cost and protections sought by the Lenders are acceptable under the circumstances and that other lenders would require similar protections.

102.     The incremental availability under the DIP Facility will provide the Debtors with the necessary liquidity and time to pursue a restructuring through these Chapter 11 Cases.

103.     Further, I believe that obtaining the DIP Facility from the Lender allows the Debtors to avoid a costly priming dispute that could disrupt the Debtors' restructuring efforts and ultimately be far more costly for all parties-in-interest in these Chapter 11 Cases.

104.     The DIP gives the Debtors much needed liquidity and a tight (but likely doable) timeline to restructure the businesses and exit chapter 11 bankruptcy.

105.    In the exercise of its business judgment, the Debtors have determined that the proposed financing terms are the best available at this time; therefore, they provide the best opportunity for the estates and the creditors to preserve going-concern value.

**F.      Debtors' Application for Entry of an Order, Pursuant to 28 U.S.C. § 156(c) Authorizing the Debtors to Employ and Retain Stretto as Claims, Noticing, and Solicitation Agent, Effective as of the Petition Date.**

106.    The Debtors anticipate that hundreds of persons or entities may file proofs of claim or interests in the Chapter 11 Cases. Therefore, the Debtors request entry of an order appointing Stretto as claims, noticing, and solicitation agent (the "Claims and Noticing Agent"), effective as of the Petition Date (the "Stretto Retention Application"). Specifically, the Debtors ask that Stretto, among other tasks, (a) serve as the noticing agent to mail notices to the estates' creditors, and other parties in interest, (b) provide computerized claims, objection, and solicitation and balloting – and related services, and (c) assist the Debtors in claim and ballot processing and other administrative services with respect to these Chapter 11 Cases, in each case, pursuant to the terms of the services agreement dated October 8, 2019 (the "Services Agreement"), between the Debtors and Stretto. A copy of the Services Agreement is attached as Exhibit A to the Stretto Retention Application.

107.    I understand that Stretto is a chapter 11 administrator comprised of leading industry professionals with significant experience in both the legal and administrative aspects of large, complex chapter 11 cases. Stretto's professionals have experience in noticing, claims administration, solicitation, balloting and facilitating other administrative aspects of chapter 11 cases and experience in matters of this size and complexity. Stretto's professionals have acted as debtors' legal counsel or as official claims and noticing agent in many large bankruptcy cases in this District and in other districts nationwide. Stretto has developed efficient and cost-effective methods to handle the voluminous mailings associated with the noticing and claims processing

portions of chapter 11 cases to ensure the efficient, orderly, and fair treatment of creditors, equity security holders, and all parties in interest.

108.    I believe that the Debtors' selection of Stretto as their proposed Claims and Noticing Agent is appropriate under the circumstances and in the best interests of the Debtors' estates. Moreover, the Debtors submit that Stretto's rates are competitive and reasonable, given Stretto's quality of services and expertise in other complex chapter 11 cases.

109.    Further, while the Debtors have not yet filed their schedules of assets liabilities, they anticipate that hundreds of persons and entities may file proofs of claim or interests in these Chapter 11 Cases. In light of the significant number of anticipated claimants and other parties in interest in these chapter 11 cases, as well as the need for the Debtors' limited personnel to focus on running the business, the Debtors submit that the appointment of Stretto as the Claims and Noticing Agent will provide the most effective and efficient means of and relieve the administrative burden on the Debtors and/or the Office of the Clerk of the Bankruptcy Court (the "Clerk") of noticing, administering certain claim-related tasks, and soliciting and tabulating votes. Therefore, Stretto's appointment is in the best interests of both the Debtors' estates and their stakeholders.

**G.    Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a), 362(a)(3), and 541 of the Bankruptcy Code and Bankruptcy Rule 3001, Establishing Notice and Hearing Procedures for Trading in, or Certain Claims of Worthlessness with Respect to, Equity Securities in Debtor Zenergy Brands, Inc.**

110.    By this motion (the "NOL Motion"), the Debtors request that the Court enter the Proposed Orders, pursuant to sections 105(a), 362(a)(3), and 541 of the Bankruptcy Code and Bankruptcy Rule 3001, establishing notification and hearing procedures for certain transfers of, or certain claims of worthlessness for federal or state-tax purposes with respect to, equity securities in Zenergy or of any beneficial interest therein, including Options (as defined below) to acquire

such equity securities, that must be complied with before such transfers of equity securities or claims of worthlessness are deemed effective. The procedures for trading in, or claiming a worthless stock deduction with respect to, equity securities in Zenergy are necessary to protect and preserve the value of the Debtors' U.S. federal and state-tax attributes, including, without limitation, significant net operating loss carryforwards ("NOLs" and, collectively with any capital losses, unrealized built-in losses, and certain other tax and business credits and other tax attributes, the "Tax Attributes").

111.    If the Court does not impose any restrictions on trading or claiming worthless stock deductions, such trading or deductions could severely limit or even eliminate the Debtors' ability to utilize their Tax Attributes, which could lead to significant negative consequences for the Debtors, the Estates, the creditors, and other stakeholders. To preserve, to the fullest extent possible, the Tax Attributes, the Debtors seek limited relief that will enable the Debtors to closely monitor certain transfers of, or certain claims of worthlessness for federal or state-tax purposes with respect to, Zenergy equity securities, so as to be in a position to act expeditiously if necessary to preserve their Tax Attributes.

112.    I believe that preserving these valuable Tax Attributes is necessary to preserve value for the Debtors' estates.

## IV.    CONCLUSION

113.    In conclusion, for the reasons stated herein and in each of the First-Day Motions filed concurrently or in connection with the commencement of the Chapter 11 Cases, I respectfully request that each of the First-Day Motions be granted in its entirety, together with such other and further relief as this Court deems just and proper.

[*Signature Page Follows*]

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

Dated: October 24, 2019        Respectfully Submitted,

*/s/ Joshua Campbell*
Joshua Campbell
Chief Operating Officer/Chief Financial Officer
Zenergy Brands, Inc.

4831-2338-3464.10