Marcus A. Helt (TX 24052187)
**FOLEY GARDERE**
Foley & Lardner LLP
2021 McKinney Avenue
Suite 1600
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667
Email: mhelt@foley.com

-and-

Jack G. Haake (*pro hac pending*)
**FOLEY & LARDNER LLP**
Washington Harbour
3000 K Street, N.W., Suite 600
Washington, D.C.  20007-5109
Telephone: (202) 295-4085
Facsimile: (202) 672-5399
Email: jhaake@foley.com

*Proposed Counsel for the Debtors*
*and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **ZENERGY BRANDS, INC.,** *et al.*,[1] | § | **Case No. 19-42886** |
| | § | |
| **Debtors.** | § | **(Joint Administration Requested)** |

## DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING, GRANTING SENIOR POSTPETITION SECURITY INTERESTS AND ACCORDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO SECTIONS 364(C) AND 364(D) OF THE BANKRUPTCY

---

[1] The Debtors in the above-captioned chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Zenergy Brands, Inc. (1686); NAUP Brokerage, LLC (7899); Zenergy Labs, LLC (8045); Zenergy Power & Gas, Inc. (1963); Enertrade Electric, LLC; Zenergy & Associates, Inc. (4022); and Zen Technologies, Inc. (7309).  The above-captioned Debtors' mailing address is 5700 Granite Pkwy, #200, Plano, TX 75024.

**CODE; (II) AUTHORIZING THE USE OF CASH COLLATERAL; (III) GRANTING
ADEQUATE PROTECTION; (IV) MODIFYING THE AUTOMATIC STAY;
AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors-in-possession (collectively, the "<u>Debtors</u>")[2]

respectfully state the following in support of this motion (the "<u>Motion</u>"):[3]

## **PRELIMINARY STATEMENT**

1.      The Debtors' ability to obtain access to liquidity is critical to fund their operations

and these chapter 11 cases (collectively, the "<u>Chapter 11 Case</u>").  Recognizing this, the Debtors

sought financing from a variety of financial institutions, lenders, including their prepetition senior

creditor, TCA Global Credit Master Fund, LP (the "<u>Prepetition Senior Creditor</u>"), to secure the

DIP Facility.  Failing to find DIP financing from any party other than the Lender, who is a lender

related to the Prepetition Senior Creditor, the Debtors seek the authority to obtain post-petition

financing pursuant to the proposed *Senior Secured Revolving Credit Facility Agreement in the*

*Maximum Amount of US$5,000,000.00*, with an initial draw of $2,000,000.00, from the Lender on

the terms and condition set forth in the Interim Order, which is attached as <u>Exhibit A</u>, any final

financing order, and the DIP Loan Documents (defined below), and to incur the DIP Obligations.

2.      The DIP Facility will provide sufficient liquidity to fund the Chapter 11 Case and

the Debtors' business operations. The DIP Facility will give the Debtors the funds necessary to

maintain their enterprise value while they develop and consummate a value-maximizing strategy

---

[2] Debtors' filed their voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code
(the "<u>Bankruptcy Code</u>"), on October 24, 2019 (the "<u>Petition Date</u>").  A detailed description of the Debtors and their
businesses, and the facts and circumstances supporting this motion and the Chapter 11 Cases, are set forth in greater
detail in the *Declaration of Joshua Campbell, in Support of Chapter 11 Petitions and First Day Motions* (the "<u>First
Day Declaration</u>"), filed on October 24, 2019. Capitalized terms used but not defined herein have the meaning ascribed
to such terms in the First Day Declaration.

[3] Capitalized terms otherwise not defined herein shall have the meaning ascribed to them in the Interim Order or the
DIP Facility, as applicable.

to exit bankruptcy. The Debtors firmly believe that approval of the DIP Facility will maximize value for their stakeholders and is a sound exercise of the Debtors' sound business judgment. Accordingly, the Debtors respectfully request that the United States Bankruptcy Court for the Eastern District of Texas (the "Bankruptcy Court") grant the requested relief.

## Jurisdiction

3.     The United States Bankruptcy Court for the Eastern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* from the United States District Court for the Eastern District of Texas, dated August 6, 1984 (the "Standing Order"). The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

5.     The statutory bases for the relief requested herein are sections 105, 361, 362, 363(c), 364(c)(1); 364(c)(2); 364(c)(3), 364(d)(1), 364(e), and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 9013 and 9014 and Rules 4001-1, 9007(b), and 9013-1 of the Local Rules of Bankruptcy Procedure of United States Bankruptcy Court for the Eastern District of Texas (the "Local Rules").

**Background**

6.     The Debtors began their relationship with their Prepetition Senior Creditor in or around August 2018, when the Debtors into that certain Investment Banking Services Agreement dated August 22, 2018 (the "Services Agreement").

7.     As of the Petition Date, the Debtor has outstanding senior secured debt evidenced by (a) that certain Securities Purchase Agreement, dated December 24, 2018 (the "Prepetition Senior SPA"), (b) that certain Senior Secured, Convertible, Redeemable Debenture in the principal amount of $1,750,000, dated December 24, 2018, (c) that certain Senior Secured, Convertible, Redeemable Debenture (Fee Debenture) in the principal amount of $16,000, maturing December 24, 2020, dated December 24, 2018, (d) that certain Senior Secured, Convertible, Redeemable Debenture (Fee Debenture) in the principal amount of $16,000, maturing June 24, 2021, dated December 24, 2018, (e) that certain Promissory Note, dated October 10, 2019 (together, as amended, modified and supplemented from time to time, the "Prepetition Senior Debentures" and together with all related documents, guaranties and agreements, the "Prepetition Senior Debenture Documents"), by and among (a) the Debtor, (b) the  Guarantors, (c) Alex Rodriguez, and (d) the Prepetition Senior Creditor.

8.     As of the Petition Date, the aggregate  outstanding principal amount owed by the Debtor under  the Prepetition Senior Debenture Documents was not less than $2,622,468.41 (the "Prepetition Credit Loan") (together  with any interest, fees (including, without limitation, any early termination and prepayment fees), costs and other charges or amounts paid,  incurred or accrued  prior  to  the  Petition  Date  in  accordance  with  the  Prepetition Senior Debenture Documents, and further including all "Obligations" as described in the Prepetition Senior SPA, and all interest, fees, costs and other charges allowable under Section 506(b) of the  Bankruptcy Code,  the  "Prepetition  Senior  Obligations"). As more  fully  set forth in the Prepetition Senior

4

Debenture Documents, prior to the Petition Date, the Debtor, the Guarantors, and Alex Rodriguez granted first-priority  security interests  in and  liens  on  any and all property, of any kind or description, tangible or intangible, real, personal or mixed, wheresoever located and whether then existing or thereafter arising or acquired,  including,  without  limitation, the Collateral (as that term is identified in the Security Agreement, dated December 24, 2018)   (collectively, the "Prepetition Collateral"), to  the  Prepetition Senior Creditor (collectively,  the  "Prepetition Senior Liens") to secure repayment  of  the  Prepetition Senior Obligations. A chart of the date and amount of the Prepetition Credit Loan is set forth below:

| Date Advanced | Loan Principal Amount |
|---|---|
| December 24, 2018 | $1,600,000 |
| March 29, 2019 | $347,463.41 |
| May 9, 2019 | $68,000 |
| May 22, 2019 | $63,175 |
| June 19, 2019 | $100,000 |
| July 3, 2019 | $34,175 |
| July 12, 2019 | $34,175 |
| July 18, 2019 | $66,700 |
| August 19, 2019 | $17,740 |
| August 28, 2019 | $122,690 |
| September 18, 2019 | $25,000 |
| September 30, 2019 | $68,350 |
| October 10, 2019 | $75,000 |
| **Total** | **$2,622,468.41** |

**Relief Requested**

9.      By this Motion, the Debtors request entry of an Interim Order in the form attached

as Exhibit A (the "Interim Order") and a final financing order (the "Final Financing Order")

(together, the "Interim and Final Financing Orders") approving the following:

> (1) authorization for the Debtors to: (A) obtain post-petition financing pursuant to a senior secured debtor-in-possession revolving credit facility in an aggregate principal amount of up to $5,000,000 (the "DIP Facility") with an initial draw of $2,000,000 as may be increased from time to time pursuant to the terms and conditions of the Interim Order and that certain Senior Secured Revolving Credit Facility Agreement, substantially in the form attached hereto as Exhibit B (the "Agreement" and together with the Interim Order, any Final Financing Order and any related agreements, documents, certificates, instruments, exhibits and schedules delivered or executed from time to time in connection therewith, as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, collectively, the "DIP Loan Documents"), by and among (x) Zenergy Brands, Inc. as Borrower (the "Borrower"), (y) Zen Technologies, Inc, Zenergy Power & Gas, Inc., NAUP Brokerage, LLC, Zenergy Labs, LLC, and Zenergy & Associates, Inc., as guarantors (collectively, the "Guarantors"), and (z) TCA Special Situations Credit Strategies ICAV, as lender (the "Lender"); and (B) incur the "Obligations" under the Agreement (such Obligations, as provided for and defined in the Agreement, shall be referred to as the "DIP Obligations");
>
> (2) authorization for the Debtors to execute and enter into the DIP Loan Documents and to perform their respective obligations thereunder and such other and further acts as may be required in connection with the DIP Loan Documents, including, without limitation, the payment of all principal, interest, fees, costs, expenses, charges, premiums and other amounts payable under the DIP Loan Documents as such amounts become due and payable;
>
> (3) granting the Lender valid, enforceable, non-avoidable, automatically and fully perfected security interests in and liens on all DIP Collateral (as defined in the Interim Order) including, without limitation, all property constituting "Cash Collateral," as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral") to secure the DIP Obligations, which liens and

6

security interests shall be subject to the rankings and priorities set forth in the Interim and Final Financing Orders and the DIP Loan Documents;

(4) authorization for the Debtors' continued use of Cash Collateral of the Prepetition Senior Creditor (as defined below) solely as provided in the Interim and Final Financing Orders, and the provision of adequate protection to the Prepetition Senior Creditor for any diminution in value of its interests in all "collateral" (the "Prepetition Collateral") under and as defined in the Prepetition Senior SPA (as defined below), including any Cash Collateral;

(5) authorization for the Debtors to borrow amounts under the DIP Facility in accordance with the terms and conditions of the DIP Loan Documents and use the proceeds of the DIP Facility solely in accordance with the budget attached as Exhibit A to the Interim Order (the "Approved Budget"), the Interim and Final Financing Orders and the DIP Loan Documents;

(6) modification of the automatic stay imposed under section 362 of the Bankruptcy Code, to the extent necessary, to implement and effectuate the terms and provisions of the DIP Loan Documents and the Interim and Final Financing Orders; and

(7) the scheduling of a final hearing (the "Final Hearing") on the Motion to consider entry of a Final Order, among other things, authorizing the borrowings under the DIP Facility on a final basis and approval of notice procedures with respect thereto.

10.     In support of this Motion, the Debtors submit the *First-Day Declaration* of Joshua Campbell, President and Director of the Debtors.

**Concise Statement Pursuant to Bankruptcy Rule 4001 and the United States Bankruptcy Court for the Eastern District of Texas Procedures for Complex Chapter 11 Case[4]**

11.     The Debtors seek entry of the Interim and Final Financing Orders:

a.     ***DIP Facility***: post-petition financing pursuant to a senior secured revolving credit facility agreement in an aggregate

---

[4] The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced, including the Agreement and the Interim Order.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Loan Documents or the Interim Order, as applicable.

7

principal amount of up to $5,000,000, with an initial draw of $2,000,000, from the Lender, on the terms and conditions set forth in the Interim Order, any Final Financing Order and the DIP Loan Documents, and to incur the DIP Obligations.

b. ***Adequate Protection***: authorizing the Debtors to grant adequate protection to the Prepetition Senior Creditor and Lender in connection with the Prepetition Senior SPA, the Agreement, and the Prepetition Secured Obligations arising thereunder;

c. ***Cash Collateral***: authorizing the Debtors to continue to use Cash Collateral subject to the restrictions set forth in the Interim and Final Financing Orders and in accordance with the Approved Budget and the granting of adequate protection to the Prepetition Secured Parties with respect thereto;

d. ***Superpriority Claims and DIP Liens***: granting superpriority priming liens on property of the Debtors' estates as set forth in the Interim Order and the DIP Loan Documents, including, subject to entry of a Final Financing Order, proceeds of any causes of action under chapter 5 of the Bankruptcy Code;

e. ***Automatic Stay***: modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the Interim and Final Financing Orders;

f. ***Indemnification***: authorizing the Debtors to indemnify and hold harmless the Lender and related parties against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including, without limitation, reasonable attorney's fees), or disbursements;

g. ***Carve-Out***

h. ***Professional Fee Reserve***; and

i. ***Final Hearing***: scheduling the Final Hearing on the Motion.

12. The following chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as

required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and the Complex Case Procedures.[5]

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B)<br>LBR 4001-2(a)(14) | Zenergy Brands, Inc.<br><br>*Interim Order, Introduction , ¶ 2* |
| **Lender**<br><br>Bankruptcy Rule 4001(c)(1)(B) | TCA Special Situations Credit Strategies ICAV<br><br>*Interim Order, Introduction , ¶ 3* |
| **Approved Budget and Variance Reporting**<br>Bankruptcy Rule 4001(c)(l)(B)<br>LBR 4001- 2(a)(2) | The DIP Facility includes standard and customary conditions that require the Debtors to provide periodic reports to the Lender and its respective professionals regarding the Budget and variances thereto.<br><br>*Interim Order, ¶ 15* |
| **DIP Facility**<br><br>4001(b)(l)(B)(i),<br>4001(c)(1)(B) | The post-petition financing pursuant to superpriority post-petition loans, advances, and other financial accommodations (the "DIP Facility"), on an interim basis for a period through and including the date of the Final Hearing (as defined below), pursuant to the terms and conditions of that certain Senior Secured Revolving Credit Facility Agreement (as amended, restated, supplemented, or otherwise modified from time to time, the "Agreement") by and among (a) the Debtor (b) the Guarantors,  and (c) TCA Special Situations Credit Strategies ICAV (the "Lender"), providing for a credit facility up to a principal amount of $5,000,000 with an initial principal advance of $2,000,000, substantially in the form of Exhibit A attached hereto; and<br><br>*Interim Order, Introduction , ¶ 1* |
| **Maturity Date**<br><br>Bankruptcy Rule 4001(b)(l)(B)(iii),<br>4001(c)(1)(B)<br>LBR 4001- 2(a)(10) | The earlier of: (i) six (6) months from the Effective Date; (ii) upon prepayment of the Revolving Note by the Borrower (subject to Section 2.1(d)(ii)); or (iii) the occurrence f an Event of Default and acceleration of the Revolving Note pursuant to this Agreement.<br><br> *Agreement, Section 1(ssss)* |
| **DIP Collateral** | (a)     Effective immediately upon the entry of this Interim Order, and subject to the DIP Carve Out, pursuant to Sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, and to secure repayment of the DIP Obligations, the Lender is hereby granted, continuing valid, binding, enforceable, non-avoidable and automatically and properly perfected post-petition security interests in and liens (collectively, the "DIP Liens") on any and all presently owned and hereafter acquired assets and real and personal property of the Debtor, including, without limitation, the following (the "DIP Collateral"):<br>1.     all Accounts; |

[5] The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced. To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart, but not otherwise defined, have the meanings ascribed to them in the DIP Loan Documents or the Interim Order, as applicable.

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | 2.     all Goods, including Equipment, Inventory and Fixtures;<br>3.     all Documents, Instruments and Chattel Paper;<br>4.     all Letters of Credit and Letter-of-Credit Rights;<br>5.     all Securities Collateral;<br>6.     all Investment Property;<br>7.     all Intellectual Property Collateral;<br>8.     effective upon entry of the Final Order, all Commercial Tort Claims;<br>9.     all General Intangibles;<br>10.    all Deposit Accounts;<br>11.    all Supporting Obligations;<br>12.    all money, cash or cash equivalents;<br>13.    all credit balances, deposits and other property now or hereafter held or received by or in transit to the Lender or at any other depository or other institution from or for the account of the Debtor, whether for safekeeping, pledge, custody, transmission, collection, or otherwise.<br>14.    all proceeds of leases of real property;<br>15.    all owned real property;<br>16.    effective upon the entry of the Final Order, all proceeds from any claim or cause of action to avoid a transfer of property (or an interest in property) or an obligation incurred by the Debtor pursuant to any applicable section of the Bankruptcy Code, including, without limitation, chapter 5 and Section 724(a) of the Bankruptcy Code (the "Avoidance Actions");<br>17.    effective upon the entry of the Final Order, the Debtor's rights under Section 506(c) and Section 550 of the Bankruptcy Code and the proceeds thereof;<br>18.    to the extent not otherwise described above, all receivables and all present and future claims, rights, interests, assets and properties recovered by or on behalf of the Debtor;<br>19.    all books, records, and information relating to any of the foregoing and/or to the operation of the Debtor's business, and all rights of access to such books, records, and information, and all property in which such books, records and information are stored, recorded and maintained; and<br>20.    to the extent not otherwise covered by clause (i) through (xix) above, all other personal property of the Debtor, whether tangible or intangible and all Proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of each of the foregoing, and any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Debtor from time to time with respect to any of the foregoing.<br><br>(b)      Effective upon the entry of the Interim Order, (i) all DIP Liens shall each be and maintain at all times a security interest priority on a pari passu basis with the Prepetition Senior Liens, (ii) all existing blocked account agreements, deposit account control agreements, securities account control agreements, credit card acknowledgements, credit card agreements, collateral access agreements, landlord agreements, warehouse agreements, bailee agreements, carrier agency agreements, customs broker agency agreements, subordination agreements and freight forwarder agreements constituting Prepetition Senior Debenture Documents, and all existing Uniform Commercial Code filings and all existing filings with the United States Patent and Trademark Office or the United States Copyright Office with respect to the recordation of an interest in the intellectual property of the Debtor, which in each case was filed by the Prepetition Senior Creditor, shall in each case be deemed to be delivered and/or filed in connection with the DIP Facility, shall constitute DIP Credit Documents and shall remain in full force and effect without any further action by the Debtors, the Lender, or any other person, and in each case the Lender shall be deemed to be a party thereto, (iii) any and all references in any such agreements or documents to the "Credit Agreement" shall hereafter be deemed to mean and refer to the Prepetition Credit Agreement and the Agreement, and (iv) any and all references in any such agreements or documents to the "Loan Documents" shall hereafter be deemed to mean and refer to the Prepetition Senior Debenture Documents and the DIP Credit Documents, in each case as amended, modified, supplemented or restated and in effect from time to time. Except as set forth in this Interim Order, nothing in this Interim Order shall be deemed to impair or otherwise modify |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | the rights of the Prepetition Senior Creditor under any such agreements or documents as in effect prior to the date hereof.<br><br>*Interim Order, ¶ 6* |
| **Adequate Protection**<br>Bankruptcy Rules<br>4001(b)(l)(B)(iv),<br>4001(c)(1)(B)(ii)<br>LBR 4001-2(a)(4) | **Adequate Protection.**  The Debtor shall pay to the Prepetition Senior Creditor $90,000 upon the entry of the Final Order and as otherwise set forth herein.  The Prepetition Senior Creditor shall receive (i) subject to the priorities set forth in paragraphs 12 and 13 below, the Adequate Protection Liens (as defined herein) to secure the Prepetition Senior Obligations and Adequate Protection Superpriority Claims (as defined herein) with respect to the Prepetition Senior Obligations, and (ii) additional adequate protection in the form of (A) payment of the Prepetition Senior Obligations from the proceeds of DIP Collateral as set forth in paragraph 18(a) below and (B) payments of interest (which shall be payable at the highest default rate under the Prepetition Senior Debenture Documents), principal amortization, fees, costs, expenses (including attorneys' fees and expenses), indemnities and other amounts with respect to the Prepetition Senior Obligations in accordance with the Prepetition Senior Debenture Documents (collectively, the "Prepetition Senior Creditor Adequate Protection Payments").  For the avoidance of doubt, the Adequate Protection Liens and the Adequate Protection Superpriority Claims each shall be junior in all respects to the DIP Liens and the DIP Carve Out, and the Adequate Protection Superpriority Claims are junior in all respects to the DIP Superpriority Claim (as defined herein).<br><br>*Interim Order, ¶¶ G, 12, 13* |
| **Waiver/Modification of the Automatic Stay**<br>Bankruptcy Rule<br>4001(c)(1)(B)(iv) | The automatic stay imposed under Section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to: (a) permit the Debtor to grant the DIP Liens, the Adequate Protection Liens, the DIP Superpriority Claim, and the Adequate Protection Superpriority Claims; and (b) authorize the Debtor to pay, and the Lender and Prepetition Senior Creditor to retain and apply, payments made in accordance with the terms of this Interim Order.<br><br>*Interim Order, ¶ 16* |
| **Carve Out Bankruptcy Rule 4001(c)(1)(B)**<br>LBR 4001- 2(a)(5) | **DIP Carve Out.**  As used in this Order, the "DIP Carve Out" means, means, collectively, the sum of: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. §1930(a) and Section  3717 of title 31 of the United States Code; (ii) the aggregate amount of all fees and expenses of the claims/noticing agent incurred or accrued; and (iii) the aggregate amount of a c c r u e d  o r  i n c u r r e d  a n d  unpaid fees and  expenses of the Debtor's professionals retained by  final order of the Court (which order has not been reversed, vacated or stayed unless such stay is  no  longer  effective) under Sections 327(a) or 1103(a) of the Bankruptcy Code (the "Case Professionals"), to the extent such fees and expenses are allowed and payable pursuant to an order of the Court (which order  has not been reversed, vacated or stayed) ("Allowed Professional Fees") but subject to the aggregate amount(s) not to exceed $125,000 plus the amount of any unused pre-bankruptcy retainer. Notwithstanding anything in this Order to the contrary, the DIP Carve Out shall be senior to all claims and liens, including DIP Obligations, the DIP Lien(s), and the DIP Superpriority Claim, as well as any adequate-protection liens and claims described in this Order.<br><br>*Interim Order, ¶ 30* |
| **Professional Fee Escrow Account** | The funding of the DIP Carve Out shall be added to and made a part of the DIP Obligations, paid into the Professional Fee Escrow Account, and secured by the DIP Collateral and otherwise entitled to the protections granted under this Order, the DIP Loan Documents, the Bankruptcy Code and applicable law.  The Debtor shall establish segregated accounts for the purpose of periodically depositing funds on account of (a) U.S. Trustee Fees and court-administration fees that will accrue during the pendency of the Case and (b) the amounts identified in the Budget for the beneficiaries of the DIP Carve Out identified in the Budget, pending approval |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | by the Court to disburse such funds to such beneficiaries, on the payment dates identified in the Budget.<br><br>*Interim Order, ¶ 30* |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B)<br>LBR 4001- 2(a)(3) | Interest Rate shall mean a fixed rate of interest equal to Fourteen percent (14%) per annum, calculated on the actual number of days elapsed over a 360-day year.<br><br>Shall mean a per annum rate of interest equal to the highest non-usurious rate permitted by applicable law, and if there is no such rate under applicable law, then twenty-four percent (24%) per annum.<br><br>*Agreement, Section 1(ee)* |
| **Use of Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(ii)<br>LBR 4001- 2(a)(2) | Use of Proceeds of the DIP Facility.  As a condition to entry into the Agreement, the extensions of credit under the DIP Facility and the authorization to use Cash Collateral, the Lender requires, and the Debtor agrees, that proceeds of the DIP Facility shall be used in a manner consistent with the terms and conditions of the DIP Loan Documents and in accordance with the budget (a copy of which is attached as Exhibit A to the Interim Order, as the same may be modified from time to time consistent with the terms of the DIP Loan Documents, and subject to such variances as may be permitted thereby, the "Budget"), solely for (i) post-petition operating expenses and other working capital, including, but not limited to, funding the amounts immediately required to enter into certain Master Energy Service Agreements ("MESA") absent which the Debtor would not be able to continue to operate, (ii) certain transaction fees and expenses, (iii) permitted payment of costs of administration of the Case, including professional fees, (iv) Prepetition Senior Creditor Adequate Protection Payments, and (v) as otherwise permitted under the DIP Loan Documents, as applicable.<br><br>*Interim Order, ¶ F(v)*<br><br>Limitations on the use of cash collateral are set forth in paragraph 31 of the Interim Order.<br><br>*Interim Order, ¶ 31* |
| **Stipulations to Prepetition Loans and Claims**<br>Bankruptcy Rule 4001(c)(1)(B)(iii)<br>LBR 4001- 2(a)(4) | After consultation with its attorneys and financial advisors, and without prejudice to the rights of parties in interest as set forth in paragraph 33 herein, and subject to entry of the Final Order, the Debtor admit, stipulate, acknowledge and agree that:<br><br><ul><li>Prepetition Senior Debenture Documents.  As of the Petition Date, the Debtor has outstanding senior secured debt evidenced by (i) that certain Securities Purchase Agreement, dated December 24, 2018 (the "Prepetition Senior SPA"), (ii) that certain Senior Secured, Convertible, Redeemable Debenture in the principal amount of $1,750,000, dated December 24, 2018, (iii) that certain Senior Secured, Convertible, Redeemable Debenture (Fee Debenture) in the principal amount of $16,000, maturing December 24, 2020, dated December 24, 2018, (iv) that certain Senior Secured, Convertible, Redeemable Debenture (Fee Debenture) in the principal amount of $16,000, maturing June 24, 2021, dated December 24, 2018, (v) that certain Promissory Note, dated October 10, 2019 (together, as amended, modified and supplemented from time to time, the "Prepetition Senior Debentures" and together with all related documents, guaranties and agreements, the "Prepetition Senior Debenture Documents"), by and among (a) the Debtor, (b) the  Guarantors,</li></ul> |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
|  | (c) Alex Rodriguez, and (d) TCA Global Credit Master Fund, L.P. (the "Prepetition Senior Creditor").<br><br>• Prepetition Senior Obligations. As of the Petition Date, the aggregate outstanding principal amount owed by the Debtor under the Prepetition Senior Debenture Documents was not less than $2,622,468.41 (the "Prepetition Credit Loan") (together with any interest, fees (including, without limitation, any early termination and prepayment fees), costs and other charges or amounts paid, incurred or accrued prior to the Petition Date in accordance with the Prepetition Senior Debenture Documents, and further including all "Obligations" as described in the Prepetition Senior SPA, and all interest, fees, costs and other charges allowable under Section 506(b) of the Bankruptcy Code, the "Prepetition Senior Obligations"). As more fully set forth in the Prepetition Senior Debenture Documents, prior to the Petition Date, the Debtor, the Guarantors and Alex Rodriguez granted first-priority security interests in and liens on any and all property, of any kind or description, tangible or intangible, real, personal or mixed, wheresoever located and whether then existing or thereafter arising or acquired, including, without limitation, the Collateral (as that term is identified in the Security Agreement, dated December 24, 2018) (collectively, the "Prepetition Collateral"), to the Prepetition Senior Creditor (collectively, the "Prepetition Senior Liens") to secure repayment of the Prepetition Senior Obligations.<br><br>• Validity, Perfection and Priority of Prepetition Liens and Obligations. The Debtor (without limiting the rights of other parties in interest under paragraphs 33 and 34 of this Interim Order), and the Prepetition Senior Creditor acknowledges and agrees that: (a) as of the Petition Date, the Prepetition Senior Liens on the Prepetition Collateral are valid, binding, enforceable, non-avoidable, and properly perfected (to the extent any such permitted liens were valid, binding, enforceable, properly perfected, non-avoidable and senior in priority to the Prepetition Senior Liens as of the Petition Date, the "Prepetition Permitted Liens"); (b) as of the Petition Date, the Prepetition Senior Liens have priority over any and all other liens, if any, on the Prepetition Collateral, subject only to certain other liens otherwise permitted by the Prepetition Senior Debenture Documents; (c) the Prepetition Senior Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtor; (d) no offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Senior Liens or the Prepetition Senior Obligations exist, and no portion of the Prepetition Senior Liens or the Prepetition Senior Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (whether equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtor and its estate have no claims, objections, challenges, causes of actions, and/or choses in action, including without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code, against the Prepetition Senior Creditor or any of its respective affiliates, agents, attorneys, advisors, professionals, officers, directors or employees arising out of, based upon or related to the Prepetition Senior Debenture |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | Documents; (f) as of the Petition Date, the value of the Prepetition Collateral securing the Prepetition Senior Obligations exceeded the amount of those obligations, and accordingly the Prepetition Senior Obligations are allowed secured claims within the meaning of Section 506 of the Bankruptcy Code, in an aggregate principal amount of not less than $2,622,468.41, together with accrued and unpaid and hereafter accruing interest, fees (including, without limitation, attorneys' fees and related expenses), costs and other charges.<br><br>• Cash Collateral. The Debtor acknowledges and stipulates that all of the Debtor's cash, including the cash in its deposit accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitute Cash Collateral and is Prepetition Collateral of the Prepetition Senior Creditor.<br><br>• Default by the Debtor. The Debtor acknowledges and stipulates that the Debtor is in default under each of the Prepetition Senior Debenture Documents.<br><br>Interim Order, ¶ E |
| **Automatic Effectiveness of Liens** Bankruptcy Rule 4001(c)(1)(B)(vii) | Effective upon the entry of the Interim Order, (i) all DIP Liens shall each be and maintain at all times a security interest priority on a pari passu basis with the Prepetition Senior Liens, (ii) all existing blocked account agreements, deposit account control agreements, securities account control agreements, credit card acknowledgments, credit card agreements, collateral access agreements, landlord agreements, warehouse agreements, bailee agreements, carrier agency agreements, customs broker agency agreements, subordination agreements and freight forwarder agreements constituting Prepetition Senior Debenture Documents, and all existing Uniform Commercial Code filings and all existing filings with the United States Patent and Trademark Office or the United States Copyright Office with respect to the recordation of an interest in the intellectual property of the Debtor, which in each case was filed by the Prepetition Senior Creditor, shall in each case be deemed to be delivered and/or filed in connection with the DIP Facility, shall constitute DIP Credit Documents and shall remain in full force and effect without any further action by the Debtors, the Lender, or any other person, and in each case the Lender shall be deemed to be a party thereto, (iii) any and all references in any such agreements or documents to the "Credit Agreement" shall hereafter be deemed to mean and refer to the Prepetition Credit Agreement and the Agreement, and (iv) any and all references in any such agreements or documents to the "Loan Documents" shall hereafter be deemed to mean and refer to the Prepetition Senior Debenture Documents and the DIP Credit Documents, in each case as amended, modified, supplemented or restated and in effect from time to time. Except as set forth in this Interim Order, nothing in this Interim Order shall be deemed to impair or otherwise modify the rights of the Prepetition Senior Creditor under any such agreements or documents as in effect prior to the date hereof.<br><br>*Interim Order, ¶ 6(b)* |
| **Payment of DIP Premiums and Expenses** Bankruptcy Rule 4001(c)(1)(B) LBR 4001- 2(a)(3), (16) | Adequate Protection Payments. The Prepetition Senior Creditor shall receive adequate protection in the form of the Prepetition Senior Creditor Adequate Protection Payments.<br><br>In addition to the amounts identified in the Budget, the Debtors shall pay the postpetition reasonable and documented fees, costs and expenses incurred by the Prepetition Senior Creditor and the reasonable and documented fees, costs and expenses of its respective legal advisors (specifically: (i) Shraiberg, Landau & Page P.A. and (ii) Lucosky Brookman (collectively, the "Secured Creditor Professionals")). The Prepetition Senior Creditor agrees that, to the extent it is later determined to be undersecured, any payments made under this paragraph 12(c) shall be recharacterized as payments on the principal amount of the prepetition loans. |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | *Interim Order, ¶¶ 12(a), 12(d)* |
| **Approved Budget** Bankruptcy Rule 4001 (c)(1)(B) LBR 4001- 2(a)(2) | The Initial Budget attached as <u>Exhibit A</u> to the proposed Interim Order. *Interim Order, ¶¶ F(v), 10* |
| **Budget Covenant** Bankruptcy Rule 4001(c)(l)(B) LBR 4001- 2(a)(2) | The Budget and any modification to, or amendment or update of, the Budget shall be in form and substance reasonably acceptable to the Lender and approved by the Lender, in its Permitted Discretion. The Debtor shall comply with and update the Budget from time to time in accordance with the DIP Loan Documents (provided that any update shall be in form and substance reasonably acceptable to the Lender and approved by the Lender, in its Permitted Discretion). On or before Wednesday of each week, the Debtor shall deliver to the Lender an Approved Budget Variance Report (with delivery of the same to the United States Trustee and the Statutory Committee, if any, each week after delivery to the Lender). During the tenth (10th) week of the initial Budget, the Debtor shall submit a budget for the next successive thirteen-week period to the Lender, which budget shall be in form and substance reasonably acceptable to the Lender and approved by the Lender, in its Permitted Discretion. Approved Budget Variance means that actual amounts spent for each tested period may not vary from the applicable Budget period (including any amounts deemed "rolled over" from a previous week) by more 10% on a cumulative basis. *Interim Order, ¶ 15* |
| **Priority of DIP Liens** Bankruptcy Rule 4001(c)(l)(B)(i) LBR 4001- 2(a)(4) | **Lender *Pari Passu* Claim**.  Upon entry of this Interim Order, the Lender is hereby granted, pursuant to Section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim in the Case and any Successor Case (collectively, the "DIP Superpriority Claim") for all DIP Obligations. The DIP Superpriority Claim shall (i) be subject and subordinate to the DIP Carve Out, (ii) be pari passu with the Prepetition Senior Liens, and (iii) otherwise have priority over any and all administrative expenses of the kinds specified in or ordered pursuant to Sections 503(b) and 507(b) of the Bankruptcy Code, as provided under Section 364(c)(1) of the Bankruptcy Code.

**Priority of DIP Superpriority Claim**.  Except Avoidance Actions, the DIP Superpriority Claim shall be payable from and have recourse to all pre- and post-petition property of the Debtor and all proceeds thereof, subject only to the payment in full in cash of the DIP Obligations.  Upon entry of the Final Order, the DIP Superpriority Claim shall be payable from or have recourse to Avoidance Actions.

The Prepetition Senior Liens and the DIP Liens shall be held by the Prepetition Senior Creditor and the Lender on a pari passu and pro-rata basis between the Prepetition Senior Creditor and the Lender, in proportion to such creditor's outstanding financing or principal amount, as applicable, owing under Prepetition Senior Debenture Documents and the DIP Loan Documents, notwithstanding anything to the contrary contained therein and irrespective of: (i) dates, times or order of when a creditor made its loan or financing available; (ii) the time, order or method of attachment or perfection of the security interests created in favor of either creditor; (iii) the time or order of filing or recording of financing statements or other documents filed or recorded to perfect security interests in any collateral; (iv) anything contained in any filing or agreement to which any creditor now or hereafter may be a party; (v) the rules for determining perfection or priority under the Uniform Commercial Code or any other law governing the relative priorities of secured creditors; and (vi) the time or order of obtaining control or possession of any collateral.

**Superpriority Claim of Prepetition Senior Creditor**. Subject and subordinate to the DIP Carve Out, as further adequate protection of the interests of the Prepetition Senior Creditor with respect to the Prepetition Senior Obligations, the Prepetition Senior Creditor is hereby granted an allowed administrative claim against the Debtor's estate under Sections 503 and 507(b) of the Bankruptcy Code (the "Adequate Protection Superpriority Claims") to the extent that the Adequate Protection Liens do not adequately protect against any diminution in the value in the aggregate of the Prepetition Senior Creditor's interests in the Prepetition Collateral. |

15

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | **Priority of Adequate Protection Superpriority Claims**. The Adequate Protection Superpriority Claim granted to the Prepetition Senior Creditor shall be junior to the DIP Carve Out, the Prepetition Permitted Liens, the DIP Liens, the DIP Superpriority Claim and the Adequate Protection Liens and shall otherwise have priority over administrative expenses of the kinds specified in or ordered pursuant to Sections 503(b) and 507(b) of the Bankruptcy Code.<br><br>*Interim Order, ¶¶ 8, 13* |
| **Event of Default**<br>Bankruptcy Rule 4001(c)(l)(B)<br>LBR 4001- 2(a)(10), (11) | Borrower, without notice or demand of any kind (except as specifically provided in this Agreement), shall be in default under this Agreement upon the occurrence of any of the following events (each an "Event of Default") (the Lender agrees that to the extent it becomes aware of any Event of Default, it shall provide notice thereof to the Borrower, however the giving of such notice, except as specifically provided in this Agreement, shall not be a condition to the occurrence of such Event of Default):<br><br>12.1    **Nonpayment of Obligations**. Any amount due and owing on the Revolving Note or any of the Obligations, whether by its terms or as otherwise provided herein, is not paid on the date that such amount is due.<br>12.2    **Misrepresentation**. Any material written warranty, representation, certificate or statement of the Credit Parties in this Agreement, the Loan Documents or any other agreement with Lender, or any report or certification provided to the Lender for it to rely upon, shall be false or misleading in any material respect when made or deemed to be made.<br>12.3    **Nonperformance**. Any failure to perform or default in the performance of any covenant, condition or agreement contained in this Agreement or any Financing Order (not otherwise addressed in this Article 12), which failure to perform or default in performance continues for a period of ten (10) days after any Credit Party receives written notice from Lender of such failure to perform or default in performance (provided that if the failure to perform or default in performance is not capable of being cured, in Lender's reasonable discretion, then the cure period set forth herein shall not be applicable and the failure or default shall be an immediate Event of Default hereunder).<br>12.4    **Default under Loan Documents**. Any failure to perform or default in the performance by any Credit Party that continues after applicable grace and cure periods under any covenant, condition or agreement contained in any of the other Loan Documents or any other agreement with Lender, all of which covenants, conditions and agreements are hereby incorporated in this Agreement by express reference.<br>12.5    **Default under Other Obligations**. Any default by the Borrower in the payment of principal, interest or any other sum for any other obligation beyond any period of grace provided with respect thereto or in the performance of any, other term, condition or covenant contained in any agreement (including any capital or operating lease or any agreement in connection with the deferred purchase price of property), the effect of which default is to cause or permit the holder of such obligation (or the other party to such other agreement) to cause such obligation or agreement to become due prior to its stated maturity, to terminate such other agreement, or to otherwise modify or adversely affect such obligation or agreement in a manner that could have a Material Adverse Effect on any Credit Party.<br>12.6    **Assignment for Creditors**. Any Credit Party makes an assignment for the benefit of creditors, fails to pay, or admits in writing its inability to pay its debts as they mature; or if a trustee of any substantial part of the assets of the Credit Parties is applied for or appointed, and in the case of such trustee being appointed in a Proceeding brought against any of the Credit Parties, the Credit Parties, by any action or failure to act indicates its approval of, consent to, or acquiescence in such appointment and such appointment is not vacated, stayed on appeal or otherwise shall not have ceased to continue in effect within sixty (60) days after the date of such appointment.<br>12.7    **Bankruptcy**. Any Proceeding involving any of the Credit Parties other than the Case, is commenced by or against any of the Credit Parties under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law or statute of the federal government or any state government, and in the case of any such Proceeding being instituted against any of the Credit Parties: (i) any of the Credit Parties, by any action or failure to act, indicates its approval of, consent to or acquiescence therein; or (ii) an order shall be entered |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | approving the petition in such Proceedings and such order is not vacated, stayed on appeal or otherwise shall not have ceased to continue in effect within sixty (60) days after the entry thereof.<br><br>**12.8**    **Motions Effecting Financing Order/Loan Documents**. Borrower or any creditor or committee of creditors (except following Lender's prior written request or with Lender's express prior written consent, and no such consent shall be implied from any other action, inaction, or acquiescence of Lender) shall file a motion with the Bankruptcy Court or any other court with jurisdiction in the matter seeking an order, or an order is otherwise entered, modifying, reversing, revoking, staying, rescinding, vacating, or amending the Financing Orders, or any of the other Loan Documents.<br><br>**12.9**    **Appointment of Trustee, Examiner or Other Fiduciary**. The appointment in the Case of a trustee, examiner, or any other fiduciary for Borrower or any property of the Borrower.<br><br>**12.10**    **Order Dismissing or Converting the Case**. The entry of an order dismissing the Case or converting the Case to a case under Chapter 7 of the Bankruptcy Code.<br><br>**12.11**    **Certain Bankruptcy Court Orders/Pleadings**.<br><br>(a)        Borrower shall file any motion seeking Bankruptcy Court approval of, or any other person shall obtain Bankruptcy Court approval of, a bidding procedures order, sale order, or similar such order, or an order confirming a plan other than an plan acceptable to the Lender is entered by the Bankruptcy Court, unless Lender has expressly joined in or consented to such plan, such order, or such motion in writing.<br><br>(b)        Borrower or any creditor or committee of creditors (except following Lender's prior written request or with Lender's express prior written consent, and no such consent shall be implied from any other action, inaction, or acquiescence of Lender) shall file a motion with the Bankruptcy Court or any other court with jurisdiction in the matter seeking an order, or an order is otherwise entered, modifying, reversing, revoking, staying, rescinding, vacating, or amending the Financing Orders, or any of the other Loan Documents.<br><br>(c)        The filing of any motion or other request with the Bankruptcy Court seeking authority to use any cash proceeds of any of the Collateral in a manner inconsistent with the Financing Orders or any other Loan Document.<br><br>(d)        Borrower shall file any motion or application, or the Bankruptcy Court allows the motion or application of any other Person, which seeks approval for or allowance of (i) the authority to use any cash in Borrrower's possession, or (ii) any claim, Lien, or security interest ranking equal or senior in priority to the claims, Liens and security interests granted to Lender under the Financing Orders or the other Loan Documents or any such equal or prior claim, Lien, or security interest shall be established in any manner, except, in any case, as expressly permitted under the Financing Orders.<br><br>(e)        Borrower's obtaining any other financing under any section of the Bankruptcy Code with respect to any of the Collateral secured by a Lien which is senior to any Lien or Superpriority Claim held by or granted to Lender, unless the proceeds of any such financing are to be immediately applied upon closing to the full payment and performance of all of the Obligations hereunder and under any Loan Document.<br><br>(f)        Borrower, any committee of creditors, or any party in interest shall file a pleading in the Bankruptcy Court or any court of competent jurisdiction (i) challenging the validity, extent, perfection, enforceability or priority of any of (or any part of) the Indebtedness or the Liens or Superpriority Claim of Lender securing the Indebtedness, (ii) challenging the validity or enforceability of any Loan Document, (iii) asserting any claims against Lender, or (iv) seeking to surcharge the Collateral securing the Indebtedness, or an order is otherwise entered granting any such relief.<br><br>(g)        The entry of an order which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code, which order permits any creditor, other than Lender, to realize upon, or to exercise any right or remedy with respect to, any asset of Borrower other than the Borrower's real property.<br><br>**12.12**    **Cessation of Operations**. Borrower's cessation of all or any material part of its remaining business operations.<br><br>**12.13**    **Failure to Perform under Financing Orders**. Borrower shall fail to comply or shall default in the performance of any term of the Financing Orders or any other "Event of Default" under and as defined in either of the Financing Orders shall occur.<br><br>**12.14**    **Final DIP Order; Other Financing Orders**. The Bankruptcy Court shall not have entered the Final DIP Order by [dated] (or such other date as Lender agrees to in writing), or any |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | Financing Order shall cease to be in full force and effect from and after the date of entry thereof by the Bankruptcy Court. |

12.15    **Judgments**.  The entry of any judgment, decree, levy, attachment, garnishment or other process, or the filing of any Lien against the property of any of the Credit Parties, unless such judgment or other process shall have been, within sixty (60) days from the entry thereof: (i) bonded over to the satisfaction of Lender and appealed; (ii) vacated; or (iii) discharged.

12.16    **Material Adverse Effect**.  A Material Adverse Effect shall occur.

12.17    **Change in Control**.  Except as permitted under this Agreement, any Change in Control shall occur; provided, however, a Change in Control shall not constitute an Event of Default if: (i) it arises out of an event or circumstance beyond the reasonable control of the Credit Parties (for example, but not by way of limitation, a transfer of ownership interest due to death or incapacity); and (ii) within sixty (60) days after such Change in Control, the Credit Parties provide Lender with information concerning the identity and qualifications of the individual or individuals who will be in Control, and such individual or individuals shall be acceptable to Lender, in Lender's sole discretion.

12.18    **Collateral Impairment**.   The entry of any judgment, decree, levy, attachment, garnishment or other process, or the filing of any Lien against, any of the Collateral or any collateral under a separate security agreement securing any of the Obligations, and such judgment or other process shall not have been, within thirty (30) days from the entry thereof: (i) bonded over to the satisfaction of Lender and appealed; (ii) vacated; or (iii) discharged, or the loss, theft, destruction, seizure or forfeiture, or the occurrence of any material deterioration or impairment of any of the Collateral or any of the Collateral under any security agreement securing any of the Obligations, or any material decline or depreciation in the value or market price thereof (whether actual or reasonably anticipated), which causes the Collateral, in the sole opinion of Lender acting in good faith, to become unsatisfactory as to value or character, or which causes Lender to reasonably believe that it is insecure and that the likelihood for repayment of the Obligations is or will soon be impaired, time being of the essence.  The cause of such deterioration, impairment, decline or depreciation shall include, but is not limited to, the failure by the Credit Parties to do any act deemed reasonably necessary by Lender to preserve and maintain the value and collectability of the Collateral.

12.19    **Adverse Change in Financial Condition**.  The determination in good faith by Lender that a material adverse change has occurred in the financial condition or operations of any of the Credit Parties, or the Collateral, which change could have a Material Adverse Effect, or otherwise adversely affect the prospect for Lender to fully and punctually realize the full benefits conferred on Lender by this Agreement, or the prospect of repayment of all Obligations.

12.20    **Adverse Change in Value of Collateral**.  The determination in good faith by Lender that the security for the Obligations is or has become inadequate.

12.21    **Prospect of Payment or Performance**.  The determination in good faith by Lender that the prospect for payment or performance of any of the Obligations is impaired for any reason.

12.22    Segregated Account.  The determination in good faith by the Lender that there has been a failure to perform or default in the performance by a Credit Party of Section 2.1(e) of this Agreement.

12.23    **Adequate Protection to other Creditors**. If any creditor of Borrower receives any adequate protection payment which is not fully acceptable to Lender in its reasonable discretion or any Lien is granted as adequate protection other than as set forth in any Financing Order.

12.24    **Consolidation Order**. The entry of an order for the substantive consolidation of Borrower or the Estate with any other Person or Entity, without the written consent of Lender which shall not be unreasonably withheld.

12.25    **Financing Order Deadlines**. Any deadline contained in any Financing Order is not met.

12.26    **Purchase Agreements**. Borrower shall file with the Bankruptcy Court or enter into any asset purchase agreement with any third party unless such asset purchase agreement has been approved by Lender in its discretion.

12.27    **Use of Proceeds in Conformity with Budget**. Borrower shall fail to utilize the proceeds of the Loan or use cash in Borrower's possession in strict conformity with the Budget.

12.28    **Budget Variations**. During any month covered by a Budget, their shall have occurred an Unpermitted Variance provided, however, Borrower may carry over from the prior month to the next two succeeding months (but not to any subsequent months) any unused portion of a budgeted line item expense in the prior month, and an actual line item expense in any month shall

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | be first applied to any unused portion of such line item budgeted expense from the least recent prior month that is carried over to such month.<br>12.29    **"Event of Default" under the Transaction Documents**.  Any "Event of Default" for purposes of the Transaction Documents (as defined in the Purchase Agreement).<br><br>*Agreement, Section 12* |
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | Effective upon entry of the Final Order, the Debtor shall indemnify and hold harmless the Lender, and its respective shareholders, members, directors, agents, officers, subsidiaries and affiliates, successors and assigns, attorneys and professional advisors, in their respective capacities as such, from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions or causes of action, whether groundless or otherwise, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an indemnified party of every nature and character arising out of or related to the DIP Loan Documents, or the DIP Facility or the transactions contemplated thereby and by this Interim Order, whether such indemnified party is party thereto, as provided in and pursuant to the terms of the DIP Loan Documents and as further described therein and herein, or in connection with this case, any plan, or any action or inaction by the Debtor; provided, that such indemnity shall not, as to any indemnified party, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such indemnified party.  The indemnity includes indemnification for the Lender's exercise of discretionary rights granted under the DIP Facility.  In all such litigation, or the preparation therefor, the Lender shall be entitled to select its own counsel and, in addition to the foregoing indemnity, the Debtor agrees to promptly pay the reasonable fees and expenses of such counsel.<br><br>*Interim Order, ¶ 27* |
| **Releases Upon Paid in Full**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br>LBR 4001-2(a)(9) | N/A |

## **Prepetition Capital Structure[6]**

13.    As of the Petition Date, the Debtors are obligors (either as borrower or guarantor) on a principal amount of prepetition funded indebtedness totaling approximately $7,257,362 as summarized below:

---

[6] The following summary is qualified in its entirety by reference to the operative documents, agreements, schedules, and exhibits. In the event of inconsistency between this summary (including the defined terms therein), the source documents shall control and govern.

| Debt Instrument (as defined herein) | Outstanding Principal Amount |
|---|---|
| **Secured Debt** | |
| TCA Senior Security Facility Convertible Notes | $2,622,468 |
| **Total Secured Debt** | **$2,622,468** |
| | |
| **Unsecured Debt** | |
| TCA Investment Banking Services Agreement | $3,000,000[7] |
| Byron Young | $260,000 |
| Mick Zeigler | $400,000 |
| Ashley Steffan | $100,000 |
| Collision Capital | $50,000 |
| Bellridge Capital | $269,500 |
| Actus | $82,432 |
| MorningView | $39,983 |
| 2 Plus 2 | $37,233 |
| Vista | $96,520 |
| EMA Financial | $78,401 |
| RB Capital | $1,092,500 |
| Powerup Lending | $73,325 |
| Greentree | $75,000 |
| K Club – Sraffan, Kildare, Ireland | $25,000 |

---

[7] TCA Capital International Group or TCA Global asserts a $3.0 mm claim against the Debtors under that certain Investment Banking Services Agreement dated August 22, 2018. The Debtors dispute that any amount is owed to TCA Global under that certain Investment Banking Services Agreement.

| Debt Instrument (as defined herein) | Outstanding Principal Amount |
| --- | --- |
| Partner and Friends | $40,000 |
| Free & Free | $600,000 |
| TCN Holdings, LLC | $1,150,000 |
| NAUP Note | $165,000 |
| Trade Vendor Debt | $920,853 |
| **Total Unsecured Debt** | **$5,555,747** |
| | |
| **Total Funded Debt** | **$8,178,215** |

## I.     The TCA Security Agreement dated December 24, 2018

14.     Zenergy Brands is the primary obligor under that certain Security Agreement by and among Zenergy Brands, Inc. and in favor of the Prepetition Senior Creditor dated December 24, 2018 (The "TCA Security Agreement").  Zen Technologies, ZPGI, NAUP, Zenergy Labs, Enertrade, and ZAI are guarantors under the TCA Security Agreement and documents related thereto.  The TCA Security Agreement was entered into to secure that certain Securities Purchase Agreement dated as of December 24, 2018 between Zenergy Brands and the Prepetition Senior Creditor (the "Securities Purchase Agreement") for the sale of up to $10,000,000 senior secured, redeemable debenture.  The Debtors issued debentures in the principal amount of $1,600,000

## II.     TCA Promissory Notes

15.     Following the Debtors entry into the TCA Security Agreement, the Debtors determined that they required additional capital to continue to run their business.  The Debtors entered into a series of promissory notes and security agreements related thereto as set forth in the chart above.

21

### III.     The September TCA Senior Secured Revolving Credit Facility

16.     Zenergy Brands is the primary obligor under that certain Senior Secured Revolving Credit Facility Agreement by and among Zenergy Brands, Inc., Zenergy Energy Services, LLC and TCA Special Situations Credit Strategies ICAV dated September 26, 2019 (the "September Revolving Credit Facility"). Zen Technologies, ZPGI, NAUP, Zenergy Labs, Enertrade and ZAI are guarantors under the Revolving Credit Facility. The September Revolving Credit Facility has a revolving credit limit in the maximum amount of $5,000,000. As of the date hereof, the Prepetition Senior Creditor has not lent any money under the September Revolving Credit Facility and has stated that it will not do so absent the initiation of these bankruptcy cases. This has led to a lack of liquidity for the Debtors' businesses.

### IV.     Unsecured Promissory Notes

17.     In order for Zenergy Brands to effectively market, sell, and implement Master Energy Service Agreements ("MESAs" and each a "MESA"), it must utilize third-party financing entities to provide project and strategic financing toward fulfilling its working capital requirements to acquire and install the equipment required under the MESA. The Debtors have entered to various unsecured promissory notes (the "Unsecured Promissory Notes) to obtain this financing.

18.     As of the Petition Date, the Debtors are obligors (either as borrower or guarantor) on a principal amount of prepetition Unsecured Promissory Notes totaling approximately $4,634,894 as set forth below. The Unsecured Promissory Notes have various maturity dates. The majority of the Unsecured Promissory Notes grant the holder the option to convert the Unsecured Promissory Note into Zenergy Brand's Class A Common Stock according to the terms of the respective debt instrument. The Debtors are in default under certain of the Unsecured Promissory Notes.

22

| Unsecured Promissory Notes | Outstanding Principal Amount |
|---|---|
| Byron Young | $260,000 |
| Mick Zeigler | $400,000 |
| Ashley Steffan | $100,000 |
| Collision Capital | $50,000 |
| Bellridge Capital | $269,500 |
| Actus | $82,432 |
| MorningView | $39,983 |
| 2 Plus 2 | $37,233 |
| Vista | $96,520 |
| EMA Financial | $78,401 |
| RB Capital | $1,092,500 |
| Powerup Lending | $73,325 |
| Greentree | $75,000 |
| K Club – Sraffan, Kildare, Ireland | $25,000 |
| Partner and Friends | $40,000 |
| Free & Free | $600,000 |
| NAUP Note | $165,000 |
| TCN Promissory Note | 1,150,000 |
| **Total Notes** | **$4,634,894** |

## V.    TCN Promissory Note

19.    In conjunction with ZPGI's acquisition of Enertrade, on April 3, 2018, ZPGI issued an unsecured Promissory Note to Luccirelli & Gomez LLC and TCN Holdings, LLC in the amount

of $1,150,000 (the "TCN Note").  The TCN Note is interest free and the principal balance was due and owed in full on November 2, 2018.

## VI.     NAUP Investments Promissory Note

20.     In conjunction with Zenergy Brand's acquisition of NAUP on June 1, 2017, Zenergy Brands issued an unsecured Promissory Note to NAUP Investments, LLC in the amount of $165,000 (the "NAUP Note").  The principal balance was due and owed in full on November 2, 2018.

## VII.    Trade Vendor Debt

21.     The Debtors rely on vendors to provide goods and services necessary for the Debtors to provide goods and services to their customers.  As of the Petition Date, the Debtors estimate that they cumulatively owe approximately $920,853 to trade vendors.

### The Debtors' Liquidity Needs and Efforts to Acquire Alternative Financing

## I.      The Debtors Cannot Prudently Operate their Businesses by Operating Only on a Cash-Collateral Basis.

22.     In connection with their liquidity struggles, the Debtors, with the assistance of their advisors, analyzed their cash needs and determined that use of the Cash Collateral, alone, was insufficient to operate their business, and that additional funding was necessary, for a number of factors.  For example, additional financing is necessary to: (a) fund working-capital requirements and other operational expenses in connection with the ordinary course operation of the Debtors' business; (b) send a strong market signal that the Case is well-funded; (c) provide a stable platform for their business; (d) fund the Debtors' pursuit of a value-maximizing restructuring or transaction for the benefit of their stakeholders; and (e) satisfy the administrative expenses to be incurred.

23.     The Debtors entered chapter 11 with limited available liquidity, which is significantly below the optimal level required to preserve and maximize value. The Debtors

business requires up front capital funding in order to obtain MESAs, which are the life-blood of the company. Without access to liquidity, the Debtors are unable to continue pursuing and obtaining MESAs, which are necessary to continue operations. Further, customers may seek other alternative products and services, and vendors and suppliers may refuse to do business with the Debtors if there exists a market perception that the Chapter 11 Case is not well-funded and the Debtors cannot effectuate fulfill their existing MESAs.

24.     The Debtors therefore require immediate access to liquidity to stave off what would be substantial damage to their operations. The Debtors may not have sufficient liquidity to continue their business operations in the ordinary course to the material detriment of customers, creditors, employees, and other parties in interest, jeopardizing the Case. Therefore, the Debtors have an immediate need to incrementally access the DIP Facility on an as-needed and interim basis.

25.     Absent the immediate relief requested by this Motion, the Debtors face a material risk of substantial, irreparable, and ongoing harm. Access to Cash Collateral and new capital under the DIP Facility will ensure that the Debtors have sufficient funds to preserve and maximize the value of its estates, responsibly administer the Case, and consummate a value-maximizing transaction.

## II.     Alternative Sources of Financing Are Not Available On Better Terms.

26.     Recognizing a financing need, the Debtors sought funding from a variety of financial institutions, lenders, and the Debtors' incumbent secured lender. In this process, the Debtors solicited four lenders. None of these lenders was willing to provide financing.

27.     The Debtors sought potential lenders based on a number of factors, including, among other things, their ability to complete diligence quickly and willingness to lend based on the Debtors current capital structure. Ultimately, the Debtors determined that debtor-in-possession financing was only viable from their Prepetition Senior Creditor.

28.     The Debtors have engaged in arms'-length negotiations with the Lender regarding the terms of the DIP Facility.  The DIP Facility will allow the Debtors to continue to operate in the Case while undertaking the process for a value maximizing restructuring or transaction for their estates.  The proposed DIP Facility represents a negotiated resolution with the Prepetition Senior Creditor and Lender that will allow the Debtors to continue to use Cash Collateral and to gain the additional financing necessary to operate in the Case.  Thus, the Debtors determined that the proposed DIP Facility provides the best path forward for the Debtors under the circumstances to both fund the Case while providing the flexibility necessary for the Debtors to maximize value for all stakeholders.

## Basis for Relief

### I.     Entering into the DIP Loan Documents Is an Exercise of the Debtors' Sound Business Judgment.

29.     The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Loan Documents, obtain access to the DIP Facility, and continue using the Cash Collateral.  Courts grant considerable deference to a debtor's business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  See, e.g., In re N. Bay Gen. Hosp., Inc., No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); In re L.A. Dodgers LLC, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long

as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

30.     Courts grant debtors considerable deference in acting in accordance with their sound business judgment in obtaining such credit.  See In re Barbara K. Enters., Inc., No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest"). Specifically, to determine whether a debtor has met this business judgment standard, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."  In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006); see also In re Curlew Valley Assocs., 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

31.     Further, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  In re Farmland Indus., Inc., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.), 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

32.     The Debtors' determination to move forward with the DIP Facility is an exercise of its sound business judgment following an arms'-length process and careful evaluation of available alternatives.  Specifically, the Debtors and their advisors determined that postpetition

financing will create certainty with respect to cash flows necessary for the administration of the Case and the continued operation of the Debtors' businesses.  The Debtors believe that they have obtained the best financing available because: (a) the DIP Facility permits the Debtors to avoid value-destructive priming issues; (b) third-party lenders were unwilling to provide viable debtor-in-possession financing junior to the Prepetition Senior Creditor due to the Debtors' high level of existing secured debt obligations; and (c) the DIP Facility presents the best financing reasonably available to the Debtors.  Finally, entry into the DIP Facility with the Debtors' Prepetition Senior Creditor will likely avoid a costly priming and adequate-protection fight that would cause significant uncertainty among the Debtors' vendors, employees, customers, and others. Accordingly, the Court should authorize the Debtors' entry into the DIP Facility, as it is a reasonable exercise of the Debtors' business judgment

## II.  The Debtors Should Be Authorized to Grant Liens and Superpriority Claims

33.  The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth in the Interim and Final Financing Orders pursuant to section 364(c) of the Bankruptcy Code.  Specifically, the Debtors propose to provide to the Lender continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on the DIP Collateral, subject to the DIP Carve Out (as set forth and defined in the Interim Order), which includes substantially all of the Debtors' assets.

34.  The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]."  11 U.S.C. § 364(c); see In re Crouse Grp., Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine whether a debtor is

entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

a.  the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, i.e., by allowing a lender only an administrative claim;

b.  the credit transaction is necessary to preserve the assets of the estate; and

c.  the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

See In re Ames Dep't Stores, 115 B.R. at 37–40; see also In re St. Mary Hosp., 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); Crouse Grp., 71 B.R. at 549.

35.     The Debtors meet each part of this test. Due to the Debtors' high level of existing secured debt obligations, no third-party lenders have been willing to provide postpetition financing junior to the Prepetition Senior Creditor. Therefore, the Debtors, in consultation with their advisors, concluded that any workable financing likely would require the support of, or be provided by, the Debtors' Prepetition Senior Creditor. Absent the DIP Facility, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders. Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the Interim Order and the DIP Loan Documents, are fair, reasonable, and adequate, all as more fully set forth below. For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing.

36.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the

Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien." 11 U.S.C. § 364(c). As described above, the Debtors are unable to obtain unsecured credit. Therefore, approving superpriority claims in favor of the Prepetition Senior Creditor and Lender is reasonable and appropriate.

37.     Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either (a) the Prepetition Senior Creditor has consented or (b) the Prepetition Senior Creditor's interests in collateral are adequately protected. What constitutes adequate protection is decided on a case-by-case basis, and adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims. In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[T]he determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case."); In re Realty Sw. Assocs., 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992) ("'Adequate protection' is a question of fact because it has as its linchpin the concept of value, and therefore is determined on a case-by-case basis.") (citation omitted); In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).

38.     The Debtors respectfully submit that their proposal more than satisfies the requirements of "adequate" protection. As described more fully in the Interim Order, the Debtors propose to provide a variety of adequate protection to protect the interests in the Debtors' property of the Prepetition Senior Creditor from any diminution in value of the Cash Collateral resulting from the use of the Cash Collateral by the Debtors and the imposition of the automatic stay, subject, in each case, to the Carve-Out (collectively, the "Adequate Protection Obligations"):[8]

  a.     payment of $90,000 to the Prepetition Senior Creditor upon the entry of the Final Order;

  b.     additional adequate protection in the form of payment of the Prepetition Senior Obligations from the proceeds of DIP Collateral, indemnities and other amounts;

  c.     valid and automatically perfected liens and security interests in and upon the DIP Collateral;

  d.     superpriority administrative claims under section 507(b) of the Bankruptcy Code;

  e.     payment of the fees and expenses of the Prepetition Senior Creditor and Lender; and

  f.     compliance with the Approved Budget.

39.     The Debtors respectfully submit that this package is more than sufficient to constitute adequate protection here as "[a]dequate protection, not absolute protection, is the statutory standard." In re Beker Indus. Corp., 58 B.R. at 741 (citation omitted).

40.     Also, the Debtors believe the likely alternative available to the Case would be an expedited liquidation of the Debtors' assets rather than the Debtors' continued operation as a going concern. Such an outcome would, in turn, decrease the value available for all stakeholders. This

---

[8] The following summary is qualified in its entirety by reference to the Interim Order. In the event of inconsistency between this summary (including the defined terms therein), the Interim Order shall control and govern.

is particularly true where the Debtors' greatest value is servicing ongoing contracts, which require the Debtors to continue operating. Thus, the DIP Facility provides these parties with adequate protection by enhancing the value of these parties' collateral. Bankruptcy Courts have recognized that a debtor's ability to maintain business value by operating in the ordinary course is itself a significant source of adequate protection. See In re Salem Plaza Assocs., 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that a debtor's use of cash collateral to pay operating expenses, thereby "preserv[ing] the base that generates the income stream," provided adequate protection to the secured creditor); In re Constable Plaza Assocs., L.P., 125 B.R. 98, 104-05 (Bankr. S.D.N.Y. 1991) (finding equity cushion alone was adequate protection when cash collateral was used to preserve value of a building pledged as collateral and noting such use would "preserve or enhance the value of the building which, in turn, will protect the collateral covered by [the] mortgage").

### III.   The Proposed Roll-Up is Appropriate

41.     The proposed financing provides that all net proceeds from the disposition of DIP Collateral shall be applied first on a *pro rata* payment to the Prepetition Senior Creditor and the Lender, in proportion to such creditor's outstanding financing or principal amount, as applicable, owing under Prepetition Senior Debenture Documents and the DIP Loan Documents (the "Roll-Up"). The result is a "creeping" (e.g., incremental) roll-up of the Prepetition Senior Creditor's prepetition debt.

42.     Courts have permitted debtors to use postpetition financing to pay prepetition claims of a lender where, as here, the loan cannot be obtained on any other basis and the claims of the prepetition lender are secured.

43.     The Roll-Up is necessary because the Lender is not willing to enter into the DIP Facility unless the Roll-Up is approved by this Court.

44.     Courts routinely grant roll-ups, even where the secured obligation was subject to a challenge.  See In re Halcon Res. Corp., Case No. 16-11724 (BLS) (Bankr. D. Del. July 29, 2016); In re Pacific Sunware of California, Inc. Case No. 16-10882 (LSS) (Bankr. D. Del. April 7, 2016).

45.     The DIP Facility, including the Roll-Up, is the Debtors' best available financing option for a variety of reasons.

   a.     First, the incremental availability under the DIP Facility under the Agreement provides the Debtors with the necessary liquidity and time to pursue a value maximizing restructure of the company or transaction, which will maximize recoveries for all creditors.

   b.     Second, the DIP Facility is the only financing option that the Debtors could obtain.

   c.     Third, obtaining the DIP Facility from the Lender allows the Debtors to avoid a costly priming dispute that could disrupt the Debtors' restructuring efforts and ultimately be far costlier for all parties-in-interest in the Case.

   d.     Fourth, no parties-in-interest will be prejudiced by the Roll-Up because any statutory committee will be given an opportunity to review the validity and enforceability of the liens.

46.     Indeed, the Debtors would be irreparably harmed without the ability to enter into the DIP Facility, including the Roll-Up, and virtually all of their creditor constituencies would suffer.  The DIP Facility allows the Debtors the ability to use their Cash Collateral.  Without the DIP Facility, the viability of the Debtors' restructuring efforts in the Case will be unclear.

47.     Furthermore, the DIP Facility's "creeping" Roll-Up feature is appropriate in these circumstances and represents a sound exercise of the Debtors' business judgment. The "creeping" structure of the DIP Facility allows the prepetition indebtedness to be gradually "rolled-up" into the DIP Facility over time both prior to and following the entry of the Final Financing Order. This feature was a critical component of the willingness of the Lender to commit to provide funding

under the DIP Facility.  Indeed, the Lender would not have agreed to provide the DIP Facility without a creeping roll-up of the prepetition obligations.

48.    The request for a "creeping" Roll-Up is not novel and has been approved by other bankruptcy courts.  See In re Draw Another Circle, LLC, Case No. 16-11452 (KJC) (Bankr. D. Del, June 14, 2016); In re EveryWare Global, Inc., Case No. 15-10743 (LSS) (Bankr. D. Del. April 10, 2015).

49.    In light of the various benefits afforded by the Debtors' entry into the DIP Facility, as described above, the Debtors submit that the Roll-Up is appropriate and should be approved pursuant to the Interim Order.

**IV.    No Comparable Alternative to the DIP Facility Is Reasonably Available.**

50.    A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. In re Snowshoe Co., Inc., 789 F.2d 1085, 1088 (4th Cir. 1986); see also In re Plabell Rubber Prods., Inc., 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); see also In re Ames Dep't Stores, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)) (citing Snowshoe Co., 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area)); In re Stanley Hotel, Inc., 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

51.     As noted above, the Debtors do not believe that comparable alternative sources of financing are reasonably available given the realities imposed by the Debtors' existing capital structure and the Debtors' unsuccessful solicitation of alternative financing proposals. Substantially all of the Debtors' existing assets, including Cash Collateral, are encumbered by the Prepetition Senior Creditor.  The Debtors conducted arms'-length negotiations with the Prepetition Senior Creditor regarding the terms of the DIP Facility.

52.     Thus, the Debtors determined that the DIP Facility provides the best opportunity available to the Debtors under the circumstances to fund the Case.  In addition to evidence to be introduced at the hearing on the Interim Order if necessary, the Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

## V.     The Debtors Should Be Authorized to Use Postpetition Collateral, Including Cash Collateral.

53.     Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) permits a debtor-in-possession to use cash collateral with the consent of the secured party. Section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral. Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  See In re Cont'l Airlines, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  In re Mosello, 195 B.R. at 289 ("[T]he determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case."); In re Realty Sw. Assocs., 140 B.R. at 366 ("'Adequate protection' is a question of fact because it has as its linchpin the concept of value, and

therefore is determined on a case-by-case basis.") (citation omitted); In re Beker Indus. Corp., 58 B.R. at 736 (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).

54.     The Debtors submit that the proposed Adequate Protection Obligations are sufficient to protect the Prepetition Lenders from any diminution in value to the Cash Collateral and Prepetition Collateral and satisfies the requirements of "adequate" protection: "[a]dequate protection, not absolute protection, is the statutory standard." In re Beker Indus. Corp., 58 B.R. at 741 (citation omitted).

55.     In addition to the proposed Adequate Protection Obligations, the critical liquidity provided by the proposed DIP Facility permits the Debtors to continue as a going concern to consummate a value-maximizing transaction.  The Debtors submit that continuing as a going concern provides additional adequate protection to the Prepetition Lenders. Cf. In re Salem Plaza Assocs., 135 B.R. at 758 (holding that debtor's use of cash collateral from shopping center to pay operating expenses, thereby "preserv[ing] the base that generates the income stream," provided adequate protection to the secured creditor); In re Constable Plaza Assocs., L.P., 125 B.R. at 104–05 (finding equity cushion alone was adequate protection when cash collateral was used to preserve value of a building pledged as collateral and noting such use would "preserve or enhance the value of the building which, in turn, will protect the collateral covered by [the] mortgage"). Further, the incremental value generated by use of the proceeds of the proposed DIP Facility will inure to the ultimate benefit of the Debtors' estates and their stakeholders.  Courts have held enhancement of collateral is a critical component of adequate protection and have considered "whether the value of the debtor's property will increase as a result of the" use of the collateral.

<u>In re 495 Cent. Park Ave. Corp.</u>, 136 B.R. 626 (Bankr. S.D.N.Y. 1992) (finding that improvements to collateral financed by postpetition financing proceeds would improve collateral value in excess of loans and, therefore, provided adequate protection); <u>see</u> <u>In re Hubbard Power & Light</u>, 202 B.R. 680 (Bankr. E.D.N.Y. 1996) (approving postpetition financing to be used, in part, to fund cleanup costs of encumbered property anticipated to improve the value of the collateral, thereby serving the goal of adequate protection).

56.     In light of the foregoing, the Debtors further submit, and the Prepetition Lenders agree, that the proposed Adequate Protection Obligations to be provided for the benefit of the Prepetition Lenders are appropriate.  Thus, the Debtors' provision of the Adequate Protection Obligations is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of the Case to ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates

## VI.     The DIP Financing Fees are Reasonable and Should Be Approved

57.     Under the DIP Loan Documents, the Debtors agreed, subject to Bankruptcy Court approval, to pay certain fees and expenses to the Prepetition Senior Creditor and Lender.  The Debtors and the Lender agree that these fees are an integral component of the overall terms of the DIP Facility, and required by the Lender and Prepetition Senior Creditor as consideration for the extension of postpetition financing.  Accordingly, the Bankruptcy Court should authorize the Debtors to pay the fees provided under the Interim Order in connection with entering into the DIP Loan Documents.

## VII.     Modification of the Automatic Stay Is Warranted

58.     The proposed Interim Order further provides that the automatic stay is modified as necessary to permit the Debtors to grant the DIP Liens to the Lender and Prepetition Senior

Creditor and to incur all liabilities and obligations set forth in the Interim Order. Finally, the proposed Interim Order provides that, following the occurrence of an Event of Default, the automatic stay shall be vacated and modified to the extent necessary to permit the Lender to exercise all rights and remedies in accordance with the DIP Loan Documents, or applicable law.

59.     Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of the Case. See, e.g., In re BCBG Max Azria Global Holdings, LLC, Case No. 17-10466 (SCC) (Bankr. S.D.N.Y. Mar. 28, 2017); In re Avaya, Inc., Case No. 17-10089 (SMB) (Bankr. S.D.N.Y. Mar. 10, 2017); In re Dacco Transmission Parts (NY), Inc., Case No. 16-13245 (MKV) (Bankr. S.D.N.Y. December 23, 2016); In re Breitburn Energy Partners LP, Case No. 16-11390 (SMB) (Bankr. S.D.N.Y. August 19, 2016); In re Aéropostale, Inc., Case No. 16-11275 (SHL) (Bankr. S.D.N.Y. June 13, 2016).

## VIII.   The Lender Parties Should Be Deemed Good-Faith Lenders under Section 364(e).

60.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Specifically, section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e). Because "good faith" is not defined in the Bankruptcy Code, courts often look to case law under section 363(m). 7 Collier on Bankruptcy, 16th ed. ¶ 364.08, p. 37 ("Section

364(e) is consistent with section 363(m), which provides similar protection to a buyer or lessee of property of the estate in a section 363 transaction.").  As one court explained, "the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." In re Pan Am Corp., No. 91 CIV. 8319 (LMM), 1992 WL 154200, at *4 (S.D.N.Y. June 18, 1992) (citing In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)); accord In re General Growth Properties, Inc., 423 B.R. 716, 722 (S.D.N.Y. 2010).

61.     As explained in detail herein, the DIP Facility is the result of the Debtors' reasonable and informed determination that the Lender offered the most favorable terms on which to obtain necessary postpetition financing to allow for the successful conclusion of the Case.

62.     The Debtors submit that the terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Facility other than as described herein.  Accordingly, the Bankruptcy Court should find that the Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

## Immediate Relief Is Required to Avoid Immediate and Irreparable Harm

63.     The Court may grant interim relief in respect of a motion filed pursuant to sections 363(c) or 364 of the Bankruptcy Code and to repay obligations arising prior to the Petition Date where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Fed. R. Bankr. P. 4001(b)(2), (c)(2); 6003(b).  As discussed in the First-Day Declaration, the Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing the Debtors to use the Cash Collateral and to borrow under the DIP Facility, is not granted promptly.  Accordingly, the Debtors have an

immediate need for access to liquidity to, among other things, continue the operation of their businesses, maintain important relationships with customers, meet payroll, procure goods and services from vendors and suppliers, and otherwise satisfy their working capital and operational needs, all of which are required to preserve and maintain the Debtors' going concern value for the benefit of all parties-in-interest.

64.     The Debtors believe that the current Approved Budget and its projections provide an accurate reflection of the Debtors' funding requirements over the identified period, which will allow the Debtors to meet their obligations—including the administrative expenses of the Case— and are reasonable and appropriate under the circumstances.

65.     The importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in other bankruptcy courts in similar circumstances.  See, e.g., In re SunEdison, Inc., Case No. 16-10992 (SMB) (Bankr. S.D.N.Y. June 9, 2016) (relief necessary to avoid immediate and irreparable harm to the Debtors); In re MPM Silicones, LLC, Case No. 14-22503 (RDD) (Bankr. S.D.N.Y. May 23, 2014) (same); In re United Retail Grp., Inc., No. 12-10405 (SMB) (Bankr. S.D.N.Y. Feb. 2, 2012) (same); In re Sbarro, Inc., No. 11-11527 (SCC) (Bankr. S.D.N.Y. Apr. 5, 2011) (same); In re MSR Resort Golf Course LLC, No. 11-10372 (SHL) (Bankr. S.D.N.Y. Mar. 16, 2011) (same); In re Insight Health Servs. Holdings Corp., No. 10-16564 (AJG) (Bankr. S.D.N.Y. Jan. 4, 2011). Accordingly, for all of the reasons set forth above, prompt entry of the Interim Order is necessary to avert immediate and irreparable harm to the Debtors' estates and is consistent with, and warranted under, Bankruptcy Rules 4001(b)(2) and (c)(2).

### **Request for this Motion to be heard at First-Day Hearing**

66.     The Court has set a first-day hearing on October 29 (the "First-Day Hearing").  The Debtors request that this Motion be heard at the First-Day Hearing.  The Debtors require immediate

funding to continue their operations. As discussed above, the Debtors' inability to receive immediate funding will result in immediate and irreparable harm.

## **Request for a Final Hearing**

67.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date that is as soon as practicable, and in no event later than 25 days after the date of the hearing on the Interim Order, to hold a hearing to consider entry of the Final Financing Order and the permanent approval of the relief requested in this Motion and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## **Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

68.     To successfully implement the foregoing, the Debtors request that the Bankruptcy Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## **Notice**

69.     The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee for the Eastern District of Texas; (b) the United States Attorney's Office for the Eastern District of Texas; (c) the Internal Revenue Service; (d) counsel for TCA Special Situations Credit Strategies ICAV, the Lender, and TCA Global Credit Master Fund, LP, the Debtors' Prepetition Senior Creditor; (e) the state attorneys general for states in which the Debtors conduct business; (f) the Securities and Exchange Commission; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002.   The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

70.     No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, for the reasons set forth herein and in the First-Day Declaration, the Debtors respectfully request that this Court (a) enter the Interim and Final Financing Orders granting the relief requested herein on an interim and permanent basis, respectively, and (b) grant such other and further relief as the Court deems appropriate.

Dated: October 27, 2019

Respectfully Submitted,

*/s/ Marcus A. Helt*
Marcus A. Helt (TX 24052187)
**FOLEY GARDERE**
Foley & Lardner LLP
2021 McKinney Avenue
Suite 1600
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667
Email: mhelt@foley.com

-and-

Jack G. Haake (*pro hac vice*)
**FOLEY & LARDNER LLP**
Washington Harbour
3000 K Street, N.W., Suite 600
Washington, D.C.  20007-5109
Telephone: (202) 295-4085
Facsimile: (202) 672-5399
Email: jhaake@foley.com

***Proposed Counsel for the Debtors and Debtors in Possession***

## CERTIFICATE OF SERVICE

I certify that on October 27, 2019, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Eastern District of Texas.

*/s/ Marcus A. Helt*
Marcus A. Helt