# EXHIBIT B

**Draft Agreement**

**SENIOR SECURED REVOLVING CREDIT FACILITY AGREEMENT**

**IN THE MAXIMUM AMOUNT OF US$5,000,000.00**

**BY AND AMONG**

**ZENERGY BRANDS, INC.**
**as Borrower,**

**ZEN TECHNOLOGIES, INC., ZENERGY POWER & GAS, INC., NAUP BROKERAGE, LLC, ZENERGY LABS, LLC, AND ZENERGY & ASSOCIATES, INC.,**
**AS CORPORATE GUARANTORS,**

**AND**

**TCA SPECIAL SITUATIONS CREDIT STRATEGIES ICAV,**
**as Lender**

**Effective as of October __, 2019**

# SENIOR SECURED REVOLVING CREDIT FACILITY AGREEMENT

This SENIOR SECURED REVOLVING CREDIT FACILITY AGREEMENT (as amended, restated, modified or supplemented from time to time, this "**Agreement**"), dated and effective as of October __, 2019 (the "**Effective Date**"), is executed by and among: (i) **ZENERGY BRANDS, INC.**, a corporation incorporated under the laws of the State of Nevada ("**Zenergy Brands**" and the "**Borrower**"); (ii) **ZEN TECHNOLOGIES, INC.**, a corporation organized and existing under the laws of the State of Texas ("**Zen Technologies**" and a "**Corporate Guarantor**"), **ZENERGY POWER & GAS, INC.**, a corporation organized and existing under the laws of the State of Texas ("**Zenergy Power**" and a "**Corporate Guarantor**"), **NAUP BROKERAGE, LLC**, a limited liability company organized and existing under the laws of the State of Texas ("**NAUP**" and a "**Corporate Guarantor**"), **ZENERGY LABS, LLC**, a limited liability company organized and existing under the laws of the State of Texas ("**Zenergy Labs**" and a "**Corporate Guarantor**"), and **ZENERGY & ASSOCIATES, INC.**, a corporation organized and existing under the laws of the State of Texas ("**Zenergy & Associates**", a "**Corporate Guarantor**" and together with Zen Technologies, Zenergy Power, NAUP, and Zenergy Labs, jointly and severally, the "**Corporate Guarantors**"), and any Person to hereafter become a Subsidiary of the Borrower pursuant to Section 10.19 hereof, and any Person that from time to time may hereafter become liable for the Obligations, or any part thereof, as joint and several guarantors (together with the Corporate Guarantors, jointly and severally, the "**Guarantors**" and together with the Borrower, the "**Credit Parties**"); and (iii) **TCA SPECIAL SITUATIONS CREDIT STRATEGIES ICAV**, an Irish collective asset vehicle, as lender (the "**Lender**").

WHEREAS, on October 24, 2019 (the "**Petition Date**"), the Borrower (the "**Debtor**") filed a voluntary petition with the Bankruptcy Court initiating its case that is pending under Chapter 11 of the Bankruptcy Code (the "**Case**") and have continued in the possession of their assets and in the management of their business pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

WHEREAS, Borrower has requested that Lender extend a senior secured revolving credit facility to Borrower (i) of up to Five Million and No/100 United States Dollars (US$5,000,000.00) to finance certain managed energy services contracts of Borrower and for any other purposes permitted hereunder; and for these purposes, and (ii) subject to the entry of the Final DIP Order. Lender is willing to make certain loans and extensions of credit available to Borrower of up to such amount and upon the terms and conditions set forth herein; and

WHEREAS, as a material inducement for Lender to make loans and extensions of credit to Borrower pursuant to the terms and conditions set forth herein: (i) the Corporate Guarantors have, inter alia, agreed to execute a Guaranty Agreement in favor of Lender, whereby the Corporate Guarantors shall guarantee any and all of the Borrower's Obligations owed under this Agreement and under any other Loan Document; and (ii) the Credit Parties have, inter alia, agreed to execute Security Agreements in favor of Lender, whereby each Credit Party shall grant to the Lender a first priority or pari passu first priority security interest in and lien upon all of its existing and after-acquired tangible and intangible assets, as security for the payment and performance of any and all Obligations owed under this Agreement and under any other Loan Document;

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter contained, and for other good and valuable consideration, the parties hereto agree as follows:

1. **DEFINITIONS.**

1.1 <u>Defined Terms</u>. For the purposes of this Agreement, the following capitalized words and phrases shall have the meanings set forth below.

(a) "**Access Details**" shall have the meaning given to it in <u>Section 2.1(e)(ii)(3)</u> hereof.

(b) "**Account**" shall mean, individually, and "**Accounts**" shall mean, collectively, any and all accounts (as such term is defined in the UCC) of any Credit Party.

(c) "**Advance Calculation Amount**" shall mean an amount, expressed in Dollars, determined by Lender from time to time, and calculated as follows: (i) the average monthly Receipts collected by the Borrower for the three (3) calendar months immediately prior to when the calculation is made by Lender, or for the entire life of the Loans, as determined by Lender in its sole discretion (such amount hereinafter called the "**AMC Amount**"); (ii) then the AMC Amount shall be multiplied by twenty percent (20%) (such resulting amount hereinafter called the "**Collected Amount**"); and (iii) the Collected Amount shall then be multiplied by eight (8), and the result shall be the Advance Calculation Amount.

(d) "**Affiliate**" (a) of Lender shall mean: (i) any entity which, directly or indirectly, Controls or is Controlled By or is under common Control with Lender; and (ii) any entity administered or managed by Lender, or an Affiliate or investment advisor thereof and which is engaged in making, purchasing, holding or otherwise investing in commercial loans; and (b) of any Credit Party shall mean any entity which, directly or indirectly, Controls or is Controlled By or is under common Control with any Credit Party.

(e) "**Affirmation and Compliance Certificate**" shall mean the representation, warranty and covenant affirmation and compliance certificate, the form of which is attached hereto as **Exhibit "A"**.

(f) "**Agreement**" shall mean this Senior Secured Revolving Credit Facility Agreement by and among the Credit Parties and the Lender.

(g) "**Asset Monitoring Fee**" shall have the meaning given to it in <u>Section 2.2(a)</u> hereof.

(h) "**Avoidance Action**" shall mean the Debtor's claims and causes of action under Sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code and any other avoidance actions under the Bankruptcy Code and the proceeds thereof and property received thereby whether by judgment, settlement or otherwise.

2

(i)         "**Bankruptcy Court**" shall mean the United States Bankruptcy Court for the Eastern District of Texas or such other bankruptcy court having jurisdiction over the Case from time to time.

(j)         "**Borrower**" shall have the meaning given to such terms in the preamble hereof.

(k)         "**Borrowing Base Amount**" shall mean an amount, expressed in Dollars, equal to the lesser of: (i) eighty percent (80%) of the then existing Eligible Accounts; or (ii) the Advance Calculation Amount.

(l)         "**Borrowing Base Certificate**" shall mean a certificate delivered by Lender to Borrower from time to time in a form acceptable to Lender, pursuant to which the formula and calculation of the Borrowing Base Amount is made by Lender.

(m)         "**Budget**" shall mean the budget for anticipated expenses agreed to by the Borrower and the Lender as approved by the Bankruptcy Court, in the form attached as Exhibit "G" to this Agreement, as the same may be modified from time to time with the prior written consent of the Lender.

(n)         "**Business Day**" shall mean any day other than a Saturday, Sunday or a legal holiday on which banks are authorized or required to be closed for the conduct of commercial banking business in the State of Wyoming.

(o)         "**BSA**" shall have the meaning given to it in Section 14.23 hereof.

(p)         "**Capital Expenditures**" shall mean expenditures (including Capital Lease obligations which should be capitalized under GAAP) for the acquisition of fixed assets which are required to be capitalized under GAAP.

(q)         "**Capital Lease**" shall mean, as to any Person, a lease of any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, by such Person as lessee that is, or should be, in accordance with Financial Accounting Standards Board Statement No. 13, as amended from time to time, or, if such Statement is not then in effect, such statement of GAAP as may be applicable, recorded as a "capital lease" on the balance sheets of any Credit Party prepared in accordance with GAAP.

(r)         "**Case**" shall have the meaning specified in the recitals hereof.

(s)         "**Case Professionals**" shall have the meaning assigned to such term in the Interim DIP Order, prior to the entry of the Final DIP Order, and the Final DIP Order thereafter.

(t)         "**Change in Control**" shall mean any sale, conveyance, assignment or other transfer, directly or indirectly, of any ownership interest of any Credit Party, which results in any change in the identity of the individuals or entities in Control of such Credit Party as of the Effective Date or the grant of a security interest in any ownership interest of any

Person, directly or indirectly Controlling the Credit Parties, which could result in a change in the identity of the individuals or entities in Control of such Credit Party as of the Effective Date.

(u)        "**Collateral**" shall mean "Collateral" as defined in the Security Agreements, and if there is more than one Security Agreement, it shall mean, as the context so requires, the "Collateral" for each individual Credit Party, as such term is defined in the Security Agreement for such applicable Credit Party, and all of the "Collateral," in the aggregate, for all Credit Parties, collectively, under each of the Security Agreements.

(v)        "**Contingent Liability**" and "**Contingent Liabilities**" shall mean, respectively, each obligation and liability of the Credit Parties and all such obligations and liabilities of the Credit Parties incurred pursuant to any agreement, undertaking or arrangement by which any Credit Party either: (i) guarantees, endorses or otherwise becomes or is contingently liable upon (by direct or indirect agreement, contingent or otherwise, to provide funds for payment, to supply funds to, or otherwise to invest in, a debtor, or otherwise to assure a creditor against loss) the indebtedness, dividend, obligation or other liability of any other Person in any manner (other than by endorsement of instruments in the course of collection), including without limitation, any indebtedness, dividend or other obligation which may be issued or incurred at some future time; (ii) guarantees the payment of dividends or other distributions upon the shares or ownership interest of any other Person; (iii) undertakes or agrees (whether contingently or otherwise): (A) to purchase, repurchase, or otherwise acquire any indebtedness, obligation or liability of any other Person or any property or assets constituting security therefor; (B) to advance or provide funds for the payment or discharge of any indebtedness, obligation or liability of any other Person (whether in the form of loans, advances, stock purchases, capital contributions or otherwise), or to maintain solvency, assets, level of income, working capital or other financial condition of any other Person; or (C) to make payment to any other Person other than for value received; (iv) agrees to lease property or to purchase securities, property or services from such other Person with the purpose or intent of assuring the owner of such indebtedness or obligation of the ability of such other Person to make payment of the indebtedness or obligation; (v) to induce the issuance of, or in connection with the issuance of, any letter of credit for the benefit of such other Person; or (vi) undertakes or agrees otherwise to assure or insure a creditor against loss. The amount of any Contingent Liability shall (subject to any limitation set forth herein) be deemed to be the outstanding principal amount (or maximum permitted principal amount, if larger) of the indebtedness, obligation or other liability guaranteed or supported thereby.

(w)        "**Control,**" "**Controlling,**" "**Controlled By,**" or words of similar import shall mean the possession, directly or indirectly, of the power to direct, or cause the direction of, the management and policies of a Person by contract, voting of securities, or otherwise.

(x)        "**Conversion Shares**" shall have the meaning given to it in Section 2.8 hereof.

(y)        "**Corporate Guarantor**" and "**Corporate Guarantors**" shall have the meaning given to it in the preamble hereof.

(z)	"**Credit Card Date**" shall have the meaning given to it in <u>Section 2.1(e)</u> hereof.

(aa)	"**Credit Party(ies)**" shall have the meaning given to such term in the preamble hereof.

(bb)	"**Credit Party Leases**" shall have the meaning given to it in <u>Section 7.18</u> hereof.

(cc)	"**Creditors' Committee**" shall mean the official committee of unsecured creditors in the Case.

(dd)	"**Customer**" shall mean any Person who is obligated to any Credit Party for any Receipts.

(ee)	"**Default Rate**" shall mean a per annum rate of interest equal to the highest non-usurious rate permitted by applicable law, and if there is no such rate under applicable law, then twenty-four percent (24%) per annum.

(ff)	"**Dollars**" or "**$**" means lawful currency of the United States of America.

(gg)	"**Due Diligence Fee**" shall have the meaning given to it in <u>Section 2.2(b)</u> hereof.

(hh)	"**Effective Date**" shall have the meaning given to it in the preamble hereof.

(ii)	"**Eligible Accounts**" means, as applicable for each Credit Party:

(A)	all sales of the Credit Parties arising from Point-of-Sale Transactions which meet each of the criteria set forth below (any sale that fails to meet the criteria below can still be deemed an Eligible Account, in Lender's sole discretion):

(i)	are genuine in all respects and have arisen in the Credit Parties' Ordinary Course of Business from the sale of goods or performance of services by the Credit Parties, which delivery of goods has occurred or performance of services have been fully performed;

(ii)	payment for the sale has been made in full by the Customer at the time of the sale, and such sale is not subject to any chargeback, credit, setoff, allowance, adjustment, repurchase or return agreement or obligation of any kind;

(iii)	the Customer on the sale is not a Subsidiary or a director, officer, employee, agent, parent or Affiliate of any Credit Party; and

5

(iv)   the Receipts from the sale are subject to a perfected, first priority and/or pari passu first priority Lien in favor of Lender and not subject to any Lien whatsoever, other than the Lien of Lender and except for Permitted Liens.

(B)   all Accounts of the Credit Parties which meet each of the criteria set forth below (an Account that fails to meet the criteria below can still be deemed an Eligible Account, in Lender's sole discretion):

(i)   are genuine in all respects and have arisen in the Credit Parties' Ordinary Course of Business from the sale of goods or performance of services by the Credit Parties, which delivery of goods has occurred or performance of services have been fully performed;

(ii)   are evidenced by an invoice delivered to the Customer obligated under such Account, are due and payable within thirty (30) days after the date of the invoice, and are not more than ninety (90) days outstanding past the invoice date;

(iii)   do not arise from a "sale on approval", "sale or return", "consignment", "guaranteed sale" or "bill and hold", or are subject to any other repurchase or return agreement;

(iv)   have not arisen in connection with a sale to a Customer obligated under such Account who is not a resident or citizen of, or an entity organized in, and is principally located within, the United States of America;

(v)   are not due from a Customer obligated under such Account which is a Subsidiary or a director, officer, employee, agent, parent or Affiliate of any Credit Party;

(vi)   do not arise out of contracts with the United States or any Governmental Authority thereof, unless a Credit Party has assigned its right to payment of such Account to Lender pursuant to the Federal Assignment of Claims Act of 1940 (or analogous statute), and evidence (satisfactory to Lender) of such assignment has been delivered to Lender;

(vii)   do not arise in connection with a sale to a Customer obligated under such Account who is located within a state or jurisdiction which requires any Credit Party, as a precondition to commencing or maintaining an action in the courts of that state or jurisdiction, either to: (A) receive a certificate of authority to do business and be in good standing in such state or jurisdiction; or (B) file a notice of business activities or similar report with such state's or jurisdiction's taxing authority, unless: (I) the applicable Credit Party has taken one of the actions described in clauses (A) or (B); (II) the failure to take one of the actions described in either clause (A) or (B) may be cured retroactively by the applicable Credit Party at its election; or (III) the applicable Credit Party has proven to the satisfaction of Lender that it is exempt from any such requirements under such state's or jurisdiction's laws;

(viii)        do not arise out of a contract or order which, by its terms, forbids or makes void or unenforceable the assignment to Lender of the Account arising with respect thereto and are not assignable to Lender for any other reason;

(ix)    are the valid, legally enforceable and unconditional obligation of the Customer obligated under such Account, are not the subject of any setoff, counterclaim, credit, allowance or adjustment by the Customer obligated under such Account, or of any claim by the Customer obligated under such Account denying liability thereunder in whole or in part, and the Customer obligated under such Account has not refused to accept and/or has not returned or offered to return any of the goods or services which are the subject of such Account;

(x)    are subject to a perfected, first priority Lien and/or pari passu first priority lien  in favor of Lender and not subject to any Lien whatsoever, other than the Lien of Lender and except for Permitted Liens;

(xi)    no Proceedings are pending or threatened against the Customer obligated under such Account which might result in any material adverse change in its financial condition or in its ability to pay any Account in full;

(xii)    if the Account is evidenced by chattel paper or an instrument, the originals of such chattel paper or instrument shall have been endorsed and/or assigned and delivered to Lender or, in the case of electronic chattel paper, shall be in the control of Lender, in each case in a manner satisfactory to Lender; and

(xiii)        there is no bankruptcy, insolvency or liquidation Proceeding pending by or against the Customer obligated under such Account, nor has the Customer obligated under such Account gone out of or suspended business, made a general assignment for the benefit of creditors or failed to pay its debts generally as they come due, and/or no condition or event has occurred having a Material Adverse Effect on the Customer obligated under such Account which would require the Accounts of such Customer to be deemed uncollectible in accordance with GAAP.

A sale or Account which is an Eligible Account shall cease to be an Eligible Account whenever it ceases to meet any one of the foregoing requirements. In addition, any sale or Account that otherwise meets each of the criteria above for an Eligible Account, may nonetheless be deemed not to be an Eligible Account, or may be deemed as an Eligible Account for a discounted value, all in Lender's sole and absolute discretion.

If Accounts representing Fifty Percent (50%) or more of the unpaid net amount of all Accounts from any one Customer fail to qualify as Eligible Accounts, including because such Accounts are unpaid more than ninety (90) days after the due date of such Accounts, then all Accounts relating to such Customer shall cease to be Eligible Accounts.  If Accounts owed by a single Customer exceed Fifty Percent (50%) of all Eligible Accounts, then all Accounts relating to such Customer in excess of such amount shall cease to be Eligible Accounts.

(jj)　　　　　"**Employee Plan**" includes any pension, stock bonus, employee stock ownership plan, retirement, disability, medical or other health plan, life insurance or other death benefit plan, profit sharing, deferred compensation, stock option, bonus or other incentive plan, vacation benefit plan, severance plan or other employee benefit plan or arrangement, including, without limitation, those pension, profit-sharing and retirement plans of the Credit Parties described from time to time in the consolidated financial statements of the Credit Parties and any pension plan, welfare plan, Defined Benefit Pension Plans (as defined in ERISA) or any multi-employer plan, maintained or administered by the Credit Parties or to which is the Credit Parties are a party or may have any liability or by which the Credit Parties are bound.

(kk)　　　　　"**Environmental Laws**" shall mean all federal, state, district, local and foreign laws, rules, regulations, ordinances, and consent decrees relating to health, safety, hazardous substances, pollution and environmental matters, as now or at any time hereafter in effect, applicable to the Credit Parties' business or facilities owned or operated by the Credit Parties, including laws relating to emissions, discharges, releases or threatened releases of pollutants, contamination, chemicals, or hazardous, toxic or dangerous substances, materials or wastes in the environment (including ambient air, surface water, land surface or subsurface strata) or otherwise relating to the generation, manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials.

(ll)　　　　　"**Equity Interests**" of any person shall mean any and all shares, interests, rights to purchase, warrants, options, participation or other equivalents of or interests in (however designated) equity of such person, including any preferred stock, any limited or general partnership interest and any limited liability company membership interest.

(mm)　　　　　"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.

(nn)　　　　　"**Estimated Over-advance Payment**" shall have the meaning given to it in Section 2.1(d)(i) hereof.

(oo)　　　　　"**Event of Default**" shall mean any of the events or conditions set forth in Section 12 hereof.

(pp)　　　　　"**Final DIP Order**" shall mean an order of the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms hereof) in form and substance reasonably satisfactory to the Lender (but in any event containing the Remedies Provision), approving, on a final basis, the Loan Documents and the transactions contemplated thereby and providing the Lender and the other Lender Indemnitees with customary releases acceptable to the Lender.

(qq)　　　　　"**Financial Statements**" shall have the meaning given to it in Section 7.10 hereof.

(rr)　　　　　"**Financing Order**" means the Interim DIP Order, the Final DIP Order, or any the order of the Bankruptcy Court, in form and substance acceptable to the Lender, entered after proper notice (a) authorizing the Borrower to use its available cash in accordance with the Budget, (b) granting the Lender adequate protection, (c) authorizing the Borrower to

8

borrow funds pursuant to this Agreement and the Loan Documents, (d) granting to the Lender the Liens and priorities provided for herein, and (e) affording related relief.

(ss)     "**Funded Indebtedness**" shall mean, as to any Person, without duplication: (i) all indebtedness for borrowed money of such Person (including principal, interest and, if not paid when due, fees and charges), whether or not evidenced by bonds, debentures, notes or similar instruments; (ii) all obligations to pay the deferred purchase price of property or services; (iii) all obligations, contingent or otherwise, with respect to the maximum face amount of all letters of credit (whether or not drawn), bankers' acceptances and similar obligations issued for the account of such Person (including the Letters of Credit), and all unpaid drawings in respect of such letters of credit, bankers' acceptances and similar obligations; and (iv) all indebtedness secured by any Lien on any property owned by such Person, whether or not such indebtedness has been assumed by such Person (provided, however, if such Person has not assumed or otherwise become liable in respect of such indebtedness, such indebtedness shall be deemed to be in an amount equal to the fair market value of the property subject to such Lien at the time of determination). Notwithstanding the foregoing, Funded Indebtedness shall not include trade payables and accrued expenses incurred by such Person in accordance with customary practices and in the Ordinary Course of Business of such Person.

(tt)     "**GAAP**" shall mean United States generally accepted accounting principles set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the U.S. accounting profession), which are applicable to the circumstances as of the date of determination; provided, however, that interim financial statements or reports shall be deemed in compliance with GAAP despite the absence of footnotes and fiscal year-end adjustments as required by GAAP.

(uu)     "**Governmental Authority**" means any foreign, federal, state or local government, or any political subdivision thereof, or any court, agency or other body, organization, group, stock market or exchange exercising any executive, legislative, judicial, quasi-judicial, regulatory or administrative function of government.

(vv)     "**Guarantor**" and "**Guarantors**" shall have the meaning given to it in the preamble hereof.  If a Guarantor is an individual, then the term "**Guarantors**" shall also include such individual's spouse, if any.

(ww)     "**Guaranty Agreement(s)**" shall mean any guaranty agreement executed by a Guarantor in favor of the Lender, pursuant to which such Guarantor shall guarantee all of the Obligations of the Borrower, the form of which is attached hereto as **Exhibit "B".**

(xx)     "**Hazardous Materials**" shall mean any hazardous, toxic or dangerous substance, materials and wastes, including hydrocarbons (including naturally occurring or man-made petroleum and hydrocarbons), flammable explosives, asbestos, urea formaldehyde insulation, radioactive materials, biological substances, polychlorinated biphenyls, pesticides, herbicides and any other kind and/or type of pollutants or contaminants (including, without limitation, materials which include hazardous constituents), sewage, sludge, industrial slag,

solvents and/or any other similar substances, materials or wastes that are or become regulated under any Environmental Law (including any that are or become classified as hazardous or toxic under any Environmental Law).

(yy)        "**Income Projections**" shall have the meaning given to it in Section 10.8 hereof.

(zz)        "**Insurance Policies**" shall have the meaning given to it in Section 7.23 hereof.

(aaa)        "**Interim DIP Order**" shall mean an order of the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms hereof) in the form set forth as Exhibit "H", with changes to such form as are reasonably satisfactory to the Lenders in its sole discretion (but in any event containing the Remedies Provision), approving the Loan Documents and the transactions contemplated thereby on an interim basis.

(bbb)        "**Interest Rate**" shall mean a fixed rate of interest equal to Fourteen percent (14%) per annum, calculated on the actual number of days elapsed over a 360-day year.

(ccc)        "**IP Rights**" shall have the meaning given to it in Section 7.21 hereof.

(ddd)        "**Lender**" shall have the meaning given to it in the preamble hereof.

(eee)        "**Lender Indemnitee(s)**" shall have the meaning given to it in Section 14.20 hereof.

(fff)        "**License Agreements**" shall have the meaning given to it in Section 7.21 hereof.

(ggg)        "**Lien**" shall mean, with respect to any Person, any mortgage, pledge, hypothecation, judgment lien or similar legal process, title retention lien, or other lien, security interest or encumbrance of any nature or kind granted by such Person or arising by judicial process or otherwise, including the interest of a vendor under any conditional sale or other title retention agreement and the interest of a lessor under a lease of any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, by such Person as lessee that is, or should be, a Capital Lease on the balance sheet of such Person prepared in accordance with GAAP.

(hhh)        "**Loan**" or "**Loans**" shall mean the aggregate of all Revolving Loans made by Lender to Borrower under and pursuant to this Agreement.

(iii)        "**Loan Documents**" shall mean those documents listed in Sections 3.1, 3.9 and 3.10 hereof, and any other documents or instruments executed in connection with this

Agreement or the Revolving Loans contemplated hereby, and all renewals, extensions, future advances, written modifications, substitutions, or replacements thereof.

(jjj)  "**Material Adverse Effect**" shall mean: (i) a material adverse change in, or a material adverse effect upon, the assets, business, prospects, properties, financial condition or results of operations of any Credit Party; (ii) a material impairment of the ability of any Credit Party to perform any of its Obligations under any of the Loan Documents; or (iii) a material adverse effect on: (A) any material portion of the Collateral; (B) the legality, validity, binding effect or enforceability against any Credit Party of any of the Loan Documents; (C) the perfection or priority (subject to Permitted Liens) of any Lien granted to Lender under any Loan Document; (D) the rights or remedies of Lender under any Loan Document; or (E) the Lender's ability to sell, without limitation or restriction, if applicable, any hereunder or any shares issued to the Lender upon a conversion pursuant to the Revolving Note.  For purposes of determining whether any of the foregoing changes, effects, impairments, or other events have occurred, such determination shall be made by Lender, in its sole and absolute discretion.

(kkk)  "**Material Contract**" shall mean any contract or agreement to which any Credit Party is a party or by which any Credit Party or any of its assets are bound and which: (i) involves aggregate payments of Twenty-Five Thousand and No/100 United States Dollars (US$25,000.00) or more to or from any Credit Party; (ii) involves delivery, purchase, licensing or provision, by or to any Credit Party, of any goods, services, assets or other items having a value (or potential value) over the term of such contract or agreement of Twenty-Five Thousand and No/100 United States Dollars (US$25,000.00) or more or is otherwise material to the conduct of the Credit Party's business as now conducted and as contemplated to be conducted in the future; (iii) involves a Credit Party Lease; (iv) imposes any guaranty, surety or indemnification obligations on any Credit Party; or (v) prohibits any Credit Party from engaging in any business or competing anywhere in the world.

(lll)  "**Material PPC**" shall have the meaning given to it in Section 2.1(e)(ii)(3).

(mmm)  "**Material Shareholder**" shall have the meaning given to it in Section 7.31 hereof.

(nnn)  "**Net Amount**" shall have the meaning given to it in Section 2.1(e) hereof.

(ooo)  "**Non-Material PPC**" shall have the meaning given to it in Section 2.1(e)(ii)(3).

(ppp)  "**Obligations**" shall mean, whether now existing or hereafter arising, created or incurred: (i) all Revolving Loans, advances (whether of principal or otherwise) and other financial accommodations (whether primary, contingent or otherwise) made by Lender to Borrower under any Loan Documents; (ii) all interest accrued thereon (including interest which would be payable as post-petition in connection with any bankruptcy or similar Proceeding, whether or not permitted as a claim thereunder); (iii) any and all fees, charges or other amounts due to Lender under this Agreement or the other Loan Documents; (iv) any and all expenses

incurred by Lender under, or in connection with, this Agreement or the other Loan Documents; (v) any and all other liabilities and obligations of any of the Credit Parties to Lender under this Agreement and any other Loan Documents; (vi) the performance by the Credit Parties of all covenants, agreements and obligations of every nature and kind on the part of any of the Credit Parties to be performed under this Agreement and any other Loan Documents, and (v) "Obligations" as defined in the Purchase Agreement.

(qqq)    "**OFAC**" shall have the meaning given to it in <u>Section 14.23</u> hereof

(rrr)    "**Ordinary Course of Business**" means the Ordinary Course of Business of the Person in question consistent with past custom and practice (including with respect to quantity, quality and frequency).

(sss)    "**Over-advance**" shall have the meaning given to it in <u>Section 2.1(d)(i)</u> hereof.

(ttt)    "**Payment Date**" shall have the meaning given to it in <u>Section 2.1(c)</u> hereof.

(uuu)    "**Payment Direction**" shall have the meaning given to it in <u>Section 2.1(e)(ii)(3)</u> hereof.

(vvv)    "**Payment Processing Companies**" shall have the meaning given to it in <u>Section 2.1(e)(ii)(3)</u> hereof.

(www)    "**Permitted Liens**" shall mean: (i) Liens for Taxes, assessments or other governmental charges not at the time delinquent or thereafter payable without penalty or being contested in good faith by appropriate proceedings and, in each case, for which adequate reserves are maintained in accordance with GAAP and in respect of which no Lien has been filed; (ii) Liens of carriers, warehousemen, mechanics and materialmen arising in the Ordinary Course of Business; (iii) Liens in the form of deposits or pledges incurred in connection with worker's compensation, unemployment compensation and other types of Social Security (excluding Liens arising under ERISA or in connection with surety bonds, bids, performance bonds and similar obligations) for sums not overdue or being contested in good faith by appropriate Proceedings and not involving any advances or borrowed money or the deferred purchase price of property or services, which do not in the aggregate materially detract from the value of the property or assets of the Credit Parties taken as a whole or materially impair the use thereof in the operation of the Credit Parties' business and, in each case, for which adequate reserves are maintained in accordance with GAAP and in respect of which no Lien has been filed; (iv) Liens described in the Financial Statements and acceptable to Lender in its sole and absolute discretion, and the replacement, extension or renewal of any such Lien upon or in the same property subject thereto arising out of the extension, renewal or replacement of the indebtedness secured thereby (without increase in the amount thereof and without expansion of such Liens upon any other property); (v) attachments, appeal bonds, judgments and other similar Liens, for sums not exceeding Fifty Thousand and No/100 United States Dollars (US$50,000.00) arising in connection with court Proceedings, <u>provided</u> the execution or other enforcement of such Liens is effectively stayed and

12

the claims secured thereby are being actively contested in good faith and by appropriate Proceedings, and only to the extent such judgments or awards do not otherwise constitute an Event of Default; (vi) zoning and similar restrictions on the use of property and easements, rights of way, restrictions, minor defects or irregularities in title and other similar Liens not interfering in any material respect with the ordinary conduct of the business of the Credit Parties; (vii) Liens arising in connection with Capital Leases (and attaching only to the property being leased); (viii) Liens that constitute purchase money security interests on any property securing indebtedness incurred for the purpose of financing all or any part of the cost of acquiring such property, <u>provided</u> that any such Lien attaches to such property within sixty (60) days of the acquisition thereof and attaches solely to the property so acquired; (ix) Liens granted to Lender hereunder and under the Loan Documents; (x) any interest or title of a lessor, sublessor, licensor or sublicensor under any lease or non-exclusive license permitted by this Agreement; (xi) Liens arising from precautionary UCC financing statements filed under any lease permitted by this Agreement; (xii) banker's Liens and rights of set-off of financial institutions arising in connection with items deposited in accounts maintained at such financial institutions and subsequently unpaid and unpaid fees and expenses that are charged to the Credit Parties by such financial institutions in the Ordinary Course of Business of the maintenance and operation of such accounts, and (xii) Liens which arose in pursuant to any "Transaction Documents" as defined in the Purchase Agreement.

(xxx)     "**Permit**" means any license, permit, approval, waiver, order, authorization, right or privilege of any nature whatsoever, granted, issued, approved or allowed by any Governmental Authority.

(yyy)     "**Person**" shall mean any individual, partnership, limited liability company, limited liability partnership, corporation, trust, joint venture, joint stock company, association, unincorporated organization, government or agency or political subdivision thereof, or other entity.

(zzz)     "**Petition Date**" shall have the meaning specified in the recitals hereof.

(aaaa)     "**Pledged Companies**" initially, shall mean the Corporate Guarantors.

(bbbb)     "**Pledgors**" initially, shall mean the Borrower.

(cccc)     "**Point-of-Sale Transactions**" means any sale transactions by any Credit Parties whereby the purchase price for the sale transaction is paid in full by the Customer at the time of the sale transaction.

(dddd)     "**Portals**" shall have the meaning given to it in <u>Section 2.1(e)(ii)(3)</u> hereof.

(eeee)     "**Prepayment Penalty**" shall have the meaning given to it in <u>Section 2.1(d)(ii)</u> hereof.

(ffff)     "**Principal Trading Market**" shall mean the Nasdaq Global Select Market, the Nasdaq Global Market, the Nasdaq Capital Market, the OTCQX, the OTCQB,

the OTC Pink, the NYSE Euronext or the New York Stock Exchange, whichever is at the time the principal trading exchange or market for the Common Stock.

(gggg) "**Proceeding**" means any demand, claim, suit, action, litigation, investigation, audit, study, arbitration, administrative hearing, or any other proceeding of any nature whatsoever.

(hhhh) "**Public Documents**" shall have the meaning given to it in <u>Section 7.11</u> hereof.

(iiii) "**Purchase Agreement**" means that certain Securities Purchase Agreement, dated as of December 24, 2018, among the Borrower, the Corporate Guarantors, certain personal guarantors, and TCA Global Credit Master Fund LP, a Cayman Islands limited partnership, as amended, restated or supplemented from time to time.

(jjjj) "**Real Property**" means any real estate, land, building, structure, improvement, fixture or other real property of any nature whatsoever, including, but not limited to, fee and leasehold interests, and specifically including the real property listed on **Schedule 7.18**.

(kkkk) "**Receipts**" shall mean all revenues, receipts, receivables, Accounts, collections or any other funds at any time received or receivable by the Credit Parties, or otherwise owing to the Credit Parties, in connection with its sales, business, operations or from any other source.

(llll) "**Remedies Notice Period**" shall mean the period commencing on the date a Termination Declaration is delivered pursuant to Section 13(a) and ending on the date that is five (5) Business Days thereafter.

(mmmm) "**Remedies Provision**" shall mean a provision of the relevant Financing Order that provides:

(i) the automatic stay in the Case otherwise applicable to the Lender shall be modified so that, immediately after the Remedies Notice Period, the Lender may exercise all rights and remedies in accordance with the Loan Documents, including without limitation, exercising rights of setoff or foreclosing on all or a portion of the Collateral, occupying the Credit Parties' premises, or a sale or disposition of the Collateral, and shall be permitted to satisfy the relevant Obligations, the Lender's Superpriority Claim and Lien on the Collateral;

(ii) during the Remedies Notice Period, the only basis on which the Borrower and/or the Creditors' Committee (if appointed) shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Bankruptcy Court shall be to contest whether an Event of Default has occurred and/or is continuing and the Lender shall consent to such emergency hearing;

(iii) unless during the Remedies Notice Period, the Bankruptcy Court determines that an Event of Default has not occurred, or the Borrower cure the Event of Default (to the extent curable under the Loan Documents) that was the

14

basis for the delivery of a Termination Declaration in accordance with the Loan Documents and the Financing Orders, the automatic stay imposed under Section 105 or 362(a) of the Bankruptcy Code or otherwise, as to the Lender, shall automatically be terminated at the end of the Remedies Notice Period without further notice or order; and

(iv)        upon expiration of the Remedies Notice Period, the Lender shall be permitted to exercise all remedies set forth herein, in the Loan Documents, and as otherwise available at law without further order of or application or motion to the Bankruptcy Court.

(nnnn)        "**Revolving Loan**" and "**Revolving Loans**" shall mean, respectively, each advance, and the aggregate of all such advances, made by Lender to Borrower under and pursuant to this Agreement or any other Loan Documents.  Any Net Amount distributed or transferred to Borrower in accordance with this Agreement shall be deemed a Revolving Loan hereunder.

(oooo)        "**Revolving Loan Availability**" shall mean at any time, the lesser of: (i) the then applicable Revolving Loan Commitment; or (ii) the Borrowing Base Amount; provided that the Parties hereby agree that as of the Effective Date the Revolving Loan Availability shall be no more than the "Initial Loan Amount" set forth in that certain Closing Statement, dated as of Effective Date among the Borrower and the Lender.

(pppp)        "**Revolving Loan Commitment**" shall mean, on the Effective Date, One Million Seven Hundred Thousand and No/100 United States Dollars (US$1,700,000.00), and in the event Borrower requests and Lender agrees to increase the Revolving Loan Commitment pursuant to Section 2.1(b), thereafter, shall mean the amount to which Lender agrees to increase the Revolving Loan Commitment, up to Five Million and No/100 United States Dollars (US$5,000,000.00), all as applicable pursuant to Section 2.1(b).

(qqqq)        "**Revolving Loan Maturity Date**" shall mean the earlier of: (i) twelve (12) months from the Effective Date; (ii) upon prepayment of the Revolving Note by Borrower (subject to Section 2.1(d)(ii)); or (iii) the occurrence of an Event of Default and acceleration of the Revolving Note pursuant to this Agreement, unless the date in clause (i) shall be extended pursuant to Section 2.3 or by Lender pursuant to any modification, extension or renewal note executed by Borrower and accepted by Lender in its sole and absolute discretion in substitution for the Revolving Note.

(rrrr)        "**Revolving Note**" shall mean that certain Revolving Note in the principal amount of the Revolving Loan Commitment of even date herewith made by Borrower in favor of Lender, the form of which is attached hereto as **Exhibit "D"**, and any renewal, extension, future advance, modification, substitution, or replacement thereof.

(ssss)        "**SEC**" shall mean the United States Securities and Exchange Commission.

(tttt)        "**Securities Act**" shall mean the Securities Act of 1933, as amended.

(uuuu)        "**Security Agreement(s)**" shall mean the security agreements executed by the Credit Parties in favor of Lender, pursuant to which each of the Credit Parties grant a first priority lien and security interest in and to all of their respective Collateral as security for the Obligations, the form of which is attached hereto as **Exhibit "E-1"** and **Exhibit "E-2"**.

(vvvv)        "**Segregated Account**" shall mean an account with the account number of _____, maintained at the Segregated Account Depository.

(wwww)        "**Segregated Account Depository**" shall mean [BANK].

(xxxx)        "**Subsidiary**" and "**Subsidiaries**" shall mean, respectively, each and all such corporations, partnerships, limited partnerships, limited liability companies, limited liability partnerships or other entities of which or in which a Person owns, directly or indirectly, fifty percent (50%) or more of: (i) the combined voting power of all classes of stock having general voting power under ordinary circumstances to elect a majority of the board of directors of such entity if a corporation; (ii) the management authority and capital interest or profits interest of such entity, if a partnership, limited partnership, limited liability company, limited liability partnership, joint venture or similar entity; or (iii) the beneficial interest of such entity, if a trust, association or other unincorporated organization.

(yyyy)        "**Superpriority Claim**" means a claim against the Debtor in the Case which is an administrative expenses claim having priority over any or all administrative expenses of the kind that are specified in, or contemplated by, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code.

(zzzz)        "**UCC**" shall mean the Uniform Commercial Code in effect in Wyoming from time to time.

(aaaaa)        "**Unpermitted Variance**" shall mean actual amounts for aggregate (a) receipts and (b) disbursements, varying negatively (from the perspective of the Borrowers' business) from such respective categories in the Budget for each of the following, without duplication: (i) with respect to receipts, by more than 10% for any Variance Period and (ii) with respect to disbursements (excluding fees, costs and expenses of Case Professionals), by more than 10% for any Variance Period.

(bbbbb)        "**Use of Proceeds Confirmation**" shall have the meaning given to it in Section 9.8 hereof.

(ccccc)        "**Validity Certificates**" shall mean the Validity Certificates executed by certain officers and directors of the Borrower, the form of which is attached hereto as **Exhibit "F"**.

(ddddd)        "**Variance Period**" means as of the last day of any full calendar week covered in the applicable Budget (commencing with the first Business Day of the second full week after the Petition Date), the period then ended measured from the first day of the first full calendar week covered in such Budget; provided that such period shall in no event exceed the four calendar week period ending with the week then ended.

16

(eeeee) "**Weekly Draw**" shall have the meaning set forth in Section 2.19(e)(i).

(fffff) "**Weekly Draw Request**" shall mean a certificate of the Chief Financial Officer of the Borrower substantially in the form of Exhibit "I" to this Agreement, which such certificate shall: (a) confirm compliance as of the proposed date of such Weekly Draw with the conditions set forth in Sections 9.12(a) through (g) specify the following information:

(i) the aggregate amount of the requested Weekly Draw (expressed in Dollars);

(ii) the date of such Weekly Draw, which shall be a Business Day;

(iii) the aggregate amount of cash in the Credit Parties' accounts after giving effect to such Weekly Draw; and

(iv) the location and number of the account to which funds are to be disbursed.

1.2    _Accounting Terms_.  Any accounting terms used in this Agreement which are not specifically defined herein shall have the meanings customarily given them in accordance with GAAP.  Calculations and determinations of financial and accounting terms used and not otherwise specifically defined hereunder and the preparation of financial statements to be furnished to Lender pursuant hereto shall be made and prepared, both as to classification of items and as to amount, in accordance with GAAP as used in the preparation of the financial statements of the Credit Parties on the date of this Agreement.  If any changes in accounting principles or practices from those used in the preparation of the financial statements are hereafter occasioned by the promulgation of rules, regulations, pronouncements and opinions by or required by the Financial Accounting Standards Board or the American Institute of Certified Public Accountants (or any successor thereto or agencies with similar functions), which results in a material change in the method of accounting in the financial statements required to be furnished to Lender hereunder or in the calculation of financial covenants, standards or terms contained in this Agreement, the parties hereto agree to enter into good faith negotiations to amend such provisions so as equitably to reflect such changes to the end that the criteria for evaluating the financial condition and performance of the Credit Parties will be the same after such changes as they were before such changes; and if the parties fail to agree on the amendment of such provisions, the Credit Parties will furnish financial statements in accordance with such changes but shall provide calculations for all financial covenants, perform all financial covenants and otherwise observe all financial standards and terms in accordance with applicable accounting principles and practices in effect immediately prior to such changes.  Calculations with respect to financial covenants required to be stated in accordance with applicable accounting principles and practices in effect immediately prior to such changes shall be reviewed and certified by the accountants of the Credit Parties.

1.3     Other Terms Defined in UCC.  All other words and phrases used herein and not otherwise specifically defined shall have the respective meanings assigned to such terms in the UCC, as amended from time to time, to the extent the same are used or defined therein.

1.4     Other Definitional Provisions; Construction.  Whenever the context so requires, the neuter gender includes the masculine and feminine, the single number includes the plural, and vice versa.  In addition: (i) the words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and references to Article, Section, Subsection, Annex, Schedule, Exhibit and like references are references to this Agreement unless otherwise specified; (ii) wherever the word "include," "includes" or "including" is used in this Agreement, it will be deemed to be followed by the words "without limitation;" (iii) an Event of Default shall "continue" or be "continuing" until such Event of Default has been cured in Lender's sole and absolute discretion, or waived by Lender in accordance with Section 14.3 hereof; (iv) any reference to the Credit Parties shall mean and refer to all the Credit Parties, collectively, and to each Credit Party, individually, and accordingly, each representation, warranty, covenant, obligation or other agreement, term or provision in this Agreement or any other Loan Documents, to the extent applicable to the Credit Parties, shall be deemed to be applicable and effective as to all Credit Parties, collectively, and to each Credit Party, individually, as the context may so require, regardless of the gender, singular, plural, or other tense used in the applicable provision; (v) references in this Agreement to any party shall include such party's successors and permitted assigns; and (vi) references to any "Section" shall be a reference to such Section of this Agreement unless otherwise stated.  To the extent any of the provisions of the other Loan Documents are inconsistent with the terms of this Agreement, the provisions of this Agreement shall govern.

1.5     Orders Control.  In the event of any discrepancy between the Interim DIP Order or, when entered, the Final DIP Order, as applicable, and any of the Loan Documents, the Interim DIP Order and, when entered, the Final DIP Order, shall control.

1.6     Provisions of Import. This Agreement is a commercial lending and financial services agreement and pre-supposes that the Borrower and each of the Credit Parties are sophisticated commercial entities, together with their principals, officers, and beneficiaries. Each provision of this Agreement is subject to negotiation because each provision represents a monetary value. All provisions should be read and understood, and special attention should be paid to those provisions in bold or all-caps.

## 2.     REVOLVING LOAN FACILITY.

2.1     Revolving Loan.

(a)          Revolving Loan Commitment.  Subject to the terms and conditions of this Agreement and the other Loan Documents, and in reliance upon the representations and warranties set forth herein and in the other Loan Documents, Lender agrees to make Revolving Loans to the Borrower from time to time, pursuant to the terms of this Agreement,

until, but not including, the Revolving Loan Maturity Date, and in such amounts as Lender may determine  from time to time up to the Revolving Loan Availability (and subject at all times to the amounts available to be borrowed in accordance with the Borrowing Base Certificate); provided, however, that the aggregate principal balance of all Revolving Loans outstanding at any time shall not exceed the Revolving Loan Availability; and further provided, however, that, notwithstanding anything contained in this Agreement or any other Loan Documents to the contrary, each Revolving Loan under this Agreement (including any Net Amount to be distributed hereunder) shall be subject to Lender's approval, which approval may be given or withheld in Lender's sole and absolute discretion.  Revolving Loans made by Lender may be repaid and, subject to the terms and conditions hereof, borrowed again up to, but not including, the Revolving Loan Maturity Date, unless the Revolving Loans are otherwise terminated or extended as provided in this Agreement. The Revolving Loans shall be used by the Borrower for the specific purposes permitted hereunder and for no other purpose.

(b)        Increase to Revolving Loan Commitment.  Borrower may request, from time to time, that the Revolving Loan Commitment be increased to up to Five Million and No/100 United States Dollars (US$5,000,000); and Lender, in its sole and absolute discretion, may make available Revolving Loan Commitment increases to Borrower.  Lender's election to increase the Revolving Loan Commitment from time to time may be granted or denied by Lender in its sole and absolute discretion, however, at a minimum, the following conditions must be satisfied, in Lender's sole and absolute discretion:

(i)        no Event of Default shall have occurred or be continuing, or result from the applicable increase of the Revolving Loan Commitment;

(ii)        Borrower shall have executed and delivered a new or revised Revolving Note;

(iii)        after giving effect to such increase, the amount of the aggregate outstanding principal balance of all Revolving Loans shall not be in excess of the Revolving Loan Availability;

(iv)        Lender shall have reviewed and accepted, in its sole and absolute discretion, the amount and type of current and historical Receipts of the Credit Parties, Eligible Accounts or other Collateral required for the increase; and

(v)        Lender shall have received any and all documents or agreements as it shall require in its sole and absolute discretion.

It is expressly agreed and acknowledged by each of the Credit Parties that, notwithstanding that this Agreement provides for the opportunity to increase the Revolving Loan Commitment as hereby provided: (i) Lender has no obligation of any nature or kind whatsoever to grant or provide any such increase to the Credit Parties; (ii) the Credit Parties did not enter into this Agreement based on any promise, express or implied, by Lender or any of its agents or representatives, or based on any expectation by any of the Credit Parties, that funds or Loans beyond the Revolving Loans made on the Effective Date would be made or provided after the Effective Date; and (iii) each of the Credit Parties hereby fully and unconditionally waives any

and all claims, counterclaims, and defenses any of them may have based on any argument that Lender had any obligation or otherwise promised to fund additional Revolving Loans beyond the Revolving Loan funded on the Effective Date, or any argument or implied covenant of fair dealing and good faith that may in any way imply an obligation upon Lender to make such additional Revolving Loans.

(c)     <u>Revolving Loan Interest and Payments</u>.  Except as otherwise provided in this Section, the outstanding principal balance of the Revolving Loans and all other Obligations shall be repaid on or before the Revolving Loan Maturity Date.  The principal amount of the Revolving Loans outstanding from time to time shall bear interest at the Interest Rate.  Accrued and unpaid interest on the unpaid principal balance of all Revolving Loans outstanding from time to time, and other fees and charges due hereunder, shall be payable on a monthly basis in each month on the date that is the same calendar day as the Effective Date (except where the Effective Date is the last date of the month, in which case such amounts shall be payable on the last day of each month), or such other date as Lender and Borrower may agree upon (commencing on the first such date to occur in the fifth month after the Effective Date) and on the Revolving Loan Maturity Date (each a "**Payment Date**").  Any amount of principal or interest on the Obligations which is not paid when due, whether at stated maturity, by acceleration or otherwise, shall at Lender's option bear interest payable on demand at the Default Rate.

(d)     <u>Revolving Loan Principal Repayments</u>.

(i)     <u>Mandatory Principal Prepayments; Over-advances</u>.  Notwithstanding the following, all Obligations shall be repaid by Borrower on or before the Revolving Loan Maturity Date, unless payable sooner pursuant to the provisions of this Agreement.  In the event at any time the aggregate outstanding principal balance of all Revolving Loans hereunder exceeds the Revolving Loan Availability (an "**Over-advance**"), Borrower shall be obligated to eliminate such Over-advance as follows: (A) if the Over-advance exists as of the Effective Date, then: (I) Lender shall determine the amount of the Over-advance, as well as the estimated amount of a payment ("**Estimated Over-advance Payment**") to be made by Borrower on each Payment Date (or such other time period as Lender may determine, such as a monthly payment) to be applied against the principal balance of the outstanding Revolving Loans, such that the Over-advance would be eliminated over a one hundred twenty (120) day period from the Effective Date (Lender shall have the right to modify the amount of the Estimated Over-advance Payment from time to time upon notice to Borrower as necessary to cause the elimination of the Over-advance over the one hundred twenty (120) day period contemplated hereby); and (II) Lender shall notify the Borrower of the amount of the Estimated Over-advance Payment, and on each Payment Date (or such other time period selected by Lender), Borrower shall make the Estimated Over-advance Payment to Lender, or, at Lender's election, notwithstanding the priorities set forth in Section 2.1(e)(iii); or (B) if an Over-advance should occur after the Effective Date and during the term of this Agreement, then: (I) Lender shall determine, in its sole discretion, whether: (1) the Over-advance needs to be paid immediately; or (2) the Over-advance can be cured during a period of time as determined by Lender, in its sole discretion, and if so, what other conditions Lender may impose in connection with such cure period.  If Lender elects option (1), then Borrower shall, upon notice or demand from Lender, immediately make such repayments of the

Revolving Loans or take such other actions as shall be necessary to immediately eliminate such Over-advance in full. If Lender elects option (2) above, then Lender shall determine the amount of the Over-advance, the cure period available to Borrower in which to eliminate the Over-advance, and any other conditions to be satisfied by Borrower in connection with the cure period selected by Lender for elimination of the Over-advance, as well as the Estimated Over-advance Payment to be made by Borrower on each Payment Date (or such other time period as Lender may determine, such as a monthly payment) to be applied against the principal balance of the outstanding Revolving Loans, such that the Over-advance would be eliminated over whatever cure period shall have been elected by Lender, in its sole discretion (Lender shall have the right to modify the amount of the Estimated Over-advance Payment from time to time upon notice to Borrower as necessary to cause the elimination of the Over-advance over the cure period selected by Lender); and (II) Lender shall notify the Borrower of the amount of the Estimated Over-advance Payment, the cure period selected by Lender during which the Over-advance must be eliminated, and any other conditions applicable thereto, and on each Payment Date (or such other time period selected by Lender), Borrower shall make the Estimated Over-advance Payment to Lender. The Credit Parties shall also satisfy whatever other conditions may be imposed by Lender as conditions to allowing the Credit Parties a cure period to eliminate the Over-advance.

(ii)     Optional Prepayments. Borrower may from time to time prepay the Revolving Loan, in whole or in part, provided, however, that if the Borrower prepays any portion of the Revolving Loan Commitment within ninety (90) days following the Effective Date, Borrower shall pay to Lender as liquidated damages and compensation for the costs of being prepared to make funds available hereunder an amount equal to five percent (5.0%) of the Revolving Loan Commitment (the "**Prepayment Penalty**").

(e)     Segregated Account; Collections.

(i)     Segregated Account; Weekly Draws.

(1)     The proceeds of each Revolving Loan shall be deposited by the Lender in the Segregated Account.

(2)     The Borrower may draw from the Segregated Account any proceeds of the Revolving Loans remaining in the Segregated Account once per week (each, a "**Weekly Draw**"), subject to compliance with Section 9.12,, and use the proceeds of such draws solely in accordance with Sections 9.8, and 9.9.

(3)     If the conditions for a Weekly Draw are satisfied, the Lender shall approve such Weekly Draw Request  two Business Days thereafter.

(ii)     Funds Collected.

(1)     Wire Transfers. To the extent any Customers make or pay any Receipts to any Credit Party by a wire transfer or other form of electronic funds transfer, effective as of the Effective Date, the Credit Parties shall direct all of such

21

Customers, in writing, to make all such wire transfer or electronic fund transfer payments directly to the Segregated Account.

(2)     Cash, Checks and Other Payments.  To the extent any Customers make or pay any Receipts to any Credit Party by any other form other than wire transfer or other form of electronic funds transfer (such as through cash or a check), then effective as of the Effective Date, the Credit Parties shall direct all of its Customers, in writing, to make, deposit, and/or send, as applicable, all such payments and Receipts directly to the Segregated Account.

(3)     Credit/Debit Card Payments.  The parties recognize that in some instances or from time to time, the Credit Parties may elect to take or receive payments from Customers through the use of a credit or debit card (including payments made using a credit or debit card, or other payment mechanisms, through online re-sellers or systems, such as PayPal, Amazon and the like).  In the event the Credit Parties shall at any time take or receive any Receipts through the use of a credit or debit card (including payments made using a credit or debit card, or other payment mechanisms, through online re-sellers or systems, such as PayPal, Amazon and the like), then effective as of the date (the "**Credit Card Date**") when the Credit Parties enter into any agreements with any credit/debit card or other payment processing companies for the processing of credit and debit card payments (including payments made using a credit or debit card, or other payment mechanisms, through online re-sellers or systems, such as PayPal, Amazon and the like) on behalf of the Credit Parties (the "**Payment Processing Companies**"), the Credit Parties shall modify all of its agreements with any such Payment Processing Companies, so as to authorize, direct and cause: (A) all credit/debit card payments from any Customers; and (B) any reserves or holdbacks withheld by any of the Payment Processing Companies, if, as, and when distributed or paid to the Credit Parties, to be deposited directly into the Segregated Account, rather than any other bank accounts of the Credit Parties.  In this regard, effective as of the Effective Date (or, if there are no agreements with any Payment Processing Companies as of the Effective Date, then effective as of the Credit Card Date), the Credit Parties shall obtain from each of the Payment Processing Companies and deliver to Lender, an estoppel certificate, disbursement direction or other similar document in form and substance acceptable to Lender (the "**Payment Direction**"), pursuant to which the Payment Processing Companies confirm and agree, among other things Lender may require: (I) to the foregoing payment directions; (II) that such payment instructions and directions shall not be changed, amended or terminated, except upon written notice from Lender; and (III) that copies of all statements, notices and other communications sent by any Payment Processing Companies to the Credit Parties, also be delivered to Lender. At any time prior to the Payment Direction being effective and in place, any Receipts received by the Credit Parties from any Payment Processing Companies shall be immediately (within twenty-four (24) hours) re-directed and deposited by Borrower into the Segregated Account; provided, however, that any such re-direction shall not diminish or abrogate the Credit Parties' obligation to obtain the Payment Direction from each of the Payment Processing Companies.  The Credit Parties shall not enter into any new agreements with any Payment Processing Companies, unless prior to or contemporaneously with entering into such relationships or agreements, such Payment Processing Companies execute a Payment Direction in favor of Lender.

Notwithstanding the foregoing to the contrary, so long as the Receipts collected by Credit Parties in any calendar year from any particular Payment Processing Company (which amount can be estimated by Lender based on Receipts collected by Credit Parties in any shorter time period as may be determined by Lender) are equal to or less than ten percent (10%) of the total Receipts collected by Credit Parties from all sources in any calendar year (which amount can be estimated by Lender based on Receipts collected by Credit Parties in any shorter time period as may be determined by Lender) (a Payment Processing Company that collects Receipts that are equal to or below the ten percent (10%) threshold as hereby contemplated is sometimes referred to as a "**Non-Material PPC**" and a Payment Processing Company that collects Receipts above the ten percent (10%) threshold as hereby contemplated is sometimes referred to as a "**Material PPC**"), then Credit Parties shall not have an obligation to deliver the Payment Direction with respect to such particular Payment Processing Company as contemplated by this Section, but only so long as: (x) no Event of Default exists under this Agreement or any other Loan Document, and provided no event has occurred that, with the passage of time, or the giving of notice, or both, would constitute an Event of Default under this Agreement or any other Loan Document; (y) Credit Parties instruct the particular Payment Processing Company to remit all credit/debit card payments from any Customers, any reserves or holdbacks withheld by such Payment Processing Company, and other Receipts, directly into the Segregated Account, rather than any accounts of the Credit Parties; and (z) to the extent that, despite the foregoing requirement to instruct such Payment Processing Company to remit all Receipts directly into the Segregated Account, any Credit Party receives any Receipts from such Payment Processing Company directly into an account of the Credit Parties, other than the Segregated Account, then Credit Parties shall notify Lender of the receipt of such Receipts or other sums within twenty-four (24) hours of receipt of same, and immediately upon receipt thereof, remit or endorse same to Lender into the Segregated Account; provided, however, that any such re-direction shall not diminish or abrogate Credit Parties' obligation to direct, instruct and require all Payment Processing Companies to make all payments and remittances otherwise due to the Credit Parties directly to the Segregated Account.  Each of the Credit Parties hereby represent and warrant to Lender that as of the Effective Date, it has no agreements or payment processing relationships with any Material PPC's.

The Lender and Credit Parties acknowledge that, in some instances, or if applicable, the mechanics of the payment processing relationships of the Credit Parties with some of its Payment Processing Companies is such that Credit Parties have portals or systems which they access online (the "**Portals**") through administrative usernames, passwords and other input details required to gain access into such Portals (the "**Access Details**"), and that once the Portals are accessed with the Access Details, the Credit Parties then, through certain user elections and options made by Credit Parties on the Portals, elect to what bank account and when funds from the Payment Processing Companies are transferred to Credit Parties. In this regard, to the extent the payment mechanics of any Payment Processing Companies use Portals and Access Details, then on the Effective Date (or, if acceptable to Lender, in Lender's sole and absolute discretion, as soon as practicably possible following the Effective Date), Credit Parties shall provide to Lender the web address for the Portals and the Access Details for each of the Payment Processing Companies, and Lender shall have the full right and authority to modify the Access Details, so that only Lender has access to the Portals and access to control all payments and remittances to and from such Payment

Processing Companies, and so that Credit Parties do not have access or authority to change or thereafter modify the elections made by Lender on the Portals (provided that Lender shall provide view/read access only to Credit Parties so Credit Parties can see, on a daily basis, the transactions processed by the Payment Processing Companies and movement of funds from the Payment Processing Companies to the Segregated Account).  Lender shall have the absolute right and authority to designate the account to which any remittances from the Payment Processing Companies are made, which account shall be the Segregated Account.  Credit Parties hereby agree to undertake any and all required actions, execute any required documents, instruments or agreements, or to otherwise do any other thing required or requested by Lender in order to effectuate the foregoing with respect to the Portals and Access Details.  Credit Parties shall not undertake any action or give any direction to any Payment Processing Companies that is in conflict with, changes, or is otherwise in derogation of the requirements and obligations of Credit Parties set forth in this paragraph. Upon indefeasible payment in full of all Obligations, and termination of all other commitments of Lender to advance sums hereunder, Lender shall provide the Access Details and control of the Portals back to the Credit Parties.

(4)     <u>General Collection Terms</u>.  The Credit Parties hereby agree to undertake any and all required actions, execute any required documents, instruments or agreements, or to otherwise do any other thing required or requested by Lender in order to effectuate the requirements of this <u>Section 2.1(e)</u>.

(iii)     <u>Rights Upon Default</u>.  Lender may, at any time and from time to time after the occurrence and during the continuance of an Event of Default, whether before or after notification to any Customer and whether before or after the maturity of any of the Obligations: (A) enforce collection of any of the Accounts (including all Eligible Accounts) and Receipts of the Credit Parties or other amounts owed to the Credit Parties by suit or otherwise; (B) exercise all of the rights and remedies of the Credit Parties with respect to Proceedings brought to collect any Accounts (including all Eligible Accounts), Receipts, or other amounts owed to the Credit Parties; (C) surrender, release or exchange all or any part of any Accounts (including all Eligible Accounts) Receipts, or other amounts owed to the Credit Parties, or compromise or extend or renew for any period (whether or not longer than the original period) any indebtedness thereunder; (D) sell or assign any Account (including all Eligible Accounts) or Receipts of the Credit Parties, or other amount owed to the Credit Parties, upon such terms, for such amount and at such time or times as Lender deems advisable; (E) prepare, file and sign any Credit Parties' name on any proof of claim in bankruptcy or other similar document against any Customer or other Person obligated to the Credit Parties; and (F) do all other acts and things which are necessary, in Lender's sole discretion, to fulfill the Credit Parties' obligations under this Agreement and the other Loan Documents and to allow Lender to collect the Accounts (including all Eligible Accounts), Receipts, or other amounts owed to the Credit Parties. In addition to any other provision hereof, Lender may at any time after the occurrence and during the continuance of an Event of Default, at the Credit Parties' expense, notify any parties obligated on any of the Accounts (including all Eligible Accounts) and Receipts to make payment directly to Lender of any amounts due or to become due thereunder.

(iv)  Statement. From time to time, Lender may deliver to Borrower an invoice and or an account statement showing all Revolving Loans, charges and payments, which shall be deemed final, binding and conclusive upon Borrower, unless Borrower notifies Lender in writing, specifying any error therein, within thirty (30) days of the date that such account statement is sent to Borrower and any such notice shall only constitute an objection to the items specifically identified.

2.2  Fees.

(a)  Asset Monitoring Fee. To compensate the Lender for expenses relating to monitoring the Collateral, the Borrower agrees to pay to Lender an asset monitoring fee (the "**Asset Monitoring Fee**") equal to One Thousand Five Hundred and No/100 United States Dollars (US$1,500.00), which shall be due and payable on the Effective Date, and thereafter on the first day of each third (3rd) calendar month during the term of this Agreement. The Asset Monitoring Fee shall be increased in increments of Five Hundred and No/100 United States Dollars (US$500.00) each time the Revolving Loan Commitment amount is increased pursuant to Section 2.1(b); provided that the Asset Monitoring Fee shall never exceed Two Thousand Five Hundred and No/100 United States Dollars (US$2,500.00).

(b)  Due Diligence Fees. To compensate the Lender's non-attorney agents for expenses relating to their research and analysis of the Credit Parties and for consideration of the Borrower's; request for financing, the Borrower agrees to pay a due diligence fee (the "**Due Diligence Fee**") equal to Fifteen Thousand and No/100 United States Dollars (US$15,000.00).

(c)  Document Review and Legal Fees. The Borrower agrees to compensate Lender's outside counsel for legal services performed in connection with this Agreement and the transactions contemplated thereby by paying document review and legal fees on an hourly basis (expected to equal approximately Ninety-Five Thousand and No/100 United States Dollars (US$95,000.00) but which in any event shall equal the actual fees incurred by Lender's counsel for legal services performed in connection with this Agreement) which shall be due and payable in full on the Effective Date, or any remaining portion thereof shall be due and payable on the Effective Date if a portion of such fee was paid upon the execution of any term sheet related to this Agreement.

(d)  Commitment Fee. Borrower agrees to pay to Lender a commitment fee equal to four percent (4.0%) of the Revolving Loan Commitment as of the Effective Date, and four percent (4.0%) on the amount of any increase thereof pursuant to Section 2.1(b), which shall be due and payable on the Effective Date and on the date of any increase to the Revolving Loan Commitment pursuant to Section 2.1(b).

(e)  Other Fees. Borrower also agrees to pay to the Lender (or any designee of the Lender), upon demand, or to otherwise be responsible for the payment of, any and all other costs, fees and expenses, including the reasonable fees, costs, expenses and disbursements of counsel for the Lender and of any experts and agents, which the Lender may incur or which may otherwise be due and payable in connection with: (i) the preparation, negotiation, execution, delivery, recordation, administration, amendment, waiver, subordination, or other modification or

25

termination of this Agreement or any other Loan Documents (provided that there shall be no fees for the preparation and negotiation of this Agreement other than as specifically set forth in the closing or settlement statement to be executed by Borrower and Lender on the Effective Date); (ii) any documentary stamp taxes, intangibles taxes, recording fees, filing fees, or other similar taxes, fees or charges imposed by or due to any Governmental Authority in connection with this Agreement or any other Loan Documents; (iii) the exercise or enforcement of any of the rights of the Lender under this Agreement or the Loan Documents; or (iv) the exercise, enforcement, or defense of any of the rights of the Lender under this Agreement or the Loan Documents including but not limited to reasonable attorneys' fees and costs at all levels of any litigation or other proceeding including but not limited to any appeals and enforcement of judgments.  Included in the foregoing shall be the amount of all fees and expenses paid or incurred by Lender in consulting with, retaining, or employing counsel, their agents, private investigators, experts, or others to opine upon, enforce, or defend any of Lender's rights or defenses under this Agreement or any other Loan Document or under applicable law. All such costs and expenses, if not so immediately paid when due or upon demand thereof, shall bear interest from the date of outlay until paid, at the Default Rate.  All of such costs and expenses shall be additional Obligations of the Credit Parties to Lender secured under the Loan Documents.  The provisions of this Subsection shall survive the termination of this Agreement.

2.3     Renewal of Revolving Loans; Non-Renewal of Revolving Loans; Fees.  So long as no Event of Default exists under this Agreement or any other Loan Documents, and so long as no event has occurred that, with the passage of time, the giving of notice, or both, would constitute an Event of Default under this Agreement or any other Loan Documents, Borrower shall have the option to request a renewal of the Revolving Loan Commitment and extension of the Revolving Loan Maturity Date. To make such request, Borrower shall give written notice to Lender of Borrower's request to renew the Revolving Loan Commitment and extend the Revolving Loan Maturity Date on or before a date that is thirty (30) days prior to the then scheduled Revolving Loan Maturity Date.

2.4     Interest and Fee Computation; Collection of Funds.  Interest accrued hereunder shall be payable as set forth in Section 2.1(c) hereof.  Except as otherwise set forth herein, all interest and fees shall be calculated on the basis of a year consisting of 360 days and shall be paid for the actual number of days elapsed.  Principal payments submitted in funds not immediately available shall continue to bear interest until collected.  If any payment to be made by Borrower hereunder or under the Revolving Note shall become due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in computing any interest in respect of such payment.  Any Obligations which are not paid when due (subject to applicable grace periods) shall bear interest at the Default Rate.

2.5     US Dollars; Currency Risk.  All Receipts will be in Dollars.  In the event that Receipts are not in Dollars, Borrower shall bear the risk of Lender's currency losses, and if Lender suffers a currency loss and the result is to increase the cost to Lender or to reduce the amount of any sum received or receivable by Lender under this Agreement or under the Revolving Note  with respect thereto, then after demand by Lender (which demand shall be accompanied by a certificate setting forth reasonably detailed calculations of the basis of such demand), Borrower shall pay to Lender such additional amount or

amounts as will compensate Lender for such increased cost or such reduction.  Borrower hereby authorizes Lender to advance or cause an advance of Revolving Loans to pay for the increased costs or reductions associated with any such currency losses.

## 3.    CONDITIONS OF BORROWING.

Notwithstanding any other provision of this Agreement, the obligation of Lender to disburse or make all or any portion of any Loans is subject to satisfaction of all of the following conditions precedent (unless a condition is waived in writing by Lender) contained in this <u>Article 3.</u>

3.1    <u>Loan Documents to be Executed by Borrower</u>.  As a condition precedent to Lender's disbursal or making of the Loans pursuant to this Agreement, Borrower shall have executed or cause to be executed, notarized and delivered to Lender all of the following documents, each of which must be satisfactory to Lender and Lender's counsel in form, substance and execution:

(a)    <u>Credit Agreement</u>.  An original of this Agreement, duly executed by the Borrower and consented and agreed to by the Guarantors, each signature of a Credit Party thereon being notarized;

(b)    <u>Revolving Note</u>.  An original Revolving Note, duly executed by the Borrower and consented and agreed to by the Guarantors, each signature of a Credit Party thereon being notarized;

(c)    <u>Security Agreements</u>.  An original each Security Agreement, duly executed by the Credit Parties, each signature of a Credit Party thereon being notarized;

(d)    <u>Guaranty Agreement</u>.  An original Guaranty Agreement, duly executed by the Corporate Guarantors, each signature of a Credit Party thereon being notarized;

(e)    <u>Validity Certificates</u>. An original of each Validity Certificate, duly executed by such officers and directors of Borrower as Lender shall require;

(f)    <u>Closing Statement</u>.  An original of a closing or settlement statement, duly executed by the Borrower; and

(g)    <u>Additional Documents</u>.  Such other agreements, documents, instruments, certificates, financial statements, schedules, resolutions, opinions of counsel, notes and other items which Lender shall require in connection with this Agreement.

3.2    <u>Organizational and Authorization Documents</u>.  A certificate of the corporate secretary, manager, members or other officer, partner, manager or equivalent authorized Person of each Credit Party certifying and attaching: (i) copies of each Credit Parties' respective articles of incorporation (including any certificates of designation, if applicable), bylaws, operating agreement, partnership agreement, certificate of organization or other applicable formation or governing documents; (ii) resolutions of the board of directors, managers, members, general partners or other Persons with proper authority to manage the

affairs of, and otherwise bind, each Credit Party, approving and authorizing the execution, delivery and performance of the Loan Documents to which it is party and the transactions contemplated thereby; (iii) resolution of each Guarantor's shareholders or members (if applicable), approving and authorizing the execution, delivery and performance of the Loan Documents to which it is party and the transactions contemplated thereby; and (iv) the signatures and incumbency of the officers, managers, members, partners or other authorized Persons of each Credit Party executing any of the Loan Documents, each of which the Borrower hereby certifies to be true and complete, and in full force and effect without modification, it being understood that Lender may conclusively rely on each such document and certificate until formally advised by Borrower of any changes therein.

3.3     Certificates of Good Standing.  Copies of certificates of good standing (or in the case of Credit Parties incorporated or organized in Texas, certificates of account status) with respect to each Credit Party, issued by the Secretary of State (or applicable Governmental Authority) of the state of incorporation or organization of each Credit Party, dated as of such a date as is reasonably acceptable to Lender, evidencing the good standing thereof.

3.4     Search Results.  Copies of UCC search reports dated as of such a date as is reasonably acceptable to Lender, listing all effective financing statements which name each Credit Party, under its present name and any previous names, as debtors, together with copies of such financing statements.

3.5     Use of Proceeds.  A detailed summary of the Borrower's use of the proceeds being funded hereunder.

3.6

3.7     Perfection of Lien on Collateral.  The Credit Parties shall have duly authorized, executed and delivered any other related documentation necessary or advisable to perfect the Lien on the Collateral in the jurisdiction of incorporation of the Credit Parties, including such UCC-1 Financing Statements and any and all documents necessary to complete any filings which Lender shall require in connection with this Agreement.

3.8     Payment of Fees.  Borrower shall have paid to Lender all fees, costs and expenses, including due diligence expenses, attorney's fees, search fees, title fees, documentation and filing fees (including documentary stamps and taxes payable on the face amount of the Revolving Note).

3.9     Loan Documents to be Executed by any Subsidiary following the Effective Date.  Within ten (10) days of any entity becoming a Subsidiary of any Credit Party, the following documents shall be executed, notarized and delivered to Lender, each of which must be satisfactory to Lender and Lender's counsel in form, substance and execution:

(a)     Consent and Agreement.  An original of a Consent and Agreement duly executed by such Subsidiary, each signature of a Credit Party thereon being notarized, pursuant to which such Subsidiary consents and agrees to become a "Credit Party" hereunder and to be bound by the terms and conditions of this Agreement and all other Loan Documents;

28

(b)    Security Agreement.  An original of a Security Agreement, duly executed by such Subsidiary, each signature of a Credit Party thereon being notarized;

(c)    Guaranty Agreement.  An original of a Guaranty Agreement, duly executed by such Subsidiary, each signature of a Credit Party thereon being notarized;

(d)    [Intentionally Omitted]

(e)    Organizational and Authorization Documents. A certificate of the corporate secretary, manager, members or other officer, partner, manager or equivalent authorized Person of such Subsidiary certifying and attaching: (i) copies of such Subsidiary's articles of incorporation (including any certificates of designation, if applicable), bylaws, operating agreement, partnership agreement, certificate of organization or other applicable formation or governing documents; (ii) resolutions of the board of directors, managers, members, general partners or other Persons with proper authority to manage the affairs of, and authorizing the execution, delivery and performance of the Loan Documents to which it is party and the transactions contemplated thereby; (iii) resolution of the Subsidiary's shareholders (if applicable), approving and authorizing the execution, delivery and performance of the Loan Documents to which it is or will become a party and the transactions contemplated thereby; and (iv) the signatures and incumbency of the officers, managers, members, partners or other authorized Persons of such Subsidiary executing any of the Loan Documents, each of which the Borrower hereby certifies to be true and complete, and in full force and effect without modification, it being understood that Lender may conclusively rely on each such document and certificate until formally advised by Borrower of any changes therein; and

(f)    Additional Documents.  Such other agreements, documents, instruments, certificates, financial statements, schedules, resolutions, opinions of counsel, notes and other items which Lender shall require in connection with this Agreement and the other Loan Documents.

3.10   Loan Documents to be Executed by each Credit Party Upon Each Subsequent Advance.  As a condition precedent to Lender's disbursal or making of additional advances of principal pursuant to this Agreement following the Effective Date, the Credit Parties shall have executed or caused to be executed and delivered to Lender all of the documents in this Section 3 applicable thereto, and such documents shall remain in full force and effect as of the date of the subsequent principal advance.

## 4.    NOTES EVIDENCING LOANS.

The Revolving Loans shall be evidenced by the Revolving Note (together with any and all renewal, extension, modification or replacement notes executed by Borrower and delivered to Lender and given in substitution therefor) duly executed by the Borrower, and consented and agreed to by each Guarantor, and payable to the order of Lender.  At the time of the initial disbursement of a Revolving Loan and at each time an additional Revolving Loan shall be requested hereunder or a repayment made in whole or in part thereon, an appropriate notation thereof shall be made on the books and records of Lender.  All amounts recorded shall be, absent demonstrable error, conclusive and binding evidence of: (i) the principal amount of the Revolving Loans advanced hereunder; (ii) any unpaid interest owing on the Revolving Loans; and (iii) all

amounts repaid on the Revolving Loans.  The failure to record any such amount or any error in recording such amounts shall not, however, limit or otherwise adversely affect the obligations of Borrower under the Revolving Note to repay the principal amount of the Revolving Loans, together with all other Obligations.

## 5.  MANNER OF BORROWING.

5.1  <u>Loan Requests</u>.  Subject to <u>Section 2.1(a)</u> and <u>Article 3</u> hereof, the Loans shall be made available to Borrower in accordance with the terms and provisions of this Agreement, up to the then applicable Revolving Loan Availability; <u>provided</u>, <u>however</u>, that, notwithstanding anything contained in this Agreement or any other Loan Documents to the contrary, each Revolving Loan requested by Borrower under this Agreement shall be subject to Lender's approval, which approval may be given or withheld in Lender's sole and absolute discretion.  A Revolving Loan may only be made if no Event of Default shall have occurred or be continuing, and only if no event shall have occurred that, with the passage of time, the giving of notice, or both, would constitute an Event of Default under this Agreement or the other Loan Documents, and shall be subject to: (i) Lender's preparation of a Borrowing Base Certificate, showing that there is borrowing availability under the Revolving Loan Availability and pursuant to a calculation of the Borrowing Base Amount; and (ii) Receipts deposited into the Segregated Account, Eligible Accounts and other Collateral being acceptable to Lender.

5.2  <u>Communications</u>. Lender is authorized to rely on any written, verbal, electronic, telephonic or telecopy loan requests which Lender believes in its good faith judgment to emanate from the President or Chief Executive Officer, or any other authorized representative of Borrower.  The Borrower hereby irrevocably confirms, ratifies and approves all such advances by Lender and the Borrower hereby indemnifies Lender against losses and expenses (including court costs, attorneys' and paralegals' fees) and shall hold Lender harmless with respect thereto.

## 6.  SECURITY FOR THE OBLIGATIONS.

6.1  <u>Security Agreement</u>.  To secure the payment and performance by Borrower of the Obligations hereunder, each of the Credit Parties grants, under and pursuant to the Security Agreement executed by the Credit Parties dated as of the Effective Date, to Lender, its successors and assigns, an unconditional, continuing, first-priority and/or pari passu first-priority, perfected security interest in, and does hereby assign, transfer, mortgage, convey, pledge, hypothecate and set over to Lender, its successors and assigns, all of the right, title and interest of the Credit Parties in and to the Collateral, whether now owned or hereafter acquired, and all proceeds (including all insurance proceeds) and products of any of the Collateral.  At any time upon Lender's request, the Credit Parties shall execute and deliver to Lender any other documents, instruments or certificates requested by Lender for the purpose of properly documenting and perfecting the security interests of Lender in and to the Collateral granted hereunder applicable under the Security Agreement, including any additional security agreements, mortgages, control agreements, and financing statements.  The Security Agreement executed by the Credit Parties shall terminate following the full payment and performance of all of the Obligations hereunder

and under any Loan Document and upon Lender's express written acknowledgement of such full payment and performance being received by the Borrower.

6.2     [Intentionally Omitted]

6.3     Priority and Liens. The Borrower hereby covenants and agrees that upon the entry of an Interim DIP Order (and when applicable, the Final DIP Order), and at all times thereafter:

(a)     Pursuant to Section 364(c)(1) of the Bankruptcy Code, all of its Obligations shall at all times constitute an allowed Superpriority Claim in the Case: (I) except as set forth in the Interim DIP Order (and when applicable, the Final DIP Order), with (a) *pari passu* priority with all Claims under the Purchase Agreement and otherwise owing to TCA Global Master Fund LP and (b) priority over any and all administrative expense claims and unsecured claims against the Borrower or its estate in the Case, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code Sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114, and any other provision of the Bankruptcy Code, as provided under Section 364(c)(1) of the Bankruptcy Code; and (II) which shall at all times be senior to the rights of the Borrowers and their estates, and any successor trustee or other estate representative to the extent permitted by law.

(b)     Such Superpriority Claim shall, for purposes of Section 1129(a)(9)(A) of the Bankruptcy Code, be considered an administrative expense allowed under Section 503(b) of the Bankruptcy Code, shall be against the Borrower, and shall be payable from and have recourse to all property of the Debtor's estate (including, without limitation, all claims and causes of action arising under chapter 5 of the Bankruptcy Code and any the proceeds thereof).

(c)     The Liens granted to the Lender securing the Obligations are continuing, valid, binding, enforceable, non-avoidable and perfected liens on all Collateral, and shall constitute, subject to clause (d) below:

(i)     pursuant to Section 364(d)(1) of the Bankruptcy Code, a valid perfected first priority priming lien on, all of the existing and after-acquired personal and real property, leasehold interests in real property, and tangible and intangible personal property of the Borrower, including, without limitation, all cash and cash equivalents, all surface land, accounts receivable and other receivables, inventory, equipment, machinery, parts, supplies, rolling stock, fixtures, patents, trade names, trademarks, copyrights, other general intangibles and membership interests, capital stock and Equity Interests owned by the Borrower, in each case, together with the proceeds thereof and all books and records relating thereto; provided, that, such priority priming lien shall be subject any account holding adequate assurance deposits for the benefit of the Borrower's utility providers during the pendency of the Case;

(ii)     pursuant to Section 364(c)(2) of the Bankruptcy Code, upon entry of the Final DIP Order and to the extent approved by the Bankruptcy Court, a valid

perfected first priority lien on any property or proceeds recovered from any Avoidance Actions.

(d) The Liens granted to the Lender and such Superpriority Claim,: (i) shall not be subject to Sections 506, 510, 549, 550, or 551 of the Bankruptcy Code or the "equities of the case" exception of Section 552 of the Bankruptcy Code, (i) shall not be subordinate to, or pari passu with, (w) any lien, security interest or claim heretofore or hereinafter granted in any of the Case or any successor case of the Borrower under Chapter 11 of the Bankruptcy Code, (y) any lien that is avoided and preserved for the benefit of the Borrower and its estate under Section 551 of the Bankruptcy Code or otherwise or (y) any intercompany or affiliate liens or claims of the Debtor, and (iii) shall be valid and enforceable against any trustee or any other estate representative appointed or elected in the Case, upon the conversion of any of the Case to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing, and/or upon the dismissal of any of the Case.

(e) All of the Liens described in this Section 6.3 that have been granted to the Lender shall be effective and perfected upon entry of the Interim DIP Order, without the necessity of the execution, recordation of filings by the Debtor of mortgages, intellectual property security agreements, security agreements, control agreements, pledge agreements, financing statements or other similar documents, lien notation on any certificates of title, or the possession or control by the Lender of, or over, any Collateral, as set forth in the Interim DIP Order.

## 7.    REPRESENTATIONS AND WARRANTIES OF THE CREDIT PARTIES.

To induce Lender to make the Loans, the Credit Parties make the following representations and warranties to Lender, each of which shall be true and correct in all material respects as of the date of the execution and delivery of this Agreement and as of the date of each Revolving Loan made hereunder, except to the extent such representation expressly relates to an earlier date, and which shall survive the execution and delivery of this Agreement:

7.1    Subsidiaries.  A list of all of the Borrower's Subsidiaries and each Guarantor's Subsidiaries, if any, are listed on **Schedule 7.1** hereto.  All of such Subsidiaries are wholly-owned Subsidiaries of the Borrower or the Guarantors, as applicable, and except for such Subsidiaries as listed on **Schedule 7.1**, neither the Borrower nor Guarantor has any Control over, any other Person.

7.2    Credit Parties Organizations and Names.  Each Credit Party is a corporation, limited liability company, or other form of legally recognized entity, as applicable, duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, and has the full power and authority and all necessary Permits to: (i) enter into and execute this Agreement and the Loan Documents and to perform all of its obligations hereunder and thereunder; and (ii) own and operate its assets and properties and to conduct and carry on its business as and to the extent now conducted.  Each Credit Party is duly qualified to transact business and is in good standing as a foreign corporation, company or other entity in each jurisdiction where the character of its business or the ownership or use and operation of its assets or properties requires such qualification.  The

32

exact legal names of each of the Credit Parties is as set forth in the first paragraph of this Agreement, and the Credit Parties do not currently conduct, nor have the Credit Parties conducted, during the last five (5) years, business under any other name or trade name.

7.3    Authorization; Validity.    Each Credit Party has full right, power and authority to enter into this Agreement, to make the borrowings and execute and deliver the Loan Documents as provided herein and to perform all of its duties and obligations under this Agreement and the Loan Documents and no other action or consent on the part of the Credit Parties, its board of directors, stockholders, members, managers, partners, or any other Person is necessary or required by the Credit Parties to execute this Agreement and the Loan Documents, consummate the transactions contemplated herein and therein, and perform all of its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Loan Documents will not, nor will the observance or performance of any of the matters and things herein or therein set forth, violate or contravene any provision of law or of the Credit Parties' articles of incorporation, bylaws, operating agreement, partnership agreement, or other governing documents.  All necessary and appropriate action has been taken on the part of the Credit Parties to authorize the execution and delivery of this Agreement and the Loan Documents and the issuance of the Revolving Note.  This Agreement and the Loan Documents are valid and binding agreements and contracts of the Credit Parties, enforceable against the Credit Parties in accordance with their respective terms, except to the extent that enforcement thereof may be limited by bankruptcy, insolvency, reorganization, moratorium and other laws enacted for the relief of debtors generally and other similar laws affecting the enforcement of creditors' rights generally or by equitable principles which may affect the availability of specific performance and other equitable remedies.  The Credit Parties do not know of any reason why the Credit Parties cannot perform any of its obligations under this Agreement, the Loan Documents or any related agreements.

7.4    Capitalization.    The authorized capital stock or other capitalization of each Credit Party, as applicable, is as set forth in **Schedule 7.4(a)** attached hereto.   **Schedule 7.4(a)** shall also specify, for each Credit Party, as applicable, as of the date hereof, the number and classes of all securities issued and outstanding, and the names and amounts of such securities owned by each Person who is an owner of any securities in any Credit Party, other than the Borrower. All of the outstanding securities of each Credit Party are validly issued, fully paid and non-assessable, have been issued in compliance with all foreign, federal and state securities laws and none of such outstanding securities were issued in violation of any preemptive rights or similar rights to subscribe for or purchase securities. As of the date of this Agreement, no shares of capital stock or other securities of any Credit Party are subject to preemptive rights or any other similar rights or any Liens suffered or permitted by any Credit Parties. Except for the securities to be issued pursuant to this Agreement, and except as set forth in **Schedule 7.4(b)**, as of the date of this Agreement: (i) there are no outstanding options, warrants, scrip, rights to subscribe to, calls or commitments of any character whatsoever relating to, or securities or rights convertible into, any shares of capital stock or other securities of any Credit Party, or contracts, commitments, understandings or arrangements by which any Credit Party is or may become bound to issue additional shares of capital stock or other securities of any Credit Party, or options, warrants, scrip, rights to subscribe to, calls or commitments of any

33

character whatsoever relating to, or securities or rights convertible into, any shares of capital stock or other securities of any Credit Party; (ii) there are no outstanding debt securities, notes, credit agreements, credit facilities or other contracts or instruments evidencing Funded Indebtedness of any Credit Party, or by which any Credit Party is or may become bound; (iii) there are no outstanding registration statements with respect to any Credit Party or any of its securities and there are no outstanding comment letters from any Governmental Authority with respect to any securities of any Credit Party; (iv) there are no agreements or arrangements under which any Credit Party is obligated to register the sale of any of its securities under the Securities Act or any other laws of any Governmental Authority, excluding the registration contemplated pursuant to Section 10.22 hereof; (v) there are no financing statements or other security interests or Liens filed with any Governmental Authority securing any obligations of any Credit Party, or filed in connection with any assets or properties of any Credit Party; (vi) there are no securities or instruments containing anti-dilution or similar provisions that will be triggered by this Agreement or any related agreement or the consummation of the transactions described herein or therein; and (vii) there are no outstanding securities or instruments of any Credit Party which contain any redemption or similar provisions, and there are no contracts or agreements by which any Credit Party is or may become bound to redeem a security of any Credit Party.  The Borrower has furnished to the Lender true, complete and correct copies of, as applicable, each Credit Parties' respective articles of incorporation (including any certificates of designation, if applicable), bylaws, operating agreement, partnership agreement, certificate of organization or similar organizational and governing documents.  Except for the documents delivered to Lender in accordance with the immediately preceding sentence, there are no other shareholder agreements, voting agreements, operating agreements, or other contracts or agreements of any nature or kind that restrict, limit or in any manner impose obligations, restrictions or limitations on the governance of any Credit Party.

7.5    No Conflicts; Consents and Approvals.  The execution, delivery  and performance of this Agreement and the Loan Documents, and the consummation of the transactions contemplated hereby and thereby, including the issuance of the Revolving Note, will not: (i) constitute a violation of or conflict with any Credit Parties' respective articles of incorporation (including any certificates of designation, if applicable), bylaws, operating agreement, partnership agreement, certificate of organization or similar governing or organizational documents; (ii) constitute a violation of, or a default or breach under (either immediately, upon notice, upon lapse of time, or both), or conflicts with, or gives to any other Person any rights of termination, amendment, acceleration or cancellation of, any provision of any contract or agreement to which any Credit Party is a party or by which any of its or their assets or properties may be bound; (iii) constitute a violation of, or a default or breach under (either immediately, upon notice, upon lapse of time, or both), or conflict with, any order, writ, injunction, decree, or any other judgment of any nature whatsoever; (iv) constitute a violation of, or conflict with, any law, rule, ordinance or other regulation (including foreign and United States federal and state securities laws); or (v) result in the loss or adverse modification of, or the imposition of any fine, penalty or other Lien, claim or encumbrance with respect to, any Permit granted or issued to, or otherwise held by or for the use of, any Credit Party or any of its assets.  The Credit Parties are not in violation of any Credit Parties' respective articles of

incorporation (including any certificates of designation, if applicable), bylaws, operating agreement, partnership agreement, certificate of organization or similar governing or organizational documents, as applicable, and the Credit Parties are not in default or breach (and no event has occurred which with notice or lapse of time or both could put any Credit Party in default or breach) under, and the Credit Parties have not taken any action or failed to take any action that would give to any other Person any rights of termination, amendment, acceleration or cancellation of, any contract or agreement to which any Credit Party is a party or by which any property or assets of any Credit Party are bound or affected. No business of any Credit Party is being conducted, and shall not be conducted, in violation of any law, rule, ordinance or other regulation. Except as specifically contemplated by this Agreement, the Credit Parties are not required to obtain any consent or approval of, from, or with any Governmental Authority, or any other Person, in order for it to execute, deliver or perform any of its obligations under this Agreement or the Loan Documents in accordance with the terms hereof or thereof. All consents and approvals which any Credit Party is required to obtain pursuant to the immediately preceding sentence have been obtained or effected on or prior to the Effective Date.

7.6    RESERVED

7.7    Compliance With Laws. The nature and transaction of the Credit Parties' business and operations and the use of its properties and assets, including the Collateral or any real estate owned, leased, or occupied by the Credit Parties, do not and during the term of the Loans shall not, violate or conflict with any applicable law, statute, ordinance, rule, regulation or order of any kind or nature, including the provisions of the Fair Labor Standards Act or any zoning, land use, building, noise abatement, occupational health and safety or other laws, any Permit or any condition, grant, easement, covenant, condition or restriction, whether recorded or not, except to the extent such violation or conflict would not result in a Material Adverse Effect.

7.8    Environmental Laws and Hazardous Materials. Except to the extent that any of the following would not have a Material Adverse Effect (including financial reserves, insurance policies and cure periods relating to compliance with applicable laws and Permits) and are used in such amounts as are customary in the Ordinary Course of Business in compliance with all applicable Environmental Laws, the Credit Parties represent and warrant to Lender that, to the best knowledge of each of the Credit Parties: (i) the Credit Parties have not generated, used, stored, treated, transported, manufactured, handled, produced or disposed of any Hazardous Materials, on or off any of the premises of the Credit Parties (whether or not owned by the Credit Parties) in any manner which at any time violates any Environmental Law or any Permit, certificate, approval or similar authorization thereunder; (ii) the operations of the Credit Parties comply in all material respects with all Environmental Laws and all Permits certificates, approvals and similar authorizations thereunder; (iii) there has been no investigation, Proceeding, complaint, order, directive, claim, citation or notice by any Governmental Authority or any other Person, nor is any of same pending or, to the Credit Parties' knowledge, threatened; and (iv) the Credit Parties do not have any liability, contingent or otherwise, in connection with a release, spill or discharge, threatened or actual, of any Hazardous Materials or the

generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Material.

7.9     Collateral Representations.  No Person other than the Credit Parties, owns or has other rights in the Collateral, and the Collateral is valid and genuine Collateral, free from any Lien of any kind, other than the Lien of Lender and Permitted Liens.

7.10     Financial Statements. The Borrower has delivered to the Lender an unaudited consolidated Balance Sheet and Statement of Income for fiscal year ending 2018, and an unaudited consolidated Balance Sheet and Statement of Income as of June 2019 (collectively, together with any financial statements filed by any Credit Party with any Governmental Authority, if applicable, the "**Financial Statements**").   The Financial Statements have been prepared in accordance with GAAP, consistently applied, during the periods involved (except: (i) as may be otherwise indicated in such Financial Statements or the notes thereto; or (ii) in the case of unaudited interim statements, to the extent they may exclude footnotes or may be condensed or summary statements), and fairly and accurately present in all material respects the consolidated financial position of the Credit Parties as of the dates thereof and the consolidated results of its operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal year-end audit adjustments).   To the best knowledge of the Credit Parties, no other information provided by or on behalf of the Credit Parties to the Lender, either as a disclosure schedule to this Agreement, or otherwise in connection with Lender's due diligence investigation of the Credit Parties, contains any untrue statement of a material fact or omits to state any material fact necessary in order to make the statements therein, in the light of the circumstance under which they are or were made, not misleading.

7.11     Public Documents. The Borrower has filed all reports, schedules, forms, statements and other documents required to be filed by it with the SEC, the Principal Trading Market, or any other Governmental Authority, as applicable (all of the foregoing filed within the two (2) years preceding the date hereof or amended after the date hereof and all exhibits included therein and financial statements and schedules thereto and documents incorporated by reference therein, being hereinafter referred to as the "Public Documents"). The Borrower is current with its filing obligations with the SEC, except for filing which are required to be restated by the Borrower, the Principal Trading Market, or any other Governmental Authority, as applicable. The Borrower represents and warrants that true and complete copies of the Public Documents are available on the SEC website or the Principal Trading Market website, as applicable (www.sec.gov, or www.otcmarkets.com) at no charge to Lender, and Lender acknowledges that it may retrieve all Public Documents from such websites and Lender's access to such Public Documents through such website shall constitute delivery of the Public Documents to Lender; provided, however, that if Lender is unable to obtain any of such Public Documents from such websites at no charge, as result of such websites not being available or any other reason beyond Lender's control, then upon request from Lender, the Borrower shall deliver to Lender true and complete copies of such Public Documents.  The Borrower shall also deliver to Lender true and complete copies of all draft filings, reports, schedules, statements and other documents required to be filed with the requirements of the Principal Trading Market that have been prepared but not filed with the Principal Trading Market as

of the date hereof. None of the Public Documents, at the time they were filed with the SEC, the Principal Trading Market, or other Governmental Authority, as applicable, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading, except to the extent any such Public Document was amended, or the Borrower has publicly disclosed that such Public Document, or the financial statements included therein, is required to be restated.  None of the statements made in any such Public Documents is, or has been, required to be amended or updated under applicable law (except for such statements as have been amended or updated in subsequent filings prior the date hereof, which amendments or updates are also part of the Public Documents), or which the Borrower has publicly disclosed that it is in the process of amending and restating.  As of their respective dates, the consolidated financial statements of the Borrower and its Subsidiaries included in the Public Documents complied in all material respects with applicable accounting requirements and any published rules and regulations of the SEC and Principal Trading Market with respect thereto, except as otherwise disclosed in the Public Documents.

7.12   <u>Absence of Certain Changes</u>.  Since the date of the most recent of the Financial Statements, none of the following have occurred:

(a)          There has been no event or circumstance of any nature whatsoever that has resulted in, or could reasonably be expected to result in, a Material Adverse Effect; or

(b)          There has been no transaction, event, action, development, payment, or any other matter of any nature whatsoever entered into by the Credit Parties other than in the Ordinary Course of Business of the Credit Parties.

7.13   <u>Litigation and Taxes</u>.  There is no Proceeding pending, or to the best knowledge of the Credit Parties, threatened, against any Credit Party or its officers, managers, members, shareholders or other principals, or against or affecting any of its assets.  In addition, there are no outstanding judgments, orders, writs, decrees or other similar matters or items against or affecting the Credit Parties, its business or assets.  The Credit Parties have not received any material complaint from any Customer, supplier, vendor or employee.  The Credit Parties have duly filed all applicable income or other tax returns and have paid all income or other taxes when due.  There is no Proceeding, controversy or objection pending or threatened in respect of any tax returns of the Credit Parties.

7.14   <u>Event of Default</u>.  No Event of Default has occurred and is continuing, whether as a result of the actions of the Credit Parties, the Lender or otherwise, and no event has occurred and is continuing which, with the lapse of time, the giving of notice, or both, would constitute such an Event of Default under this Agreement or any of the other Loan Documents. Further, the Credit Parties are not in default (without regard to grace or cure periods) under any contract or agreement to which it is a party or by which any of their respective assets are bound.

7.15    ERISA Obligations.  To the best knowledge of each of the Credit Parties, all Employee Plans of the Credit Parties meet the minimum funding standards of Section 302 of ERISA, where applicable, and each such Employee Plan that is intended to be qualified within the meaning of Section 401 of the Internal Revenue Code of 1986 is qualified.  No withdrawal liability has been incurred under any such Employee Plans and no "Reportable Event" or "Prohibited Transaction" (as such terms are defined in ERISA), has occurred with respect to any such Employee Plans, unless approved by the appropriate Governmental Authority.  To the best knowledge of each of the Credit Parties, the Credit Parties have promptly paid and discharged all obligations and liabilities arising under ERISA of a character which if unpaid or unperformed might result in the imposition of a Lien against any of its properties or assets.

7.16    Adverse Circumstances.  No condition, circumstance, event, agreement, document, instrument, restriction, litigation or Proceeding (or threatened litigation or Proceeding or basis therefor) exists which: (i) could adversely affect the validity or priority of the Liens granted to Lender under the Loan Documents; (ii) could adversely affect the ability of the Credit Parties to perform its obligations under the Loan Documents; (iii) would constitute a default under any of the Loan Documents; (iv) would constitute such a default with the giving of notice or lapse of time or both; or (v) would constitute or give rise to a Material Adverse Effect.

7.17    Liabilities and Indebtedness of the Borrower.  The Credit Parties do not have any Funded Indebtedness or any liabilities or obligations of any nature whatsoever, except: (i) as disclosed in the Financial Statements; or (ii) liabilities and obligations incurred in the Ordinary Course of Business since the date of the last Financial Statements which do not or would not, individually or in the aggregate, exceed Ten Thousand and No/100 United States Dollars (US$10,000.00) or otherwise have a Material Adverse Effect.

7.18    Real Estate.

(a)        Real Property Ownership.  Except for the Credit Party Leases and as otherwise disclosed in **Schedule 7.18**, the Borrower does not own any Real Property.

(b)        Real Property Leases.  Except for ordinary leases for office space from which the Credit Parties conduct its business (the "**Credit Party Leases**"), the Credit Parties do not lease any other Real Property.  With respect to each of the Credit Party Leases: (i) the Credit Parties have been in peaceful possession of the property leased thereunder and neither the Credit Parties nor the landlord is in default thereunder; (ii) no waiver, indulgence or postponement of any of the obligations thereunder has been granted by the Credit Parties or landlord thereunder; and (iii) there exists no event, occurrence, condition or act known to the officers or directors of the Credit Parties which, upon notice or lapse of time or both, would be or could become a default thereunder or which could result in the termination of the Credit Party Leases, or any of them, or have a Material Adverse Effect.  The Credit Parties have not violated nor breached any provision of any such Credit Party Leases, and all obligations required to be performed by the Credit Parties under any of such Credit Party Leases have been fully, timely and properly performed.  The Credit Parties have delivered to the Lender true, correct and complete copies of all Credit Party Leases,

including all modifications and amendments thereto, whether in writing or otherwise. The Credit Parties have not received any written or oral notice to the effect that any of the Credit Party Leases will not be renewed at the termination of the term of such Credit Party Leases, or that the Credit Party Leases will be renewed only at higher rents.

7.19    <u>Material Contracts</u>.  An accurate, current and complete copy of each of the Material Contracts has been furnished to Lender, and each of the Material Contracts constitutes the entire agreement of the respective parties thereto relating to the subject matter thereof.  There are no outstanding offers, bids, proposals or quotations made by any Credit Party which, if accepted, would create a Material Contract with any Credit Party. Each of the Material Contracts is in full force and effect and is a valid and binding obligation of the parties thereto in accordance with the terms and conditions thereof.  To the best knowledge of each Credit Party, all obligations required to be performed under the terms of each of the Material Contracts by any party thereto have been fully performed by all parties thereto, and no party to any Material Contracts is in default with respect to any term or condition thereof, nor has any event occurred which, through the passage of time or the giving of notice, or both, would constitute a default thereunder or would cause the acceleration or modification of any obligation of any party thereto or the creation of any Lien, claim, charge or other encumbrance upon any of the assets or properties of any Credit Party.  Further, no Credit Party has received any notice, nor does any Credit Party have any knowledge, of any pending or contemplated termination of any of the Material Contracts and, no such termination is proposed or has been threatened, whether in writing or orally.

7.20    <u>Title to Assets</u>.  The Credit Parties have good and marketable title to, or a valid leasehold interest in, all of their assets and properties which are material to their business and operations as presently conducted, free and clear of all Liens, claims, charges or other encumbrances or restrictions on the transfer or use of same.  Except as would not have a Material Adverse Effect, the assets and properties of each Credit Party are in good operating condition and repair, ordinary wear and tear excepted, and are free of any latent or patent defects which might impair their usefulness, and are suitable for the purposes for which they are currently used and for the purposes for which they are proposed to be used.

7.21    <u>Intellectual Property</u>. The Credit Parties own or possess adequate and legally enforceable rights or licenses to use all trademarks, trade names, service marks, service mark registrations, service names, patents, patent rights, copyrights, inventions, licenses, approvals, governmental authorizations, trade secrets and all other intellectual property rights necessary to conduct its business as now conducted (collectively, the "**IP Rights**").  All IP Rights, and any federal, state, local or foreign patent and trademark office, or functional equivalent thereof where any such IP Rights may be filed or registered, is set forth in **Schedule 7.21**.  All of the IP Rights are owned by the Credit Parties, except for IP Rights licensed by the Credit Parties, which licensed IP Rights are specifically outlined and described in **Schedule 7.21**.  If any IP Rights are licensed by any Credit Party, the underlying license agreement or other agreement pursuant to which such IP Rights are licensed (collectively, the "**License Agreements**"), permits Lender to encumber such License Agreements without any further consent or approval of any other Person, including the underlying owner of such IP Rights, such that if there was an Event of Default and Lender foreclosed on all Collateral, Lender would have the right to use such IP Rights

39

under the License Agreements, subject only to Lender's obligation to comply with the terms of such License Agreements. The Credit Parties do not have any knowledge of any infringement by any Credit Party of any IP Rights of others, and, to the knowledge of the Credit Parties, there is no claim, demand or Proceeding, or other demand of any nature being made or brought against, or to any Credit Party's knowledge, being threatened against, any Credit Party regarding IP Rights or other intellectual property infringement; and is the Credit Parties are not aware of any facts or circumstances which might give rise to any of the foregoing.

7.22   <u>Labor and Employment Matters</u>. The Credit Parties are not involved in any labor dispute or, to the knowledge of the Credit Parties, is any such dispute threatened. To the knowledge of the Credit Parties and its officers, none of the employees of any Credit Party is a member of a union and the Credit Parties believe that its relations with its employees are good. To the knowledge of the Credit Parties and its officers, the Credit Parties have complied in all material respects with all laws, rules, ordinances and regulations relating to employment matters, civil rights and equal employment opportunities.

7.23   <u>Insurance</u>. The Credit Parties are each covered by valid, outstanding and enforceable policies of insurance which were issued them by reputable insurers of recognized financial responsibility, covering their properties, assets and business against losses and risks normally insured against by other corporations or entities in the same or similar lines of businesses as the Credit Parties are engaged and in coverage amounts which are prudent and typically and reasonably carried by such other corporations or entities (the "**<u>Insurance Policies</u>**"). Such Insurance Policies are in full force and effect, and all premiums due thereon have been paid. None of the Insurance Policies will lapse or terminate as a result of the transactions contemplated by this Agreement. The Credit Parties have complied with the provisions of such Insurance Policies. The Credit Parties have not been refused any insurance coverage sought or applied for and the Credit Parties do not have any reason to believe that they will not be able to renew their existing Insurance Policies as and when such Insurance Policies expire or to obtain similar coverage from similar insurers as may be necessary to continue their business at a cost that would not materially and adversely affect the condition, financial or otherwise, or the earnings, business or operations of the Credit Parties.

7.24   <u>Permits</u>. The Credit Parties possess all Permits necessary to conduct their business, and the Credit Parties have not received any notice of, or are otherwise involved in, any Proceedings relating to the revocation or modification of any such Permits. All such Permits are valid and in full force and effect and the Credit Parties are in full compliance with the respective requirements of all such Permits.

7.25   <u>Lending Relationship</u>. The Credit Parties acknowledge and agree that the relationship hereby created with Lender, any advisory or investment banking relationship and/or any other relationship otherwise existing is, has been and will be conducted on an open and arm's length basis in which no fiduciary relationship exists and that Borrower has not relied on, nor is relying on, any such fiduciary relationship in executing this Agreement and any other Loan Document and in consummating the Loans.

40

7.26     Compliance with Regulation U.  No portion of the proceeds of the Loans shall be used by Borrower, or any Affiliates of the Borrower, either directly or indirectly, for the purpose of purchasing or carrying any margin stock, within the meaning of Regulation U as adopted by the Board of Governors of the Federal Reserve System.

7.27     Governmental Regulation.  The Credit Parties are not, nor after giving effect to any Loan, will be, subject to regulation under the Public Utility Holding Borrower Act of 1935, the Federal Power Act or the Investment Company Act of 1940 or to any federal or state statute or regulation limiting its ability to incur indebtedness for borrowed money.

7.28     Bank Accounts.  **Schedule 7.28** sets forth, with respect to each account of the Credit Parties with any bank, broker, Payment Processing Company, or other depository institution: (i) the name and account number of such account; (ii) the name and address of the institution where such account is held; (iii) the name of any Person(s) holding a power of attorney with respect to such account, if any; and (iv) the names of all authorized signatories and other Persons authorized to withdraw funds from each such account.

7.29     Places of Business.  The principal place of business of each of the Credit Parties is set forth on **Schedule 7.29** and the Credit Parties shall promptly notify Lender of any change in such location.  The Credit Parties will not remove or permit the Collateral to be removed from such locations without the prior written consent of Lender, except for: (i) certain heavy equipment kept at third party sites when conducting business or maintenance; (ii) vehicles, containers and rolling stock; (iii) Inventory sold or leased in the Ordinary Course of Business of the Credit Parties; and (iv) temporary removal of Collateral to other locations for repair or maintenance as may be required from time to time in each instance in the Ordinary Course of Business of the Credit Parties.

7.30     Illegal Payments.  Neither the Credit Parties, nor any director, officer, member, manager,  agent, employee or other Person acting on behalf of the Credit Parties has, in the course of his actions for, or on behalf of, the Credit Parties: (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended; or (iv) made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any foreign or domestic government official or employee.

7.31     Related Party Transactions.  Except for arm's length transactions pursuant to which the Credit Parties make payments in the Ordinary Course of Business of the Credit Parties upon terms no less favorable than the Credit Parties could obtain from third parties, or as otherwise set forth in the Public Documents, none of the officers, directors, managers, or employees of the Credit Parties, nor any stockholders, members or partners who own, legally or beneficially, five percent (5%) or more of the ownership interests of the Credit Parties (each a "**Material Shareholder**"), is presently a party to any transaction with the Credit Parties (other than for services as employees, officers and directors), including any contract providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from, any officer,

41

director or such employee or Material Shareholder or, to the best knowledge of the Credit Parties, any other Person in which any officer, director, or any such employee or Material Shareholder has a substantial or material interest in or of which any officer, director or employee of the Borrower or Material Shareholder is an officer, director, trustee or partner. There are no claims, demands, disputes or Proceedings of any nature or kind between the Credit Parties and any officer, director or employee of the Credit Parties or any Material Shareholder, or between any of them, relating to the Credit Parties.

7.32    Internal Accounting Controls.    The Credit Parties maintain a system of internal accounting controls sufficient to provide reasonable assurance that: (i) transactions are executed in accordance with management's general or specific authorizations; (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain asset accountability; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

7.33    Brokerage Fees.    There is no Person acting on behalf of the Credit Parties who is entitled to or has any claim for any brokerage or finder's fee or commission in connection with the execution of this Agreement or the consummation of the transactions contemplated hereby.

7.34    Acknowledgment Regarding Lender's Loans.    The Credit Parties acknowledge and agree that Lender is acting solely in the capacity of an arm's length lender with respect to this Agreement and the transactions contemplated hereby. The Credit Parties further acknowledge that Lender is not acting as a financial advisor or fiduciary of the Credit Parties (or in any similar capacity) with respect to this Agreement and the transactions contemplated hereby and any advice given by Lender or any of its representatives or agents in connection with this Agreement and the transactions contemplated hereby is merely incidental to the making of the Loans hereunder by Lender. The Credit Parties further represent to Lender that the Credit Parties' decision to enter into this Agreement has been based solely on the independent evaluation by the Credit Parties and their representatives.

7.35    Seniority.    No Funded Indebtedness or other equity or debt security of the Credit Parties is senior to the Obligations in right of payment, whether with respect to interest or upon liquidation or dissolution, or otherwise.

7.36    No General Solicitation.    Neither the Credit Parties, nor any of their Affiliates, nor any Person acting on their behalf, has engaged in any form of general solicitation or general advertising (within the meaning of Regulation D under the Securities Act) in connection with the offer or issuance of the Revolving Note  or the shares issuable upon conversion of the Revolving Notes.

7.37    No Integrated Offering.    Neither the Credit Parties, nor any of their Affiliates, nor any Person acting on their behalf has, directly or indirectly, made any offers or sales of any security or solicited any offers to buy any security, under circumstances that

42

would require registration of the Revolving Note under the Securities Act or any similar laws of any foreign jurisdiction, or cause this offering of such securities to be integrated with prior offerings by the Credit Parties for purposes of the Securities Act or any similar laws of any foreign jurisdiction.

7.38    <u>Private Placement</u>.  Assuming the accuracy of the Lender's representations and warranties set forth in <u>Section 8</u> below, no registration under the Securities Act or the laws, rules or regulation of any other Governmental Authority is required for the issuance of the Revolving Note.

7.39    <u>Complete Information</u>.  This Agreement and all financial statements, schedules, certificates, confirmations, agreements, contracts, and other materials submitted to Lender in connection with or in furtherance of this Agreement by or on behalf of the Credit Parties fully and fairly states the matters with which they purport to deal, and do not misstate any material fact nor, separately or in the aggregate, fail to state any material fact necessary to make the statements made not misleading.

7.40    **<u>NO-RELIANCE</u>. ANY CURRENT OR PRIOR UNDERSTANDINGS, STATEMENTS, REPRESENTATIONS, AND AGREEMENTS, ORAL OR WRITTEN, INCLUDING, BUT NOT LIMITED TO, RENDERINGS OR REPRESENTATIONS CONTAINED IN E-MAILS AND ORAL STATEMENTS OF THE AGENTS OR EMPLOYEES OF THE LENDER, IF NOT SPECIFICALLY EXPRESSED IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENTS, ARE VOID AND HAVE NO EFFECT. EACH CREDIT PARTY ACKNOWLEDGES AND AGREES THAT HE/SHE/IT HAS NOT RELIED ON ANY SUCH ITEMS.**

7.41    <u>Interpretation; Reliance; Survival</u>.  Each warranty and representation made by the Credit Parties in this Agreement or pursuant hereto, or in any other Loan Documents, is independent of all other warranties and representations made by the Credit Parties in this Agreement or pursuant hereto, or in any other Loan Documents (whether or not covering identical, related or similar matters) and must be independently and separately satisfied. Exceptions or qualifications to any such warranty or representation shall not be construed as exceptions or qualifications to any other warranty or representation.  Notwithstanding any investigation made by Lender or any of its agents or representatives, or any rights to conduct such investigations, and notwithstanding any knowledge of facts determined or determinable by Lender as a result of such investigation or right of investigation, the Lender has the unqualified right to rely upon the representations and warranties made by the Credit Parties in this Agreement and in the Schedules attached hereto or pursuant hereto, or in any other Loan Documents.  Each and every representation and warranty of the Credit Parties made herein, pursuant hereto, or in any other Loan Documents has been relied upon by Lender, and is material to the decision of the Lender to enter into this Agreement and to make the Loans contemplated herein.  All representations and warranties of the Credit Parties made in this Agreement or pursuant hereto, or in any other Loan Documents, shall survive the Effective Date, the consummation of any Loans made hereunder, and any investigation, and shall be deemed and construed as continuing representations and warranties.

## 8.    REPRESENTATIONS AND WARRANTIES OF LENDER.

Lender makes the following representations and warranties to the Borrower, each of which shall be true and correct in all material respects as of the date of the execution and delivery of this Agreement and as of the date of each Loan made hereunder, except to the extent such representation expressly relates to an earlier date, and which shall survive the execution and delivery of this Agreement:

8.1    <u>Investment Purpose</u>. Lender is acquiring the Revolving Note for its own account, for investment only and not with a view towards, or for resale in connection with, the public sale or distribution thereof, except pursuant to sales registered or exempted under the Securities Act.

8.2    <u>Accredited Investor Status</u>. Lender is an "Accredited Investor" as that term is defined in Rule 501 of Regulation D promulgated under the Securities Act.

8.3    <u>Reliance on Exemptions</u>. Lender understands that the Revolving Note is being offered and sold to it in reliance on specific exemptions from the registration requirements of United States federal and state securities laws and that Borrower is relying in part upon the truth and accuracy of, and Lender's compliance with, the representations, warranties, agreements, acknowledgments and understandings of Lender set forth herein in order to determine the availability of such exemptions and the eligibility of Lender to acquire such securities.

8.4    <u>Information</u>. Lender has been furnished with all materials it has requested relating to the business, finances and operations of the Credit Parties and information deemed material by Lender to making an informed investment decision regarding the Revolving Note. Lender has been afforded the opportunity to ask questions of the Credit Parties and its management.    Neither such inquiries nor any other due diligence investigations conducted by Lender or its representatives shall modify, amend or affect Lender's right to rely on the Credit Parties' representations and warranties contained in <u>Article 7</u> above or elsewhere in this Agreement or in any other Loan Documents. Lender understands that its investment in the Revolving Note involves a high degree of risk. Lender is in a position regarding the Credit Parties, which, based upon economic bargaining power, enabled and enables Lender to obtain information from the Credit Parties in order to evaluate the merits and risks of this investment. Lender has sought such accounting, legal and tax advice, as it has considered necessary to make an informed investment decision with respect to the Revolving Note.

8.5    <u>No Governmental Review</u>. Lender understands that no United States federal or state agency or any other Governmental Authority has passed on or made any recommendation or endorsement of the Revolving Note, or the fairness or suitability of the investment in the Revolving Note, nor have such authorities passed upon or endorsed the merits of the offering of the Revolving Note.

8.6    <u>Transfer or Resale</u>.  Lender understands that: (i) the Revolving Note has not been and is not being registered under the Securities Act or any other foreign or state

securities laws, and may not be offered for sale, sold, assigned or transferred unless: (A) subsequently registered thereunder; or (B) such securities to be sold, assigned or transferred may be sold, assigned or transferred pursuant to an exemption from such registration requirements; and (ii) neither the Credit Parties nor any other Person is under any obligation to register such securities under the Securities Act or any foreign or state securities laws or to comply with the terms and conditions of any exemption thereunder, except as otherwise set forth in this Agreement.

8.7     <u>Authorization, Enforcement</u>.  This Agreement has been duly and validly authorized, executed and delivered on behalf of Lender, meaning it has been authorized, executed and delivered by an agent of the Lender with proper corporate authority to do so, and is a valid and binding agreement of Lender enforceable in accordance with its terms, except as such enforceability may be limited by general principles of equity or applicable bankruptcy, insolvency, reorganization, moratorium, liquidation and other similar laws relating to, or affecting generally, the enforcement of applicable creditors' rights and remedies.

8.8     <u>Due Formation of Lender.</u> Lender is an entity that has been formed and validly exists and has not been organized for the specific purpose of purchasing the Revolving Note and is not prohibited from doing so.

8.9     <u>No Legal Advice from Credit Parties</u>. Lender acknowledges that it had the opportunity to review this Agreement and the transactions contemplated by this Agreement with its own legal counsel and investment and tax advisors. Lender is relying solely on such counsel and advisors and not on any statements or representations of the Credit Parties or any of its representatives or agents for legal, tax or investment advice with respect to this investment, the transactions contemplated by this Agreement or the securities laws of any jurisdiction; provided, however, the foregoing shall not modify, amend or affect Lender's right to rely on the Credit Parties' representations and warranties contained in <u>Article 7</u> above or in any other Loan Documents.

8.10     <u>No Insider Trading</u>. Lender is aware of and agrees to comply with the restrictions imposed by federal securities laws on the purchase or sale of Zenergy Brand's securities by any Person who has received material non-public information from or on behalf of Zenergy Brand's and on the communication of such information to any other Person when it is reasonably foreseeable that such other person may purchase or sell Zenergy Brand's securities while in possession of such information.

## 9.     NEGATIVE COVENANTS.

9.1     <u>Indebtedness</u>.  The Credit Parties shall not, either directly or indirectly, create, assume, incur or have outstanding any Funded Indebtedness (including purchase money indebtedness), or become liable, whether as endorser, guarantor, surety or otherwise, for any debt or obligation of any other Person, except:

(a)             the Obligations;

45

(b) endorsement for collection or deposit of any commercial paper secured in the Ordinary Course of Business of the Credit Parties;

(c) obligations for taxes, assessments, municipal or other governmental charges; <u>provided</u>, the same are being contested in good faith by appropriate Proceedings and are insured against or bonded over to the satisfaction of Lender;

(d) obligations for accounts payable, other than for money borrowed, incurred in the Ordinary Course of Business of the Credit Parties; provided that any fees or other sums, other than salary accrued in the Credit Parties' Ordinary Course of Business, payable by the Credit Parties to any officer, director, member, manager, principal, or Material Shareholder, shall be fully subordinated in right of payment to the prior payment in full of the Obligations hereunder;

(e) unsecured intercompany Funded Indebtedness incurred in the Ordinary Course of Business of the Credit Parties;

(f) Funded Indebtedness existing on the Effective Date and set forth in the Financial Statements, including any extensions or refinancings of the foregoing, which do not increase the principal amount of such Funded Indebtedness as of the date of such extension or refinancing; provided such Funded Indebtedness is subordinated to the Obligations owed to Lender pursuant to a subordination agreement, in form and content acceptable to Lender in its sole discretion, which shall include an indefinite standstill on remedies and payment blockage rights during any default;

(g) Funded Indebtedness consisting of Capital Lease obligations or secured by Permitted Liens of the type described in clause (vii) of the definition thereof not to exceed Fifty Thousand and No/100 United States Dollars (US$50,000.00) in the aggregate at any time;

(h) Contingent Liabilities arising with respect to customary indemnification obligations in favor of purchasers in connection with dispositions permitted hereunder;

(i) Contingent Liabilities incurred in the Ordinary Course of Business with respect to surety and appeal bonds, performance bonds and other similar obligations; and

(j) Contingent Liabilities arising under indemnity agreements to title insurers to cause such title insurers to issue to Lender title insurance policies.

9.2     <u>Encumbrances</u>.  The Credit Parties shall not, either directly or indirectly, create, assume, incur or suffer or permit to exist any Lien or charge of any kind or character upon any asset of the Credit Parties, whether owned at the date hereof or hereafter acquired, except Permitted Liens or as otherwise authorized by Lender in writing.

9.3     <u>Investments</u>.  The Credit Parties shall not, either directly or indirectly, make or have outstanding any new investments (whether through purchase of stocks, obligations or otherwise) in, or loans or advances to, any other Person, or acquire all or any substantial

46

part of the assets, business, stock or other evidence of beneficial ownership of any other Person, except for the following:

(a)        the stock or other ownership interests in a Subsidiary existing as of the Effective Date;

(b)        investments in direct obligations of the United States or any state in the United States;

(c)        trade credit extended by the Credit Parties in the Ordinary Course of Business of the Credit Parties;

(d)        investments in securities of Customers received pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of such Customers;

(e)        investments existing on the Effective Date and set forth in the Financial Statements;

(f)        Contingent Liabilities permitted pursuant to Section 9.1; or

(g)        Capital Expenditures permitted under Section 9.5.

9.4      Transfer; Merger.  The Credit Parties shall not, either directly or indirectly, permit a Change in Control, merge, consolidate, sell, transfer, license, lease, encumber or otherwise dispose of all or any part of its property or business or all or any substantial part of its assets, or sell or discount (with or without recourse) any of its Notes (as defined in the UCC), Chattel Paper, Payment Intangibles or Accounts; provided, however, that the Credit Parties may:

(a)        sell or lease Inventory and Equipment in the Ordinary Course of Business of the Credit Parties;

(b)        upon not less than three (3) Business Days' prior written notice to Lender, any Subsidiary of the Borrower may merge with (so long as such Borrower remains the surviving entity), or dissolve or liquidate into, or transfer its property to such Borrower;

(c)        dispose of used, worn-out or surplus equipment in the Ordinary Course of Business of the Credit Parties;

(d)        discount or write-off overdue Accounts for collection in the Ordinary Course of Business of the Credit Parties;

(e)        sell or otherwise dispose (including cancellation of Funded Indebtedness) of any Investment permitted under Section 9.3 in the Ordinary Course of Business of the Credit Parties; and

(f)        grant Permitted Liens.

9.5     <u>Capital Expenditures</u>.  Without Lender's prior written consent or unless disclosed in a Use of Proceeds Confirmation, the Credit Parties shall not make or incur obligations for any Capital Expenditures.

9.6     <u>Issuance of Stock</u>.  The Credit Parties shall not either directly or indirectly, issue or distribute any additional capital stock or other securities (including any securities convertible or exercisable into capital stock or other securities) of any Credit Party without the prior written consent of Lender.

9.7     <u>Distributions; Restricted Payments; Change in Management</u>.  The Credit Parties shall not: (i) purchase or redeem any shares of their capital stock or other securities, or declare or pay any dividends or distributions, whether in cash or otherwise, set aside any funds for any such purpose, or make any distribution of any kind to their shareholders, partners, or members, make any distribution of their property or assets, or make any loans, advances or extensions of credit to, or investments in, any Persons, including such Credit Parties' Affiliates, officers, directors, members, managers, principals, Material Shareholders, or employees, without the prior written consent of Lender; (ii) make any payments of any Funded Indebtedness other than as specifically permitted under the Use of Proceeds Confirmation and as otherwise permitted hereunder; (iii) increase the annual salary paid to any officers of the Credit Parties as of the Effective Date, unless any such increase is part of a written employment contract with any such officers entered into prior to the Effective Date, a copy of which has been delivered to and approved by the Lender; or (iv) add, replace, remove, or otherwise change any officers, managers, senior management positions or Persons with authority to bind the Credit Parties from the officers, managers, senior management positions, or other such Persons existing as of the Effective Date, unless approved by Lender in writing.

9.8     <u>Use of Proceeds</u>.  The Credit Parties shall not use any portion of the proceeds of the Loans, either directly or indirectly, for the purpose of purchasing any securities underwritten by any Affiliate of Lender.  In addition, the Credit Parties shall not use any portion of the proceeds of the Loans, either directly or indirectly, for any of the following purposes: (i) to make any payment towards any Funded Indebtedness of the Credit Parties or any Affiliates thereof, except as specifically permitted under the Use of Proceeds Confirmation; (ii) to pay any taxes of any nature or kind that may be due by the Credit Parties or any Affiliates thereof; (iii) to pay any obligations or liabilities of any nature or kind due or owing to any managers, officers, directors, employees, members, principals, or Material Shareholders of the Credit Parties or any Affiliates thereof.  The Credit Parties shall only use the proceeds of the Loans (or any portion thereof) for the purposes set forth in a "**<u>Use of Proceeds Confirmation</u>**" to be executed by Borrower on each funding date of a Revolving Loan, unless Borrower obtain the prior written consent of Lender to use the proceeds of the Loans for any other purpose, which consent may be granted or withheld by Lender in its sole and absolute discretion.

9.9     <u>Business Activities; Change of Legal Status and Organizational Documents</u>.  The Credit Parties shall not: (i) engage in any line of business other than the businesses engaged in on the date hereof and business reasonably related thereto; (ii) change its name, its type of organization, its jurisdictions of organization or other legal

structure; or (iii) permit its articles of incorporation, certificate of organization (including any certificates of designation, if applicable), bylaws, operating agreement, partnership agreement, certificate of organization or similar governing or organizational documents to be amended or modified in any way which could reasonably be expected to have a Material Adverse Effect.

9.10    <u>Transactions with Affiliates</u>.  The Credit Parties shall not enter into any transaction with any of their Affiliates, except in the Ordinary Course of Business of the Credit Parties and upon fair and reasonable terms that are no less favorable to the Credit Parties than it would obtain in a comparable arm's length transaction with a Person that is not an Affiliate of the Credit Parties.

9.11    <u>Bank Accounts</u>.  The Credit Parties shall not maintain any bank, deposit or credit card payment processing accounts with any financial institution, or any other Person, for the Credit Parties or any Affiliate of the Credit Parties, other than the accounts of the Credit Parties listed in the attached **Schedule 7.28**, and other than the Segregated Account established pursuant to this Agreement.  Specifically, the Credit Parties shall not change, modify, close or otherwise affect the Segregated Account or any of the other accounts listed in **Schedule 7.28**, without Lender's prior written approval, which approval may be withheld or conditioned in Lender's sole and absolute discretion.

9.12    <u>Weekly Draws</u>.  The Credit Parties shall not, make any Weekly Draw unless each of the following conditions have been satisfied on or prior to the date of such Weekly Draw:

(a)    the Lender shall have received, and there shall remain in effect, a continuing, valid, binding, enforceable, non-avoidable and perfected security interest in and a Lien on the Collateral in the priority set forth in Section 6.3;

(b)    no Material Adverse Effect shall have occurred since the later of (i) the Effective Date and (ii) the date of the previous Weekly Draw;

(c)    on such date, both immediately prior to and after giving effect to such Weekly Draw, no Event of Default shall have occurred and the Revolving Loan Availability shall be greater than zero;

(d)    the amount of such Weekly Draw shall be in an amount in accordance with the Budget for the applicable week (it being understood that in no event shall the amount of such Weekly Draw exceed the amount set forth in the Budget, as adjusted for any variance reasonably anticipated by the Borrower not constituting an Unpermitted Variance in respect of total disbursements for such week) for the applicable week;

(e)    the representations and warranties of each Credit Party contained in each Loan Document to which it is a party shall be true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality) on and as of the date of such Weekly Draw, with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which

case such representations and warranties shall be true and correct in all material respects (or if applicable, in all respects) as of such earlier date);

(f)     the Borrower shall have paid all fees and expenses of the Lender accrued and payable on or prior to such date and set forth in a monthly invoice delivered to the Borrower, including the accrued fees and expenses of counsel to Lender payable hereunder; and

(g)     no later than 12:00 p.m., New York City time two (2) Business Days prior to the date of such Weekly Draw, the Lender shall have received a Weekly Draw Request.

## 10.    AFFIRMATIVE COVENANTS.

10.1    Compliance with Regulatory Requirements.    Upon demand by Lender, Borrower shall reimburse Lender for Lender's additional costs and/or reductions in the amount of principal or interest received or receivable by Lender if at any time after the date of this Agreement any law, treaty or regulation or any change in any law, treaty or regulation or the interpretation thereof by any Governmental Authority charged with the administration thereof or any other authority having jurisdiction over Lender or the Loans, whether or not having the force of law, shall impose, modify or deem applicable any reserve and/or special deposit requirement against or in respect of assets held by or deposits in or for the account of the Loans by Lender or impose on Lender any other condition with respect to this Agreement or the Loans, the result of which is to either increase the cost to Lender of making or maintaining the Loans or to reduce the amount of principal or interest received or receivable by Lender with respect to such Loans.    Said additional costs and/or reductions will be those which directly result from the imposition of such requirement or condition on the making or maintaining of such Loans.

10.2    Corporate Existence.    Each of the Credit Parties shall at all times preserve and maintain its: (i) existence and good standing in the jurisdiction of its organization; and (ii) its qualification to do business and good standing in each jurisdiction where the nature of its business makes such qualification necessary (other than such jurisdictions in which the failure to be qualified or in good standing could not reasonably be expected to have a Material Adverse Effect), and shall at all times continue as a going concern in the business which Borrower is presently conducting.

10.3    Maintain Property.    Each of the Credit Parties shall at all times maintain, preserve and keep its plants, properties and equipment, including, but not limited to, any Collateral, in good repair, working order and condition, normal wear and tear excepted, and shall from time to time, as Borrower deems appropriate in its reasonable judgment, make all needful and proper repairs, renewals, replacements, and additions thereto so that at all times the efficiency thereof shall be fully preserved and maintained.    The Credit Parties shall permit Lender to examine and inspect such plant, properties and equipment, including any Collateral, at all reasonable times upon reasonable notice during business hours.    During the continuance of any Event of Default, Lender shall, at the Credit Parties' expense, have the right to make additional inspections without providing advance notice.

10.4     <u>Maintain Insurance</u>.  The Credit Parties' shall at all times insure and keep insured with insurance companies acceptable to Lender, all insurable property owned by the Credit Parties which is of a character usually insured by companies similarly situated and operating like properties, against loss or damage from environmental, fire and such other hazards or risks as are customarily insured against by companies similarly situated and operating like properties; and shall similarly insure employers', public and professional liability risks.  Prior to the date of the funding of any Loans under this Agreement, Borrower shall deliver to Lender a certificate setting forth in summary form the nature and extent of the insurance maintained pursuant to this Section.  All such policies of insurance must be satisfactory to Lender in relation to the amount and term of the Obligations and type and value of the Collateral and assets of the Credit Parties, shall identify Lender as sole/lender's loss payee and as an additional insured.  In the event the Credit Parties fail to provide Lender with evidence of the insurance coverage required by this Section or at any time hereafter shall fail to obtain or maintain any of the policies of insurance required above, or to pay any premium in whole or in part relating thereto, then Lender, without waiving or releasing any obligation or default by Borrower hereunder, may at any time (but shall be under no obligation to so act), obtain and maintain such policies of insurance and pay such premium and take any other action with respect thereto, which Lender deems advisable.  This insurance coverage: (i) may, but need not, protect the Credit Parties' interest in such property, including, but not limited to, the Collateral; and (ii) may not pay any claim made by, or against, the Credit Parties in connection with such property, including, but not limited to, the Collateral.  The Credit Parties may later cancel any such insurance purchased by Lender, but only after providing Lender with evidence that the insurance coverage required by this Section is in force.  The costs of such insurance obtained by Lender, through and including the effective date that such insurance coverage is canceled or expires, shall be payable on demand by the Credit Parties to Lender, together with interest at the Default Rate on such amounts until repaid and any other charges by Lender in connection with the placement of such insurance.  The costs of such insurance, which may be greater than the cost of insurance which the Credit Parties may be able to obtain on their own, together with interest thereon at the Default Rate and any other charges by Lender in connection with the placement of such insurance may be added to the total Obligations due and owing to the extent not paid by the Credit Parties.

10.5     <u>Tax Liabilities</u>.

(a)          The Credit Parties shall at all times pay and discharge all property, income and other taxes, assessments and governmental charges upon, and all claims (including claims for labor, materials and supplies) against the Credit Parties or any of their properties, Equipment or Inventory, before the same shall become delinquent and before penalties accrue thereon, unless and to the extent that the same are being contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP are being maintained.

(b)          Borrower shall be solely responsible for the payment of any and all documentary stamps and other taxes in connection with the execution of the Loan Documents.

10.6     <u>ERISA Liabilities; Employee Plans</u>.  The Credit Parties shall: (i) keep in full force and effect any and all Employee Plans which are presently in existence or may,

from time to time, come into existence under ERISA, and not withdraw from any such Employee Plans, unless such withdrawal can be effected or such Employee Plans can be terminated without liability to the Credit Parties; (ii) make contributions to all of such Employee Plans in a timely manner and in a sufficient amount to comply with the standards of ERISA, including the minimum funding standards of ERISA; (iii) comply with all material requirements of ERISA which relate to such Employee Plans; (iv) notify Lender immediately upon receipt by the Credit Parties of any notice concerning the imposition of any withdrawal liability or of the institution of any Proceeding or other action which may result in the termination of any such Employee Plans or the appointment of a trustee to administer such Employee Plans; (v) promptly advise Lender of the occurrence of any "Reportable Event" or "Prohibited Transaction" (as such terms are defined in ERISA), with respect to any such Employee Plans; and (vi) amend any Employee Plan that is intended to be qualified within the meaning of Section 401 of the Internal Revenue Code of 1986 to the extent necessary to keep the Employee Plan qualified, and to cause the Employee Plan to be administered and operated in a manner that does not cause the Employee Plan to lose its qualified status.

10.7   <u>Financial Statements</u>.  The Credit Parties shall at all times maintain a system of accounting which is capable of producing its individual and consolidated financial statements in compliance with GAAP (provided that monthly financial statements shall not be required to have footnote disclosure, are subject to normal year-end adjustments and need not be consolidated), and shall furnish to Lender or its authorized representatives such information regarding the business affairs, operations and financial condition of the Credit Parties as Lender may from time to time request or require, including, but not limited to:

(a)       If the Revolving Loan Maturity Date is extended beyond the original term, as soon as available, and in any event, within ninety (90) days after the close of each fiscal year, a copy of the annual audited consolidated financial statements of Borrower, including balance sheet, statement of income and retained earnings, statement of cash flows for the fiscal year then ended, in reasonable detail, prepared and reviewed by an independent certified public accountant reasonably acceptable to Lender, containing an unqualified opinion of such accountant;

(b)       as soon as available, and in any event, within thirty (30) days after the close of each fiscal quarter, a copy of the quarterly unaudited consolidated financial statements of Borrower, including balance sheet, statement of income and retained earnings, statement of cash flows for the fiscal year then ended, in reasonable detail, prepared and certified as accurate in all material respects by the President, Chief Executive Officer or Chief Financial Officer of Borrower; and

(c)       as soon as available, and in any event, within fifteen (15) days following the end of each calendar month, a consolidated cash flow report of the Borrower for the month then ended, in reasonable detail, prepared and certified as accurate in all material respects by the President, Chief Executive Officer or Chief Financial Officer of the Borrower.

No change with respect to such accounting principles shall be made by the Credit Parties without giving prior notification to Lender. The Credit Parties represent and warrant to Lender that the financial statements delivered to Lender at or prior to the execution and delivery

of this Agreement and to be delivered at all times thereafter accurately reflect and will accurately reflect the financial condition of the Credit Parties in all material respects. Lender shall have the right at all times (and on reasonable notice so long as there then does not exist any Event of Default) during business hours to inspect the books and records of the Credit Parties and make extracts therefrom.

The Borrower agrees to advise Lender immediately, in writing, of the occurrence of any Material Adverse Effect, or the occurrence of any event, circumstance or other happening that could be reasonably expected to lead to or become a Material Adverse Effect.

10.8    <u>Additional Reporting Requirements</u>. Borrower shall provide the following reports and statements to Lender as follows:

(a)         On or prior to the Effective Date, Borrower shall provide to Lender an income statement or profit and loss statement showing actual results of the Borrower's consolidated operations for the prior twelve (12) months, as well as an income statement projection showing, in reasonable detail, the Borrower's consolidated income statement projections for the twelve (12) calendar months following the Effective Date (the "**Income Projections**").  In addition, on the first (1st) day of every calendar month after the Effective Date, the Borrower shall provide to Lender a report comparing the Income Projections to actual results in the month preceding the month ending immediately prior to such first (1st) day.  Any variance in the Income Projections to actual results that is more than ten percent (10%) (either above or below) will require the Borrower to submit to Lender written explanations as to the nature and circumstances for the variance.

(b)         On a weekly basis after the Effective Date, the Borrower shall provide to Lender a report comparing the use of the proceeds of the Revolving Loans set forth in the Budget, with the actual use of such proceeds.  Any variance in the actual use of such proceeds from the amounts set forth in the Budget will require the Borrower to submit to Lender written explanations as to the nature and circumstances for the variance.

(c)         Borrower shall submit to Lender true and correct copies of all bank statements (and statements from any other depository accounts, brokerage accounts, or accounts with any Payment Processing Companies) received by the Credit Parties within five (5) days after the Credit Parties' receipt thereof from its bank.

(d)         Promptly upon receipt thereof, Borrower shall provide to Lender copies of interim and supplemental reports, if any, submitted to Borrower by independent accountants in connection with any interim audit or review of the books of the Credit Parties.

(e)         On or prior to the Effective Date, the Credit Parties shall provide Lender view only access to any and all accounts listed on the attached **Schedule 7.28**.  In the event the Credit Parties, with the Lender's prior written consent, open any new bank, deposit, credit card payment processing accounts, or other accounts with any financial institution, and/or the Lender discovers an account of the Credit Parties that is in existence prior to the Effective Date but is not listed on **Schedule 7.28**, the Credit Parties shall provide the Lender view only access to such account(s) within one (1) Business Day following the opening or discovery of such account(s).

10.9    Aged Accounts/Payables Schedules. The Borrower shall, on the fifteenth (15th) day of each and every calendar month, deliver to Lender an aged schedule of the Accounts of the Credit Parties, listing the name and amount due from each Customer and showing the aggregate amounts due from: (i) 0-30 days; (ii) 31-60 days; (iii) 61-90 days; (iv) 91-120 days; and (v) more than 120 days, and certified as accurate by the Chief Financial Officer or the President of the Borrower. Borrower shall, on the fifteenth (15th) day of each and every calendar month, deliver to Lender an aged schedule of the accounts payable of the Credit Parties, listing the name and amount due to each creditor and showing the aggregate amounts due from: (v) 0-30 days; (w) 31-60 days; (x) 61-90 days; (y) 91-120 days; and (z) more than 120 days, and certified as accurate by the Chief Financial Officer or the President of the Borrower. If the Credit Parties engage in Point-of-Sale Transactions exclusively, the foregoing requirement to deliver an aged schedule of the Accounts of the Credit Parties shall not be applicable; provided, however, in such a circumstance, Lender may request, and the Credit Parties shall be obligated to deliver to Lender, any other reports or schedules as Lender may require or request from time to time to evidence or confirm the Point-of-Sale Transactions.

10.10    Personal Information. Notwithstanding any provision of any other Loan Document, each Guarantor hereby agrees provide such personal information within fourteen (14) days of the applicable request as the Lender may from time to time reasonably request for the purpose of evaluating the health, stability and collectability of the amounts owing hereunder including, but not limited to, bank account records, tax returns and financial statements.

10.11    Continued Provision of Financial Information. In the event that the that Lender seeks to enforce any of its rights under this Agreement or any other Loan Document whether as a result of Event of Default or otherwise, subject to Lender's agreement to maintain appropriate safe guards relating to the disclosure of non-public information, each of the Credit Parties, not excluding the Guarantors, hereby waives any and all objections to continuing to provide any of the information required to be delivered by Sections 10.7, 10.8 and 10.9 hereof and any other financial information required to be delivered hereunder.

10.12    Representation, Warranty and Covenant Compliance. The Credit Parties shall, within thirty (30) days after the end of each calendar month, deliver to Lender an Affirmation and Compliance Certificate (A) affirming each of the Representations and Warranties of Credit Parties, (B) affirming each of the affirmative and negative covenants herein, and (C) attesting to compliance with such covenants by the Credit Parties. This Affirmation and Compliance Certificate shall be certified as accurate by the President or Chief Executive Officer of the Borrower and in a form consistent with that attached as Exhibit A. The Credit Parties agree and understand that regular and timely receipt of this document is a material term to this Agreement and a relevant factor in considering any request for increased funding.

10.13    Continued Due Diligence/Field Audits. The Borrower acknowledges that during the term of this Agreement, Lender and its agents and representatives undertake ongoing and continuing due diligence reviews of the Credit Parties and its business and

operations. Such ongoing due diligence reviews may include, and the Credit Parties do hereby allow Lender, to conduct site visits and field examinations of the office locations of the Credit Parties and the assets and records of the Credit Parties, the results of which must be satisfactory to Lender in Lender's sole and absolute discretion. In this regard, in order to cover Lender's expenses of the ongoing due diligence reviews and any site visits or field examinations which Lender may undertake from time to time while this Agreement is in effect, the Borrower shall pay to Lender, within five (5) Business Days after receipt of an invoice or demand therefor from Lender, a fee of up to Ten Thousand and No/100 Dollars (US$10,000.00) per year (based on four (4) expected field audit) to cover such ongoing expenses. Failure to pay such fee as and when required shall be deemed an Event of Default under this Agreement and all other Loan Documents. The foregoing notwithstanding, from and after the occurrence of an Event of Default or any event which with notice, lapse of time or both, would become an Event of Default, Lender may conduct site visits, field examinations and other ongoing reviews of the Credit Parties' records, assets and operations at any time, in its sole discretion, without any limitations in terms of number of site visits or examinations and without being limited to the fee hereby contemplated, all at the sole expense of Borrower.

10.14 <u>Notice and Other Reports</u>. Borrower shall provide prompt written notice to Lender if at any time the Credit Parties fail to comply with any of the covenants in <u>Section 11</u> herein. In addition, Borrower shall, within such period of time as Lender may reasonably specify, deliver to Lender such other schedules and reports as Lender may reasonably require.

10.15 <u>Collateral Records</u>. The Credit Parties shall keep full and accurate books and records relating to the Collateral and shall mark such books and records to indicate Lender's Lien in the Collateral including placing a legend, in form and content reasonably acceptable to Lender, on all Chattel Paper created by the Credit Parties indicating that Lender has a Lien in such Chattel Paper.

10.16 <u>Notice of Proceedings</u>. Borrower shall, promptly, but not more than five (5) days after knowledge thereof shall have come to the attention of any officer of the Credit Parties, give written notice to Lender of all threatened or pending actions, suits, and Proceedings before any Governmental Agency or other administrative agency, or before or involving any other Person, which may have a Material Adverse Effect.

10.17 <u>Notice of Default</u>. Borrower shall, promptly, but not more than five (5) days after the commencement thereof, give notice to Lender in writing of the occurrence of an Event of Default or of any event which, with the lapse of time, the giving of notice or both, would constitute an Event of Default hereunder.

10.18 <u>Environmental Matters</u>. If any release or threatened release or other disposal of Hazardous Materials shall occur or shall have occurred on any real property or any other assets of the Credit Parties or any Subsidiary or Affiliate of the Credit Parties, the Credit Parties shall cause the prompt containment and/or removal of such Hazardous Materials and the remediation and/or operation of such real property or other assets as necessary to comply with all Environmental Laws and to preserve the value of such real

property or other assets. Without limiting the generality of the foregoing, the Credit Parties shall comply with any Federal or state judicial or administrative order requiring the performance at any real property of the Credit Parties of activities in response to the release or threatened release of any Hazardous Materials. To the extent that the transportation of Hazardous Materials is permitted by this Agreement, Borrower shall dispose of such Hazardous Materials, or of any other wastes, only at licensed disposal facilities operating in compliance with Environmental Laws.

10.19   <u>Subsidiaries</u>.   Any Subsidiary which is formed or acquired or otherwise becomes a Subsidiary of the Credit Parties following the date hereof, within five (5) Business Days of such event, shall become an additional Credit Party hereto, and the Borrower shall take any and all actions necessary or required by Lender to cause said Subsidiary to execute a counterpart to this Agreement and any and all other documents which the Lender shall require, including causing such party to execute those documents contained in <u>Section 3.9</u> hereof.

## 11.   FINANCIAL COVENANTS.

11.1   <u>Capital Expenditures</u>.   Without Lender's prior written consent, the Credit Parties shall not in any calendar year make or incur obligations for any Capital Expenditures, in excess of  Three Hundred Thousand and No/100 United States Dollars ($300,000.00) For purposes of this Agreement, "Capital Expenditures" shall mean expenditures (including capital lease obligations which should be capitalized under GAAP) for the acquisition of fixed assets which are required to be capitalized under GAAP.

## 12.   EVENTS OF DEFAULT.

Borrower, without notice or demand of any kind (except as specifically provided in this Agreement), shall be in default under this Agreement upon the occurrence of any of the following events (each an "**Event of Default**") (the Lender agrees that to the extent it becomes aware of any Event of Default, it shall provide notice thereof to the Borrower, however the giving of such notice, except as specifically provided in this Agreement, shall not be a condition to the occurrence of such Event of Default):

12.1   <u>Nonpayment of Obligations</u>.   Any amount due and owing on the Revolving Note or any of the Obligations, whether by its terms or as otherwise provided herein, is not paid on the date that such amount is due.

12.2   <u>Misrepresentation</u>.   Any material written warranty, representation, certificate or statement of the Credit Parties in this Agreement, the Loan Documents or any other agreement with Lender, or any report or certification provided to the Lender for it to rely upon, shall be false or misleading in any material respect when made or deemed to be made.

12.3   <u>Nonperformance</u>.   Any failure to perform or default in the performance of any covenant, condition or agreement contained in this Agreement or any Financing Order

(not otherwise addressed in this <u>Article 12</u>), which failure to perform or default in performance continues for a period of ten (10) days after any Credit Party receives written notice from Lender of such failure to perform or default in performance (provided that if the failure to perform or default in performance is not capable of being cured, in Lender's reasonable discretion, then the cure period set forth herein shall not be applicable and the failure or default shall be an immediate Event of Default hereunder).

12.4    <u>Default under Loan Documents</u>.  Any failure to perform or default in the performance by any Credit Party that continues after applicable grace and cure periods under any covenant, condition or agreement contained in any of the other Loan Documents or any other agreement with Lender, all of which covenants, conditions and agreements are hereby incorporated in this Agreement by express reference.

12.5    <u>Default under Other Obligations</u>.  Any default by the Borrower in the payment of principal, interest or any other sum for any other obligation beyond any period of grace provided with respect thereto or in the performance of any, other term, condition or covenant contained in any agreement (including any capital or operating lease or any agreement in connection with the deferred purchase price of property), the effect of which default is to cause or permit the holder of such obligation (or the other party to such other agreement) to cause such obligation or agreement to become due prior to its stated maturity, to terminate such other agreement, or to otherwise modify or adversely affect such obligation or agreement in a manner that could have a Material Adverse Effect on any Credit Party.

12.6    <u>Assignment for Creditors</u>.  Any Credit Party other than the Borrower makes an assignment for the benefit of creditors, fails to pay, or admits in writing its inability to pay its debts as they mature; or if a trustee of any substantial part of the assets of the Credit Parties other than the Borrower is applied for or appointed, and in the case of such trustee being appointed in a Proceeding brought against any of the Credit Parties other than the Borrower, any Credit Party other than the Borrower, by any action or failure to act indicates its approval of, consent to, or acquiescence in such appointment and such appointment is not vacated, stayed on appeal or otherwise shall not have ceased to continue in effect within sixty (60) days after the date of such appointment.

12.7    <u>Bankruptcy</u>.  Any Proceeding, other than the Case, , is commenced by or against any of the Credit Parties other than the Borrower under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law or statute of the federal government or any state government, and in the case of any such Proceeding being instituted against any of the Credit Parties other than the Borrower: (i) any of the Credit Parties other than the Borrower, by any action or failure to act, indicates its approval of, consent to or acquiescence therein; or (ii) an order shall be entered approving the petition in such Proceedings and such order is not vacated, stayed on appeal or otherwise shall not have ceased to continue in effect within sixty (60) days after the entry thereof.

12.8    <u>Motions Effecting Financing Order/Loan Documents</u>. Borrower or any creditor or committee of creditors (except following Lender's prior written request or with

Lender's express prior written consent, and no such consent shall be implied from any other action, inaction, or acquiescence of Lender) shall file a motion with the Bankruptcy Court or any other court with jurisdiction in the matter seeking an order, or an order is otherwise entered, modifying, reversing, revoking, staying, rescinding, vacating, or amending the Financing Orders, or any of the other Loan Documents.

12.9    Appointment of Trustee, Examiner or Other Fiduciary. The appointment in the Case of a trustee, examiner, or any other fiduciary for Borrower or any property of the Borrower.

12.10    Order Dismissing or Converting the Case. The entry of an order dismissing the Case or converting the Case to a case under Chapter 7 of the Bankruptcy Code.

12.11    Certain Bankruptcy Court Orders/Pleadings.

(a)        Borrower shall file any motion seeking Bankruptcy Court approval of, or any other person shall obtain Bankruptcy Court approval of, a bidding procedures order, sale order, or similar such order, or an order confirming a plan other than an plan acceptable to the Lender is entered by the Bankruptcy Court, unless Lender has expressly joined in or consented to such plan, such order, or such motion in writing.

(b)        Borrower or any creditor or committee of creditors (except following Lender's prior written request or with Lender's express prior written consent, and no such consent shall be implied from any other action, inaction, or acquiescence of Lender) shall file a motion with the Bankruptcy Court or any other court with jurisdiction in the matter seeking an order, or an order is otherwise entered, modifying, reversing, revoking, staying, rescinding, vacating, or amending the Financing Orders, or any of the other Loan Documents.

(c)        The filing of any motion or other request with the Bankruptcy Court seeking authority to use any cash proceeds of any of the Collateral in a manner inconsistent with the Financing Orders or any other Loan Document.

(d)        Borrower shall file any motion or application, or the Bankruptcy Court allows the motion or application of any other Person, which seeks approval for or allowance of (i) the authority to use any cash in Borrrower's possession, or (ii) any claim, Lien, or security interest ranking equal or senior in priority to the claims, Liens and security interests granted to Lender under the Financing Orders or the other Loan Documents or any such equal or prior claim, Lien, or security interest shall be established in any manner, except, in any case, as expressly permitted under the Financing Orders.

(e)        Borrower's obtaining any other financing under any section of the Bankruptcy Code with respect to any of the Collateral secured by a Lien which is senior to any Lien or Superpriority Claim held by or granted to Lender, unless the proceeds of any such financing are to be immediately applied upon closing to the full payment and performance of all of the Obligations hereunder and under any Loan Document.

(f)        Borrower, any committee of creditors, or any party in interest shall file a pleading in the Bankruptcy Court or any court of competent jurisdiction (i) challenging the

validity, extent, perfection, enforceability or priority of any of (or any part of) the Indebtedness or the Liens or Superpriority Claim of Lender securing the Indebtedness, (ii) challenging the validity or enforceability of any Loan Document, (iii) asserting any claims against Lender, or (iv) seeking to surcharge the Collateral securing the Indebtedness, or an order is otherwise entered granting any such relief.

(g)     The entry of an order which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code, which order permits any creditor, other than Lender, to realize upon, or to exercise any right or remedy with respect to, any asset of Borrower other than the Borrower's real property.

12.12   Cessation of Operations. Borrower's cessation of all or any material part of its remaining business operations.

12.13   Failure to Perform under Financing Orders. Borrower shall fail to comply or shall default in the performance of any term of the Financing Orders or any other "Event of Default" under and as defined in either of the Financing Orders shall occur

12.14   Final DIP Order; Other Financing Orders. The Bankruptcy Court shall not have entered the Final DIP Order by [dated] (or such other date as Lender agrees to in writing), or any Financing Order shall cease to be in full force and effect from and after the date of entry thereof by the Bankruptcy Court.

12.15   Judgments.   The entry of any judgment, decree, levy, attachment, garnishment or other process, or the filing of any Lien against the property of any of the Credit Parties, unless such judgment or other process shall have been, within sixty (60) days from the entry thereof: (i) bonded over to the satisfaction of Lender and appealed; (ii) vacated; or (iii) discharged.

12.16   Material Adverse Effect.   A Material Adverse Effect shall occur.

12.17   Change in Control.   Except as permitted under this Agreement, any Change in Control shall occur; provided, however, a Change in Control shall not constitute an Event of Default if: (i) it arises out of an event or circumstance beyond the reasonable control of the Credit Parties (for example, but not by way of limitation, a transfer of ownership interest due to death or incapacity); and (ii) within sixty (60) days after such Change in Control, the Credit Parties provide Lender with information concerning the identity and qualifications of the individual or individuals who will be in Control, and such individual or individuals shall be acceptable to Lender, in Lender's sole discretion.

12.18   Collateral Impairment.   The entry of any judgment, decree, levy, attachment, garnishment or other process, or the filing of any Lien against, any of the Collateral or any collateral under a separate security agreement securing any of the Obligations, and such judgment or other process shall not have been, within thirty (30) days from the entry thereof: (i) bonded over to the satisfaction of Lender and appealed; (ii) vacated; or (iii) discharged, or the loss, theft, destruction, seizure or forfeiture, or the occurrence of any material deterioration or impairment of any of the Collateral or any of the Collateral under any security agreement securing any of the Obligations, or any

material decline or depreciation in the value or market price thereof (whether actual or reasonably anticipated), which causes the Collateral, in the sole opinion of Lender acting in good faith, to become unsatisfactory as to value or character, or which causes Lender to reasonably believe that it is insecure and that the likelihood for repayment of the Obligations is or will soon be impaired, time being of the essence.  The cause of such deterioration, impairment, decline or depreciation shall include, but is not limited to, the failure by the Credit Parties to do any act deemed reasonably necessary by Lender to preserve and maintain the value and collectability of the Collateral.

12.19   <u>Adverse Change in Financial Condition</u>.  The determination in good faith by Lender that a material adverse change has occurred in the financial condition or operations of any of the Credit Parties, or the Collateral, which change could have a Material Adverse Effect, or otherwise adversely affect the prospect for Lender to fully and punctually realize the full benefits conferred on Lender by this Agreement, or the prospect of repayment of all Obligations.

12.20   <u>Adverse Change in Value of Collateral</u>.  The determination in good faith by Lender that the security for the Obligations is or has become inadequate.

12.21   <u>Prospect of Payment or Performance</u>.  The determination in good faith by Lender that the prospect for payment or performance of any of the Obligations is impaired for any reason.

12.22   <u>Segregated Account</u>.  The determination in good faith by the Lender that there has been a failure to perform or default in the performance by a Credit Party of Section 2.1(e) of this Agreement.

12.23   <u>Adequate Protection to other Creditors</u>. If any creditor of Borrower receives any adequate protection payment which is not fully acceptable to Lender in its reasonable discretion or any Lien is granted as adequate protection other than as set forth in any Financing Order.

12.24   <u>Consolidation Order</u>. The entry of an order for the substantive consolidation of Borrower or the Estate with any other Person or Entity, without the written consent of Lender which shall not be unreasonably withheld.

12.25   <u>Financing Order Deadlines</u>. Any deadline contained in any Financing Order is not met.

12.26   <u>Purchase Agreements</u>. Borrower shall file with the Bankruptcy Court or enter into any asset purchase agreement with any third party unless such asset purchase agreement has been approved by Lender in its discretion.

12.27   <u>Use of Proceeds in Conformity with Budget</u>. Borrower shall fail to utilize the proceeds of the Loan or use cash in Borrrower's possession in strict conformity with the Budget.

12.28   <u>Budget Variations</u>. During any month covered by a Budget, their shall have occurred an Unpermitted Variance provided, however, Borrower may carry over from the prior month to the next two succeeding months (but not to any subsequent months) any unused portion of a budgeted line item expense in the prior month, and an actual line item expense in any month shall be first applied to any unused portion of such line item budgeted expense from the least recent prior month that is carried over to such month.

12.29   <u>"Event of Default" under the Transaction Documents</u>. Any "Event of Default" for purposes of the Transaction Documents (as defined in the Purchase Agreement).

## 13.   REMEDIES.

(a)      Following the occurrence and during the continuance of any Event of Default, upon five (5) Business Days' written notice to Borrower, with a copy to the Office of the United States Trustee (a "**Default Notice**"), Lender may exercise any or all of the following rights and remedies in accordance with and subject to the terms of the Financing Orders:

(i)      Lender shall not have any obligation to make any further Advances, and Lender may, upon a Default Notice, declare its commitment hereunder to be terminated, whereupon the same shall forthwith terminate.

(ii)      Lender may, upon a Default Notice, declare the Indebtedness to be forthwith and immediately due and payable, whereupon all Indebtedness shall become and be forthwith and immediately due and payable, without presentment, notice of dishonor, protest or further notice of any kind, all of which Borrower hereby expressly waives.

(iii)      Lender may exercise and enforce its rights and remedies under the other Loan Documents.

(iv)      Lender shall be entitled to seek, on an expedited basis, modification of any automatic stay otherwise applicable to Lender so that Lender shall be entitled to enforce its rights and remedies in accordance with the Financing Orders and the other Loan Documents.

(v)      Immediately following the occurrence of an Event of Default: (i) Borrower shall continue to deliver and cause the delivery of the proceeds of Collateral as provided in the Financing Orders; (ii) such proceeds shall continue to be applied in accordance with the provisions of the Financing Orders; and (iii) Borrower shall have no right to use any of such proceeds, nor any other cash in Borrower's possession other than towards the satisfaction of the Indebtedness in accordance with and subject to the terms of the Financing Orders.

(vi)      Lender shall be entitled to seek the appointment of a Chapter 11 trustee and have an expedited hearing with respect to such request, on not more than three (3) Business Days notice, subject to the Bankruptcy Court's calendar.

(vii)     Lender may exercise any other rights and remedies available to it by law or agreement (the exercise of any right under any of the foregoing clauses (i) through (vi), a "**Termination Declaration**");.

(b)          Notwithstanding anything to the contrary contained in the Financing Order or in any other Loan Document, in connection with its exercise of remedies, Lender shall have the right to make such protective and other advances as it deems necessary or appropriate in order to protect or liquidate the Collateral or to otherwise enhance the recovery from the Collateral (the "**Protective Advances**"), the repayment of which Protective Advances shall become part of the Indebtedness under the Loan Documents. Upon the occurrence and during the continuance of an Event of Default, Lender shall have all rights, powers and remedies set forth in the Loan Documents, in any written agreement or instrument (other than this Agreement or the Loan Documents) relating to any of the Obligations or any security therefor, or as otherwise provided at law or in equity.

(c)          No Event of Default shall be waived by Lender, except and unless such waiver is in writing and signed by Lender.  No failure or delay on the part of Lender in exercising any right, power or remedy hereunder shall operate as a waiver of the exercise of the same or any other right at any other time; nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder.  There shall be no obligation on the part of Lender to exercise any remedy available to Lender in any order. The remedies provided for herein are cumulative and not exclusive of any remedies provided at law or in equity.  The Credit Parties agree that in the event that Borrower fails to perform, observe or discharge any of its Obligations or liabilities under this Agreement, the Revolving Note, and other Loan Documents, or any other agreements with Lender, no remedy of law will provide adequate relief to Lender, and further agrees that Lender shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages.

## 14.     MISCELLANEOUS.

14.1     <u>Obligations Absolute</u>.  None of the following shall affect the Obligations of the Credit Parties to Lender under this Agreement or Lender's rights with respect to the Collateral:

(a)          acceptance or retention by Lender of other property or any interest in property as security for the Obligations;

(b)          release by Lender of all or any part of the Collateral or of any party liable with respect to the Obligations (other than Borrower);

(c)          release, extension, renewal, modification or substitution by Lender of the Revolving Note, or any note evidencing any of the Obligations; or

(d)          failure of Lender to resort to any other security or to pursue the Credit Parties or any other obligor liable for any of the Obligations before resorting to remedies against the Collateral.

14.2  <u>Entire Agreement</u>.  This Agreement and the other Loan Documents: (i) are valid, binding and enforceable against the Credit Parties and Lender in accordance with their provisions and no conditions exist as to their legal effectiveness; (ii) constitute the entire agreement between the parties; and (iii) are the final expression of the intentions of the Credit Parties and Lender.  No promises, either expressed or implied, exist between the Credit Parties and Lender, unless contained herein or in the Loan Documents.  This Agreement and the Loan Documents supersede all negotiations, representations, warranties, commitments, offers, contracts (of any kind or nature, whether oral or written) prior to or contemporaneous with the execution hereof. **EACH CREDIT PARTY ACKNOWLEDGES THAT HE/SHE/IT HAS NOT RELIED UPON ANY STATEMENTS, PROMISES OR REPRESENTATIONS, IF ANY, THAT ARE NOT CONTAINED WITHIN THIS AGREEMENT OR IN ANY OTHER THE LOAN DOCUMENT AND WAIVES ANY RIGHTS, DEFENSES, OR CLAIMS ARISING FROM ANY SUCH STATEMENTS, PROMISES OR REPRESENTATION**S.

14.3  <u>Amendments; Waivers</u>.  No promises of future action, amendment, modification, forbearance, termination, discharge or waiver of any provision of this Agreement or of the Loan Documents, nor any consent to any departure from the terms of this Agreement or any other Loan Document, by the Credit Parties therefrom, shall in any event be effective unless the same shall be in writing and signed by Lender, and then such waiver or consent shall be effective only for the specific purpose for which given. This Agreement does not permit implied amendments based upon course of dealing or silence or oral representations of any sort.

14.4  **<u>WAIVER OF CLAIMS AND DEFENSES</u>. THE CREDIT PARTIES WAIVE EVERY PRESENT AND FUTURE DEFENSE, CAUSE OF ACTION, COUNTERCLAIM OR SETOFF WHICH THE CREDIT PARTIES MAY NOW HAVE AS OF THE DATE HEREOF, OR AS THEY MAY IN THE FUTURE COME TO HAVE, TO ANY ACTION BY LENDER IN ENFORCING THIS AGREEMENT OR ANY OTHER LOAN DOCUMENTS -- OTHER THAN FOR SET OFF TO ESTABLISH THE AMOUNTS DUE AND PAID IN RESPCT OF THE LOANS. THE CREDIT PARTIES UNDERSTAND AND AGREE THAT THEY ARE WAIVING DEFENSES AND CLAIMS WHICH MAY NOT YET HAVE ACCRUED OR OF WHICH THEY MAY NOT YET BE AWARE AS MATERIAL INDUCEMENT FOR LENDER ENTERING THIS AGREEMENT AND GRANTING ANY FINANCIAL ACCOMMODATION TO THE CREDIT PARTIES. THIS PROVISION IS INTENDED TO BE CONSTRUED AS BROADLY AS PERMISSIBLE UNDER APPLICABLE LAW. FURTHER, EACH OF THE CREDIT PARTIES UNDERSTANDS AND ACKNOWLEDGES THAT THE AGENTS AND REPRESENTATIVES OF THE LENDER DO NOT HAVE AUTHORITY TO MAKE ANY STATEMENTS, PROMISES OR REPRESENTATIONS IN CONFLICT WITH OR IN ADDITION TO THE INFORMATION CONTAINED IN THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, AND LENDER HEREBY SPECIFICALLY DISCLAIMS ANY RESPONSIBILITY FOR ANY SUCH STATEMENTS, PROMISES OR REPRESENTATIONS. BY EXECUTION OF THIS AGREEMENT, EACH CREDIT PARTY ACKNOWLEDGES THAT HE/SHE/IT HAS NOT RELIED**

**UPON SUCH STATEMENTS, PROMISES OR REPRESENTATIONS, IF ANY, AND WAIVES ANY RIGHTS, DEFENSES, OR CLAIMS ARISING FROM ANY SUCH STATEMENTS, PROMISES OR REPRESENTATIONS.**.

14.5    <u>WAIVER OF JURY TRIAL</u>. LENDER AND CREDIT PARTIES, AFTER CONSULTING OR HAVING HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL, KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE, IRREVOCABLY, THE RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE REVOLVING NOTE, ANY LOAN DOCUMENT OR ANY OF THE OBLIGATIONS, THE COLLATERAL, OR ANY OTHER AGREEMENT EXECUTED OR CONTEMPLATED TO BE EXECUTED IN CONJUNCTION WITH THIS AGREEMENT, OR ANY COURSE OF CONDUCT OR COURSE OF DEALING IN WHICH LENDER AND CREDIT PARTIES ARE ADVERSE PARTIES.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER GRANTING ANY FINANCIAL ACCOMMODATION TO BORROWER.

14.6    **<u>MANDATORY FORUM SELECTION</u>.  TO INDUCE LENDER TO MAKE THE LOANS, EACH OF THE CREDIT PARTIES IRREVOCABLY AGREES THAT ANY DISPUTE ARISING UNDER, RELATING TO, OR IN CONNECTION WITH, DIRECTLY OR INDIRECTLY, THIS AGREEMENT OR RELATED TO ANY MATTER WHICH IS THE SUBJECT OF OR INCIDENTAL TO THIS AGREEMENT ANY OTHER LOAN DOCUMENT, OR THE COLLATERAL (WHETHER OR NOT SUCH CLAIM IS BASED UPON BREACH OF CONTRACT OR TORT) SHALL, EXCEPT AS HEREINAFTER PROVIDED, BE SUBJECT TO THE EXCLUSIVE JURISDICTION AND VENUE OF THE STATE AND/OR FEDERAL COURTS LOCATED IN BROWARD COUNTY, FLORIDA; PROVIDED, HOWEVER, LENDER MAY, AT LENDER'S SOLE OPTION, ELECT TO BRING ANY ACTION IN ANY OTHER JURISDICTION. THIS PROVISION IS INTENDED TO BE A "MANDATORY" FORUM SELECTION CLAUSE AND GOVERNED BY AND INTERPRETED CONSISTENT WITH FLORIDA LAW. EACH OF THE CREDIT PARTIES HEREBY CONSENTS TO THE EXCLUSIVE JURISDICTION AND VENUE OF ANY STATE OR FEDERAL COURT HAVING IT SITUS IN SUCH COUNTY (OR TO ANY JURISDICTION OR VENUE, IF LENDER SO ELECTS), AND EACH OF THE CREDIT PARTIES HEREBY WAIVES ANY OBJECTION BASED ON FORUM NON CONVENIENS.**

14.7    **<u>WAIVER OF PERSONAL SERVICE</u>. EACH CREDIT PARTY HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND CONSENTS THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, OR BY FEDERAL EXPRESS, DIRECTED TO THE BORROWER, AS SET FORTH AND ACCORDING TO THE TERMS IN THE NOTICE PROVISIONS HEREIN. EACH OF THE CREDIT PARTIES AGREES THAT NO ACKNOWLEDGMENT OF ACTUAL RECEIPT OF PROCESS IS REQUIRED AND SERVICE WILL BE DEEMED EFFECTIVE PURSUANT TO TERMS OF NOTICE PROVISIONS**

**CONTAINED HEREIN. SERVICE MAY ALSO BE MADE IN ANY MANNER PROVIDED BY APPLICABLE STATUTE, LAW, RULE OF COURT OR OTHERWISE.**

14.8    <u>Usury/High Interest Savings Clause</u>. Notwithstanding any provision in this Agreement or the other Loan Documents, the total liability for payments of interest and payments in the nature of interest, including, without limitation, all charges, fees, exactions, or other sums which may at any time be deemed to be interest, shall not exceed the limit imposed by the usury laws of the jurisdiction governing this Agreement or any other applicable law. **EACH OF THE CREDIT PARTIES UNDERSTANDS AND ACKNOWLEDGES THAT IT HAS HAD AN OPPORTUNITY TO REVIEW AND DISCUSS THE OPERATION OF THIS AGREEMENT, ANY FEES, INTEREST, OR OTHER CHARGES OCCASIONED IN THE LOAN DOCUMENTS WITH A COMPETENT ATTORNEY OF THEIR CHOOSING, AND DOES IN FACT UNDERSTAND THEIR OPERATION AND THUS AGREES THAT IT IS NOT THE LENDER'S INTENT TO CHARGE ANY AMOUNT, FEE, OR INTEREST HIGHER THAN THAT PERMITTED UNDER APPLICABLE LAW, AND THAT IN FACT, THE OBLIGATIONS AND EFFECT OF THE LOAN DOCUMENTS DO NOT CALL FOR THE PAYMENT OF ANY AMOUNT, FEE, INTEREST OR CHARGE GREATER THAN THAT PERMITTED BY APPLICABLE LAW.** In the event the total liability of payments of interest and payments in the nature of interest, including, without limitation, all charges, fees, exactions or other sums which may at any time be deemed to be interest, shall, for any reason whatsoever, result in an effective rate of interest, which for any month or other interest payment period exceeds the limit imposed by the usury laws of the jurisdiction governing this Agreement or any other applicable laws, all sums in excess of those lawfully collectible as interest for the period in question shall, without further agreement or notice by, between, or to any party hereto, be applied to the reduction of the outstanding principal balance of this Agreement immediately upon receipt of such sums by the Lender, with the same force and effect as though the Borrower had specifically designated such excess sums to be so applied to the reduction of such outstanding principal balance and the Lender had agreed to accept such sums as a penalty-free payment of principal; provided, however, that the Lender may, at any time and from time to time, elect, by notice in writing to the Borrower, to waive, reduce, or limit the collection of any sums in excess of those lawfully collectible as interest rather than accept such sums as a prepayment of the outstanding principal balance.  It is the intention of the parties that the Borrower does not intend or expect to pay nor does the Lender intend or expect to charge or collect any interest under this Agreement greater than the highest legal, non-usurious rate of interest which may be charged under applicable law.

14.9    <u>Assignability</u>. Lender may at any time assign Lender's rights in this Agreement, the Revolving Note, any Loan Documents, the Obligations, or any part thereof, and transfer Lender's rights in any or all of the Collateral, all without the Credit Parties' consent or approval, and Lender thereafter shall be relieved from all liability with respect to such instrument or Collateral so transferred.  In addition, Lender may at any time sell one or more participations in the Loans, all without the Credit Parties' consent or approval. The Credit Parties may not sell or assign this Agreement, any Loan Document or any other agreement with Lender, or any portion thereof, either voluntarily or by operation of law,

nor delegate any of its duties or obligations hereunder or thereunder, without the prior written consent of Lender, which consent may be withheld in Lender's sole and absolute discretion. This Agreement shall be binding upon Lender and the Credit Parties and their respective legal representatives, successors and permitted assigns. All references herein to a Credit Party shall be deemed to include any successors, whether immediate or remote. In the case of a joint venture or partnership, the term "Borrower" or "Credit Party" shall be deemed to include all joint venturers or partners thereof, who shall be jointly and severally liable hereunder.

14.10   Confidentiality. Each of the Credit Parties shall keep confidential any information obtained from Lender (except information publicly available or in Credit Parties' domain prior to disclosure of such information from Lender, and except as required by applicable laws) and shall promptly return to the Lender all schedules, documents, instruments, work papers and other written information without retaining copies thereof, previously furnished by it as a result of this Agreement or in connection herewith.

14.11   Publicity. Lender shall have the right to approve, before issuance, any press release or any other public statement with respect to the transactions contemplated hereby made by the Credit Parties; provided, however, that the Credit Parties shall be entitled, without the prior approval of Lender, to issue any press release or other public disclosure with respect to such transactions required under applicable securities or other laws or regulations. Notwithstanding the foregoing, the Credit Parties shall use their best efforts to consult Lender in connection with any such press release or other public disclosure prior to its release and Lender shall be provided with a copy thereof upon release thereof. Lender shall have the right to make any press release with respect to the transactions contemplated hereby without the Credit Parties' approval. In addition, with respect to any press release to be made by Lender, the Borrower hereby authorizes and grants blanket permission to Lender to include such Borrower's stock symbol, if any, in any press releases. The Borrower shall, promptly upon request, execute any additional documents of authority or permission as may be requested by Lender in connection with any such press releases.

14.12   Binding Effect. This Agreement shall become effective upon execution by the Credit Parties and Lender.

14.13   Governing Law. Except in the case of the Mandatory Forum Selection Clause in Section 14.6 above, which clause shall be governed and interpreted in accordance with Florida law, this Agreement, the Loan Documents and the Revolving Note shall be delivered and accepted in, and shall be deemed to be contracts made under and governed by, the internal laws of the State of Wyoming, and for all purposes shall be construed in accordance with the laws of the State of Wyoming, without giving effect to the choice of law provisions of such State. The governing law provisions of this Section 14.13 are a material inducement for Lender to enter into this Agreement, and the Borrower hereby agrees, acknowledges and understands that the Lender would not have entered into this Agreement, nor made or provided the Loans, without the full agreement and consent of the Credit Parties, with full knowledge and understanding, that except in the case of the Mandatory Forum Selection Clause in Section 14.6 above, which clause shall be governed and interpreted in accordance with Florida law, this Agreement, and each of the Loan

Documents, shall be governed by the internal laws of the State of Wyoming, and for all purposes shall be construed in accordance with the laws of the State of Wyoming, without giving effect to the choice of law provisions. In this regard, each of the Credit Parties hereby acknowledges that it has reviewed this Agreement and all Loan Documents, and specifically, this Section 14.13, with competent counsel selected by the Credit Parties, and in that regard, each of the Credit Parties fully understands the choice of law provisions set forth in this Section. In addition, each of the Credit Parties agree, and acknowledge that it has had an opportunity to negotiate the terms and provisions of this Agreement and the other Loan Documents with and through its counsel, and that the Credit Parties have sufficient leverage and economic bargaining power, and have used such leverage and economic bargaining power, to fairly and fully negotiate this Agreement and the other Loan Documents in a manner that is acceptable to the Credit Parties. Moreover, because of the material nature of this choice of law provision in inducing Lender to enter into this Agreement and to make the Loans to the Credit Parties, each of the Credit Parties hereby fully and absolutely waives any and all rights to make any claims, counterclaims, defenses, to raise or make any arguments (including any claims, counterclaims, defenses, or arguments based on grounds of public policy, unconscionability, or implied covenants of fair dealing and good faith), or to otherwise undertake any litigation strategy or maneuver of any nature or kind that would result in, or which otherwise seeks to, invalidate this choice of law provision, or that would otherwise result in or require the application of the laws of any other State other than the State of Wyoming in the interpretation or governance of this Agreement or any other Loan Documents (except for the Mandatory Forum Selection clause in Section 14.6 hereof). Each of the Credit Parties has carefully considered this Section 14.13 and has carefully reviewed its application and effect with competent counsel, and in that regard, fully understands and agrees that Lender would not have entered into this Agreement, nor made the Loans, without the express agreement and acknowledgement of each of the Credit Parties to this choice of law provision, and the express waivers set forth herein.

14.14   Enforceability. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by, unenforceable or invalid under any jurisdiction, such provision shall as to such jurisdiction, be severable and be ineffective to the extent of such prohibition or invalidity, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

14.15   Survival of Borrower's Representations.   All covenants, agreements, representations and warranties made by the Credit Parties herein shall, notwithstanding any investigation by Lender, be deemed material and relied upon by Lender and shall survive the making and execution of this Agreement and the Loan Documents and the issuance of the Revolving Note, and shall be deemed to be continuing representations and warranties until such time as the Credit Parties have fulfilled all of their Obligations to Lender, and Lender has been indefeasibly paid in full. Lender, in extending financial accommodations to Borrower, is expressly acting and relying on the aforesaid representations and warranties.

14.16   <u>Extensions of Lender's Commitment and the Revolving Note</u>.   This Agreement shall secure and govern the terms of any extensions or renewals of Lender's commitment hereunder and the Revolving Note pursuant to the execution of any modification, extension or renewal note executed by Borrower, consented and agreed to by the Guarantors, and accepted by Lender in its sole and absolute discretion in substitution for the Revolving Note.

14.17   <u>Time of Essence</u>.   Time is of the essence in making payments of all amounts due Lender under this Agreement and in the performance and observance by the Credit Parties of each covenant, agreement, provision and term of this Agreement.

14.18   <u>Execution</u>.   This Agreement may be executed in one or more counterparts, all of which taken together shall be deemed and considered one and the same Agreement. In the event that any signature of this Agreement or any other Loan Documents is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format file or other similar format file, such signature shall be deemed an original for all purposes and shall create a valid and binding obligation of the party executing same with the same force and effect as if such facsimile or ".pdf" signature page was an original thereof.   Notwithstanding the foregoing, Lender shall not be obligated to accept any document or instrument signed by facsimile transmission or by e-mail delivery of a ".pdf" format file or other similar format file as an original, and may in any instance require that an original document be submitted to Lender in lieu of, or in addition to, any such document executed by facsimile transmission or by e-mail delivery of a ".pdf" format file or other similar format file.

14.19   <u>Notices</u>.   Any notices, consents, waivers, or other communications required or permitted to be given under the terms of this Agreement must be in writing and in each case properly addressed to the party to receive the same in accordance with the information below, and will be deemed to have been delivered: (i) if mailed by certified mail, return receipt requested, postage prepaid and properly addressed to the address below, then three (3) Business Days after deposit of same in a regularly maintained U.S. Mail receptacle; or (ii) if mailed by Federal Express, UPS or other nationally recognized overnight courier service, overnight delivery, then one (1) Business Day after deposit of same in a regularly maintained receptacle of such overnight courier; or (iii) if hand delivered, then upon hand delivery thereof to the address indicated on or prior to 5:00 p.m., EST, on a Business Day. Any notice hand delivered after 5:00 p.m., EST, shall be deemed delivered on the following Business Day.   Notwithstanding the foregoing, notice, consents, waivers or other communications referred to in this Agreement may be sent by facsimile, e-mail, or other method of delivery, but shall be deemed to have been delivered only when the sending party has confirmed (by reply e-mail or some other form of written confirmation) that the notice has been received by the other party.   The addresses and facsimile numbers for such communications shall be as set forth below and shall be deemed valid and operative unless such address or information is changed by a notice conforming to the requirements hereof. It is the independent duty of each of the Credit Parties to promptly notify Lender of any change in their actual address and to provide a current e-mail address at which they can be contacted. No notice to or demand on Borrower in any case shall entitle Borrower to any other or further notice or demand in similar or other circumstances:

| | |
|---|---|
| If to the Borrower or any of the Corporate Guarantors: | Zenergy Brands, Inc.<br>5700 Granite Parkway, Suite #200<br>Plano, TX 75024<br>Attention:   Josh Campbell<br>E-Mail:       jcampbell@whatiszenergy.com |
| With a copy to: | |
| | Attention:<br>E-Mail: |
| If to the Lender: | TCA Special Situations Credit Strategies ICAV<br>1315 S. Hwy 89<br>Suite 101<br>Jackson, Wyoming 83001<br>Attention:   Alyce Schreiber<br>E-Mail:       aschreiber@tcaglobalfund.com |
| With a copy to: | Lucosky Brookman LLP<br>101 Wood Avenue South<br>Woodbridge, NJ 08830<br>Attention:   Seth A. Brookman<br>E-Mail:       sbrookman@lucbro.com |

14.20  <u>Indemnification</u>.  As a material inducement for Lender to enter into this Agreement, the Credit Parties agree to defend, protect, indemnify and hold harmless Lender, and its parent companies, Subsidiaries, Affiliates, divisions, and their respective attorneys, officers, directors, agents, shareholders, members, partners, employees, and representatives, and the predecessors, successors, assigns, personal representatives, heirs and executors of each of them (including those retained in connection with the transactions contemplated by this Agreement) (each, a "**<u>Lender Indemnitee</u>**" and collectively, the "**<u>Lender Indemnitees</u>**") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, Proceedings, suits, claims, costs, expenses and distributions of any kind or nature (including the disbursements and the reasonable fees of counsel and paralegals for each Lender Indemnitee thereto throughout all trial and appellate levels, bankruptcy Proceedings, mediations, arbitrations, administrative hearings and at all other levels and tribunals), which may be imposed on, incurred by, or asserted against, any Lender Indemnitee (whether direct, indirect or consequential and whether based on any federal, state or local laws or regulations, including securities, Environmental Laws and commercial laws and regulations, under common law or in equity, or based on contract, tort, or otherwise) in any manner relating to or arising out of this Agreement or any of the Loan Documents, or any act, event or transaction related or attendant thereto, the preparation, execution and delivery of this Agreement and the Loan Documents, including

the making or issuance and management of the Loans, the use or intended use of the proceeds of the Loans, the enforcement of Lender's rights and remedies under this Agreement, the Loan Documents, the Revolving Note, any other instruments and documents delivered hereunder, or under any other agreement between the Borrower and Lender.  To the extent that the undertaking to indemnify set forth in the preceding sentence may be unenforceable because it violates any law or public policy, the Credit Parties shall satisfy such undertaking to the maximum extent permitted by applicable law.  Any liability, obligation, loss, damage, penalty, cost or expense covered by this indemnity shall be paid to each Lender Indemnitee on demand, and, failing prompt payment, shall, together with interest thereon at the Default Rate from the date incurred by each Lender Indemnitee until paid by Borrower, be added to the Obligations of Borrower and be secured by the Collateral.  The provisions of this Section shall survive the satisfaction and payment of the other Obligations and the termination of this Agreement.

14.21  **WAIVER AND RELEASE.  IN CONSIDERATION OF THE MUTUAL PROMISES AND COVENANTS MADE HEREIN, AND OTHER GOOD AND VALUABLE CONSIDERATION, THE RECEIPT AND SUFFICIENCY OF WHICH IS HEREBY ACKNOWLEDGED, AND INTENDING TO BE LEGALLY BOUND HEREBY, EACH CREDIT PARTY HEREBY AGREES TO FULLY, FINALLY AND FOREVER RELEASE AND FOREVER DISCHARGE AND COVENANT NOT TO SUE THE LENDER INDEMNITEES, AND EACH ONE OF THEM, FROM ANY AND ALL DEBTS, FEES, ATTORNEYS' FEES, LIENS, COSTS, EXPENSES, DAMAGES, SUMS OF MONEY, ACCOUNTS, BONDS, BILLS, COVENANTS, PROMISES, JUDGMENTS, CHARGES, DEMANDS, CLAIMS, CAUSES OF ACTION, PROCEEDINGS, SUITS, LIABILITIES, EXPENSES, OBLIGATIONS OR CONTRACTS OF ANY KIND WHATSOEVER, WHETHER IN LAW OR IN EQUITY, WHETHER ASSERTED OR UNASSERTED, WHETHER KNOWN OR UNKNOWN, FIXED OR CONTINGENT, UNDER STATUTE OR OTHERWISE, FROM THE BEGINNING OF TIME THROUGH THE EFFECTIVE DATE AND FROM THE EFFECTIVE DATE THROUGH THE FUTURE, INCLUDING ANY AND ALL CLAIMS RELATING TO OR ARISING OUT OF ANY FINANCING TRANSACTIONS, CREDIT FACILITIES, NOTES, DEBENTURES, SECURITY AGREEMENTS, AND OTHER AGREEMENTS, INCLUDING EACH OF THE LOAN DOCUMENTS, ENTERED INTO BY THE CREDIT PARTIES WITH LENDER. WITHOUT IN ANY MANNER LIMITING THE GENERALITY OF THE FOREGOING RELEASE, EACH OF THE CREDIT PARTIES HEREBY AGREES AND ACKNOWLEDGES THAT THEY ARE RELEASING ANY CLAIMS THEY HAVE NOW WHICH HAVE ACCRUED OR WHICH MAY ACCRUE IN THE FUTURE, SPECIFICALLY INCLUDING BUT NOT LIMITED TO: (A) ANY AND ALL CLAIMS REGARDING OR RELATING TO THE ENFORCEABILITY OF THE LOAN DOCUMENTS AS AGAINST ANY OF THE CREDIT PARTIES; (B) ANY AND ALL CLAIMS REGARDING, RELATING TO, OR OTHERWISE CHALLENGING THE GOVERNING LAW PROVISIONS OF THE LOAN DOCUMENTS ; (C) ANY AND ALL CLAIMS REGARDING OR RELATING TO THE AMOUNT OF PRINCIPAL, INTEREST, FEES OR OTHER OBLIGATIONS DUE FROM ANY OF THE CREDIT PARTIES TO THE LENDER UNDER ANY**

**OF THE LOAN DOCUMENTS ; (D) ANY AND ALL CLAIMS REGARDING OR RELATING TO THE LENDER'S CONDUCT OR LENDER'S FAILURE TO PERFORM ANY OF LENDER'S COVENANTS OR OBLIGATIONS UNDER ANY OF THE LOAN DOCUMENTS; (E) ANY AND ALL CLAIMS REGARDING OR RELATING TO ANY DELIVERY OR FAILURE TO DELIVER ANY NOTICES BY THE LENDER TO THE CREDIT PARTIES; (F) ANY AND ALL CLAIMS REGARDING OR RELATING TO ANY FAILURE BY THE LENDER TO FUND ANY ADVANCES OR OTHER AMOUNTS UNDER ANY OF THE LOAN DOCUMENTS; (G) ANY AND ALL CLAIMS REGARDING OR RELATING TO ANY ADVISORY OR INVESTMENT BANKING SERVICES (OR THE LACK THEREOF) PROVIDED BY THE LENDER TO ANY OF THE CREDIT PARTIES FOR WHICH ANY ADVISORY OR INVESTMENT BANKING FEES MAY BE DUE AND OWING AND INCLUDED WITHIN THE OBLIGATIONS; AND (H) ANY AND ALL CLAIMS BASED ON GROUNDS OF PUBLIC POLICY, UNCONSCIONABILITY, OR IMPLIED COVENANTS OF FAIR DEALING AND GOOD FAITH – OTHER THAN THOSE DEEMED NON-WAIVABLE BY LAW OR APPLICABLE PUBLIC POLICY. THE CREDIT PARTIES FURTHER EXPRESSLY AGREE THAT THE FOREGOING RELEASE AND WAIVER IS INTENDED TO BE AS BROAD AND INCLUSIVE AS PERMITTED BY THE LAWS GOVERNING THE LOAN DOCUMENTS, AND THESE RELEASED CLAIMS INCLUDE CLAIMS THAT THE CREDIT PARTIES DO NOT KNOW OR SUSPECT TO EXIST, WHETHER THROUGH IGNORANCE, OVERSIGHT, ERROR, NEGLIGENCE, OR OTHERWISE, AND WHICH, IF KNOWN, WOULD MATERIALLY AFFECT THEIR DECISION TO ENTER INTO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT. THE CREDIT PARTIES UNDERSTAND THAT THEY COULD HAVE CLAIMS ACCRUE IN THE FUTURE IN CONNECTION HEREWITH, BUT VOLUNTARILY ELECT TO RELEASE THOSE CLAIMS NOW AS AN INDUCEMENT TO THE FINANCIAL ACOMMODATIONS PROVIDED HERE BY THE LENDER. THE FOREGOING WAIVERS AND RELEASES BY THE CREDIT PARTIES ARE A MATERIAL INDUCEMENT FOR THE LENDER TO ENTER INTO THIS AGREEMENT, AND THE LENDER'S AGREEMENT TO ENTER INTO THIS AGREEMENT IS SEPARATE AND MATERIAL CONSIDERATION TO THE CREDIT PARTIES FOR THE WAIVERS AND RELEASES CONTAINED HEREIN, THE RECEIPT AND SUFFICIENCY OF SUCH CONSIDERATION IS HEREBY ACKNOWLEDGED BY THE CREDIT PARTIES. IN ADDITION, EACH OF THE CREDIT PARTIES AGREES AND ACKNOWLEDGES THAT IT HAS HAD AN OPPORTUNITY TO NEGOTIATE THIS SPECIFIC WAIVER AND RELEASE PROVISION OF THIS AGREEMENT, WITH AND THROUGH THEIR OWN COMPETENT COUNSEL. THE FOREGOING WAIVERS AND RELEASES SHALL SURVIVE THE TERMINATION OF THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS, AND REPAYMENT OF THE OBLIGATIONS.**

14.22   <u>Interpretation</u>.   If any provision in this Agreement requires judicial or similar interpretation, the judicial or other such body interpreting or construing such provision shall not apply the assumption that the terms hereof shall be more strictly

construed against one party because of the rule that an instrument must be construed more strictly against the party which itself or through its agents prepared the same. The parties hereby agree that all parties and their agents have participated in the preparation hereof equally.

14.23   Compliance with Federal Law. The Credit Parties shall: (i) ensure that no Person who owns a Controlling interest in or otherwise Controls the Credit Parties is or shall be listed on the Specially Designated Nationals and Blocked Person List or other similar lists maintained by the Office of Foreign Assets Control ("**OFAC**"), the Department of the Treasury, included in any Executive Orders or any other similar lists from any Governmental Authority; (ii) not use or permit the use of the proceeds of the Loans to violate any of the foreign asset control regulations of OFAC or any enabling statute or Executive Order relating thereto, or any other similar national or foreign governmental regulations; and (iii) comply with all applicable Lender Secrecy Act ("**BSA**") laws and regulations, as amended. As required by federal law and Lender's policies and practices, Lender may need to obtain, verify and record certain customer identification information and documentation in connection with opening or maintaining accounts or establishing or continuing to provide services.

14.24   Consents. With respect to any provisions of this Agreement or any other Loan Documents which require the consent or approval of Lender, unless expressly otherwise provided in any such provision, such consent or approval may be granted, conditioned, or withheld by Lender in its sole and absolute discretion. In any event, when any consent or approval of Lender is required under this Agreement or any other Loan Documents, the Credit Parties shall not be entitled to make any claim for, and the Credit Parties hereby expressly waives any claim for, damages incurred by the Credit Parties by reason of Lender's granting, conditioning or withholding any such consent or approval, and the Credit Parties' sole and absolute remedy with respect thereto shall be an action for specific performance. To the extent that any consent or approval is given by Lender under any provision hereunder or under any other Loan Documents, such consent or approval shall only be applicable to the specific instance to which it relates and shall not be deemed to be a continuing or future consent or approval, and any such consent or approval shall not impose any liability or warranty obligation on the Lender.

14.25   Non-U.S. Status. The Lender is a non-U.S. person as that term is defined in the United States Internal Revenue Code. It is hereby agreed and understood that the obligations hereunder may be sold or resold only to non-U.S. persons. The interest payable hereunder is payable only outside the United States. Any U.S. person who holds this obligation will be subject to limitations under the United States income tax law.

**[REMAINDER OF PAGE LEFT BLANK, SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, Borrower and Lender have executed this Credit Agreement as of the date first above written.

**BORROWER**:

**ZENERGY BRANDS, INC.**


By: _____
Name: Josh Campbell
Title: CEO


STATE OF _____  )
          ) SS.
COUNTY OF _____  )


The undersigned, a Notary Public in and for the said County, in the State aforesaid, DOES HEREBY CERTIFY that Josh Campbell, the CEO of Zenergy Brands, Inc., a Nevada corporation, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he/she signed and delivered the said instrument as his/her own free and voluntary act and as the free and voluntary act of said limited liability company, for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this \_\_\_\_\_ day of _____, 20\_\_\_\_.


_____
Notary Public

My Commission Expires:


_____

**LENDER**:

**TCA SPECIAL SITUATIONS CREDIT STRATEGIES ICAV**

By: _____
Name:  Matthew Wrigley
Title:   Director

## CONSENT AND AGREEMENT

The undersigned, referred to in the foregoing senior secured revolving credit facility agreement as a guarantor, hereby consents and agrees to said senior secured revolving credit facility agreement and to the payment of the amounts contemplated therein, documents contemplated thereby, representations and warranties made therein, and to the provisions contained therein relating to conditions to be fulfilled and obligations to be performed by it pursuant to or in connection with said senior secured revolving credit facility agreement to the same extent as if the undersigned were a party to said senior secured revolving credit facility agreement.

**GUARANTOR**:

**ZEN TECHNOLOGIES, INC.**

By: _____
Name: Josh Campbell
Title: Chief Executive Officer

STATE OF _____          )
                                     )  SS.
COUNTY OF _____            )

The undersigned, a Notary Public in and for the said County, in the State aforesaid, DOES HEREBY CERTIFY that Josh Campbell, the Chief Executive Officer of Zen Technologies, Inc., a Texas corporation, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he/she signed and delivered the said instrument as his/her own free and voluntary act and as the free and voluntary act of said corporation, for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this _____ day of _____, 20____.

_____
Notary Public

My Commission Expires:

_____

[signature page to Senior Secured Revolving Credit Facility Agreement]

## CONSENT AND AGREEMENT

The undersigned, referred to in the foregoing senior secured revolving credit facility agreement as a guarantor, hereby consents and agrees to said senior secured revolving credit facility agreement and to the payment of the amounts contemplated therein, documents contemplated thereby, representations and warranties made therein, and to the provisions contained therein relating to conditions to be fulfilled and obligations to be performed by it pursuant to or in connection with said senior secured revolving credit facility agreement to the same extent as if the undersigned were a party to said senior secured revolving credit facility agreement.

### GUARANTOR:

**ZENERGY POWER & GAS, INC.**

By: _____
Name: Josh Campbell
Title: Chief Executive Officer

STATE OF _____        )
                                  ) SS.
COUNTY OF _____          )

      The undersigned, a Notary Public in and for the said County, in the State aforesaid, DOES HEREBY CERTIFY that Josh Campbell, the Chief Executive Officer of Zenergy Power & Gas, Inc., a Texas corporation, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he/she signed and delivered the said instrument as his/her own free and voluntary act and as the free and voluntary act of said corporation, for the uses and purposes therein set forth.

      GIVEN under my hand and notarial seal this _____ day of _____, 20_____.

_____
Notary Public
My Commission Expires:
_____

[signature page to Senior Secured Revolving Credit Facility Agreement]

## CONSENT AND AGREEMENT

The undersigned, referred to in the foregoing senior secured revolving credit facility agreement as a guarantor, hereby consents and agrees to said senior secured revolving credit facility agreement and to the payment of the amounts contemplated therein, documents contemplated thereby, representations and warranties made therein, and to the provisions contained therein relating to conditions to be fulfilled and obligations to be performed by it pursuant to or in connection with said senior secured revolving credit facility agreement to the same extent as if the undersigned were a party to said senior secured revolving credit facility agreement.

## GUARANTOR:

**NAUP BROKERAGE, LLC**

By: _____
Name: Josh Campbell
Title: Chief Executive Officer

STATE OF _____          )
                                     ) SS.
COUNTY OF _____             )

The undersigned, a Notary Public in and for the said County, in the State aforesaid, DOES HEREBY CERTIFY that Josh Campbell, the Chief Executive Officer of NAUP Brokerage, LLC, a Texas limited liability company, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he/she signed and delivered the said instrument as his/her own free and voluntary act and as the free and voluntary act of said limited liability company, for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this _____ day of _____, 20____.

_____
Notary Public
My Commission Expires:
_____
_____

[signature page to Senior Secured Revolving Credit Facility Agreement]

## CONSENT AND AGREEMENT

The undersigned, referred to in the foregoing senior secured revolving credit facility agreement as a guarantor, hereby consents and agrees to said senior secured revolving credit facility agreement and to the payment of the amounts contemplated therein, documents contemplated thereby, representations and warranties made therein, and to the provisions contained therein relating to conditions to be fulfilled and obligations to be performed by it pursuant to or in connection with said senior secured revolving credit facility agreement to the same extent as if the undersigned were a party to said senior secured revolving credit facility agreement.

**GUARANTOR:**

**ZENERGY LABS, LLC**

By: _____
Name: Josh Campbell
Title: Chief Executive Officer

STATE OF _____          )
                                      )  SS.
COUNTY OF _____          )

The undersigned, a Notary Public in and for the said County, in the State aforesaid, DOES HEREBY CERTIFY that Josh Campbell, the Chief Executive Officer of Zenergy Labs, LLC, a Texas limited liability company, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he/she signed and delivered the said instrument as his/her own free and voluntary act and as the free and voluntary act of said limited liability company, for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this _____ day of _____, 20_____.

_____
Notary Public
My Commission Expires:
_____
_____

[signature page to Senior Secured Revolving Credit Facility Agreement]

## CONSENT AND AGREEMENT

The undersigned, referred to in the foregoing senior secured revolving credit facility agreement as a guarantor, hereby consents and agrees to said senior secured revolving credit facility agreement and to the payment of the amounts contemplated therein, documents contemplated thereby, representations and warranties made therein, and to the provisions contained therein relating to conditions to be fulfilled and obligations to be performed by it pursuant to or in connection with said senior secured revolving credit facility agreement to the same extent as if the undersigned were a party to said senior secured revolving credit facility agreement.

## GUARANTOR:

**ZENERGY & ASSOCIATES, INC.**

By: _____
Name: Josh Campbell
Title: Chief Executive Officer

STATE OF _____          )
                                     ) SS.
COUNTY OF _____          )

The undersigned, a Notary Public in and for the said County, in the State aforesaid, DOES HEREBY CERTIFY that Josh Campbell, the Chief Executive Officer of Zenergy & Associates, Inc., a Texas corporation, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he/she signed and delivered the said instrument as his/her own free and voluntary act and as the free and voluntary act of said corporation, for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this _____ day of _____, 20_____.

_____
Notary Public
My Commission Expires:
_____
_____

[signature page to Senior Secured Revolving Credit Facility Agreement]

## INDEX OF EXHIBITS

| | |
|---|---|
| **Exhibit A** | **Form of Affirmation and Compliance Certificate** |
| **Exhibit B** | **Form of Guaranty** |
| **Reserved** | |
| **Exhibit D** | **Form of Revolving Note** |
| **Exhibit E-1** | **Form of Security Agreement (Borrower)** |
| **Exhibit E-2** | **Form of Security Agreement (Subsidiary/Guarantor)** |
| **Exhibit F** | **Form of Validity Certificate** |
| **Exhibit G** | **Form of Budget** |
| **Exhibit H** | **Form of Interim DIP Order** |
| **Exhibit I** | **Form of Weekly Draw Request** |

## INDEX OF SCHEDULES

| | |
|---|---|
| **Schedule 7.1** | **Subsidiaries** |
| **Schedule 7.4(a)** | **Capitalization** |
| **Schedule 7.4(b)** | **Outstanding Options, Warrants, Scrip, Rights to Subscribe** |
| **Schedule 7.18** | **Real Property** |
| **Schedule 7.21** | **IP Rights** |
| **Schedule 7.28** | **Bank Accounts and Deposit Accounts** |
| **Schedule 7.29** | **Places of Business** |

**Exhibit A**

**Form of Affirmation and Compliance Certificate**

FORM OF AFFIRMATION AND COMPLIANCE CERTIFICATE

TCA Special Situations Credit Strategies ICAV
1315 S. Hwy 89, Suite 101
Jackson, Wyoming 83001
E-mail:  aschreiber@tcaglobalfund.com

> Re: ZENERGY BRANDS, INC., a Nevada corporation (the "Borrower"), Covenant Compliance Certificate for the Period Ending on _____, 20__ (the "Reporting Date")

Dear Sir/Madam:

Reference is made to that certain Senior Secured Revolving Credit Facility Agreement, dated and effective as of October __, 2019 (the "Credit Agreement"), by and between the Borrower and TCA Special Situations Credit Strategies ICAV ("Lender"). Capitalized terms used, but not defined, herein shall have the respective meanings assigned to such terms in the Credit Agreement.

Pursuant to Section 10.12 of the Credit Agreement, the undersigned hereby certifies to Lender that: (a) all representations and warranties in Section 7 of the Credit Agreement are true and correct as of the Reporting Date; (b) the undersigned has no knowledge of any default or Event of Default under the Credit Agreement or any other Loan Documents that has not been cured or waived, except as set forth on Schedule 1 attached hereto; (c) to the best of the undersigned's knowledge, the Borrower has, in all material respects, observed and performed all of its other covenants and other agreements, and has satisfied every condition contained in the Credit Agreement and the other Loan Documents to be observed, performed or satisfied by it during the calendar month ending on the Reporting Date; and (d) no changes, effects, impairments, or other events have occurred as of the Reporting Date that could be deemed a Material Adverse Effect.

[signature page follows]

IN WITNESS WHEREOF, the undersigned hereby certifies to the above as of the Reporting Date.


_____
[●]

# Exhibit B

# Form of Guaranty Agreement

## **GUARANTY AGREEMENT**

This GUARANTY AGREEMENT is dated and effective as of October _____, 2019 (the "Guaranty"), and is made Zen Technologies, Inc., a corporation organized and existing under the laws of the State of Texas ("Zen Technologies"), Zenergy Power & Gas, Inc., a corporation organized and existing under the laws of the State of Texas ("Zenergy Power"), NAUP Brokerage, LLC, a limited liability company organized and existing under the laws of the State of Texas ("NAUP"), Zenergy Labs, Inc., a corporation organized and existing under the laws of the State of Texas ("Zenergy Labs"), Zenergy & Associates, Inc., a corporation organized and existing under the State of Texas ("Zenergy & Associates") (together the "Guarantors"), in favor of **TCA SPECIAL SITUATIONS CREDIT STRATEGIES ICAV**, an Irish collective asset vehicle (the "Secured Party").

WHEREAS, the Secured Party previously agreed to enter into a Senior Secured Credit Facility Agreement (the "Credit Agreement") dated and effective as of even date herewith with Zenergy Brands, Inc., a corporation incorporated under the laws of the State of Nevada (the "Company");

WHEREAS, in order to induce the Secured Party to enter into the Credit Agreement, each Guarantor has agreed to execute and deliver to the Secured Party this Agreement for the benefit of the Secured Party and to grant to Secured Party an unconditional and continuing, first priority security interest in all of the assets and property of such Guarantor to secure the prompt payment, performance and discharge in full of all of Company's obligations under the Credit Agreement and the other Loan Documents; and

WHEREAS, the Guarantors will substantially benefit from the Credit Agreement; and

NOW, THEREFORE, in consideration of the mutual covenants and agreements of the parties hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties each intending to be legally bound, hereby do agree as follows:

**1.**     OBLIGATIONS GUARANTEED

Each Guarantor, jointly and severally, hereby guarantees and becomes surety to Secured Party for the full, prompt and unconditional payment and performance of the Obligations, when and as the same shall become due, whether at the stated maturity date, by acceleration or otherwise, and the full, prompt and unconditional performance of each term and condition to be performed by the Company under the Loan Documents. This Guaranty is a primary obligation of each Guarantor and shall be a continuing inexhaustible Guaranty. This is a guaranty of payment and not of collection. Secured Party may require each Guarantor to pay and perform its liabilities and obligations under this Guaranty and may proceed immediately against any Guarantor without being required to bring any proceeding or take any action against the Company or any other Person prior thereto; the liability of a Guarantor hereunder being independent of and separate from the liability of the Company, any other guarantor, any other Person, and the availability of other collateral security for the Loan Documents.

**2.**    DEFINITIONS

All capitalized terms used in this Guaranty that are defined in the Credit Agreement shall have the meanings assigned to them in the Credit Agreement, unless the context of this Guaranty requires otherwise.

**3.**    REPRESENTATIONS AND WARRANTIES. Each Guarantor represents and warrants to Secured Party as follows:

3.1.    <u>Debtor Organization and Name</u>.  Such Guarantor, except for any Guarantor which is a natural person, is a corporation or limited liability company, duly organized, existing and in good standing under the laws of its state of organization, with full and adequate power to carry on and conduct its business as presently conducted.  Such Guarantor is duly licensed or qualified in all foreign jurisdictions wherein the nature of its activities requires such qualification or licensing.  Such Guarantor's Organizational Identification Number, if applicable, is set forth in the Credit Agreement.  The exact legal name of such Guarantor is as set forth in the first paragraph of this Guaranty Agreement, and such Guarantor currently does not conduct, nor has it during the last five (5) years conducted, business under any other name or trade name.

3.2.    <u>Authorization</u>.  Each Guarantor has full right, power and authority to enter in this Guaranty Agreement and to perform all of its duties and obligations under the Guaranty Agreement.  The execution and delivery of this Guaranty Agreement and the other Loan Documents will not, nor will the observance or performance of any of the matters and things herein or therein set forth, violate or contravene any provision of law or of the articles of incorporation, bylaws, operating agreement, or other governing documents of each guarantor is not a natural person.  All necessary and appropriate action has been taken on the part of Guarantor to authorize the execution and delivery of this Guaranty Agreement.

3.3.    <u>Execution of Guaranty</u>. This Guaranty, and each other Loan Document to which each Guarantor is a party, have been duly executed and delivered by such Guarantor. Execution, delivery and performance of this Guaranty and each other Loan Document to which Guarantor is a party will not: (i) violate any provision of any law, rule or regulation, any judgment, order, writ, decree or other instrument of any governmental authority, or any provision of any contract or other instrument to which such Guarantor is a party or by which such Guarantor or any of its properties or assets are bound; (ii) result in the creation or imposition of any lien, claim or encumbrance of any nature, other than the liens created by the Loan Documents; and (iii) require any consent from, exemption of, or filing or registration with, any governmental authority or any other Person, other than any filings in connection with the liens created by the Loan Documents.

3.4.    <u>Obligations of Guarantor</u>. This Guaranty and each other Loan Document to which each Guarantor is a party are the legal, valid and binding obligations of such Guarantor, enforceable against such Guarantor in accordance with their terms, except as the same may be limited by bankruptcy, insolvency, reorganization or other laws relating to or affecting the enforcement of creditors' rights generally or by equitable principles which may affect the availability of specific performance and other equitable remedies. Entry into the Credit Agreement by Secured Party and the assumption by each Guarantor of its obligations hereunder and under any

other Loan Document to which such Guarantor is a party will result in material benefits to such Guarantor. This Guaranty was entered into by Guarantor for commercial purposes.

3.5.    <u>Litigation</u>. There is no demand, claim, suit, action, litigation, investigation, audit, study, arbitration, administrative hearing, or any other proceeding of any nature whatsoever at law or in equity or by or before any governmental authority now pending or, to the knowledge of each Guarantor, threatened, against or affecting any Guarantor or any of his/her properties, assets or rights which, if adversely determined, would materially impair or affect: (i) the value of any collateral securing the Obligations; (ii) any Guarantor's right to carry on his/her business substantially as now conducted (and as now contemplated); (iii) any Guarantor's financial condition; or (iv) any Guarantor's capacity to consummate and perform his/her obligations under this Guaranty or any other Loan Document to which such Guarantor is a party.

3.6.    <u>No Defaults</u>. No Guarantor is in default beyond the expiration of any applicable grace or cure periods, in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained herein or in any contract or other instrument to which such Guarantor is a party or by which such Guarantor or any of his/her properties or assets are bound.

3.7.    <u>No Untrue Statements</u>. To the knowledge of any Guarantor, no Loan Document or other document, certificate or statement furnished to Secured Party by or on behalf of the Company or a Guarantor contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein and therein not misleading. Each Guarantor acknowledges that all such statements, representations and warranties shall be deemed to have been relied upon by Secured Party as an inducement to enter into the Credit Agreement.

**4.**    NO LIMITATION OF LIABILITY

4.1.    Each Guarantor acknowledges that the obligations undertaken herein involve the guaranty of obligations of a Person other than such Guarantor and, in full recognition of that fact, each Guarantor consents and agrees that Secured Party may, at any time and from time to time, without notice or demand, and without affecting the enforceability or continuing effectiveness of this Guaranty: (i) change the manner, place or terms of payment of (including, without limitation, any increase or decrease in the principal amount of the Obligations or the interest rate), and/or change or extend the time for payment of, or renew, supplement or modify, any of the Obligations, any security therefor, or any of the Loan Documents evidencing same, and the Guaranty herein made shall apply to the Obligations and the Loan Documents as so changed, extended, renewed, supplemented or modified; (ii) sell, exchange, release, surrender, realize upon or otherwise deal with in any manner and in any order, any property securing the Obligations; (iii) supplement, modify, amend or waive, or enter into or give any agreement, approval, waiver or consent with respect to, any of the Obligations, or any part thereof, or any of the Loan Documents, or any additional security or guaranties, or any condition, covenant, default, remedy, right, representation or term thereof or thereunder; (iv) exercise or refrain from exercising any rights against the Company or other Persons (including any Guarantor) or against any security for the Obligations; (v) accept new or additional instruments, documents or agreements in exchange for or relative to any of the Loan Documents or the Obligations, or any part thereof; (vi) accept partial payments on the Obligations; (vii) receive and hold additional security or guaranties for the Obligations, or any

part thereof; (viii) release, reconvey, terminate, waive, abandon, fail to perfect, subordinate, exchange, substitute, transfer and/or enforce any security or guaranties, and apply any security and direct the order or manner of sale thereof as Secured Party, in its sole and absolute discretion, may determine; (ix) add, release, settle, modify or discharge the obligation of any maker, endorser, guarantor, surety, obligor or any other Person who is in any way obligated for any of the Obligations, or any part thereof; (x) settle or compromise any Obligations, whether in a Proceeding or not, and whether voluntarily or involuntarily, dispose of any security therefor (with or without consideration and in whatever manner Secured Party deems appropriate), and subordinate the payment of any of the Obligations, whether or not due, to the payment of liabilities owing to creditors of the Company other than Secured Party and Guarantors; (xi) consent to the merger, change or any other restructuring or termination of the corporate existence of the Company or any other Person, and correspondingly restructure the Obligations, and any such merger, change, restructuring or termination shall not affect the liability of Guarantors or the continuing effectiveness hereof, or the enforceability hereof with respect to all or any part of the Obligations; (xii) apply any sums it receives, by whomever paid or however realized, to any of the Obligations and/or (xiii) take any other action which might constitute a defense available to, or a discharge of, the Company or any other Person (including Guarantors) in respect of the Obligations.

4.2.    The invalidity, irregularity or unenforceability of all or any part of the Obligations or any Loan Document, or the impairment or loss of any security therefor, whether caused by any action or inaction of Secured Party, or otherwise, shall not affect, impair or be a defense to a Guarantor's obligations under this Guaranty.

4.3.    Upon the occurrence and during the continuance of any Event of Default, Secured Party may enforce this Guaranty independently of any other remedy, guaranty or security Secured Party at any time may have or hold in connection with the Obligations, and it shall not be necessary for Secured Party to marshal assets in favor of the Company, any other guarantor of the Obligations or any other Person or to proceed upon or against and/or exhaust any security or remedy before proceeding to enforce this Guaranty. Each Guarantor expressly waives any right to require Secured Party to marshal assets in favor of the Company or any other Person, or to proceed against the Company or any other guarantor of the Obligations or any collateral provided by any Person, and agrees that Secured Party may proceed against any obligor (including a Guarantor) and/or the collateral in such order as Secured Party shall determine in its sole and absolute discretion. Secured Party may file a separate action or actions against either Guarantor, whether action is brought or prosecuted with respect to any security or against any other Person, or whether any other Person is joined in any such action or actions. Each Guarantor agrees that Secured Party and the Company may deal with each other in connection with the Obligations or otherwise, or alter any contracts or agreements now or hereafter existing between them, in any manner whatsoever, all without in any way altering or affecting the security of this Guaranty.

**4.4.    EACH GUARANTOR EXPRESSLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, EVERY PRESENT AND FUTURE DEFENSE, CAUSE OF ACTION, COUNTERCLAIM WHICH THE CREDIT PARTIES MAY NOW HAVE AS OF THE DATE HEREOF, OR AS THEY MAY IN THE FUTURE COME TO HAVE, TO ANY ACTION BY SECURED PARTY IN ENFORCING THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS -- OTHER THAN FOR SET**

**OFF TO ESTABLISH THE AMOUNTS DUE AND PAID PURSUANT TO THE LOAN, INCLUDING BUT NOT LIMITED TO THOSE ASSERTED BY REASON OF: (I) ANY DISABILITY OR OTHER DEFENSE OF THE COMPANY, OR ANY OTHER GUARANTOR FOR THE OBLIGATIONS, WITH RESPECT TO THE OBLIGATIONS; (II) THE UNENFORCEABILITY OR INVALIDITY OF ANY SECURITY FOR OR GUARANTY OF THE OBLIGATIONS OR THE LACK OF PERFECTION OR CONTINUING PERFECTION OR FAILURE OF PRIORITY OF ANY SECURITY FOR THE OBLIGATIONS; (III) THE CESSATION FOR ANY CAUSE WHATSOEVER OF THE LIABILITY OF THE COMPANY, OR ANY OTHER GUARANTOR OF THE OBLIGATIONS (OTHER THAN BY REASON OF THE FULL PAYMENT AND PERFORMANCE OF ALL OBLIGATIONS (OTHER THAN CONTINGENT INDEMNIFICATION OBLIGATIONS)); (IV) ANY FAILURE OF SECURED PARTY TO MARSHAL ASSETS IN FAVOR OF THE COMPANY OR ANY OTHER PERSON; (V) ANY FAILURE OF SECURED PARTY TO GIVE NOTICE OF SALE OR OTHER DISPOSITION OF COLLATERAL TO THE COMPANY OR ANY OTHER PERSON OR ANY DEFECT IN ANY NOTICE THAT MAY BE GIVEN IN CONNECTION WITH ANY SALE OR DISPOSITION OF COLLATERAL; (VI) ANY FAILURE OF SECURED PARTY TO COMPLY WITH APPLICABLE LAWS IN CONNECTION WITH THE SALE OR OTHER DISPOSITION OF ANY COLLATERAL OR OTHER SECURITY FOR ANY OBLIGATIONS, INCLUDING, WITHOUT LIMITATION, ANY FAILURE OF SECURED PARTY TO CONDUCT A COMMERCIALLY REASONABLE SALE OR OTHER DISPOSITION OF ANY COLLATERAL OR OTHER SECURITY FOR ANY OBLIGATIONS; (VII) ANY ACT OR OMISSION OF SECURED PARTY OR OTHERS THAT DIRECTLY OR INDIRECTLY RESULTS IN OR AIDS THE DISCHARGE OR RELEASE OF THE COMPANY OR ANY OTHER GUARANTOR OF THE OBLIGATIONS, OR OF ANY SECURITY OR GUARANTY THEREFOR BY OPERATION OF LAW OR OTHERWISE; (VIII) ANY LAW WHICH PROVIDES THAT THE OBLIGATION OF A SURETY OR GUARANTOR MUST NEITHER BE LARGER IN AMOUNT OR IN OTHER RESPECTS MORE BURDENSOME THAN THAT OF THE PRINCIPAL OR WHICH REDUCES A SURETY'S OR GUARANTOR'S OBLIGATION IN PROPORTION TO THE PRINCIPAL OBLIGATION; (IX) ANY FAILURE OF SECURED PARTY TO FILE OR ENFORCE A CLAIM IN ANY BANKRUPTCY OR OTHER PROCEEDING WITH RESPECT TO ANY PERSON; (X) THE ELECTION BY SECURED PARTY, IN ANY BANKRUPTCY PROCEEDING OF ANY PERSON, OF THE APPLICATION OR NON-APPLICATION OF SECTION 1111(B)(2) OF THE UNITED STATES BANKRUPTCY CODE; (XI) ANY EXTENSION OF CREDIT OR THE GRANT OF ANY LIEN UNDER SECTION 364 OF THE UNITED STATES BANKRUPTCY CODE; (XII) ANY USE OF COLLATERAL UNDER SECTION 363 OF THE UNITED STATES BANKRUPTCY CODE; (XIII) ANY AGREEMENT OR STIPULATION WITH RESPECT TO THE PROVISION OF ADEQUATE PROTECTION IN ANY BANKRUPTCY PROCEEDING OF ANY PERSON; (XIV) THE AVOIDANCE OF ANY LIEN OR SECURITY INTEREST IN FAVOR OF SECURED PARTY FOR ANY REASON; (XV) ANY BANKRUPTCY, INSOLVENCY, REORGANIZATION, ARRANGEMENT, READJUSTMENT OF DEBT, LIQUIDATION OR DISSOLUTION PROCEEDING COMMENCED BY OR AGAINST ANY PERSON, INCLUDING WITHOUT LIMITATION ANY DISCHARGE OF, OR BAR OR STAY AGAINST**

**COLLECTING, ALL OR ANY OF THE OBLIGATIONS (OR ANY INTEREST THEREON) IN OR AS A RESULT OF ANY SUCH PROCEEDING; OR (XVI) ANY ACTION TAKEN BY SECURED PARTY THAT IS AUTHORIZED BY THIS SECTION OR ANY OTHER PROVISION OF ANY LOAN DOCUMENT. EACH GUARANTOR EXPRESSLY WAIVES ALL SETOFFS (OTHER THAN AS SET FORTH HEREIN) AND COUNTERCLAIMS AND ALL PRESENTMENTS, DEMANDS FOR PAYMENT OR PERFORMANCE, NOTICES OF NONPAYMENT OR NONPERFORMANCE, PROTESTS, NOTICES OF PROTEST, NOTICES OF DISHONOR AND ALL OTHER NOTICES OR DEMANDS OF ANY KIND OR NATURE WHATSOEVER WITH RESPECT TO THE OBLIGATIONS, AND ALL NOTICES OF ACCEPTANCE OF THIS GUARANTY OR OF THE EXISTENCE, CREATION OR INCURRENCE OF NEW OR ADDITIONAL OBLIGATIONS. EACH GUARANTOR UNDERSTANDS AND AGREES THAT THEY ARE WAIVING DEFENSES AND CLAIMS WHICH MAY NOT YET HAVE ACCRUED OR OF WHICH THEY MAY NOT YET BE AWARE AS A MATERIAL INDUCEMENT FOR SECURED PARTY ENTERING THIS GUARANTY AND GRANTING ANY FINANCIAL ACCOMMODATION TO THE CREDIT PARTIES. THIS PROVISION IS INTENDED TO BE ONSTRUED AS BROADLY AS PERMISSIBLE UNDER APPLICABLE LAW.**

4.5.    This is a continuing guaranty and shall remain in full force and effect as to all of the Obligations until such date as all amounts owing by the Company to Secured Party shall have been paid in full in cash and all obligations of the Company with respect to any of the Obligations shall have terminated or expired (other than contingent indemnification obligations) (such date is referred to herein as the "Termination Date").

## 5.    LIMITATION ON SUBROGATION

Until the Termination Date, each Guarantor waives any present or future right to which such Guarantor is or may become entitled to be subrogated to Secured Party's rights against the Company or to seek contribution, reimbursement, indemnification, payment or the like, or participation in any claim, right or remedy of Secured Party against the Company or any security which Secured Party now has or hereafter acquires, whether or not such claim, right or remedy arises under contract, in equity, by statute, under common law or otherwise. If, notwithstanding such waiver, any funds or property shall be paid or transferred to a Guarantor on account of such subrogation, contribution, reimbursement, or indemnification at any time when all of the Obligations have not been paid in full, such Guarantor shall hold such funds or property in trust for Secured Party and shall forthwith pay over to Secured Party such funds and/or property to be applied by Secured Party to the Obligations.

## 6.    COVENANTS

6.1.    Financial Statements; Compliance Certificate. No later than ten (10) days after written request therefore from Secured Party, each Guarantor shall deliver to Secured Party: (a) financial statements disclosing all of such Guarantor's assets, liabilities, net worth, income and contingent liabilities, all in reasonable detail and in form reasonably acceptable to Secured Party, signed by such Guarantor, and certified by such Guarantor to Secured Party to be true, correct and

complete in all material respects; (b) complete copies of federal tax returns, including all schedules, each of which shall be signed and certified by such Guarantor to be true and complete copies of such returns; (c) an Affirmation and Compliance Certificate as provided in section 10.11 of the Credit Agreement every sixty (60) days following closing of the Effective Date and (d) such other information respecting such Guarantor as Secured Party may from time to time reasonably request.

6.2.     <u>Subordination of Other Debts</u>. Guarantor hereby: subordinates the obligations now or hereafter owed by the Company to Guarantor ("<u>Subordinated Debt</u>") to any and all obligations of the Company to Secured Party now or hereafter existing while this Guaranty is in effect, and hereby agrees that Guarantor will not request or accept payment of or any security for any part of the Subordinated Debt, and any proceeds of the Subordinated Debt paid to Guarantor, through error or otherwise, shall immediately be forwarded to Secured Party by Guarantor, properly endorsed to the order of Secured Party, to apply to the Obligations.

6.3.     <u>Security for Guaranty</u>. The obligations and liabilities of each Guarantor evidenced by this Guaranty are also secured by all of the Collateral of such Guarantor pursuant to that a Security Agreement by and between such Guarantor and Secured Party made of even date herewith (the "<u>Security Agreement</u>"). All of the agreements, conditions, covenants, provisions, representations, warranties and stipulations contained in the Security Agreement or any other Loan Documents to which a Guarantor is a party which are to be kept and performed by a Guarantor are hereby made a part of this Guaranty to the same extent and with the same force and effect as if they were fully set forth herein, and each Guarantor covenants and agrees to keep and perform them, or cause them to be kept or performed, strictly in accordance with their terms.

## 7.     EVENTS OF DEFAULT

Each of the Events of Default in the Credit Agreement or any other Loan Document shall constitute an Event of Default hereunder.

## 8.     REMEDIES.

8.1.     Upon an Event of Default, as provided in the Credit Agreement or any other Loan Document, all liabilities and obligations of a Guarantor hereunder shall become immediately due and payable without demand or notice and, in addition to any other remedies provided by law or in equity, Secured Party may:

8.1.1.   Enforce the obligations of a Guarantor under this Guaranty.

8.1.2.   To the extent not prohibited by and in addition to any other remedy provided by law or equity, setoff against any of the Obligations any sum owed by Secured Party in any capacity to a Guarantor whether due or not.

8.1.3.   Perform any covenant or agreement of a Guarantor in default hereunder (but without obligation to do so) and in that regard pay such money as may be required or as Secured Party may reasonably deem expedient. Any costs, expenses or fees, including reasonable attorneys' fees and costs, incurred by Secured Party in connection with the foregoing shall be

included in the Obligations guaranteed hereby, and shall be due and payable on demand, together with interest at the highest non-usurious rate permitted by applicable law, such interest to be calculated from the date of such advance to the date of repayment thereof. Any such action by Secured Party shall not be deemed to be a waiver or release of a Guarantor hereunder and shall be without prejudice to any other right or remedy of Secured Party.

8.2.    Settlement of any claim by Secured Party against the Company, whether in any Proceeding or not, and whether voluntary or involuntary, shall not reduce the amount due under the terms of this Guaranty, except to the extent of the amount actually paid by the Company or any other obligated Person and legally retained by Secured Party in connection with the settlement (unless otherwise provided for herein or therein).

9.    MISCELLANEOUS.

9.1.    <u>Disclosure of Financial Information</u>. Secured Party is hereby authorized to disclose any financial or other information about a Guarantor to any governmental authority having jurisdiction over Secured Party or to any present, future or prospective participant or successor in interest in the Credit Agreement, <u>provided</u> that any such participant or successor in interest agree to maintain such information confidential and limit the distribution of such information only to such persons' Affiliates' respective partners, directors, officers, employees, representatives, advisors and agents, including accountants, legal counsel and other advisors (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such information and instructed to keep such information confidential). The information provided may include, without limitation, amounts, terms, balances, payment history, return item history and any financial or other information about a Guarantor.

9.2.    <u>Remedies Cumulative</u>. The rights and remedies of Secured Party, as provided herein and in any other Loan Document, shall be cumulative and concurrent, may be pursued separately, successively or together, may be exercised as often as occasion therefor shall arise, and shall be in addition to any other rights or remedies conferred upon Secured Party at law or in equity. The failure, at any one or more times, of Secured Party to exercise any such right or remedy shall in no event be construed as a waiver or release thereof. Secured Party shall have the right to take any action it deems appropriate without the necessity of resorting to any collateral securing this Guaranty.

9.3.    <u>Integration</u>. This Guaranty and the other Loan Documents constitute the sole agreement of the parties with respect to the transactions contemplated hereby and thereby and supersede all oral negotiations and prior writings with respect thereto.

**9.4.    <u>NON-RELIANCE</u>. EACH GUARANTOR UNDERSTANDS AND ACKNOWLEDGES THAT THE AGENTS AND REPRESENTATIVES OF SECURED PARTY DO NOT HAVE AUTHORITY TO MAKE ANY STATEMENTS, PROMISES OR REPRESENTATIONS IN CONFLICT WITH OR IN ADDITION TO THE INFORMATION CONTAINED IN THIS GUARANTY OR ANY OTHER LOAN DOCUMENTS, AND SECURED PARTY HEREBY SPECIFICALLY DISCLAIMS ANY RESPONSIBILITY FOR ANY SUCH STATEMENTS, PROMISES OR**

**REPRESENTATIONS. BY EXECUTION OF THIS GUARANTY, EACH GUARANTOR ACKNOWLEDGES THAT HE/SHE HAS NOT RELIED UPON SUCH STATEMENTS, PROMISES OR REPRESENTATIONS, IF ANY, AND WAIVES ANY RIGHTS, DEFENSES, OR CLAIMS ARISING FROM ANY SUCH STATEMENTS, PROMISES OR REPRESENTATIONS.**

9.5.    <u>Attorneys' Fees and Expenses</u>. If Secured Party retains the services of counsel in connection with the exercise, enforcement, or defense of any of the rights of the Secured Party under this Agreement or the Loan Documents, on account of any matter involving this Guaranty, or for examination of matters subject to Secured Party's approval under the Loan Documents, all costs of suit and all reasonable attorneys' fees and such other reasonable expenses so incurred by Secured Party shall forthwith, on demand, become due and payable and shall be guaranteed hereby, including but not limited to reasonable attorneys' fees and costs at all levels of any litigation or other proceeding including but not limited to any appeals and enforcement of judgments.

9.6.    <u>No Implied Waiver</u>. Secured Party shall not be deemed to have modified or waived any of its rights or remedies hereunder unless such modification or waiver is in writing and signed by Secured Party, and then only to the extent specifically set forth therein. A waiver in one event shall not be construed as continuing or as a waiver of or bar to such right or remedy on a subsequent event.

9.7.    <u>Waiver</u>. Except as otherwise provided herein or in any of the Loan Documents, each Guarantor waives notice of acceptance of this Guaranty and notice of the Obligations and waives notice of default, non-payment, partial payment, presentment, demand, protest, notice of protest or dishonor, and all other notices to which such Guarantor might otherwise be entitled or which might be required by law to be given by Secured Party. Guarantor waives the right to any stay of execution and the benefit of all exemption laws, to the extent permitted by law, and any other protection granted by law to guarantors, now or hereafter in effect with respect to any action or proceeding brought by Secured Party against it. Each Guarantor irrevocably waives all claims of waiver, release, surrender, alteration or compromise and the right to assert against Secured Party any defenses, set-offs, counterclaims, or claims that such Guarantor may have at any time against the Company or any other party liable to Secured Party.

9.8.    <u>No Third Party Beneficiary</u>. Except as otherwise provided herein, each Guarantor and Secured Party do not intend the benefits of this Guaranty to inure to any third party and no third party (including the Company) shall have any status, right or entitlement under this Guaranty.

9.9.    <u>Partial Invalidity</u>. The invalidity or unenforceability of any one or more provisions of this Guaranty shall not render any other provision invalid or unenforceable. In lieu of any invalid or unenforceable provision, there shall be added automatically a valid and enforceable provision as similar in terms to such invalid or unenforceable provision as may be possible.

9.10.    <u>Binding Effect</u>. The covenants, conditions, waivers, releases and agreements contained in this Guaranty shall bind, and the benefits thereof shall inure to, the parties hereto and their respective heirs, executors, administrators, successors and permitted assigns; provided, however, that this Guaranty cannot be assigned by a Guarantor without the prior written consent

of Secured Party, and any such assignment or attempted assignment by a Guarantor shall be void and of no effect with respect to the Secured Party.

9.11.   <u>Modifications</u>. This Guaranty may not be supplemented, extended, modified or terminated except by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification or discharge is sought. This Agreement does not permit implied amendments based upon course of dealing or silence or oral representations of any sort.

9.12.   <u>Sales or Participations</u>. Secured Party may from time to time assign the Credit Agreement, in whole or in part, or grant participations in the Credit Agreement and/or the obligations evidenced thereby without the consent of the Company or the Guarantors (other than as provided in the Credit Agreement), provided, however, Secured Party shall provide written notice to the Company and Guarantors of any such assignment or grant of participations. The holder of any such sale, assignment or participation, if the applicable agreement between Secured Party and such holder so provides, shall be: (a) entitled to all of the rights, obligations and benefits of Secured Party (to the extent of such holder's interest or participation); and (b) deemed to hold and may exercise the rights of setoff or banker's lien with respect to any and all obligations of such holder to a Guarantor (to the extent of such holder's interest or participation), in each case as fully as though such Guarantor were directly indebted to such holder. Secured Party may in its discretion give notice to such Guarantor of such sale, assignment or participation; however, the failure to give such notice shall not affect any of Secured Party's or such holder's rights hereunder.

**9.13.   <u>MANDATORY FORUM SELECTION</u>. ANY DISPUTE ARISING UNDER, RELATING TO, OR IN CONNECTION WITH THIS GUARANTY OR RELATED TO ANY MATTER WHICH IS THE SUBJECT OF OR INCIDENTAL TO THIS GUARANTY, ANY OTHER TRANSACTION DOCUMENT, OR THE COLLATERAL (WHETHER OR NOT SUCH CLAIM IS BASED UPON BREACH OF CONTRACT OR TORT) SHALL BE SUBJECT TO THE EXCLUSIVE JURISDICTION AND VENUE OF THE STATE AND/OR FEDERAL COURTS LOCATED IN BROWARD COUNTY, FLORIDA; PROVIDED, HOWEVER, SECURED PARTY MAY, AT ITS SOLE OPTION, ELECT TO BRING ANY ACTION IN ANY OTHER JURISDICTION. THIS PROVISION IS INTENDED TO BE A "MANDATORY" FORUM SELECTION CLAUSE AND GOVERNED BY AND INTERPRETED CONSISTENT WITH FLORIDA LAW OR WYOMING LAW, AS APPLICABLE.  EACH GUARANTOR HEREBY CONSENTS TO THE EXCLUSIVE JURISDICTION AND VENUE OF ANY STATE OR FEDERAL COURT HAVING IT SITUS IN SUCH COUNTY (OR TO ANY JURISDICTION OR VENUE, IF SECURED PARTY SO ELECTS), AND EACH GUARANTOR HEREBY WAIVES ANY OBJECTION BASED ON FORUM NON CONVENIENS.**

**9.14.   <u>WAIVER OF PERSONAL SERVICE</u>. EACH GUARANTOR HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND CONSENTS THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, OR BY FEDERAL EXPRESS, DIRECTED TO SUCH GUARANTOR, AS SET FORTH AND ACCORDING TO THE TERMS IN THE NOTICE PROVISIONS HEREIN. EACH GUARANTOR AGREES THAT NO ACKNOWLEDGMENT OF ACTUAL RECEIPT OF PROCESS IS REQUIRED AND**

**SERVICE WILL BE DEEMED EFFECTIVE PURSUANT TO THE TERMS OF NOTICE PROVISIONS CONTAINED HEREIN. SERVICE MAY ALSO BE MADE IN ANY MANNER PROVIDED BY APPLICABLE STATUTE, LAW, RULE OF COURT OR OTHERWISE.**

9.15.  <u>Notices</u>. All notices, requests and demands to or upon Secured Party or a Guarantor, to be effective, shall be delivered in the manner and addressed at the applicable address set forth in the Credit Agreement.  Each Guarantor agrees and acknowledges that notice to each of them may be sent and delivered to the Company, as required under the Credit Agreement, and such notice to the Company shall be deemed valid and effective notice to such Guarantor hereunder.

9.16.  <u>Governing Law</u>. Except in the case of the Mandatory Forum Selection clause set forth in <u>Section 9.13</u> hereof, this Guaranty shall be governed by and construed in accordance with the substantive laws of the State of Wyoming without reference to conflict of laws principles.

9.17.  <u>Joint and Several Liability</u>. The word "Guarantor" or "Guarantors" shall mean all of the undersigned persons, if more than one, and their liability shall be joint and several. The liability of a Guarantor shall also be joint and several with the liability of any other guarantor under any other guaranty.

9.18.  <u>Continuing Enforcement</u>. If, after receipt of any payment of all or any part of the Obligations, Secured Party is compelled or reasonably agrees, for settlement purposes, to surrender such payment to any person or entity for any reason (including, without limitation, a determination that such payment is void or voidable as a preference or fraudulent conveyance, an impermissible setoff, or a diversion of trust funds), then this Guaranty shall continue in full force and effect or be reinstated, as the case may be, and each Guarantor shall be liable for, and shall indemnify, defend and hold harmless Secured Party with respect to the full amount so surrendered. The provisions of this Section shall survive the termination of this Guaranty and shall remain effective notwithstanding the payment of the Obligations, the cancellation of this Guaranty or any other Loan Document, the release of any security interest, lien or encumbrance securing the Obligations or any other action which Secured Party may have taken in reliance upon its receipt of such payment. Any cancellation, release or other such action shall be deemed to have been conditioned upon any payment of the Obligations having become final and irrevocable.

**9.19.  <u>WAIVER OF JURY TRIAL</u>. EACH GUARANTOR AGREES THAT, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY SUIT, ACTION OR PROCEEDING, WHETHER CLAIM OR COUNTERCLAIM, BROUGHT BY SECURED PARTY OR A GUARANTOR ON OR WITH RESPECT TO THIS GUARANTY OR ANY OTHER LOAN DOCUMENT OR THE DEALINGS OF THE PARTIES WITH RESPECT HERETO OR THERETO, SHALL BE TRIED ONLY BY A COURT AND NOT BY A JURY. SECURED PARTY AND EACH GUARANTOR HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND INTELLIGENTLY, AND WITH THE ADVICE OF THEIR RESPECTIVE COUNSEL, WAIVE, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH SUIT, ACTION OR PROCEEDING. FURTHER, SECURED PARTY AND EACH GUARANTOR WAIVES ANY RIGHT THEY MAY HAVE TO CLAIM OR RECOVER,**

**IN ANY SUCH SUIT, ACTION OR PROCEEDING, ANY SPECIAL, EXEMPLARY, PUNITIVE, CONSEQUENTIAL OR OTHER DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES. EACH GUARANTOR ACKNOWLEDGES AND AGREES THAT THIS SECTION IS A SPECIFIC AND MATERIAL ASPECT OF THIS GUARANTY AND THAT SECURED PARTY WOULD NOT ENTER THE CREDIT AGREEMENT IF THE WAIVERS SET FORTH IN THIS SECTION WERE NOT A PART OF THIS GUARANTY.**

[ signature page follows ]

IN WITNESS WHEREOF, the undersigned, intending to be legally bound, has duly executed and delivered this Guaranty Agreement as of the day and year first above written.

**ZEN TECHNOLOGIES, INC.**

_____
Name: Joshua Campbell
Title: Chief Executive Officer

STATE OF _____       )
                                 ) SS.
COUNTY OF _____         )

The undersigned, a Notary Public in and for the said County, in the State aforesaid, DOES HEREBY CERTIFY that Joshua Campbell, the Chief Executive Officer of Zen Technologies, Inc., a Texas corporation, who is personally known to me to be the same person whose name is subscribed to the foregoing, appeared before me this day in person and acknowledged that he/she signed and delivered the said instrument as his/her own free and voluntary act and as the free and voluntary act of said corporation, for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this _____ day of _____, 20_____.

_____
Notary Public

My Commission Expires:

_____

[signature page to Guaranty Agreement (Guarantors)]

13

IN WITNESS WHEREOF, the undersigned, intending to be legally bound, has duly executed and delivered this Guaranty Agreement as of the day and year first above written.

**ZENERGY POWER & GAS, INC.**

_____
Name: Joshua Campbell
Title: Chief Executive Officer

STATE OF _____        )
                                  ) SS.
COUNTY OF _____          )

The undersigned, a Notary Public in and for the said County, in the State aforesaid, DOES HEREBY CERTIFY that Joshua Campbell, the Chief Executive Officer of Zenergy Power & Gas, Inc., a Texas corporation, who is personally known to me to be the same person whose name is subscribed to the foregoing, appeared before me this day in person and acknowledged that he/she signed and delivered the said instrument as his/her own free and voluntary act and as the free and voluntary act of said corporation, for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this _____ day of _____, 20_____.

_____
Notary Public
My Commission Expires:
_____

[signature page to Guaranty Agreement (Guarantors)]

14

IN WITNESS WHEREOF, the undersigned, intending to be legally bound, has duly executed and delivered this Guaranty Agreement as of the day and year first above written.

**NAUP BROKERAGE, LLC**

_____

Name: Joshua Campbell
Title: Chief Executive Officer

STATE OF _____        )
                                                          ) SS.
COUNTY OF _____        )

The undersigned, a Notary Public in and for the said County, in the State aforesaid, DOES HEREBY CERTIFY that Joshua Campbell, the Chief Executive Officer of NAUP Brokerage, LLC, a Texas limited liability company, who is personally known to me to be the same person whose name is subscribed to the foregoing, appeared before me this day in person and acknowledged that he/she signed and delivered the said instrument as his/her own free and voluntary act and as the free and voluntary act of said limited liability company, for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this _____ day of _____, 20____.

_____

Notary Public
My Commission Expires:

_____

[signature page to Guaranty Agreement (Guarantors)]

IN WITNESS WHEREOF, the undersigned, intending to be legally bound, has duly executed and delivered this Guaranty Agreement as of the day and year first above written.

**ZENERGY LABS, LLC**

_____
Name: Joshua Campbell
Title: Chief Executive Officer

STATE OF _____          )
                                                        ) SS.
COUNTY OF _____          )

The undersigned, a Notary Public in and for the said County, in the State aforesaid, DOES HEREBY CERTIFY that Joshua Campbell, the Chief Executive Officer of Zenergy Labs, LLC, a Texas limited liability company, who is personally known to me to be the same person whose name is subscribed to the foregoing, appeared before me this day in person and acknowledged that he/she signed and delivered the said instrument as his/her own free and voluntary act and as the free and voluntary act of said limited liability company, for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this _____ day of _____, 20____.

_____
Notary Public
My Commission Expires:

_____

[signature page to Guaranty Agreement (Guarantors)]

IN WITNESS WHEREOF, the undersigned, intending to be legally bound, has duly executed and delivered this Guaranty Agreement as of the day and year first above written.

**ZENERGY & ASSOCIATES, INC.**

_____
Name: Joshua Campbell
Title: Chief Executive Officer

STATE OF _____          )
                                    ) SS.
COUNTY OF _____           )

The undersigned, a Notary Public in and for the said County, in the State aforesaid, DOES HEREBY CERTIFY that Joshua Campbell, the Chief Executive Officer of Zenergy & Associates, Inc., a Texas corporation, who is personally known to me to be the same person whose name is subscribed to the foregoing, appeared before me this day in person and acknowledged that he/she signed and delivered the said instrument as his/her own free and voluntary act and as the free and voluntary act of said corporation, for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this _____ day of _____, 20____.

_____
Notary Public

My Commission Expires:

_____

[signature page to Guaranty Agreement (Guarantors)]

# RESERVED

# Exhibit D

# Form of Revolving Note

**NEITHER THIS NOTE NOR THE SECURITIES THAT ARE ISSUABLE TO THE LENDER UPON CONVERSION HEREOF (COLLECTIVELY, THE "SECURITIES") HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "1933 ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THE SECURITIES NOR ANY INTEREST OR PARTICIPATION THEREIN MAY BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED: (I) IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE 1933 ACT OR APPLICABLE STATE SECURITIES LAWS; OR (II) IN THE ABSENCE OF AN OPINION OF COUNSEL, IN A FORM REASONABLY ACCEPTABLE TO THE ISSUER, THAT REGISTRATION IS NOT REQUIRED UNDER THE 1933 ACT OR; (III) UNLESS SOLD, TRANSFERRED OR ASSIGNED PURSUANT TO RULE 144 UNDER THE 1933 ACT.**

**BY ACCEPTING THIS OBLIGATION, THE LENDER REPRESENTS AND WARRANTS THAT IT IS NOT A UNITED STATES PERSON (OTHER THAN AN EXEMPT RECIPIENT DESCRIBED IN SEC 6049(B)(4) OF THE INTERNAL REVENUE CODE AND REGULATIONS THEREUNDER) AND THAT IT IS NOT ACTING FOR OR ON BEHALF OF A UNITED STATES PERSON (OTHER THAN AN EXEMPT RECIPIENT DESCRIBED IN SEC 6049(B)(4) OF THE INTERNAL REVENUE CODE AND THE REGULATIONS THEREUNDER).**

**SENIOR SECURED PROMISSORY NOTE**

**$5,000,000.00**                              Issuance Date:  as of October ___, 2019
                                               Effective Date: as of October ___, 2019


FOR VALUE RECEIVED, **ZENERGY BRANDS, INC.**, a corporation incorporated under the laws of the State of Nevada, whose address is 5700 Granite Parkway, #200, Plano, TX 75024 ("**Zenergy Brands**" and the "**Borrower**"), promises to pay to the order of **TCA SPECIAL SITUATION CREDIT STRATEGIES ICAV** (hereinafter, together with any holder hereof, "**Lender**"), whose address 1315 S. Hwy 89, Suite 101, Jackson, Wyoming 83001, on or before the Revolving Loan Maturity Date: (A) the lesser of: (i) FIVE MILLION AND NO/100 DOLLARS ($5,000,000.00); or (ii) the aggregate principal amount of all Loans outstanding under and pursuant to that certain Senior Secured Revolving Credit Facility Agreement dated as of October ____, 2019 and effective as of October _____, 2019, executed by and between Borrower, other Credit Parties, and Lender, as amended from time to time (as amended, supplemented or modified from time to time, the "**Credit Agreement**"), and made available by Lender to Borrower at the maturity or maturities and in the amount or amounts stated on the records of Lender; together with (B) interest (computed on the actual number of days elapsed on the basis of a 360 day year) on the aggregate principal amount of all Loans and other Obligations outstanding from time to time, as provided in the Credit Agreement; and together with (C) all other Obligations due, owing and payable under the terms of the Credit Agreement and all other Loan Documents. Capitalized words and phrases not otherwise defined herein shall have the meanings assigned thereto in the Credit Agreement.

This Senior Secured Promissory Note ("**Note**") evidences the Loans incurred by Borrower under and pursuant to the Credit Agreement, to which reference is hereby made for a statement of the terms and conditions under which the Revolving Loan Maturity Date or any payment hereon may be accelerated. The holder of this Note is entitled to all of the benefits and security provided for in the Credit Agreement and all other Loan Documents, of even date herewith, executed by and between Borrower and Lender. All Loans and all other Obligations shall be repaid by Borrower on the Revolving Loan Maturity Date, unless payable sooner pursuant to the provisions of the Credit Agreement.

Principal, interest and other Obligations shall be paid to Lender as set forth in the Credit Agreement, or at such other place as the holder of this Note shall designate in writing to Borrower. Each Loan made by Lender, and all payments on account of the principal and interest thereof shall be recorded on the books and records of Lender and the principal balance as shown on such books and records, or any copy thereof certified by an officer of Lender, shall be rebuttably presumptive evidence of the principal amount owing hereunder.

Except for such notices as may be required under the terms of the Credit Agreement, Borrower waives presentment, demand, notice, protest, and all other demands, or notices, in connection with the delivery, acceptance, performance, default, or enforcement of this Note, and assents to any extension or postponement of the time of payment or any other indulgence.

Borrower hereby waives personal service of any and all process and consents that all such service of process may be made by certified mail, return receipt requested, or by federal express, directed to the Borrower, as set forth and according to the terms in the notice provisions in the Credit Agreement. Each of the signatories agrees that no acknowledgment of actual receipt of process is required and service will be deemed effective pursuant to the terms of the notice provisions contained in the Credit Agreement. Service may also be made in any manner provided by applicable statute, law, rule of court or otherwise.

Borrower shall be solely responsible for the payment of any and all documentary stamps and other taxes applicable to the full face amount of this Note.

This Note shall be governed and construed in accordance with the laws of the State of Wyoming, and shall be binding upon Borrower and its legal representatives, successors, and assigns. Wherever possible, each provision of the Credit Agreement and this Note shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of the Credit Agreement or this Note shall be prohibited by or be invalid under such law, such provision shall be severable, and be ineffective to the extent of such prohibition or invalidity, without invalidating the remaining provisions of the Credit Agreement or this Note.

Nothing herein contained, nor in any instrument or transaction relating hereto, shall be construed or so operate as to require Borrower, or any person liable for the payment of this Note, to pay interest in an amount or at a rate greater than the highest rate permissible under applicable law. **THE BORROWER UNDERSTANDS AND ACKNOWLEDGES THAT IT HAS HAD AN OPPORTUNITY TO REVIEW AND DISCUSS THE OPERATION OF THIS NOTE, ANY FEES, INTEREST, OR OTHER CHARGES OCCASIONED IN THE LOAN DOCUMENTS WITH A COMPETENT ATTORNEY OF THEIR CHOOSING, AND**

**DOES IN FACT UNDERSTAND THEIR OPERATION AND THUS AGREES THAT IT IS NOT THE LENDER'S INTENT TO CHARGE ANY AMOUNT, FEE, OR INTEREST HIGHER THAN THAT PERMITTED UNDER APPLICABLE LAW, AND THAT IN FACT, THE OBLIGATIONS AND EFFECT OF THE LOAN DOCUMENTS DO NOT CALL FOR THE PAYMENT OF ANY AMOUNT, FEE, INTEREST OR CHARGE GREATER THAT THAT PERMITTED BY APPLICABLE LAW.** By acceptance hereof, Lender hereby warrants and represents to Borrower that Lender has no intention of charging a usurious rate of interest. Should any interest or other charges paid by Borrower, or any parties liable for the payments made pursuant to this Note, result in the computation or earning of interest in excess of the highest rate permissible under applicable law, any and all such excess shall be and the same is hereby waived by the holder hereof. Lender shall make adjustments in the Note or Credit Agreement, as applicable, as necessary to ensure that Borrower will not be required to pay further interest in excess of the amount permitted by applicable law. All such excess shall be automatically credited against and in reduction of the outstanding principal balance. Any portion of such excess which exceeds the outstanding principal balance shall be paid by the holder hereof to the Lender and any parties liable for the payment of this Note, it being the intent of the parties hereto that under no circumstances shall Borrower, or any party liable for the payments hereunder, be required to pay interest in excess of the highest legal non- usurious rate permissible under applicable law.

THE LENDER IS A NON-U.S. PERSON AS THAT TERM IS DEFINED IN THE UNITED STATES INTERNAL REVENUE CODE. IT IS HEREBY AGREED AND UNDERSTOOD THAT THE OBLIGATIONS HEREUNDER MAY BE SOLD OR RESOLD ONLY TO NON-U.S. PERSONS. THE INTEREST PAYABLE HEREUNDER IS PAYABLE ONLY OUTSIDE THE UNITED STATES. ANY U.S. PERSON WHO HOLDS THIS OBLIGATION WILL BE SUBJECT TO LIMITATIONS UNDER THE UNITED STATES INCOME TAX LAW.

At any time and from time to time while this Note is outstanding, this Note may be, at the sole option of the Lender upon an Event of Default, convertible into shares of the common stock, par value $0.001 per share (the "Common Stock") of Zenergy Brands, in accordance with the terms and conditions set forth below.

(a)    Voluntary Conversion. At any time while this Note is outstanding, the Lender may, at its sole option upon an Event of Default, convert all or any portion of the outstanding principal, accrued and unpaid interest, and any other sums due and payable hereunder or under the Credit Agreement (such total amount, the "Conversion Amount") into shares of Common Stock of Zenergy Brands (the "Conversion Shares") in an amount of shares equal to: (i) the Conversion Amount (the numerator); divided by (ii) eighty-five percent (85%) of the lowest daily volume weighted average price of Zenergy Brands' Common Stock during the five (5) Business Days immediately prior to the Conversion Date, which price shall be indicated in the conversion notice (in the form attached hereto as Exhibit A, the "Conversion Notice") (the denominator) (the "Conversion Price"). The Lender shall submit a Conversion Notice indicating the Conversion Amount, the number of Conversion Shares issuable upon such conversion, and where the Conversion Shares should be delivered.

3

(b)    The Lender's Conversion Limitations. Zenergy Brands shall not affect any conversion of this Note, and the Lender shall not have the right to convert any portion of this Note, to the extent that after giving effect to the conversion set forth on the Conversion Notice submitted by the Lender, the Lender (together with the Lender's Affiliates and any Persons acting as a group together with the Lender or any of the Lender's Affiliates) would beneficially own shares of Common Stock in excess of the Beneficial Ownership Limitation (as defined herein). To ensure compliance with this restriction, prior to delivery of any Conversion Notice, the Lender shall have the right to request that Zenergy Brands provide to the Lender a written statement of the percentage ownership of Zenergy Brands' Common Stock that would be beneficially owned by the Lender and its Affiliates in Zenergy Brands if the Lender converted such portion of this Note then intended to be converted by Lender. Zenergy Brands shall, within two (2) Business Days of such request, provide Lender with the requested information in a written statement, and the Lender shall be entitled to rely on such written statement from Zenergy Brands in issuing its Conversion Notice and ensuring that its ownership of Zenergy Brands' Common Stock is not in excess of the Beneficial Ownership Limitation.  The restriction described in this Section may be waived by Lender, in whole or in part, upon notice from the Lender to Zenergy Brands to increase such percentage.

For purposes of this Note, the "Beneficial Ownership Limitation" shall be 4.99% of the number of shares of Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock issuable upon conversion of this Note.  The limitations contained in this Section shall apply to a successor holder of this Note.  For purposes of this Note, "Person" means an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization or a government or any department or agency thereof.

(c)    Mechanics of Conversion.  The conversion of this Note shall be conducted in the following manner:

(1)    To convert this Note into shares of Common Stock on any date set forth in the Conversion Notice by the Lender (the "Conversion Date"), the Lender shall transmit by facsimile or electronic mail (or otherwise deliver) a copy of the fully executed Conversion Notice to Zenergy Brands (or, under certain circumstances as set forth below, by delivery of the Conversion Notice to Zenergy Brands' transfer agent).

(2)    Upon receipt by Zenergy Brands of a copy of a Conversion Notice, Zenergy Brands shall as soon as practicable, but in no event later than two (2) Business Days after receipt of such Conversion Notice, send, via facsimile or electronic mail (or otherwise deliver) a confirmation of receipt of such Conversion Notice (the "Conversion Confirmation") to the Lender indicating that Zenergy Brands will process such Conversion Notice in accordance with the terms herein. In the event Zenergy Brands fails to issue its Conversion Confirmation within said two (2) Business Day time period, the Lender shall have the absolute and irrevocable right and authority to deliver the fully executed Conversion Notice to Zenergy Brands' transfer agent, and pursuant to the terms of the Credit Agreement, Zenergy Brands' transfer agent shall issue the applicable Conversion Shares to Lender as hereby provided. Within five (5) Business  Days after the date of the Conversion

4

Confirmation (or the date of the Conversion Notice, if Zenergy Brands tails to issue the Conversion Confirmation), provided that Zenergy Brands' transfer agent is participating in the Depository Trust Company's ("DTC") Fast Automated Securities Transfer ("FAST") program, Zenergy Brands shall cause the transfer agent to (or, if for any reason Zenergy Brands fails to instruct or cause its transfer agent to so act, then pursuant to the Credit Agreement, the Lender may request and require Zenergy Brands' transfer agent to) electronically transmit the applicable Conversion Shares to which the Lender shall be entitled by crediting the account of the Lender's prime broker with DTC through its Deposit Withdrawal Agent Commission ("DWAC") system, and provide proof satisfactory to the Lender of such delivery. In the event that Zenergy Brands' transfer agent is not participating in the DTC FAST program and is not otherwise DWAC eligible, within five (5) Business Days after the date of the Conversion Confirmation (or the date of the Conversion Notice, if Zenergy Brands fails to issue the Conversion Confirmation), Zenergy Brands shall instruct and cause its transfer agent to (or, if for any reason Zenergy Brands fails to instruct or cause its transfer agent to so act, then pursuant to the Credit Agreement, the Lender may request and require Zenergy Brands' transfer agent to) issue and surrender to a nationally recognized overnight courier for delivery to the address specified in the Conversion Notice, a certificate, registered in the name of the Lender, or its designees, for the number of Conversion Shares to which the Lender shall be entitled. To effect conversions hereunder, the Lender shall not be required to physically surrender this Note to Zenergy Brands unless the entire principal amount of this Note, plus all accrued and unpaid interest thereon, has been so converted. Conversions hereunder shall have the effect of lowering the outstanding principal amount of this Note in an amount equal to the applicable conversion. The Lender and Zenergy Brands shall maintain records showing the principal amount(s) converted and the date of such conversion(s). The Lender, and any assignee by acceptance of this Note, acknowledge and agree that, by reason of the provisions of this paragraph, following conversion of a portion of this Note, the unpaid and unconverted principal amount of this Note may be less than the amount stated on the face hereof.

(3)      The Person(s) entitled to receive the shares of Common Stock issuable upon a conversion of this Note shall be treated for all purposes as the record holder(s) of such shares of Common Stock as of the Conversion Date.

(4)      If in the case of any Conversion Notice, the certificate or certificates are not delivered to or as directed by the Lender by the date required hereby, the Lender shall be entitled to elect by written notice to Zenergy Brands at any time on or before its receipt of such certificate or certificates, to rescind such Conversion Notice, in which event Zenergy Brands shall promptly return to the Lender any original Note delivered to Zenergy Brands and the Lender shall promptly return to Zenergy Brands the Common Stock certificates representing the principal amount of this Note unsuccessfully tendered  for conversion to Zenergy Brands.

(5)      Zenergy Brands' obligations to issue and deliver the Conversion Shares upon conversion of this Note in accordance with the terms hereof are absolute and unconditional, irrespective of any action or inaction by the Lender to enforce the same, any waiver or consent with respect to any provision hereof, the recovery of any judgment against any person or entity or any action to enforce the same, or any setoff, counterclaim, recoupment, limitation or termination, or  any breach or alleged breach by the Lender or any other person or entity of any obligation to  Zenergy Brands

or any violation or alleged violation of law by the Lender or any other person or entity, and irrespective of any other circumstance which might otherwise limit such obligation of Zenergy Brands to the Lender in connection with the issuance of such Conversion Shares; provided, however, that such delivery shall not operate as a waiver by Zenergy Brands of any such action Zenergy Brands may have against the Lender. In the event the Lender of this Note shall elect to convert any or all of the outstanding principal amount hereof and accrued but unpaid interest thereon in accordance with the terms of this Note, Zenergy Brands may not refuse conversion based on any claim that the Lender or anyone associated or affiliated with the Lender has been engaged in any violation of law, agreement or for any other reason, unless an injunction from a court, on notice to Lender, restraining and or enjoining conversion of all or part of this Note shall have been sought and obtained, and Zenergy Brands posts a surety bond for the benefit of the Lender in the amount of 150% of the outstanding principal amount of this Note, which is subject to the injunction, which bond shall remain in effect until the completion of arbitration/litigation of the underlying dispute and the proceeds of which shall be payable to such Lender to the extent it obtains judgment.  In the absence of such injunction, Zenergy Brands shall issue Conversion Shares upon a properly noticed conversion.  If Zenergy Brands fails for any reason to deliver to the Lender such certificate or certificates representing Conversion Shares pursuant to timing and delivery requirements of this Note, Zenergy Brands shall pay to such Lender, in cash, as liquidated damages and not as a penalty, for each $1,000 of principal amount being converted, $1.00 per day for each day after the date by which such certificates should have been delivered until such certificates are delivered. Nothing herein shall limit a Lender's right to pursue actual damages or declare an Event of Default pursuant to the Credit Agreement, this Note or any agreement securing the indebtedness under this Note for Zenergy Brands' failure to deliver Conversion Shares within the period specified herein and such Lender shall have the right to pursue all remedies available to it hereunder, at law or in equity, including, without limitation, a decree of specific performance and/or injunctive relief. The exercise of any such rights shall not prohibit the Lender from seeking to enforce damages pursuant to any other Section hereof or under applicable law. Nothing herein shall prevent the Lender from having the Conversion Shares issued directly by Zenergy Brands' transfer agent in accordance with the Credit Agreement, in the event for any reason Zenergy Brands fails to issue or deliver, or cause its transfer agent to issue and deliver, the Conversion Shares to the Lender upon exercise of Lender's conversion rights hereunder.

(6)      The issuance of certificates for shares of the Common Stock on conversion of this Note shall be made without charge to the Lender hereof for any documentary stamp or similar taxes, or any other issuance or transfer fees of any nature or kind that may be payable in respect of the issue or delivery of such certificates, any such taxes or fees, if payable, to be paid by Zenergy Brands.

(7)      Zenergy Brands shall take all action reasonably necessary to at all times have authorized, and reserved for the purpose of issuance, such number of shares of Common Stock as shall be necessary to effect the full conversion of the Note in accordance with its terms (the "Share Reserve").  If at any time the Share Reserve is insufficient to effect the full conversion of the Note then outstanding, Zenergy Brands shall increase the Share Reserve accordingly. If Zenergy Brands does not have sufficient authorized and unissued shares of Common Stock available to increase the Share Reserve, Zenergy Brands shall use commercially reasonable best efforts to call and hold a special meeting of the shareholders within forty-five (45) days of such occurrence, or take action by the written consent of the holders of a majority of the outstanding shares of Common Stock, if

6

possible, for the sole purpose of increasing the number of shares authorized to an amount of shares equal to three (3) times the Conversion Shares.  Zenergy Brands' management shall recommend to the shareholders to vote in favor of increasing the number of shares of Common Stock authorized.

(d)      Adjustments to Conversion Price.

(1)      If Zenergy Brands, at any time while this Note is outstanding: (i) pays a stock dividend or otherwise makes a distribution or distributions payable in shares of Common Stock on outstanding shares of Common Stock, (ii) subdivides outstanding shares of Common Stock into a larger number of shares, (iii) combines (including by way of a reverse stock split) outstanding shares of Common Stock into a smaller number of shares, or (iv) issues, in the event of a reclassification of shares of Common Stock, any shares of capital stock of Zenergy Brands, then the Conversion Price shall be multiplied by a fraction, the numerator of which shall be the number of shares of Common Stock (excluding any treasury shares of Zenergy Brands) outstanding immediately before such event, and the denominator of which shall be the number of shares of Common Stock outstanding immediately after such event. Any adjustment made pursuant to this Section shall become effective immediately after the record date for the determination of stockholders entitled to receive such dividend or distribution and shall become effective immediately after the effective date in the case of a subdivision, combination, or re-classification.

(2)      If, at any time while this Note is outstanding: (i) Zenergy Brands effects any merger or consolidation of Zenergy Brands with or into another Person, (ii) Zenergy Brands effects any sale of all or substantially all of its assets in one transaction or a series of related transactions, (iii) any tender offer or exchange offer (whether by Zenergy Brands or another Person) is completed pursuant to which holders of Common Stock are permitted  to tender or exchange their shares for other securities, cash or property, or (iv) Zenergy Brands effects any reclassification of the Common Stock or any compulsory share exchange pursuant to which the Common Stock is effectively converted into or exchanged for other securities, cash or property (in any such case, a "Fundamental Transaction"), then upon any subsequent conversion of this Note, the Lender shall have the right to receive, for each Conversion Share that would have been issuable upon such conversion immediately prior to the occurrence of such Fundamental Transaction, the same kind and amount of securities, cash or property as it would have been entitled to receive upon the occurrence of such Fundamental Transaction if it had been, immediately prior to such Fundamental Transaction, the holder of one (1) share of Common  Stock (the "Alternate Consideration"). For purposes of any such conversion, the determination of the Conversion Price shall be appropriately adjusted to apply to such Alternate Consideration based on the amount of Alternate Consideration issuable in respect of one (1) share of Common Stock in such Fundamental Transaction, and Zenergy Brands shall apportion the Conversion Price among the Alternate Consideration in a reasonable manner reflecting the relative value of any different components of the Alternate Consideration. If holders of Common Stock are given any choice as to the securities, cash or property to be received in a Fundamental Transaction, then the Lender shall be given the same choice as to the Alternate Consideration it receives upon any conversion of this Note following such Fundamental Transaction. To the extent necessary to effectuate the foregoing provisions, any successor to Zenergy Brands or surviving entity in such Fundamental Transaction shall issue to the Lender a new note consistent with the foregoing provisions and evidencing the Lender's right

to convert such note into Alternate Consideration. The terms of any agreement pursuant to which a Fundamental Transaction is effected shall include terms requiring any such successor or surviving entity to comply with the provisions of this Section and insuring that this Note (or any such replacement security) will be similarly adjusted upon any subsequent transaction analogous to a Fundamental Transaction.

(3)     Whenever the Conversion Price is adjusted pursuant to any provision of this Note, Zenergy Brands shall promptly deliver to Lender a notice setting forth the Conversion Price after such adjustment and setting forth a brief statement of the facts requiring such adjustment.

(4)     If: (A) Zenergy Brands shall declare a dividend (or any other distribution in whatever form) on the Common Stock, (B) Zenergy Brands shall declare a special nonrecurring cash dividend on or a redemption of the Common Stock, (C) Zenergy Brands shall authorize the granting to all holders of the Common Stock of rights or warrants to subscribe for or purchase any shares of capital stock of any class or of any rights, (D) the approval of any stockholders of Zenergy Brands shall be required in connection with any reclassification of the Common Stock, any consolidation or merger to which Zenergy Brands is a party, any sale or transfer of all or substantially all of the assets of Zenergy Brands, of any compulsory share exchange whereby the Common Stock is converted into other securities, cash or property, or (E) Zenergy Brands shall authorize the voluntary or involuntary dissolution, liquidation or winding up of the affairs of Zenergy Brands, then, in each case, Zenergy Brands shall cause to be filed at each office or agency maintained for the purpose of conversion of this Note, and shall cause to be delivered to the Lender at its last address as it shall appear upon Zenergy Brands' records, at least twenty (20) calendar days prior to the applicable record or effective date hereinafter specified, a notice stating: (x) the date on which a record is to be taken for the purpose of such dividend, distribution, redemption, rights or warrants, or if a record is not to be taken, the date as of which the holders of the Common Stock of record to be entitled to such dividend, distributions, redemption, rights or warrants are to be determined, or (y) the date on which such reclassification, consolidation, merger, sale, transfer or share exchange is expected to become effective or close, and the date as of which it is expected that holders of the Common Stock of record shall be entitled to exchange their shares of Common Stock for securities, cash or other property deliverable upon such reclassification, consolidation, merger, sale, transfer or share exchange, provided that the failure to deliver such notice or any defect therein or in the delivery thereof shall not affect the validity of the corporate action required to be specified in such notice. The Lender is entitled to convert this Note during the 10-day period commencing on the date of such notice through the effective date of the event triggering such notice.

(e)     Make-Whole Rights. Upon liquidation by the Lender of Conversion Shares issued pursuant to a Conversion Notice, provided that the Lender realizes a net amount from such liquidation equal to less than the Conversion Amount specified in the relevant Conversion Notice (such net realized amount, the "Realized Amount"), the Company shall issue to the Lender additional shares of the Company's Common Stock equal to: (i) the Conversion Amount specified in the relevant Conversion Notice; minus (ii) the Realized Amount, as evidenced by a reconciliation statement from the Lender (a "Sale Reconciliation") showing the Realized Amount from the sale of the Conversion Shares; divided by (iii) the average volume weighted average price of the Company's

8

Common Stock during the five (5) Business Days immediately prior to the date upon which the Lender delivers notice (the "Make-Whole Notice") to the Company that such additional shares are requested by the Lender (the "Make-Whole Stock Price") (such number of additional shares to be issued, the "Make-Whole Shares"). Upon receiving the Make-Whole Notice and Sale Reconciliation evidencing the number of Make-Whole Shares requested, the Company shall instruct its transfer agent to issue certificates representing the Make-Whole Shares, which Make-Whole Shares shall be issued and delivered in the same manner and within the same time frames as set forth herein. The Make-Whole Shares, when issued, shall be deemed to be validly issued, fully paid, and non-assessable shares of the Company's Common Stock. Following the sale of the Make-Whole Shares by the Lender: (i) in the event that the Lender receives net proceeds from such sale which, when added to the Realized Amount from the prior relevant Conversion Notice, is less than the Conversion Amount specified in the relevant Conversion Notice, the Lender shall deliver an additional Make-Whole Notice to the Company following the procedures provided previously in this paragraph, and such procedures and the delivery of Make-Whole Notices and issuance of Make-Whole Shares shall continue until the Conversion Amount has been fully satisfied; and (ii) in the event that the Lender received net proceeds from the sale of Make-Whole Shares in excess of the Conversion Amount specified in the relevant Conversion Notice, such excess amount shall be applied to satisfy any and all amounts owed hereunder in excess of the Conversion Amount specified in the relevant Conversion Notice.


**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the Borrower has executed this Note as of the date set forth above.

**BORROWER**:

**ZENERGY BRANDS, INC.**

By:    _____

Name:    Josh Campbell

Title:    CEO

STATE OF _____        )
                                )  SS.
COUNTY OF _____        )

The undersigned, a Notary Public in and for the said County, in the State aforesaid, DOES HEREBY CERTIFY that Josh Campbell, the CEO of Zenergy Brands, Inc., a Nevada corporation, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he/she signed and delivered the said instrument as his/her own free and voluntary act and as the free and voluntary act of said limited liability company, for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this _____ day of _____, 20____.

_____
Notary Public

My Commission Expires:

_____

_____

## CONSENT AND AGREEMENT

The undersigned, referred to in the foregoing note as a guarantor, hereby consents and agrees to said note and to the payment of the amounts contemplated therein, documents contemplated thereby and to the provisions contained therein relating to conditions to be fulfilled and obligations to be performed by it pursuant to or in connection with said note to the same extent as if the undersigned were a party to said note.

**GUARANTOR**:

**ZEN TECHNOLOGIES, INC.**

By: _____

Name: Josh Campbell

Title: Chief Executive Officer

STATE OF _____          )

                                          ) SS.

COUNTY OF _____          )

       The undersigned, a Notary Public in and for the said County, in the State aforesaid, DOES HEREBY CERTIFY that Josh Campbell, the Chief Executive Officer of Zen Technologies, Inc., a Texas corporation, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he/she signed and delivered the said instrument as his/her own free and voluntary act and as the free and voluntary act of said corporation, for the uses and purposes therein set forth.

       GIVEN under my hand and notarial seal this _____ day of _____, 20____.

_____

                    Notary Public

                My Commission Expires:

_____

## CONSENT AND AGREEMENT

The undersigned, referred to in the foregoing note as a guarantor, hereby consents and agrees to said note and to the payment of the amounts contemplated therein, documents contemplated thereby and to the provisions contained therein relating to conditions to be fulfilled and obligations to be performed by it pursuant to or in connection with said note to the same extent as if the undersigned were a party to said note.

**GUARANTOR:**

**ZENERGY POWER & GAS, INC.**

By: _____
Name: Josh Campbell
Title: Chief Executive Officer

STATE OF _____          )
                                   ) SS.
COUNTY OF _____           )

  The undersigned, a Notary Public in and for the said County, in the State aforesaid, DOES HEREBY CERTIFY that Josh Campbell, the Chief Executive Officer of Zenergy Power & Gas, Inc., a Texas corporation, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he/she signed and delivered the said instrument as his/her own free and voluntary act and as the free and voluntary act of said corporation, for the uses and purposes therein set forth.

  GIVEN under my hand and notarial seal this _____ day of _____, 20____.

       _____
         Notary Public
        My Commission Expires:
       _____

**CONSENT AND AGREEMENT**

The undersigned, referred to in the foregoing note as a guarantor, hereby consents and agrees to said note and to the payment of the amounts contemplated therein, documents contemplated thereby and to the provisions contained therein relating to conditions to be fulfilled and obligations

to be performed by it pursuant to or in connection with said note to the same extent as if the undersigned were a party to said note.

**GUARANTOR:**

**NAUP BROKERAGE, LLC**

By: _____
Name: Josh Campbell
Title: Chief Executive Officer

STATE OF _____        )
                                                          ) SS.
COUNTY OF _____        )

      The undersigned, a Notary Public in and for the said County, in the State aforesaid, DOES HEREBY CERTIFY that Josh Campbell, the Chief Executive Officer of NAUP Brokerage, LLC, a Texas limited liability company, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he/she signed and delivered the said instrument as his/her own free and voluntary act and as the free and voluntary act of said limited liability company, for the uses and purposes therein set forth.

      GIVEN under my hand and notarial seal this _____ day of _____, 20____.

_____
Notary Public
My Commission Expires:

_____
_____

## CONSENT AND AGREEMENT

The undersigned, referred to in the foregoing note as a guarantor, hereby consents and agrees to said note and to the payment of the amounts contemplated therein, documents contemplated thereby and to the provisions contained therein relating to conditions to be fulfilled and obligations to be performed by it pursuant to or in connection with said note to the same extent as if the undersigned were a party to said note..

**GUARANTOR:**

**ZENERGY LABS, LLC**

By: _____

Name: Josh Campbell

Title: Chief Executive Officer

STATE OF _____          )

          ) SS.

COUNTY OF _____          )

      The undersigned, a Notary Public in and for the said County, in the State aforesaid, DOES HEREBY CERTIFY that Josh Campbell, the Chief Executive Officer of Zenergy Labs, LLC, a Texas limited liability company, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he/she signed and delivered the said instrument as his/her own free and voluntary act and as the free and voluntary act of said limited liability company, for the uses and purposes therein set forth.

      GIVEN under my hand and notarial seal this _____ day of _____, 20____.

_____

Notary Public

My Commission Expires:

_____

_____

## CONSENT AND AGREEMENT

The undersigned, referred to in the foregoing note as a guarantor, hereby consents and agrees to said note and to the payment of the amounts contemplated therein, documents contemplated thereby and to the provisions contained therein relating to conditions to be fulfilled and obligations to be performed by it pursuant to or in connection with said note to the same extent as if the undersigned were a party to said note.

## GUARANTOR:

**ZENERGY & ASSOCIATES, INC.**

By: _____
Name: Josh Campbell
Title: Chief Executive Officer

STATE OF _____         )
                                  ) SS.
COUNTY OF _____          )

 The undersigned, a Notary Public in and for the said County, in the State aforesaid, DOES HEREBY CERTIFY that Josh Campbell, the Chief Executive Officer of Zenergy & Associates, Inc., a Texas corporation, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he/she signed and delivered the said instrument as his/her own free and voluntary act and as the free and voluntary act of said corporation, for the uses and purposes therein set forth.

 GIVEN under my hand and notarial seal this _____ day of _____, 20____.

_____
Notary Public
My Commission Expires:
_____
_____

## EXHIBIT A

## NOTICE OF CONVERSION

The undersigned hereby elects to convert principal and/or interest under the Revolving Convertible Promissory Note (the "**Note**") of Zenergy Brands, Inc., a corporation incorporated under the laws of the State of Nevada (the "**Company**"), into shares of common stock, par value $0.001 per share (the "**Common Shares**"), of the Company in accordance with the conditions of the Note, as of the date written below.

Based solely on information provided by the Company to Lender, the undersigned represents and warrants to the Company that its ownership of the Common Shares does not exceed the Beneficial Ownership Limitation as specified under the Note.

Conversion Calculations
Effective Date of Conversion: _____
Principal Amount and/or Interest to be Converted:
Number of Common Shares to be Issued: _____

[HOLDER]

By:

Name:

Title:

Address:

# Exhibit E-1

# Form of Security Agreement – Borrower

# SECURITY AGREEMENT

This **SECURITY AGREEMENT** (the "**Security Agreement**") dated and made effective as of October ____, 2019, is executed by **Zenergy Brands, Inc.**, a Nevada corporation (the "**Borrower**"), , and **TCA Special Situations Credit Strategies ICAV**, an Irish collective asset vehicle (the "**Secured Party**").

## R E C I T A L S:

WHEREAS, Borrower desires to borrow funds and obtain financial accommodations from Secured Party pursuant to that certain Senior Secured Revolving Credit Facility Agreement of even date herewith among the Borrower, any additional Credit Parties, and Secured Party (as amended, renewed, supplemented or modified from time to time, the "**Credit Agreement**").

NOW, THEREFORE, in consideration of the credit extended now and in the future by Secured Party to the Debtors and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Debtors and Secured Party hereby agree as follows:

## A G R E E M E N T S:

## 1 DEFINITIONS.

1.1 <u>Defined Terms</u>. Capitalized terms used but not otherwise defined in this Security Agreement (including the Recitals) shall have the meanings ascribed to them in the Credit Agreement. For the purposes of this Security Agreement, the following capitalized words and phrases shall have the meanings set forth below.

(a) "**Capital Securities**" shall mean, with respect to any Person, all shares, interests, participations or other equivalents (however designated, whether voting or non-voting) of such Person's capital, whether now outstanding or issued or acquired after the date hereof, including common shares, preferred shares, membership interests in a limited liability company, limited or general partnership interests in a partnership or any other equivalent of such ownership interest.

(b) "**Collateral**" shall have the meaning set forth in <u>Section 2.1</u> hereof.

(c) "**Obligor**" shall mean Borrower, or any other party liable with respect to the Obligations.

(d) "**Organizational Identification Number**" means, with respect to Borrower, the organizational identification number assigned to Borrower by the applicable governmental unit or agency of the jurisdiction of organization of Borrower, if any.

(e) "**Taxes**" shall mean any and all present and future taxes, duties, levies, imposts, deductions, assessments, charges or withholdings, and any and all liabilities (including interest and penalties and other additions to taxes) with respect to the foregoing.

1

   (f) "**Unmatured Event of Default**" shall mean any event which, with the giving of notice, the passage of time or both, would constitute an Event of Default.

   1.2 <u>Other Terms Defined in UCC</u>.  All other capitalized words and phrases used herein and not otherwise specifically defined herein or in the Credit Agreement shall have the respective meanings assigned to such terms in the UCC, to the extent the same are used or defined therein.

   1.3 <u>Other Interpretive Provisions</u>.

   (a) The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.  Whenever the context so requires, the neutral gender includes the masculine and feminine, the single number includes the plural, and vice versa, and in particular the word "Debtors" shall be so construed.

   (b) Section and Schedule references are to this Security Agreement unless otherwise specified.  The words "hereof", "herein" and "hereunder" and words of similar import when used in this Security Agreement shall refer to this Security Agreement as a whole and not to any particular provision of this Security Agreement

   (c) The term "including" (or words of similar import) is not limiting, and means "including, without limitation".

   (d) In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding", and the word "through" means "to and including".

   (e) Unless otherwise expressly provided herein: (i) references to agreements (including this Security Agreement and the other Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, supplements and other modifications thereto, but only to the extent such amendments, restatements, supplements and other modifications are not prohibited by the terms of any Loan Document; and (ii) references to any statute or regulation shall be construed as including all statutory and regulatory provisions amending, replacing, supplementing or interpreting such statute or regulation.

   (f) To the extent any of the provisions of the other Loan Documents are inconsistent with the terms of this Security Agreement, the provisions of this Security Agreement shall govern.

   (g) This Security Agreement and the other Loan Documents may use several different limitations, tests or measurements to regulate the same or similar matters.  All such limitations, tests and measurements are cumulative and each shall be performed in accordance with its terms.

## 2      SECURITY FOR THE OBLIGATIONS.

2.1      <u>Security for Obligations</u>.  As security for the payment and performance of the Obligations, Borrower hereby pledges, assigns, transfers, delivers and grants to Secured Party, for its own benefit and as agent for its Affiliates, a continuing and unconditional security interest in and to any and all property of Borrower, of any kind or description, tangible or intangible, wheresoever located and whether now existing or hereafter arising or acquired, including the following (all of which property for Borrower, along with the products and proceeds therefrom, are individually and collectively referred to as the "**Collateral**"):

(a)      all property of, or for the account of, Borrower now or hereafter coming into the possession, control or custody of, or in transit to, Secured Party or any agent or bailee for Secured Party or any parent, affiliate or subsidiary of Secured Party or any participant with Secured Party in the Obligations (whether for safekeeping, deposit, collection, custody, pledge, transmission or otherwise), including all cash, earnings, dividends, interest, or other rights in connection therewith and the products and proceeds therefrom, including the proceeds of insurance thereon; and

(b)      the additional property of Borrower, whether now existing or hereafter arising or acquired, and wherever now or hereafter located, together with all additions and accessions thereto, substitutions, betterments and replacements therefor, products and Proceeds therefrom, and all of Debtor's books and records and recorded data relating thereto (regardless of the medium of recording or storage), together with all of Debtor's right, title and interest in and to all computer software required to utilize, create, maintain and process any such records or data on electronic media, identified and set forth as follows:

(i)      All Accounts and all goods whose sale, lease or other disposition by Borrower has given rise to Accounts and have been returned to, or repossessed or stopped in transit by, Borrower, or rejected or refused by a Customer;

(ii)      All Inventory, including raw materials, work-in-process and finished goods;

(iii)      All goods (other than Inventory), including embedded software, Equipment, vehicles, furniture and Fixtures;

(iv)      All Software and computer programs;

(v)      All Securities, Investment Property, Financial Assets and Deposit Accounts, specifically including the Lock Box Account, and all funds at any time deposited therewith, and all funds and amounts reserved or held back by any Payment Processing Companies;

(vi)      All As-Extracted Collateral, Commodity Accounts, Commodity Contracts, and Farm Products;

(vii)   All Chattel Paper, Electronic Chattel Paper, Instruments, Documents, Letter of Credit Rights, all proceeds of letters of credit, Health-Care-Insurance Receivables, Supporting Obligations, notes secured by real estate, Commercial Tort Claims and General Intangibles, including Payment Intangibles;

(viii)   All real estate property owned by Borrower and the interest of Borrower in fixtures related to such real property; and

(ix)   All Proceeds (whether Cash Proceeds or Non-cash Proceeds) of the foregoing property, including all insurance policies and proceeds of insurance payable by reason of loss or damage to the foregoing property, including unearned premiums, and of eminent domain or condemnation awards.

2.2   <u>Possession and Transfer of Collateral</u>.   Until an Event of Default has occurred, but subject to Secured Party's rights under the Credit Agreement (specifically with respect to Secured Party's rights to use and apply money in the Lock Box Account), Borrower shall be entitled to possession and use of the Collateral (other than Instruments or Documents (including Tangible Chattel Paper and Investment Property consisting of certificated securities) and other Collateral required to be delivered to Secured Party pursuant to this <u>Section 2</u>).   The cancellation or surrender of any promissory note evidencing an Obligation, upon payment or otherwise, shall not affect the right of Secured Party to retain the Collateral for any other of the Obligations, except upon payment in full of the Obligations.   Borrower shall not sell, assign (by operation of law or otherwise), license, lease or otherwise dispose of, or grant any option with respect to any of the Collateral, except as permitted pursuant to the Credit Agreement.

2.3   <u>Financing Statements</u>.   Borrower authorizes Secured Party to prepare and file such financing statements, amendments and other documents and do such acts as Secured Party deems necessary in order to establish and maintain valid, attached and perfected, security interests in the Collateral in favor of Secured Party, for its own benefit and as agent for its Affiliates, free and clear of all Liens and claims and rights of third parties whatsoever, except Permitted Liens.   Borrower hereby irrevocably authorizes Secured Party at any time, and from time to time, to file in any jurisdiction any initial financing statements and amendments thereto that: (a) indicate the Collateral: (i) is comprised of all assets of Borrower (or words of similar effect), regardless of whether any particular asset comprising a part of the Collateral falls within the scope of Article 9 of the UCC of the jurisdiction wherein such financing statement or amendment is filed; or (ii) as being of an equal or lesser scope or within greater detail as the grant of the security interest set forth herein; and (b) contain any other information required by Section 5 of Article 9 of the UCC of the jurisdiction wherein such financing statement or amendment is filed regarding the sufficiency or filing office acceptance of any financing statement or amendment, including: (A) whether Borrower is an organization, the type of organization and any Organizational Identification Number issued to Borrower; and (B) in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of the real property to which the Collateral relates.   Borrower agrees to furnish any such information to Secured Party promptly upon request.   In addition, Borrower shall make appropriate entries

4

on its books and records disclosing the security interests of Secured Party, for its own benefit and as agent for its Affiliates, in the Collateral. Borrower hereby agrees that a photogenic or other reproduction of this Security Agreement is sufficient for filing as a financing statement and Borrower authorizes Secured Party to file this Security Agreement as a financing statement in any jurisdiction.

2.4    <u>Preservation of the Collateral</u>. Secured Party may, but is not required to, take such actions from time to time as Secured Party deems appropriate to maintain or protect the Collateral. Secured Party shall have exercised reasonable care in the custody and preservation of the Collateral if Secured Party takes such action as Borrower shall reasonably request in writing which is not inconsistent with Secured Party's status as a secured party, but the failure of Secured Party to comply with any such request shall not be deemed a failure to exercise reasonable care; <u>provided</u>, <u>however</u>, Secured Party's responsibility for the safekeeping of the Collateral shall: (i) be deemed reasonable if such Collateral is accorded treatment substantially equal to that which Secured Party accords its own property; and (ii) not extend to matters beyond the control of Secured Party, including acts of God, war, insurrection, riot or governmental actions. In addition, any failure of Secured Party to preserve or protect any rights with respect to the Collateral against prior or third parties, or to do any act with respect to preservation of the Collateral, not so requested by Borrower, shall not be deemed a failure to exercise reasonable care in the custody or preservation of the Collateral. Borrower shall have the sole responsibility for taking such action as may be necessary, from time to time, to preserve all rights of Borrower and Secured Party in the applicable Collateral against prior or third parties. Without limiting the generality of the foregoing, where Collateral consists, in whole or in part, of Capital Securities, Borrower represents to, and covenants with, Secured Party that Borrower has made arrangements for keeping informed of changes or potential changes affecting the Capital Securities (including rights to convert or subscribe, payment of dividends, reorganization or other exchanges, tender offers and voting rights), and Borrower agrees that Secured Party shall have no responsibility or liability for informing Borrower of any such or other changes or potential changes or for taking any action or omitting to take any action with respect thereto.

2.5    <u>Other Actions as to any and all Collateral</u>. Borrower further agrees to take any other action reasonably requested by Secured Party to ensure the attachment, perfection and priority of, and the ability of Secured Party to enforce, the security interest of Secured Party, for its own benefit and as agent for its Affiliates, in any and all of the Collateral, including: (i) causing Secured Party's name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or ability of the bank to enforce, the security interest of Secured Party, for its own benefit and as agent for its Affiliates, in such Collateral; (ii) complying with any provision of any statute, regulation or treaty of the United States as to any material portion of the Collateral as soon as possible but not more than forty-five (45) days after such request if compliance with such provision is a condition to attachment, perfection or priority of, or ability of Secured Party to enforce, the security interest of Secured Party, for its own benefit and as agent for its Affiliates, in such Collateral; (iii) obtaining governmental and other third party consents and approvals, including, without limitation, any consent of any licensor, lessor or other Person with authority or control over or an interest in any material portion of the Collateral as soon

5

as possible but not more than forty-five (45) days after such request; (iv) obtaining waivers from mortgagees and landlords in form and substance reasonably satisfactory to Secured Party which affect any material portion of the Collateral as soon as possible but not more than forty-five (45) days after such request; and (v) taking all actions required by the UCC in effect from time to time or by other law, as applicable in any relevant UCC jurisdiction, or by other law as applicable in any foreign jurisdiction. Borrower further agrees to indemnify and hold Secured Party harmless against claims of any Persons not a party to this Security Agreement concerning disputes arising over the Collateral, except to the extent resulting from the gross negligence or willful misconduct of Secured Party or its Affiliates.

2.6    <u>Collateral in the Possession of a Warehouseman or Bailee</u>.  If any material portion of the Collateral at any time is in the possession of a warehouseman or bailee, Borrower shall promptly notify Secured Party thereof, and, as soon as possible, but not more than forty-five (45) days later, shall obtain a Collateral Access Agreement in form and substance reasonably satisfactory to Secured Party from such warehouseman or bailee.

2.7    <u>Letter-of-Credit Rights</u>.  If Borrower at any time is a beneficiary under a letter of credit now or hereafter issued in favor of Borrower, Borrower shall promptly notify Secured Party thereof and, at the request and option of Secured Party, Borrower shall, pursuant to an agreement in form and substance reasonably satisfactory to Secured Party, either: (i) arrange for the issuer and any confirmer of such letter of credit to consent to an assignment to Secured Party, for its own benefit and as agent for its Affiliates, of the proceeds of any drawing under the letter of credit; or (ii) arrange for Secured Party, for its own benefit and as agent for its Affiliates, to become the transferee beneficiary of the letter of credit, with Secured Party agreeing, in each case, that the proceeds of any drawing under the letter to credit are to be applied as provided in the Credit Agreement.

2.8    <u>Commercial Tort Claims</u>.  If Borrower shall at any time hold or acquire a Commercial Tort Claim, Borrower shall promptly notify Secured Party in writing signed by Borrower of the details thereof and grant to Secured Party, for its own benefit and as agent for its Affiliates, in such written notice or other written instrument, a security interest therein and in the proceeds thereof, all upon the terms of this Security Agreement, in each case in form and substance reasonably satisfactory to Secured Party, and shall execute any amendments hereto deemed reasonably necessary by Secured Party to perfect the security interest of Secured Party, for its own benefit and as agent for its Affiliates, in such Commercial Tort Claim.

2.9    <u>Electronic Chattel Paper and Transferable Records</u>.  If Borrower at any time holds or acquires an interest in any electronic chattel paper or any "transferable record", as that term is defined in Section 201 of the federal Electronic Signatures in Global and National Commerce Act, or in Section 16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction, Borrower shall promptly notify Secured Party thereof and, at the request of Secured Party, shall take such action as Secured Party may reasonably request to vest in Secured Party control under Section 9-105 of the UCC of such electronic chattel paper or control under Section 201 of the federal Electronic Signatures in Global and National Commerce Act or, as the case may be, Section 16 of the Uniform Electronic Transactions Act,

6

as so in effect in such jurisdiction, of such transferable record.  Secured Party agrees with Borrower that Secured Party will arrange, pursuant to procedures reasonably satisfactory to Secured Party and so long as such procedures will not result in Secured Party's loss of control, for Borrower to make alterations to the electronic chattel paper or transferable record permitted under Section 9-105 of the UCC or, as the case may be, Section 201 of the federal Electronic Signatures in Global and National Commerce Act or Section 16 of the Uniform Electronic Transactions Act, for a party in control to make without loss of control.

2.10     Additional Requirements on Collateral.  Borrower shall fully cooperate with Secured Party to obtain and keep in effect one or more control agreements in Deposit Accounts, Electronic Chattel Paper, Investment Property and Letter-of-Credit Rights Collateral.  Such control agreements shall only be required if, in the reasonable discretion of the Secured Party, the nature of the Collateral requires any such control agreements in order for the Secured Party to perfect its security interests in any Collateral as granted hereunder, and in such event, Borrower shall promptly provide any such control agreements upon request from the Secured Party. In addition, Borrower, at the Debtor's expense, shall promptly: (A) execute all notices of security interest for each relevant type of Software and other General Intangibles in forms suitable for filing with any United States or foreign office handling the registration or filing of patents, trademarks, copyrights and other intellectual property and any successor office or agency thereto; and (B) take all commercially reasonable steps in any hearing, suit, action, or other proceeding before any such office or any similar office or agency in any other country or any political subdivision thereof, to diligently prosecute or maintain, as applicable, each application and registration of any Software, General Intangibles or any other intellectual property rights and assets that are part of the Collateral, including filing of renewals, affidavits of use, affidavits of incontestability and opposition, interference and cancellation proceedings.

**3      REPRESENTATIONS AND WARRANTIES.**

Borrower makes the following representations and warranties to Secured Party:

3.1     Borrower Organization and Name.  Borrower is a corporation, duly organized, existing and in good standing under the laws of their States of organization, with full and adequate power to carry on and conduct its business as presently conducted. Borrower is duly licensed or qualified in all foreign jurisdictions wherein the nature of their activities requires such qualification or licensing.  Debtor's Organizational Identification Number, if applicable, is set forth in the Credit Agreement.  The exact legal name of Borrower is as set forth in the first paragraph of this Security Agreement, and Borrower currently does not conduct, nor has during the last five (5) years conducted, business under any other name or trade name, except for Compliance Systems Corporation.

3.2     Authorization.  Borrower has full right, power and authority to enter into this Security Agreement and to perform all of its duties and obligations under this Security Agreement.  The execution and delivery of this Security Agreement and the other Loan Documents will not, nor will the observance or performance of any of the matters and things herein or therein set forth, violate or contravene any provision of law or of the articles of incorporation, bylaws, operating agreement, or other governing documents of Borrower.  All

7

necessary and appropriate action has been taken on the part of Borrower to authorize the execution and delivery of this Security Agreement.

3.3     <u>Validity and Binding Nature</u>.  This Security Agreement is the legal, valid and binding obligation of Borrower, enforceable against Borrower in accordance with its terms, subject to bankruptcy, insolvency and similar laws affecting the enforceability of creditors' rights generally and to general principles of equity.

3.4     <u>Consent; Absence of Breach</u>.  The execution, delivery and performance of this Security Agreement and any other documents or instruments to be executed and delivered by Borrower in connection herewith, do not and will not: (a) require any consent, approval, authorization, or filings with, notice to or other act by or in respect of, any governmental authority or any other Person (other than filings or notices pursuant to federal or state securities laws or other than any consent or approval which has been obtained and is in full force and effect); (b) conflict with: (i) any provision of law or any applicable regulation, order, writ, injunction or decree of any court or governmental authority; (ii) the articles of incorporation, bylaws, or other organic or governance document of Borrower; or (iii) any agreement, indenture, instrument or other document, or any judgment, order or decree, which is binding upon Borrower or any of its properties or assets; or (c) require, or result in, the creation or imposition of any Lien on any asset of Borrower, other than Liens in favor of Secured Party created pursuant to this Security Agreement and Permitted Liens.

3.5     <u>Ownership of Collateral; Liens</u>.   Borrower is the sole owner of all the Collateral, free and clear of all Liens, charges and claims (including infringement claims with respect to patents, trademarks, service marks, copyrights and other intellectual property rights), other than Permitted Liens.

3.6     <u>Adverse Circumstances</u>.  No condition, circumstance, event, agreement, document, instrument, restriction, litigation or proceeding (or threatened litigation or proceeding or basis therefor) exists which: (i) would have a Material Adverse Effect upon Borrower; or (ii) would constitute an Event of Default or an Unmatured Event of Default.

3.7     <u>Security Interest</u>.  This Security Agreement creates a valid security interest in favor of Secured Party in the Collateral and, when properly perfected by filing in the appropriate jurisdictions, or by possession or control of such Collateral by Secured Party or delivery of such Collateral to Secured Party, shall constitute a valid, perfected, first-priority security interest in such Collateral.

3.8     <u>Place of Business</u>.  The principal place of business and books and records of Borrower is set forth in the preamble to this Security Agreement, and the location of all Collateral, if other than at such principal place of business, is as set forth on **<u>Schedule 3.8</u>** attached hereto and made a part hereof, and Borrower shall promptly notify Secured Party of any change in such locations.  Borrower will not remove or permit the Collateral to be removed from such locations without the prior written consent of Secured Party, except as permitted pursuant to the Credit Agreement.

3.9     <u>Complete Information</u>.    This Security Agreement and all financial statements, schedules, certificates, confirmations, agreements, contracts, and other materials and information heretofore or contemporaneously herewith furnished in writing by Borrower to Secured Party for purposes of, or in connection with, this Security Agreement and the transactions contemplated hereby is, and all written information hereafter furnished by or on behalf of Borrower to Secured Party pursuant hereto or in connection herewith will be, true and accurate in every material respect on the date as of which such information is dated or certified, and none of such information is or will be incomplete by omitting to state any material fact necessary to make such information not misleading in light of the circumstances under which made (it being recognized by Secured Party that any projections and forecasts provided by Borrower are based on good faith estimates and assumptions believed by Borrower to be reasonable as of the date of the applicable projections or assumptions and that actual results during the period or periods covered by any such projections and forecasts may differ from projected or forecasted results).

# 4     **REMEDIES.**

Upon the occurrence of any default in the payment or performance of any of the covenants, conditions and agreements contained in this Security Agreement or any other Event of Default, Secured Party shall have all rights, powers and remedies set forth in this Security Agreement or the other Loan Documents or in any other written agreement or instrument relating to any of the Obligations or any security therefor, as a secured party under the UCC or as otherwise provided at law or in equity. Without limiting the generality of the foregoing, Secured Party may, at its option upon the occurrence of an Event of Default, declare its commitments to Borrower to be terminated and all Obligations to be immediately due and payable, or, if provided in the Loan Documents, all commitments of Secured Party to Borrower shall immediately terminate and all Obligations shall be automatically due and payable, all without demand, notice or further action of any kind required on the part of Secured Party.  Borrower hereby waives any and all presentment, demand, notice of dishonor, protest, and all other notices and demands in connection with the enforcement of Secured Party's rights under the Loan Documents, and hereby consents to, and waives notice of release, with or without consideration, of any Collateral, notwithstanding anything contained herein or in the Loan Documents to the contrary.  In addition to the foregoing:

4.1     <u>Possession and Assembly of Collateral</u>. Secured Party may, without notice, demand or the initiation of legal process of any kind, take possession of any or all of the Collateral (in addition to Collateral of which Secured Party already has possession), wherever it may be found, and for that purpose may pursue the same wherever it may be found, and may at any time enter into any of Debtor's premises where any of the Collateral may be or is supposed to be, and search for, take possession of, remove, keep and store any of the Collateral until the same shall be sold or otherwise disposed of and Secured Party shall have the right to store and conduct a sale of the same in any of Debtor's premises without cost to Secured Party.  At Secured Party's request, Borrower will, at Debtor's sole expense, assemble the Collateral and make it available to Secured Party at a place or places to be designated by Secured Party which is reasonably convenient to Secured Party and Borrower.

4.2     Sale of Collateral.  Secured Party may sell any or all of the Collateral at public or private sale, upon such terms and conditions as Secured Party may deem proper, and Secured Party may purchase any or all of the Collateral at any such sale.  Borrower acknowledges that Secured Party may be unable to effect a public sale of all or any portion of the Collateral because of certain legal and/or practical restrictions and provisions which may be applicable to the Collateral and, therefore, may be compelled to resort to one or more private sales to a restricted group of offerees and purchasers.  Borrower consents to any such private sale so made even though at places and upon terms less favorable than if the Collateral were sold at public sale.  Secured Party shall have no obligation to clean-up or otherwise prepare the Collateral for sale.  Secured Party may apply the net proceeds, after deducting all costs, expenses, attorneys' and paralegals' fees incurred or paid at any time in the collection, protection and sale of the Collateral and the Obligations, to the payment of the Obligations, returning the excess proceeds, if any, to Borrower.  Borrower shall remain liable for any amount remaining unpaid after such application, with interest at the Default Rate.  Any notification of intended disposition of the Collateral required by law shall be conclusively deemed reasonably and properly given if given by Secured Party at least ten (10) calendar days before the date of such disposition.  Borrower hereby confirms, approves and ratifies all acts and deeds of Secured Party relating to the foregoing, and each part thereof, and expressly waives any and all claims of any nature, kind or description which it has or may hereafter have against Secured Party or its representatives, by reason of taking, selling or collecting any portion of the Collateral.  Borrower consents to releases of the Collateral at any time (including prior to default) and to sales of the Collateral in groups, parcels or portions, or as an entirety, as Secured Party shall deem appropriate.  Borrower expressly absolves Secured Party from any loss or decline in market value of any Collateral by reason of delay in the enforcement or assertion or non-enforcement of any rights or remedies under this Security Agreement.

4.3     Standards for Exercising Remedies.  To the extent that applicable law imposes duties on Secured Party to exercise remedies in a commercially reasonable manner, Borrower acknowledges and agrees that it is not commercially unreasonable for Secured Party: (i) to incur expenses deemed necessary by Secured Party to prepare Collateral for disposition or otherwise to complete raw material or work-in-process into finished goods or other finished products for disposition; (ii) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of; (iii) to fail to exercise collection remedies against Customers or other Persons obligated on Collateral or to remove liens or encumbrances on or any adverse claims against Collateral; (iv) to exercise collection remedies against Customers and other Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists; (v) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature; (vi) to contact other Persons, whether or not in the same business as Borrower, for expressions of interest in acquiring all or any portion of the Collateral; (vii) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature; (viii) to dispose of Collateral by utilizing internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or

10

that match buyers and sellers of assets; (ix) to dispose of assets in wholesale rather than retail markets; (x) to disclaim disposition warranties, including any warranties of title; (xi) to purchase insurance or credit enhancements to insure Secured Party against risks of loss, collection or disposition of Collateral or to provide to Secured Party a guaranteed return from the collection or disposition of Collateral; or (xii) to the extent deemed appropriate by Secured Party, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist Secured Party in the collection or disposition of any of the Collateral. Borrower acknowledges that the purpose of this section is to provide non-exhaustive indications of what actions or omissions by Secured Party would not be commercially unreasonable in Secured Party's exercise of remedies against the Collateral and that other actions or omissions by Secured Party shall not be deemed commercially unreasonable solely on account of not being indicated in this Section.  Without limitation upon the foregoing, nothing contained in this Section shall be construed to grant any rights to Borrower or to impose any duties on Secured Party that would not have been granted or imposed by this Security Agreement or by applicable law in the absence of this Section.

4.4     <u>UCC and Offset Rights</u>.  Secured Party may exercise, from time to time, any and all rights and remedies available to it under the UCC or under any other applicable law in addition to, and not in lieu of, any rights and remedies expressly granted in this Security Agreement or in any other agreements between any Obligor and Secured Party, and may, without demand or notice of any kind, appropriate and apply toward the payment of such of the Obligations, whether matured or unmatured, including costs of collection and attorneys' and paralegals' fees and costs, and in such order of application as Secured Party may, from time to time, elect, any indebtedness of Secured Party to any Obligor, however created or arising, including balances, credits, deposits, accounts or moneys of such Obligor in the possession, control or custody of, or in transit to Secured Party.  Borrower, on behalf of itself and any Obligor, hereby waives the benefit of any law that would otherwise restrict or limit Secured Party in the exercise of its right, which is hereby acknowledged, to appropriate at any time hereafter any such indebtedness owing from Secured Party to any Obligor.

4.5     <u>Additional Remedies</u>.  Upon the occurrence of an Event of Default, Secured Party shall have the right and power to:

(a)     instruct Borrower, at its own expense, to notify any parties obligated on any of the Collateral, including any Customers and Payment Processing Companies, to make payment directly to Secured Party of any amounts due or to become due thereunder, or Secured Party may directly notify such obligors of the security interest of Secured Party, and/or of the assignment to Secured Party of the Collateral and direct such obligors to make payment to Secured Party of any amounts due or to become due with respect thereto, and thereafter, collect any such amounts due on the Collateral directly from such Persons obligated thereon;

(b)     enforce collection of any of the Collateral, including any Accounts, by suit or otherwise, or make any compromise or settlement with respect to any of the Collateral, or surrender, release or exchange all or any part thereof, or compromise, extend or renew for any period (whether or not longer than the original period) any indebtedness thereunder;

11

(c)    take possession or control of any proceeds and products of any of the Collateral, including the proceeds of insurance thereon;

(d)    extend, renew or modify for one or more periods (whether or not longer than the original period) the Obligations or any obligation of any nature of any other obligor with respect to the Obligations;

(e)    grant releases, compromises or indulgences with respect to the Obligations, any extension or renewal of any of the Obligations, any security therefor, or to any other obligor with respect to the Obligations;

(f)    transfer the whole or any part of Capital Securities which may constitute Collateral into the name of Secured Party or Secured Party's nominee without disclosing, if Secured Party so desires, that such Capital Securities so transferred are subject to the security interest of Secured Party, and any corporation, association, or any of the managers or trustees of any trust issuing any of such Capital Securities, or any transfer agent, shall not be bound to inquire, in the event that Secured Party or such nominee makes any further transfer of such Capital Securities, or any portion thereof, as to whether Secured Party or such nominee has the right to make such further transfer, and shall not be liable for transferring the same;

(g)    vote the Collateral;

(h)    make an election with respect to the Collateral under Section 1111 of the Bankruptcy Code or take action under Section 364 or any other section of Bankruptcy Code; provided, however, that any such action of Secured Party as set forth herein shall not, in any manner whatsoever, impair or affect the liability of Borrower hereunder, nor prejudice, waive, nor be construed to impair, affect, prejudice or waive Secured Party's rights and remedies at law, in equity or by statute, nor release, discharge, nor be construed to release or discharge, Borrower, any guarantor or other Person liable to Secured Party for the Obligations; and

(i)    at any time, and from time to time, accept additions to, releases, reductions, exchanges or substitution of the Collateral, without in any way altering, impairing, diminishing or affecting the provisions of this Security Agreement, the Loan Documents, or any of the other Obligations, or Secured Party's rights hereunder, under the Obligations.

Borrower hereby ratifies and confirms whatever Secured Party may do with respect to the Collateral and agrees that Secured Party shall not be liable for any error of judgment or mistakes of fact or law with respect to actions taken in connection with the Collateral.

4.6    Attorney-in-Fact.  Borrower hereby irrevocably makes, constitutes and appoints Secured Party (and any officer of Secured Party or any Person designated by Secured Party for that purpose) as Debtor's true and lawful proxy and attorney-in-fact (and agent-in-fact) in Debtor's name, place and stead, with full power of substitution, to: (i) take such actions as are permitted in this Security Agreement; (ii) execute such financing statements and other documents and to do such other acts as Secured Party may require to perfect and preserve Secured Party's security interest in, and to enforce such interests in the Collateral; and (iii) upon the occurrence of an Event of Default, carry out any remedy provided for in this

12

Security Agreement, the Credit Agreement, or otherwise at law or in equity, including endorsing Debtor's name to checks, drafts, instruments and other items of payment, and proceeds of the Collateral, executing change of address forms with the postmaster of the United States Post Office serving the address of Borrower, changing the address of Borrower to that of Secured Party, opening all envelopes addressed to Borrower and applying any payments contained therein to the Obligations, and changing any merchant accounts or instructions to Payment Processing Companies regarding any credit/debit card payments from Customers. Borrower hereby acknowledges that the constitution and appointment of such proxy and attorney-in-fact are coupled with an interest and are irrevocable. Borrower hereby ratifies and confirms all that such attorney-in-fact may do or cause to be done by virtue of any provision of this Security Agreement.

4.7     No Marshaling. Secured Party shall not be required to marshal any present or future collateral security (including this Security Agreement and the Collateral) for, or other assurances of payment of, the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order. To the extent that it lawfully may, Borrower hereby agrees that it will not invoke any law relating to the marshaling of collateral which might cause delay in or impede the enforcement of Secured Party's rights under this Security Agreement or under any other instrument creating or evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, Borrower hereby irrevocably waives the benefits of all such laws.

4.8     No Waiver. No Event of Default shall be waived by Secured Party except in writing. No failure or delay on the part of Secured Party in exercising any right, power or remedy hereunder shall operate as a waiver of the exercise of the same or any other right at any other time; nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder. There shall be no obligation on the part of Secured Party to exercise any remedy available to Secured Party in any order. The remedies provided for herein are cumulative and not exclusive of any remedies provided at law or in equity. Borrower agrees that in the event that Borrower fails to perform, observe or discharge any of its Obligations or liabilities under this Security Agreement or any other agreements with Secured Party, no remedy of law will provide adequate relief to Secured Party, and further agrees that Secured Party shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages.

4.9     Application of Proceeds. Secured Party will, within three (3) Business Days after receipt of cash or solvent credits from collection of items of payment, proceeds of Collateral or any other source, apply the whole or any part thereof against the Obligations secured hereby. Secured Party shall further have the exclusive right to determine how, when and what application of such payments and such credits shall be made on the Obligations, and such determination shall be conclusive upon Borrower. Any proceeds of any disposition by Secured Party of all or any part of the Collateral may be first applied by Secured Party to the payment of expenses incurred by Secured Party in connection with the Collateral, including reasonable attorneys' fees and legal expenses and costs as provided for in Section 5.13 hereof.

13

## 5       MISCELLANEOUS.

5.1       <u>Entire Agreement</u>.       This Security Agreement and the other Loan Documents: (i) are valid, binding and enforceable against Borrower and Secured Party in accordance with their respective provisions and no conditions exist as to their legal effectiveness; (ii) constitute the entire agreement between the parties with respect to the subject matter hereof and thereof; and (iii) are the final expression of the intentions of Borrower and Secured Party. No promises, either expressed or implied, exist between Borrower and Secured Party, unless contained herein or therein. This Security Agreement, together with the other Loan Documents, supersedes all negotiations, representations, warranties, commitments, term sheets, discussions, negotiations, offers or contracts (of any kind or nature, whether oral or written) prior to or contemporaneous with the execution hereof with respect to any matter, directly or indirectly related to the terms of this Security Agreement and the other Loan Documents. This Security Agreement and the other Loan Documents are the result of negotiations between Secured Party and Borrower and have been reviewed (or have had the opportunity to be reviewed) by counsel to all such parties, and are the products of all parties. Accordingly, this Security Agreement and the other Loan Documents shall not be construed more strictly against Secured Party merely because of Secured Party's involvement in their preparation. **BORROWER ACKNOWLEDGES THAT THEY HAVE NOT RELIED UPON ANY STATEMENTS, PROMISES OR REPRESENTATIONS, IF ANY, THAT ARE NOT CONTAINED WITHIN THIS SECURITY AGREEMENT OR IN ANY OTHER THE LOAN DOCUMENT AND WAIVES ANY RIGHTS, DEFENSES, OR CLAIMS ARISING FROM ANY SUCH STATEMENTS, PROMISES OR REPRESENTATIONS**.

5.2       <u>Amendments; Waivers</u>.       No delay on the part of Secured Party in the exercise of any right, power or remedy shall operate as a waiver thereof, nor shall any single or partial exercise by Secured Party of any right, power or remedy preclude other or further exercise thereof, or the exercise of any other right, power or remedy. No amendment, modification or waiver of, or consent with respect to, any provision of this Security Agreement or the other Loan Documents shall in any event be effective unless the same shall be in writing and acknowledged by Secured Party, and then any such amendment, modification, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

5.3       **<u>WAIVER OF CLAIMS AND DEFENSES</u>. THE BORROWER WAIVES EVERY PRESENT AND FUTURE DEFENSE, CAUSE OF ACTION, COUNTERCLAIM OR SETOFF WHICH THE BORROWER MAY NOW HAVE AS OF THE DATE HEREOF, OR AS IT MAY IN THE FUTURE COME TO HAVE, TO ANY ACTION BY SECURED PARTY IN ENFORCING THIS SECURITY AGREEMENT OR ANY OTHER LOAN DOCUMENTS -- OTHER THAN FOR SET OFF TO ESTABLISH THE AMOUNTS DUE AND PAID IN RESPECT OF THE LOANS. THE BORROWER UNDERSTANDS AND AGREES THAT THEY ARE WAIVING DEFENSES AND CLAIMS WHICH MAY NOT YET HAVE ACCRUED OR OF WHICH IT MAY NOT YET BE AWARE AS MATERIAL INDUCEMENT FOR SECURED PARTY ENTERING THIS SECURITY AGREEMENT AND**

14

**GRANTING ANY FINANCIAL ACCOMMODATION TO THE BORROWER. THIS PROVISION IS INTENDED TO BE CONSTRUED AS BROADLY AS PERMISSIBLE UNDER APPLICABLE LAW. FURTHER, THE BORROWER UNDERSTANDS AND ACKNOWLEDGES THAT THE AGENTS AND REPRESENTATIVES OF THE SECURED PARTY DO NOT HAVE AUTHORITY TO MAKE ANY STATEMENTS, PROMISES OR REPRESENTATIONS IN CONFLICT WITH OR IN ADDITION TO THE INFORMATION CONTAINED IN THIS SECURITY AGREEMENT OR ANY OTHER LOAN DOCUMENT, AND SECURED PARTY HEREBY SPECIFICALLY DISCLAIMS ANY RESPONSIBILITY FOR ANY SUCH STATEMENTS, PROMISES OR REPRESENTATIONS. BY EXECUTION OF THIS AGREEMENT, THE BORROWER ACKNOWLEDGES THAT THEY HAVE NOT RELIED UPON SUCH STATEMENTS, PROMISES OR REPRESENTATIONS, IF ANY, AND WAIVES ANY RIGHTS, DEFENSES, OR CLAIMS ARISING FROM ANY SUCH STATEMENTS, PROMISES OR REPRESENTATIONS.**

**5.4      MANDATORY FORUM SELECTION. TO INDUCE SECURED PARTY TO MAKE CERTAIN FINANCIAL ACCOMMODATIONS TO BORROWER, BORROWER IRREVOCABLY AGREES THAT ANY DISPUTE ARISING UNDER, RELATING TO, OR IN CONNECTION WITH, DIRECTLY OR INDIRECTLY, THIS SECURITY AGREEMENT OR RELATED TO ANY MATTER WHICH IS THE SUBJECT OF OR INCIDENTAL TO THIS SECURITY AGREEMENT ANY OTHER LOAN DOCUMENT, OR THE COLLATERAL (WHETHER OR NOT SUCH CLAIM IS BASED UPON BREACH OF CONTRACT OR TORT) SHALL, EXCEPT AS HEREINAFTER PROVIDED, BE SUBJECT TO THE EXCLUSIVE JURISDICTION AND VENUE OF THE STATE AND/OR FEDERAL COURTS LOCATED IN BROWARD COUNTY, FLORIDA; PROVIDED, HOWEVER, SECURED PARTY MAY, AT SECURED PARTY'S SOLE OPTION, ELECT TO BRING ANY ACTION IN ANY OTHER JURISDICTION. THIS PROVISION IS INTENDED TO BE A "MANDATORY" FORUM SELECTION CLAUSE AND GOVERNED BY AND INTERPRETED CONSISTENT WITH FLORIDA LAW. BORROWER HEREBY CONSENTS TO THE EXCLUSIVE JURISDICTION AND VENUE OF ANY STATE OR FEDERAL COURT HAVING IT SITUS IN SUCH COUNTY (OR TO ANY JURISDICTION OR VENUE, IF SECURED PARTY SO ELECTS), AND BORROWER HEREBY WAIVES ANY OBJECTION BASED ON FORUM NON CONVENIENS.**

**5.5      WAIVER OF PERSONAL SERVICE. BORROWER HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND CONSENTS THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, OR BY FEDERAL EXPRESS, DIRECTED TO THE BORROWER, AS SET FORTH AND ACCORDING TO THE TERMS IN THE NOTICE PROVISIONS HEREIN. BORROWER AGREES THAT NO ACKNOWLEDGMENT OF ACTUAL RECEIPT OF PROCESS IS REQUIRED AND SERVICE WILL BE DEEMED EFFECTIVE PURSUANT TO TERMS OF NOTICE PROVISIONS CONTAINED HEREIN. SERVICE MAY ALSO BE MADE IN ANY**

**MANNER PROVIDED BY APPLICABLE STATUTE, LAW, RULE OF COURT OR OTHERWISE.**

5.6 **WAIVER OF JURY TRIAL. BORROWER AND SECURED PARTY, AFTER CONSULTING OR HAVING HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL, EACH KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE IRREVOCABLY, ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS SECURITY AGREEMENT, ANY NOTE, ANY OTHER LOAN DOCUMENT, ANY OF THE OTHER OBLIGATIONS, THE COLLATERAL, OR ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH OR THEREWITH OR ARISING FROM ANY LENDING RELATIONSHIP EXISTING IN CONNECTION WITH ANY OF THE FOREGOING, OR ANY COURSE OF CONDUCT OR COURSE OF DEALING IN WHICH SECURED PARTY AND BORROWER ARE ADVERSE PARTIES, AND EACH AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR SECURED PARTY GRANTING ANY FINANCIAL ACCOMMODATION TO BORROWER.**

5.7 <u>Assignability</u>. Secured Party, without consent from or notice to anyone, may at any time assign Secured Party's rights in this Security Agreement, the other Loan Documents, the Obligations, or any part thereof and transfer Secured Party's rights in any or all of the Collateral, and Secured Party thereafter shall be relieved from all liability with respect to such Collateral. This Security Agreement shall be binding upon Secured Party and Borrower and its respective legal representatives and successors. All references herein to Borrower shall be deemed to include any successors, whether immediate or remote. In the case of a joint venture or partnership, the term "Borrower" shall be deemed to include all joint venturers or partners thereof, who shall be jointly and severally liable hereunder.

5.8 <u>Binding Effect</u>. This Security Agreement shall become effective upon execution by Borrower and Secured Party, and shall bind the Borrower and Secured Party, and their respective successors and permitted assigns.

5.9 <u>Governing Law</u>. Except in the case of the Mandatory Forum Selection Clause in Section 5.4 above, which clause shall be governed and interpreted in accordance with Florida law, this Security Agreement shall be delivered and accepted in and shall be deemed to be a contract made under and governed by the internal laws of the State of Wyoming, and for all purposes shall be construed in accordance with the laws of such State, without giving effect to the choice of law provisions of such State.

5.10 <u>Enforceability</u>. Wherever possible, each provision of this Security Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Security Agreement shall be prohibited by, unenforceable or invalid under any jurisdiction, such provision shall as to such jurisdiction, be severable and be ineffective to the extent of such prohibition or invalidity, without invalidating the

16

remaining provisions of this Security Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

5.11     Time of Essence.  Time is of the essence in making payments of all amounts due Secured Party under the Loan Documents and in the performance and observance by Borrower of each covenant, agreement, provision and term of this Security Agreement and the other Loan Documents.

5.12     Counterparts; Facsimile Signatures.  This Security Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute but one and the same Security Agreement.  Receipt of an executed signature page to this Security Agreement by facsimile or other electronic transmission shall constitute effective delivery thereof.  Electronic records of executed Loan Documents maintained by Secured Party shall be deemed to be originals thereof.

5.13     Notices.  Except as otherwise provided herein, Borrower waives all notices and demands in connection with the enforcement of Secured Party's rights hereunder.  All notices, requests, demands and other communications provided for hereunder shall be made in accordance with the terms of the Credit Agreement.

5.14     Costs, Fees and Expenses.  Borrower shall pay or reimburse Secured Party for all reasonable costs, fees and expenses incurred by Secured Party or for which Secured Party becomes obligated in connection with the enforcement or defense of this Security Agreement, including search fees, costs and expenses and attorneys' fees, costs and time charges of counsel to Secured Party and all taxes payable in connection with this Security Agreement.  In furtherance of the foregoing, Borrower shall pay any and all stamp and other taxes, UCC search fees, filing fees and other costs and expenses in connection with the execution and delivery of this Security Agreement and the other Loan Documents to be delivered hereunder, and agrees to save and hold Secured Party harmless from and against any and all liabilities with respect to or resulting from any delay in paying or omission to pay such costs and expenses.  That portion of the Obligations consisting of costs, expenses or advances to be reimbursed by Borrower to Secured Party pursuant to this Security Agreement or the other Loan Documents which are not paid on or prior to the date hereof shall be payable by Borrower to Secured Party on demand.  If at any time or times hereafter Secured Party: (a) employs counsel for advice or other representation: (i) with respect to this Security Agreement or the other Loan Documents; (ii) to represent Secured Party in any litigation, contest, dispute, suit or proceeding or to commence, defend, or intervene or to take any other action in or with respect to any litigation, contest, dispute, suit, or proceeding (whether instituted by Secured Party, Borrower, or any other Person) in any way or respect relating to this Security Agreement; or (iii) to enforce any rights of Secured Party against Borrower or any other Person under of this Security Agreement; (b) takes any action to protect, collect, sell, liquidate, or otherwise dispose of any of the Collateral; and/or (c) attempts to or enforces any of Secured Party's rights or remedies under this Security Agreement, the costs and expenses incurred by Secured Party in any manner or way with respect to the foregoing, shall be part of the Obligations, payable by Borrower to Secured Party on demand.

17

5.15    Termination.  This Security Agreement and the Liens and security interests granted hereunder shall not terminate until the termination of the Credit Agreement and the commitments to make Loans thereunder and the full and complete performance and satisfaction and payment in full of all the Obligations (other than contingent indemnification obligations to the extent no claim giving rise thereto has been asserted).  Upon termination of this Security Agreement, Secured Party shall also deliver to Borrower (at the sole expense of Borrower) such UCC termination statements, certificates for terminating the liens on the Motor Vehicles (if any) and such other documentation, without recourse, warranty or representation whatsoever, as shall be reasonably requested by Borrower to effect the termination and release of the Liens and security interests in favor of Secured Party affecting the Collateral; provided, however, to the extent any such terminations or releases require Secured Party to expend any sums in terminating or releasing any such Liens, Secured Party may refrain from terminating or releasing such Liens unless and until Borrower pays to Secured Party the estimated cost, as reasonably determined by Secured Party, of effectuating such terminations or releases.

5.16    Reinstatement.  This Security Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against Borrower for liquidation or reorganization, should Borrower becomes insolvent or make an assignment for the benefit of any creditor or creditors or should a receiver or trustee be appointed for all or any significant part of Debtor's assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made.  In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

5.17    Increase in Obligations.  It is the intent of the parties to secure payment of the Obligations, as the amount of such Obligations may increase from time to time in accordance with the terms and provisions of the Loan Documents, and all of the Obligations, as so increased from time to time, shall be and are secured hereby.  Upon the execution hereof, Borrower shall pay any and all documentary stamp taxes and/or other charges required to be paid in connection with the execution and enforcement of the Loan Documents, and if, as and to the extent the Obligations are increased from time to time in accordance with the terms and provisions of the Loan Documents, then Borrower shall immediately pay any additional documentary stamp taxes or other charges in connection therewith.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, Borrower and Secured Party have executed this Security Agreement as of the date first above written.

**Borrower:**

**ZENERGY BRANDS, INC.**

By: _____
Name:  Joshua Campbell
Title:   Chief Executive Officer

STATE OF _____          )

                                                              )  SS.

COUNTY OF _____          )

The undersigned, a Notary Public in and for the said County, in the State aforesaid, DOES HEREBY CERTIFY that Joshua Campbell, the Chief Executive Officer of Zenergy Brands, Inc., a Nevada corporation, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that she signed and delivered the said instrument as her own free and voluntary act and as the free and voluntary act of said corporation, for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this _____ day of _____, 20____.

_____

Notary Public

My Commission Expires:

_____

[Signature Page to Security Agreement (Borrower)]

IN WITNESS WHEREOF, Borrower and Secured Party have executed this Security Agreement as of the date first above written.

Agreed and accepted:

**<u>Secured Party</u>:**

**TCA SPECIAL SITUATIONS CREDIT STRATEGIES ICAV**

By:_____
Name:
Title:

**Schedule 3.8**

**Collateral Locations/Places of Business**

## Exhibit E-2

## Form of Security Agreement – Subsidiaries

## SECURITY AGREEMENT

This **SECURITY AGREEMENT** (the "**Security Agreement**") dated and made effective as of October ____, 2019, is executed by ZEN TECHNOLOGIES, INC., a Texas corporation, ZENERGY POWER & GAS, INC., a Texas corporation, NAUP BROKERAGE, LLC, a Texas limited liability company, ZENERGY LABS, LLC, a Texas limited liability company, and ZENERGY & ASSOCIATES, INC., a Texas corporation, (each, a "**Debtor**", together, jointly and severally, the "**Debtors**"), and **TCA Special Situations Credit Strategies ICAV**, an Irish collective asset vehicle (the "**Secured Party**").

### R E C I T A L S:

WHEREAS, pursuant to a Senior Secured Revolving Credit Facility Agreement dated as of October __, 2019 and effective as of October__, 2019 by and between Zenergy Brands, Inc., a corporation organized and existing under the laws of the State of Nevada (the "**Company**") and the Secured Party (the "**Credit Agreement**") and acknowledged and agreed by the Debtors, the Secured Party has agreed to make certain financial accommodations to the Company, as more specifically set forth in the Credit Agreement;

WHEREAS, the Debtors have guaranteed the Company Obligations under the Credit Agreement and the other Loan Documents pursuant to the terms of a guaranty agreement, dated as of the date hereof; and

WHEREAS, the Debtors are subsidiaries, affiliates or related persons, as applicable, of the Company and/or will substantially benefit from Secured Party's entering into the Credit Agreement.

WHEREAS, in order to induce the Secured Party to enter into the Credit Agreement, the Debtors have agreed to execute and deliver to the Secured Party this Agreement for the benefit of the Secured Party and to grant to Secured Party an unconditional and continuing, security interest in all of the assets and property of the Debtors to secure the prompt payment, performance and discharge in full of all of the Company's Obligations under the Credit Agreement and the other Loan Documents.

### A G R E E M E N T S:

## 1    DEFINITIONS.

1.1    Defined Terms.  Capitalized terms used but not otherwise defined in this Security Agreement (including the Recitals) shall have the meanings ascribed to them in the Credit Agreement.  For the purposes of this Security Agreement, the following capitalized words and phrases shall have the meanings set forth below.

(a)    "**Capital Securities**" shall mean, with respect to any Person, all shares, interests, participations or other equivalents (however designated, whether voting or non-voting) of such Person's capital, whether now outstanding or issued or acquired after the date hereof, including common shares, preferred shares, membership interests in a limited liability company,

1

limited or general partnership interests in a partnership or any other equivalent of such ownership interest.

(b)     "**Collateral**" shall have the meaning set forth in <u>Section 2.1</u> hereof.

(c)     "**Obligor(s)**" shall mean each Debtor, or any other party liable with respect to the Obligations.

(d)     "**Organizational Identification Number**" means, with respect to each Debtor, the organizational identification number assigned to such Debtor by the applicable governmental unit or agency of the jurisdiction of organization of such Debtor, if any.

(e)     "**Taxes**" shall mean any and all present and future taxes, duties, levies, imposts, deductions, assessments, charges or withholdings, and any and all liabilities (including interest and penalties and other additions to taxes) with respect to the foregoing.

(f)     "**Unmatured Event of Default**" shall mean any event which, with the giving of notice, the passage of time or both, would constitute an Event of Default.

1.2     <u>Other Terms Defined in UCC</u>.  All other capitalized words and phrases used herein and not otherwise specifically defined herein or in the Credit Agreement shall have the respective meanings assigned to such terms in the UCC, to the extent the same are used or defined therein.

1.3     <u>Other Interpretive Provisions</u>.

(a)     The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.  Whenever the context so requires, the neutral gender includes the masculine and feminine, the single number includes the plural, and vice versa, and in particular the word "Debtor" shall be so construed.

(b)     Section and Schedule references are to this Security Agreement unless otherwise specified.  The words "hereof", "herein" and "hereunder" and words of similar import when used in this Security Agreement shall refer to this Security Agreement as a whole and not to any particular provision of this Security Agreement

(c)     The term "including" (or words of similar import) is not limiting, and means "including, without limitation".

(d)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding", and the word "through" means "to and including".

(e)     Unless otherwise expressly provided herein: (i) references to agreements (including this Security Agreement and the other Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, supplements and other modifications thereto, but only to the extent such amendments, restatements, supplements

2

and other modifications are not prohibited by the terms of any Loan Document; and (ii) references to any statute or regulation shall be construed as including all statutory and regulatory provisions amending, replacing, supplementing or interpreting such statute or regulation.

(f)     To the extent any of the provisions of the other Loan Documents are inconsistent with the terms of this Security Agreement, the provisions of this Security Agreement shall govern.

(g)     This Security Agreement and the other Loan Documents may use several different limitations, tests or measurements to regulate the same or similar matters. All such limitations, tests and measurements are cumulative and each shall be performed in accordance with its terms.

## 2     SECURITY FOR THE OBLIGATIONS.

2.1     <u>Security for Obligations</u>. As security for the payment and performance of the Obligations, each Debtor does hereby pledge, assign, transfer, deliver and grant to Secured Party, for its own benefit and as agent for its Affiliates, a continuing and unconditional security interest in and to any and all property of such Debtor, of any kind or description, tangible or intangible, wheresoever located and whether now existing or hereafter arising or acquired, including the following (all of which property for such Debtor, along with the products and proceeds therefrom, are individually and collectively referred to as the "**<u>Collateral</u>**"):

(a)     all property of, or for the account of, such Debtor now or hereafter coming into the possession, control or custody of, or in transit to, Secured Party or any agent or bailee for Secured Party or any parent, affiliate or subsidiary of Secured Party or any participant with Secured Party in the Obligations (whether for safekeeping, deposit, collection, custody, pledge, transmission or otherwise), including all cash, earnings, dividends, interest, or other rights in connection therewith and the products and proceeds therefrom, including the proceeds of insurance thereon; and

(b)     the additional property of such Debtor, whether now existing or hereafter arising or acquired, and wherever now or hereafter located, together with all additions and accessions thereto, substitutions, betterments and replacements therefor, products and Proceeds therefrom, and all of such Debtor's books and records and recorded data relating thereto (regardless of the medium of recording or storage), together with all of such Debtor's right, title and interest in and to all computer software required to utilize, create, maintain and process any such records or data on electronic media, identified and set forth as follows:

(i)     All Accounts and all goods whose sale, lease or other disposition by such Debtor has given rise to Accounts and have been returned to, or repossessed or stopped in transit by, such Debtor, or rejected or refused by any of its customers;

(ii)     All Inventory, including raw materials, work-in-process and finished goods;

3

(iii)    All goods (other than Inventory), including embedded software, Equipment, vehicles, furniture and Fixtures;

(iv)    All Software and computer programs;

(v)    All Securities, Investment Property, financial assets and Deposit Accounts, and all funds at any time deposited therewith, and all funds and amounts reserved or held back by any of such Debtor's payment processing service providers;

(vi)    All As-Extracted Collateral, Commodity Accounts, Commodity Contracts, and Farm Products;

(vii)    All Chattel Paper, Electronic Chattel Paper, Instruments, Documents, Letter of Credit Rights, all proceeds of letters of credit, Health-Care-Insurance Receivables, Supporting Obligations, notes secured by real estate, Commercial Tort Claims and General Intangibles, including Payment Intangibles; and

(viii)    All real estate property owned by such Debtor and the interest of such Debtor in fixtures related to such real property;

(ix)    All Proceeds (whether Cash Proceeds or Non-cash Proceeds) of the foregoing property, including all insurance policies and proceeds of insurance payable by reason of loss or damage to the foregoing property, including unearned premiums, and of eminent domain or condemnation awards.

2.2    <u>Possession and Transfer of Collateral</u>.    Until an Event of Default has occurred, each Debtor shall be entitled to possession and use of the Collateral (other than Instruments or Documents (including Tangible Chattel Paper and Investment Property consisting of certificated securities) and other Collateral required to be delivered to Secured Party pursuant to this <u>Section 2</u>).    The cancellation or surrender of any promissory note evidencing an Obligation, upon payment or otherwise, shall not affect the right of Secured Party to retain the Collateral for any other of the Obligations, except upon payment in full of the Obligations.    Debtors shall not sell, assign (by operation of law or otherwise), license, lease or otherwise dispose of, or grant any option with respect to any of the Collateral, except as permitted pursuant to the Credit Agreement.

2.3    <u>Financing Statements</u>.    Each Debtor authorizes Secured Party to prepare and file such financing statements, amendments and other documents and do such acts as Secured Party deems necessary in order to establish and maintain valid, attached and perfected security interests in the Collateral in favor of Secured Party, for its own benefit and as agent for its Affiliates, free and clear of all Liens and claims and rights of third parties whatsoever, except Permitted Liens.    Each Debtor hereby irrevocably authorizes Secured Party at any time, and from time to time, to file in any jurisdiction any initial financing statements and amendments thereto that: (a) indicate the Collateral: (i) is comprised of all assets of such Debtor (or words of similar effect), regardless of whether any particular asset comprising a part of the Collateral falls within the scope of Article 9 of the UCC of the jurisdiction wherein such financing statement or amendment is filed; or (ii) as being of an equal or lesser scope or within greater

4

detail as the grant of the security interest set forth herein; and (b) contain any other information required by Section 5 of Article 9 of the UCC of the jurisdiction wherein such financing statement or amendment is filed regarding the sufficiency or filing office acceptance of any financing statement or amendment, including: (A) whether such Debtor is an organization, the type of organization and any Organizational Identification Number issued to such Debtor; and (B) in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of the real property to which the Collateral relates.  Each Debtor agrees to furnish any such information to Secured Party promptly upon request.  In addition, each Debtor shall make appropriate entries on its books and records disclosing the security interests of Secured Party, for its own benefit and as agent for its Affiliates, in the Collateral.  Each Debtor hereby agrees that a photogenic or other reproduction of this Security Agreement is sufficient for filing as a financing statement and Debtor authorizes Secured Party to file this Security Agreement as a financing statement in any jurisdiction.

2.4     <u>Preservation of the Collateral</u>.  Secured Party may, but is not required to, take such actions from time to time as Secured Party deems appropriate to maintain or protect the Collateral.  Secured Party shall have exercised reasonable care in the custody and preservation of the Collateral if Secured Party takes such action as a Debtor shall reasonably request in writing which is not inconsistent with Secured Party's status as a secured party, but the failure of Secured Party to comply with any such request shall not be deemed a failure to exercise reasonable care; <u>provided</u>, <u>however</u>, Secured Party's responsibility for the safekeeping of the Collateral shall: (i) be deemed reasonable if such Collateral is accorded treatment substantially equal to that which Secured Party accords its own property; and (ii) not extend to matters beyond the control of Secured Party, including acts of God, war, insurrection, riot or governmental actions.  In addition, any failure of Secured Party to preserve or protect any rights with respect to the Collateral against prior or third parties, or to do any act with respect to preservation of the Collateral, not so requested by a Debtor, shall not be deemed a failure to exercise reasonable care in the custody or preservation of the Collateral.  Each Debtor shall have the sole responsibility for taking such action as may be necessary, from time to time, to preserve all rights of such Debtor and Secured Party in the applicable Collateral against prior or third parties.  Without limiting the generality of the foregoing, where Collateral consists, in whole or in part, of Capital Securities, each Debtor represents to, and covenants with, Secured Party that such Debtor has made arrangements for keeping informed of changes or potential changes affecting the Capital Securities (including rights to convert or subscribe, payment of dividends, reorganization or other exchanges, tender offers and voting rights), and each Debtor agrees that Secured Party shall have no responsibility or liability for informing such Debtor of any such or other changes or potential changes or for taking any action or omitting to take any action with respect thereto.

2.5     <u>Other Actions as to any and all Collateral</u>.  Each Debtor further agrees to take any other action reasonably requested by Secured Party to ensure the attachment, perfection and priority of, and the ability of Secured Party to enforce, the security interest of Secured Party, for its own benefit and as agent for its Affiliates, in any and all of the Collateral, including: (i) causing Secured Party's name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or

5

ability of the bank to enforce, the security interest of Secured Party, for its own benefit and as agent for its Affiliates, in such Collateral; (ii) complying with any provision of any statute, regulation or treaty of the United States as to any material portion of the Collateral as soon as possible but not more than forty-five (45) days after such request if compliance with such provision is a condition to attachment, perfection or priority of, or ability of Secured Party to enforce, the security interest of Secured Party, for its own benefit and as agent for its Affiliates, in such Collateral; (iii) obtaining governmental and other third party consents and approvals, including, without limitation, any consent of any licensor, lessor or other Person with authority or control over or an interest in any material portion of the Collateral as soon as possible but not more than forty-five (45) days after such request; (iv) obtaining waivers from mortgagees and landlords in form and substance reasonably satisfactory to Secured Party which affect any material portion of the Collateral as soon as possible but not more than forty-five (45) days after such request; and (v) taking all actions required by the UCC in effect from time to time or by other law, as applicable in any relevant UCC jurisdiction, or by other law as applicable in any foreign jurisdiction.  Each Debtor further agrees to indemnify and hold Secured Party harmless against claims of any Persons not a party to this Security Agreement concerning disputes arising over the Collateral, except to the extent resulting from the gross negligence or willful misconduct of Secured Party or its Affiliates.

2.6     Collateral in the Possession of a Warehouseman or Bailee.  If any material portion of the Collateral at any time is in the possession of a warehouseman or bailee, the Debtors shall promptly notify Secured Party thereof, and, as soon as possible, but not more than forty-five (45) days later, shall obtain a collateral access agreement in form and substance reasonably satisfactory to Secured Party from such warehouseman or bailee.

2.7     Letter-of-Credit Rights.  If a Debtor at any time is a beneficiary under a letter of credit now or hereafter issued in favor of such Debtor, such Debtor shall promptly notify Secured Party thereof and, at the request and option of Secured Party, such Debtor shall, pursuant to an agreement in form and substance reasonably satisfactory to Secured Party, either: (i) arrange for the issuer and any confirmer of such letter of credit to consent to an assignment to Secured Party, for its own benefit and as agent for its Affiliates, of the proceeds of any drawing under the letter of credit; or (ii) arrange for Secured Party, for its own benefit and as agent for its Affiliates, to become the transferee beneficiary of the letter of credit, with Secured Party agreeing, in each case, that the proceeds of any drawing under the letter to credit are to be applied as provided in the Credit Agreement.

2.8     Commercial Tort Claims.  If a Debtor shall at any time hold or acquire a Commercial Tort Claim, such Debtor shall promptly notify Secured Party in writing signed by such Debtor of the details thereof and grant to Secured Party, for its own benefit and as agent for its Affiliates, in such written notice or other written instrument, a security interest therein and in the proceeds thereof, all upon the terms of this Security Agreement, in each case in form and substance reasonably satisfactory to Secured Party, and shall execute any amendments hereto deemed reasonably necessary by Secured Party to perfect the security interest of Secured Party, for its own benefit and as agent for its Affiliates, in such Commercial Tort Claim.

2.9     <u>Electronic Chattel Paper and Transferable Records</u>.  If a Debtor at any time holds or acquires an interest in any electronic chattel paper or any "transferable record", as that term is defined in Section 201 of the federal Electronic Signatures in Global and National Commerce Act, or in Section 16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction, such Debtor shall promptly notify Secured Party thereof and, at the request of Secured Party, shall take such action as Secured Party may reasonably request to vest in Secured Party control under Section 9-105 of the UCC of such electronic chattel paper or control under Section 201 of the federal Electronic Signatures in Global and National Commerce Act or, as the case may be, Section 16 of the Uniform Electronic Transactions Act, as so in effect in such jurisdiction, of such transferable record.  Secured Party agrees with such Debtor that Secured Party will arrange, pursuant to procedures reasonably satisfactory to Secured Party and so long as such procedures will not result in Secured Party's loss of control, for such Debtor to make alterations to the electronic chattel paper or transferable record permitted under Section 9-105 of the UCC or, as the case may be, Section 201 of the federal Electronic Signatures in Global and National Commerce Act or Section 16 of the Uniform Electronic Transactions Act, for a party in control to make without loss of control.

2.10     <u>Additional Requirements on Collateral</u>.  Each Debtor shall fully cooperate with Secured Party to obtain and keep in effect one or more control agreements in Deposit Accounts, Electronic Chattel Paper, Investment Property and Letter-of-Credit Rights Collateral.  Such control agreements shall only be required if, in the reasonable discretion of the Secured Party, the nature of the Collateral requires any such control agreements in order for the Secured Party to perfect its security interests in any Collateral as granted hereunder, and in such event, each Debtor shall promptly provide any such control agreements upon request from the Secured Party. In addition, each Debtor, at such Debtor's expense, shall promptly: (A) execute all notices of security interest for each relevant type of Software and other General Intangibles in forms suitable for filing with any United States or foreign office handling the registration or filing of patents, trademarks, copyrights and other intellectual property and any successor office or agency thereto; and (B) take all commercially reasonable steps in any hearing, suit, action, or other proceeding before any such office or any similar office or agency in any other country or any political subdivision thereof, to diligently prosecute or maintain, as applicable, each application and registration of any Software, General Intangibles or any other intellectual property rights and assets that are part of the Collateral, including filing of renewals, affidavits of use, affidavits of incontestability and opposition, interference and cancellation proceedings.

## 3     REPRESENTATIONS AND WARRANTIES.

Each Debtor makes the following representations and warranties to Secured Party:

3.1     <u>Debtor Organization and Name</u>. Such Debtor, except for any Debtor which is a natural person, is a corporation, duly organized, existing and in good standing under the laws of its State of organization or limited liability company, with full and adequate power to carry on and conduct its business as presently conducted.  Such Debtor is duly licensed or qualified in all foreign jurisdictions wherein the nature of its activities requires such qualification or licensing.  Such Debtor's Organizational Identification Number, if applicable,

is set forth in the Credit Agreement.  The exact legal name of such Debtor is as set forth in the first paragraph of this Security Agreement, and such Debtor currently does not conduct, nor has it during the last five (5) years conducted, business under any other name or trade name.

3.2     Authorization.  Each Debtor has full right, power and authority to enter into this Security Agreement and to perform all of its duties and obligations under this Security Agreement.  The execution and delivery of this Security Agreement and the other Loan Documents will not, nor will the observance or performance of any of the matters and things herein or therein set forth, violate or contravene any provision of law or of the articles of incorporation, bylaws, operating agreement, or other governing documents of each Debtor is not a natural person.  All necessary and appropriate action has been taken on the part of Debtor to authorize the execution and delivery of this Security Agreement.

3.3     Validity and Binding Nature.  This Security Agreement is the legal, valid and binding obligation of such Debtor, enforceable against such Debtor in accordance with its terms, subject to bankruptcy, insolvency and similar laws affecting the enforceability of creditors' rights generally and to general principles of equity.

3.4     Consent; Absence of Breach.  The execution, delivery and performance of this Security Agreement and any other documents or instruments to be executed and delivered by such Debtor in connection herewith, do not and will not: (a) require any consent, approval, authorization, or filings with, notice to or other act by or in respect of, any governmental authority or any other Person (other than filings or notices pursuant to federal or state securities laws or other than any consent or approval which has been obtained and is in full force and effect); (b) conflict with: (i) any provision of law or any applicable regulation, order, writ, injunction or decree of any court or governmental authority; (ii) the articles of incorporation, bylaws, or other organic or governance document of such Debtor if it is not a natural person; or (iii) any agreement, indenture, instrument or other document, or any judgment, order or decree, which is binding upon such Debtor or any of its properties or assets; or (c) require, or result in, the creation or imposition of any Lien on any asset of such Debtor, other than Liens in favor of Secured Party created pursuant to this Security Agreement and Permitted Liens.

3.5     Ownership of Collateral; Liens.  Such Debtor is the sole owner of all of its Collateral, free and clear of all Liens, charges and claims (including infringement claims with respect to patents, trademarks, service marks, copyrights and other intellectual property rights), other than Permitted Liens.

3.6     Adverse Circumstances.  No condition, circumstance, event, agreement, document, instrument, restriction, litigation or proceeding (or threatened litigation or proceeding or basis therefor) exists which: (i) would have a Material Adverse Effect upon any Debtor; or (ii) would constitute an Event of Default or an Unmatured Event of Default.

3.7     Security Interest.  This Security Agreement creates a valid security interest in favor of Secured Party in the Collateral and, when properly perfected by filing in the appropriate jurisdictions, or by possession or control of such Collateral by Secured Party or

8

delivery of such Collateral to Secured Party, shall constitute a valid, perfected, security interest in such Collateral.

3.8     <u>Place of Business</u>.  The principal place of business and books and records of such Debtor is set forth in the preamble to this Security Agreement, and the location of all Collateral, if other than at such principal place of business, is as set forth on **<u>Schedule 3.8</u>** attached hereto and made a part hereof, and such Debtor shall promptly notify Secured Party of any change in such locations.  Such Debtor will not remove or permit the Collateral to be removed from such locations without the prior written consent of Secured Party, except as permitted pursuant to the Credit Agreement.

3.9     <u>Complete Information</u>.   This Security Agreement and all financial statements, schedules, certificates, confirmations, agreements, contracts, and other materials and information heretofore or contemporaneously herewith furnished in writing by such Debtor to Secured Party for purposes of, or in connection with, this Security Agreement and the transactions contemplated hereby is, and all written information hereafter furnished by or on behalf of such Debtor to Secured Party pursuant hereto or in connection herewith will be, true and accurate in every material respect on the date as of which such information is dated or certified, and none of such information is or will be incomplete by omitting to state any material fact necessary to make such information not misleading in light of the circumstances under which made (it being recognized by Secured Party that any projections and forecasts provided by such Debtor are based on good faith estimates and assumptions believed by such Debtor to be reasonable as of the date of the applicable projections or assumptions and that actual results during the period or periods covered by any such projections and forecasts may differ from projected or forecasted results).

# 4     <u>REMEDIES.</u>

Upon the occurrence of any default in the payment or performance of any of the covenants, conditions and agreements contained in this Security Agreement or any other Event of Default, Secured Party shall have all rights, powers and remedies set forth in this Security Agreement or the other Loan Documents or in any other written agreement or instrument relating to any of the Obligations or any security therefor, as a secured party under the UCC or as otherwise provided at law or in equity. Without limiting the generality of the foregoing, Secured Party may, at its option upon the occurrence of an Event of Default, declare its commitments to the Company to be terminated and all Obligations to be immediately due and payable, or, if provided in the Loan Documents, all commitments of Secured Party to the Company shall immediately terminate and all Obligations shall be automatically due and payable, all without demand, notice or further action of any kind required on the part of Secured Party.  Each Debtor hereby waives any and all presentment, demand, notice of dishonor, protest, and all other notices and demands in connection with the enforcement of Secured Party's rights under the Loan Documents, and hereby consents to, and waives notice of release, with or without consideration, of any Collateral, notwithstanding anything contained herein or in the Loan Documents to the contrary.  In addition to the foregoing:

4.1     <u>Possession and Assembly of Collateral</u>.  Secured Party may, without notice, demand or the initiation of legal process of any kind, take possession of any or all of the Collateral (in addition to Collateral of which Secured Party already has possession), wherever

9

it may be found, and for that purpose may pursue the same wherever it may be found, and may at any time enter into any of premises of a Debtor where any of the Collateral may be or is supposed to be, and search for, take possession of, remove, keep and store any of the Collateral until the same shall be sold or otherwise disposed of and Secured Party shall have the right to store and conduct a sale of the same in any premises of a Debtor without cost to Secured Party. At Secured Party's request, each Debtor will, at such Debtor's sole expense, assemble the Collateral and make it available to Secured Party at a place or places to be designated by Secured Party which is reasonably convenient to Secured Party and such Debtor.

4.2     <u>Sale of Collateral</u>.  Secured Party may sell any or all of the Collateral at public or private sale, upon such terms and conditions as Secured Party may deem proper, and Secured Party may purchase any or all of the Collateral at any such sale.  Each Debtor acknowledges that Secured Party may be unable to effect a public sale of all or any portion of the Collateral because of certain legal and/or practical restrictions and provisions which may be applicable to the Collateral and, therefore, may be compelled to resort to one or more private sales to a restricted group of offerees and purchasers.  Each Debtor consents to any such private sale so made even though at places and upon terms less favorable than if the Collateral were sold at public sale.  Secured Party shall have no obligation to clean-up or otherwise prepare the Collateral for sale.  Secured Party may apply the net proceeds, after deducting all costs, expenses, attorneys' and paralegals' fees incurred or paid at any time in the collection, protection and sale of the Collateral and the Obligations, to the payment of the Obligations, returning the excess proceeds, if any, to Debtors. Each Debtor shall remain liable for any amount remaining unpaid after such application, with interest at the default rate under the Credit Agreement.  Any notification of intended disposition of the Collateral required by law shall be conclusively deemed reasonably and properly given if given by Secured Party at least ten (10) calendar days before the date of such disposition.  Each Debtor hereby confirms, approves and ratifies all acts and deeds of Secured Party relating to the foregoing, and each part thereof, and expressly waives any and all claims of any nature, kind or description which it has or may hereafter have against Secured Party or its representatives, by reason of taking, selling or collecting any portion of the Collateral.  Each Debtor consents to releases of the Collateral at any time (including prior to default) and to sales of the Collateral in groups, parcels or portions, or as an entirety, as Secured Party shall deem appropriate.  Each Debtor expressly absolves Secured Party from any loss or decline in market value of any Collateral by reason of delay in the enforcement or assertion or non-enforcement of any rights or remedies under this Security Agreement.

4.3     <u>Standards for Exercising Remedies</u>.  To the extent that applicable law imposes duties on Secured Party to exercise remedies in a commercially reasonable manner, each Debtor acknowledges and agrees that it is not commercially unreasonable for Secured Party: (i) to incur expenses deemed necessary by Secured Party to prepare Collateral for disposition or otherwise to complete raw material or work-in-process into finished goods or other finished products for disposition; (ii) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of; (iii) to fail to exercise collection remedies against any of its customer

10

or other Persons obligated on Collateral or to remove liens or encumbrances on or any adverse claims against Collateral; (iv) to exercise collection remedies against any of its customers and other Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists; (v) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature; (vi) to contact other Persons, whether or not in the same business as any Debtor, for expressions of interest in acquiring all or any portion of the Collateral; (vii) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature; (viii) to dispose of Collateral by utilizing internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets; (ix) to dispose of assets in wholesale rather than retail markets; (x) to disclaim disposition warranties, including any warranties of title; (xi) to purchase insurance or credit enhancements to insure Secured Party against risks of loss, collection or disposition of Collateral or to provide to Secured Party a guaranteed return from the collection or disposition of Collateral; or (xii) to the extent deemed appropriate by Secured Party, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist Secured Party in the collection or disposition of any of the Collateral.  Each Debtor acknowledges that the purpose of this section is to provide non-exhaustive indications of what actions or omissions by Secured Party would not be commercially unreasonable in Secured Party's exercise of remedies against the Collateral and that other actions or omissions by Secured Party shall not be deemed commercially unreasonable solely on account of not being indicated in this Section.  Without limitation upon the foregoing, nothing contained in this Section shall be construed to grant any rights to any Debtor or to impose any duties on Secured Party that would not have been granted or imposed by this Security Agreement or by applicable law in the absence of this Section.

4.4     UCC and Offset Rights.  Secured Party may exercise, from time to time, any and all rights and remedies available to it under the UCC or under any other applicable law in addition to, and not in lieu of, any rights and remedies expressly granted in this Security Agreement or in any other agreements between any Obligor and Secured Party, and may, without demand or notice of any kind, appropriate and apply toward the payment of such of the Obligations, whether matured or unmatured, including costs of collection and attorneys' and paralegals' fees and costs, and in such order of application as Secured Party may, from time to time, elect, any indebtedness of Secured Party to any Obligor, however created or arising, including balances, credits, deposits, accounts or moneys of such Obligor in the possession, control or custody of, or in transit to Secured Party.  Each Debtor, on behalf of itself and any Obligor, hereby waives the benefit of any law that would otherwise restrict or limit Secured Party in the exercise of its right, which is hereby acknowledged, to appropriate at any time hereafter any such indebtedness owing from Secured Party to any Obligor.

4.5     Additional Remedies.  Upon the occurrence of an Event of Default, Secured Party shall have the right and power to:

(a)     instruct any Debtor, at its own expense, to notify any parties obligated on any of the Collateral, including any of its customers and of any Debtor's payment processing service providers, to make payment directly to Secured Party of any amounts due or to become

11

due thereunder, or Secured Party may directly notify such obligors of the security interest of Secured Party, and/or of the assignment to Secured Party of the Collateral and direct such obligors to make payment to Secured Party of any amounts due or to become due with respect thereto, and thereafter, collect any such amounts due on the Collateral directly from such Persons obligated thereon;

(b)     enforce collection of any of the Collateral, including any Accounts, by suit or otherwise, or make any compromise or settlement with respect to any of the Collateral, or surrender, release or exchange all or any part thereof, or compromise, extend or renew for any period (whether or not longer than the original period) any indebtedness thereunder;

(c)     take possession or control of any proceeds and products of any of the Collateral, including the proceeds of insurance thereon;

(d)     extend, renew or modify for one or more periods (whether or not longer than the original period) the Obligations or any obligation of any nature of any other obligor with respect to the Obligations;

(e)     grant releases, compromises or indulgences with respect to the Obligations, any extension or renewal of any of the Obligations, any security therefor, or to any other obligor with respect to the Obligations;

(f)     transfer the whole or any part of Capital Securities which may constitute Collateral into the name of Secured Party or Secured Party's nominee without disclosing, if Secured Party so desires, that such Capital Securities so transferred are subject to the security interest of Secured Party, and any corporation, association, or any of the managers or trustees of any trust issuing any of such Capital Securities, or any transfer agent, shall not be bound to inquire, in the event that Secured Party or such nominee makes any further transfer of such Capital Securities, or any portion thereof, as to whether Secured Party or such nominee has the right to make such further transfer, and shall not be liable for transferring the same;

(g)     vote the Collateral;

(h)     make an election with respect to the Collateral under Section 1111 of the Bankruptcy Code or take action under Section 364 or any other section of Bankruptcy Code; provided, however, that any such action of Secured Party as set forth herein shall not, in any manner whatsoever, impair or affect the liability of any Debtor hereunder, nor prejudice, waive, nor be construed to impair, affect, prejudice or waive Secured Party's rights and remedies at law, in equity or by statute, nor release, discharge, nor be construed to release or discharge, any Debtor, any guarantor or other Person liable to Secured Party for the Obligations; and

(i)     at any time, and from time to time, accept additions to, releases, reductions, exchanges or substitution of the Collateral, without in any way altering, impairing, diminishing or affecting the provisions of this Security Agreement, the Loan Documents, or any of the other Obligations, or Secured Party's rights hereunder, under the Obligations.

12

Each Debtor hereby ratifies and confirms whatever Secured Party may do with respect to the Collateral and agrees that Secured Party shall not be liable for any error of judgment or mistakes of fact or law with respect to actions taken in connection with the Collateral.

4.6     Attorney-in-Fact.  Each Debtor hereby irrevocably makes, constitutes and appoints Secured Party (and any officer of Secured Party or any Person designated by Secured Party for that purpose) as such Debtor's true and lawful proxy and attorney-in-fact (and agent-in-fact) in such Debtor's name, place and stead, with full power of substitution, to: (i) take such actions as are permitted in this Security Agreement; (ii) execute such financing statements and other documents and to do such other acts as Secured Party may require to perfect and preserve Secured Party's security interest in, and to enforce such interests in the Collateral; and (iii) upon the occurrence of an Event of Default, carry out any remedy provided for in this Security Agreement, the Credit Agreement, or otherwise at law or in equity, including endorsing such Debtor's name to checks, drafts, instruments and other items of payment, and proceeds of the Collateral, executing change of address forms with the postmaster of the United States Post Office serving the address of such Debtor, changing the address of Debtor to that of Secured Party, opening all envelopes addressed to such Debtor and applying any payments contained therein to the Obligations, and changing any merchant accounts or instructions to such Debtor's payment processing service providers regarding any credit/debit card payments from  any of its customers.  Each Debtor hereby acknowledges that the constitution and appointment of such proxy and attorney-in-fact are coupled with an interest and are irrevocable.  Each Debtor hereby ratifies and confirms all that such attorney-in-fact may do or cause to be done by virtue of any provision of this Security Agreement.

4.7     No Marshaling.  Secured Party shall not be required to marshal any present or future collateral security (including this Security Agreement and the Collateral) for, or other assurances of payment of, the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order.  To the extent that it lawfully may, each Debtor hereby agrees that it will not invoke any law relating to the marshaling of collateral which might cause delay in or impede the enforcement of Secured Party's rights under this Security Agreement or under any other instrument creating or evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, each Debtor hereby irrevocably waives the benefits of all such laws.

4.8     No Waiver.  No Event of Default shall be waived by Secured Party except in writing.  No failure or delay on the part of Secured Party in exercising any right, power or remedy hereunder shall operate as a waiver of the exercise of the same or any other right at any other time; nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder.  There shall be no obligation on the part of Secured Party to exercise any remedy available to Secured Party in any order.  The remedies provided for herein are cumulative and not exclusive of any remedies provided at law or in equity.  Each Debtor agrees that in the event that such Debtor fails to perform, observe or discharge any of its Obligations or liabilities under this Security Agreement or any other agreements with Secured Party, no remedy of law will provide adequate relief to Secured Party, and further agrees that

13

Secured Party shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages.

4.9     Application of Proceeds.   Secured Party will, within three (3) Business Days after receipt of cash or solvent credits from collection of items of payment, proceeds of Collateral or any other source, apply the whole or any part thereof against the Obligations secured hereby.   Secured Party shall further have the exclusive right to determine how, when and what application of such payments and such credits shall be made on the Obligations, and such determination shall be conclusive upon Debtor.   Any proceeds of any disposition by Secured Party of all or any part of the Collateral may be first applied by Secured Party to the payment of expenses incurred by Secured Party in connection with the Collateral, including reasonable attorneys' fees and legal expenses and costs as provided for in Section 5.14 hereof.

## 5     MISCELLANEOUS.

5.1     Entire Agreement.     This Security Agreement and the other Loan Documents: (i) are valid, binding and enforceable against each Debtor and Secured Party in accordance with their respective provisions and no conditions exist as to their legal effectiveness; (ii) constitute the entire agreement between the parties with respect to the subject matter hereof and thereof; and (iii) are the final expression of the intentions of each Debtor and Secured Party.   No promises, either expressed or implied, exist between any Debtor and Secured Party, unless contained herein or therein.   This Security Agreement, together with the other Loan Documents, supersedes all negotiations, representations, warranties, commitments, term sheets, discussions, negotiations, offers or contracts (of any kind or nature, whether oral or written) prior to or contemporaneous with the execution hereof with respect to any matter, directly or indirectly related to the terms of this Security Agreement and the other Loan Documents.   This Security Agreement and the other Loan Documents are the result of negotiations between Secured Party and Debtors and have been reviewed (or have had the opportunity to be reviewed) by counsel to all such parties, and are the products of all parties.   Accordingly, this Security Agreement and the other Loan Documents shall not be construed more strictly against Secured Party merely because of Secured Party's involvement in their preparation.   **EACH DEBTOR ACKNOWLEDGES THAT IT HAS NOT RELIED UPON ANY STATEMENTS, PROMISES OR REPRESENTATIONS, IF ANY, THAT ARE NOT CONTAINED WITHIN THIS SECURITY AGREEMENT OR IN ANY OTHER THE LOAN DOCUMENT AND WAIVES ANY RIGHTS, DEFENSES, OR CLAIMS ARISING FROM ANY SUCH STATEMENTS, PROMISES OR REPRESENTATION**S.

5.2     Amendments; Waivers.   No delay on the part of Secured Party in the exercise of any right, power or remedy shall operate as a waiver thereof, nor shall any single or partial exercise by Secured Party of any right, power or remedy preclude other or further exercise thereof, or the exercise of any other right, power or remedy.   No amendment, modification or waiver of, or consent with respect to, any provision of this Security Agreement or the other Loan Documents shall in any event be effective unless the same shall be in writing and acknowledged by Secured Party, and then any such amendment,

14

modification, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

5.3 **WAIVER OF CLAIMS AND DEFENSES. EACH DEBTOR WAIVES EVERY PRESENT AND FUTURE DEFENSE, CAUSE OF ACTION, COUNTERCLAIM OR SETOFF WHICH SUCH DEBTOR MAY NOW HAVE AS OF THE DATE HEREOF, OR AS IT MAY IN THE FUTURE COME TO HAVE, TO ANY ACTION BY SECURED PARTY IN ENFORCING THIS SECURITY AGREEMENT OR ANY OTHER LOAN DOCUMENTS -- OTHER THAN FOR SET OFF TO ESTABLISH THE AMOUNTS DUE AND PAID IN RESPECT OF THE CREDIT AGREEMENT. EACH DEBTOR UNDERSTANDS AND AGREES THAT IT IS WAIVING DEFENSES AND CLAIMS WHICH MAY NOT YET HAVE ACCRUED OR OF WHICH IT MAY NOT YET BE AWARE AS MATERIAL INDUCEMENT FOR SECURED PARTY ENTERING THIS SECURITY AGREEMENT AND GRANTING ANY FINANCIAL ACCOMMODATION TO THE COMPANY. THIS PROVISION IS INTENDED TO BE CONSTRUED AS BROADLY AS PERMISSIBLE UNDER APPLICABLE LAW. FURTHER, EACH DEBTOR UNDERSTANDS AND ACKNOWLEDGES THAT THE AGENTS AND REPRESENTATIVES OF THE SECURED PARTY DO NOT HAVE AUTHORITY TO MAKE ANY STATEMENTS, PROMISES OR REPRESENTATIONS IN CONFLICT WITH OR IN ADDITION TO THE INFORMATION CONTAINED IN THIS SECURITY AGREEMENT OR ANY OTHER LOAN DOCUMENT, AND SECURED PARTY HEREBY SPECIFICALLY DISCLAIMS ANY RESPONSIBILITY FOR ANY SUCH STATEMENTS, PROMISES OR REPRESENTATIONS. BY EXECUTION OF THIS AGREEMENT, EACH DEBTOR ACKNOWLEDGES THAT IT HAS NOT RELIED UPON SUCH STATEMENTS, PROMISES OR REPRESENTATIONS, IF ANY, AND WAIVES ANY RIGHTS, DEFENSES, OR CLAIMS ARISING FROM ANY SUCH STATEMENTS, PROMISES OR REPRESENTATIONS.**

5.4 **MANDATORY FORUM SELECTION. TO INDUCE SECURED PARTY TO MAKE CERTAIN FINANCIAL ACCOMMODATIONS TO THE COMPANY, EACH DEBTOR IRREVOCABLY AGREES THAT ANY DISPUTE ARISING UNDER, RELATING TO, OR IN CONNECTION WITH, DIRECTLY OR INDIRECTLY, THIS SECURITY AGREEMENT OR RELATED TO ANY MATTER WHICH IS THE SUBJECT OF OR INCIDENTAL TO THIS SECURITY AGREEMENT ANY OTHER LOAN DOCUMENT, OR THE COLLATERAL (WHETHER OR NOT SUCH CLAIM IS BASED UPON BREACH OF CONTRACT OR TORT) SHALL, EXCEPT AS HEREINAFTER PROVIDED, BE SUBJECT TO THE EXCLUSIVE JURISDICTION AND VENUE OF THE STATE AND/OR FEDERAL COURTS LOCATED IN BROWARD COUNTY, FLORIDA; PROVIDED, HOWEVER, SECURED PARTY MAY, AT SECURED PARTY'S SOLE OPTION, ELECT TO BRING ANY ACTION IN ANY OTHER JURISDICTION. THIS PROVISION IS INTENDED TO BE A "MANDATORY" FORUM SELECTION CLAUSE AND GOVERNED BY AND INTERPRETED CONSISTENT WITH FLORIDA LAW. EACH DEBTOR HEREBY CONSENTS TO THE EXCLUSIVE JURISDICTION AND VENUE OF ANY STATE OR FEDERAL COURT HAVING IT**

**SITUS IN SUCH COUNTY (OR TO ANY JURISDICTION OR VENUE, IF SECURED PARTY SO ELECTS), AND EACH DEBTOR HEREBY WAIVES ANY OBJECTION BASED ON FORUM NON CONVENIENS.**

5.5 <u>**WAIVER OF PERSONAL SERVICE**</u>. **EACH DEBTOR HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND CONSENTS THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, OR BY FEDERAL EXPRESS, DIRECTED TO THE DEBTORS, AS SET FORTH AND ACCORDING TO THE TERMS IN THE NOTICE PROVISIONS HEREIN. EACH DEBTOR AGREES THAT NO ACKNOWLEDGMENT OF ACTUAL RECEIPT OF PROCESS IS REQUIRED AND SERVICE WILL BE DEEMED EFFECTIVE PURSUANT TO TERMS OF NOTICE PROVISIONS CONTAINED HEREIN. SERVICE MAY ALSO BE MADE IN ANY MANNER PROVIDED BY APPLICABLE STATUTE, LAW, RULE OF COURT OR OTHERWISE.**

5.6 <u>**WAIVER OF JURY TRIAL**</u>. **EACH DEBTOR AND SECURED PARTY, AFTER CONSULTING OR HAVING HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL, EACH KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE IRREVOCABLY, ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS SECURITY AGREEMENT, ANY NOTE, ANY OTHER LOAN DOCUMENT, ANY OF THE OTHER OBLIGATIONS, THE COLLATERAL, OR ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH OR THEREWITH OR ARISING FROM ANY LENDING RELATIONSHIP EXISTING IN CONNECTION WITH ANY OF THE FOREGOING, OR ANY COURSE OF CONDUCT OR COURSE OF DEALING IN WHICH SECURED PARTY AND ANY DEBTOR ARE ADVERSE PARTIES, AND EACH AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR SECURED PARTY GRANTING ANY FINANCIAL ACCOMMODATION TO THE COMPANY.**

5.7 <u>Assignability</u>. Secured Party, without consent from or notice to anyone, may at any time assign Secured Party's rights in this Security Agreement, the other Loan Documents, the Obligations, or any part thereof and transfer Secured Party's rights in any or all of the Collateral, and Secured Party thereafter shall be relieved from all liability with respect to such Collateral. This Security Agreement shall be binding upon Secured Party and each Debtor and its respective legal representatives and successors. All references herein to Debtor shall be deemed to include any successors, whether immediate or remote. In the case of a joint venture or partnership, the term "Debtor" shall be deemed to include all joint venturers or partners thereof, who shall be jointly and severally liable hereunder.

16

5.8     <u>Binding Effect</u>.   This Security Agreement shall become effective upon execution by each Debtor and Secured Party, and shall bind the Debtors and Secured Party, and their respective successors and permitted assigns.

5.9     <u>Governing Law</u>.   Except in the case of the Mandatory Forum Selection Clause in Section 5.4 above, which clause shall be governed and interpreted in accordance with Florida law, this Security Agreement shall be delivered and accepted in and shall be deemed to be a contract made under and governed by the internal laws of the State of Wyoming, and for all purposes shall be construed in accordance with the laws of such State, without giving effect to the choice of law provisions of such State.

5.10     <u>Enforceability</u>.   Wherever possible, each provision of this Security Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Security Agreement shall be prohibited by, unenforceable or invalid under any jurisdiction, such provision shall as to such jurisdiction, be severable and be ineffective to the extent of such prohibition or invalidity, without invalidating the remaining provisions of this Security Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

5.11     <u>Time of Essence</u>.   Time is of the essence in making payments of all amounts due Secured Party under the Loan Documents and in the performance and observance by each Debtor of each covenant, agreement, provision and term of this Security Agreement and the other Loan Documents.

5.12     <u>Counterparts; Facsimile Signatures</u>.   This Security Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute but one and the same Security Agreement.  Receipt of an executed signature page to this Security Agreement by facsimile or other electronic transmission shall constitute effective delivery thereof.  Electronic records of executed Loan Documents maintained by Secured Party shall be deemed to be originals thereof.

5.13     <u>Notices</u>.   Except as otherwise provided herein, each Debtor waives all notices and demands in connection with the enforcement of Secured Party's rights hereunder. All notices, requests, demands and other communications provided for hereunder shall be made in accordance with the terms of the Credit Agreement.

5.14     <u>Costs, Fees and Expenses</u>.   Debtors shall pay or reimburse Secured Party for all reasonable costs, fees and expenses incurred by Secured Party or for which Secured Party becomes obligated in connection with the enforcement or defense of this Security Agreement, including search fees, costs and expenses and attorneys' fees, costs and time charges of counsel to Secured Party and all taxes payable in connection with this Security Agreement.  In furtherance of the foregoing, Debtors shall pay any and all stamp and other taxes, UCC search fees, filing fees and other costs and expenses in connection with the execution and delivery of this Security Agreement and the other Loan Documents to be delivered hereunder, and agrees to save and hold Secured Party harmless from and against any and all liabilities with respect to or resulting from any delay in paying or omission to pay

17

such costs and expenses.  That portion of the Obligations consisting of costs, expenses or advances to be reimbursed by Debtors to Secured Party pursuant to this Security Agreement or the other Loan Documents which are not paid on or prior to the date hereof shall be payable by Debtor to Secured Party on demand.  If at any time or times hereafter Secured Party: (a) employs counsel for advice or other representation: (i) with respect to this Security Agreement or the other Loan Documents; (ii) to represent Secured Party in any litigation, contest, dispute, suit or proceeding or to commence, defend, or intervene or to take any other action in or with respect to any litigation, contest, dispute, suit, or proceeding (whether instituted by Secured Party, any Debtor, or any other Person) in any way or respect relating to this Security Agreement; or (iii) to enforce any rights of Secured Party against any Debtor or any other Person under of this Security Agreement; (b) takes any action to protect, collect, sell, liquidate, or otherwise dispose of any of the Collateral; and/or (c) attempts to or enforces any of Secured Party's rights or remedies under this Security Agreement, the costs and expenses incurred by Secured Party in any manner or way with respect to the foregoing, shall be part of the Obligations, payable by Debtors to Secured Party on demand.

5.15    Termination.  This Security Agreement and the Liens and security interests granted hereunder shall not terminate until the termination of the Credit Agreement and the commitments to make Loans thereunder and the full and complete performance and satisfaction and payment in full of all the Obligations (other than contingent indemnification obligations to the extent no claim giving rise thereto has been asserted).  Upon termination of this Security Agreement, Secured Party shall also deliver to Debtor (at the sole expense of Debtors) such UCC termination statements, certificates for terminating the liens on the Motor Vehicles (if any) and such other documentation, without recourse, warranty or representation whatsoever, as shall be reasonably requested by a Debtor to effect the termination and release of the Liens and security interests in favor of Secured Party affecting the Collateral; provided, however, to the extent any such terminations or releases require Secured Party to expend any sums in terminating or releasing any such Liens, Secured Party may refrain from terminating or releasing such Liens unless and until Debtors pay to Secured Party the estimated cost, as reasonably determined by Secured Party, of effectuating such terminations or releases.

5.16    Reinstatement.  This Security Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against any Debtor for liquidation or reorganization, should a Debtor become insolvent or make an assignment for the benefit of any creditor or creditors or should a receiver or trustee be appointed for all or any significant part of any Debtor's assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made.  In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

5.17    Increase in Obligations.  It is the intent of the parties to secure payment of the Obligations, as the amount of such Obligations may increase from time to time in

18

accordance with the terms and provisions of the Loan Documents, and all of the Obligations, as so increased from time to time, shall be and are secured hereby.  Upon the execution hereof, Debtors shall pay any and all documentary stamp taxes and/or other charges required to be paid in connection with the execution and enforcement of the Loan Documents, and if, as and to the extent the Obligations are increased from time to time in accordance with the terms and provisions of the Loan Documents, then Debtors shall immediately pay any additional documentary stamp taxes or other charges in connection therewith.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, Debtors and Secured Party have executed this Security Agreement as of the date first above written.

**Debtors:**

**ZEN TECHNOLOGIES, INC.**

By: _____
Name:  Joshua Campbell
Title:   Chief Executive Officer

STATE OF _____       )

                                                        )  SS.

COUNTY OF _____       )

The undersigned, a Notary Public in and for the said County, in the State aforesaid, DOES HEREBY CERTIFY that Joshua Campbell, the Chief Executive Officer of Zen Technologies, Inc., a Texas corporation, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that she signed and delivered the said instrument as her own free and voluntary act and as the free and voluntary act of said corporation, for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this _____ day of _____, 20____.

_____

Notary Public

My Commission Expires:

[Signature page to the Security Agreement (Debtors)]

IN WITNESS WHEREOF, the parties hereto have duly executed this Security Agreement as of the day and year first above written.

**Debtors**:

**ZENERGY POWER & GAS, INC.**

By: _____
Name: Joshua Campbell
Title:   Chief Executive Officer

STATE OF _____          )

                                                        )  SS.

COUNTY OF _____          )

The undersigned, a Notary Public in and for the said County, in the State aforesaid, DOES HEREBY CERTIFY that Joshua Campbell, the Chief Executive Officer of Zenergy Power & Gas, Inc., a Texas corporation, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that she signed and delivered the said instrument as her own free and voluntary act and as the free and voluntary act of said corporation, for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this _____ day of _____, 20_____.

_____

Notary Public

My Commission Expires:

[Signature page to the Security Agreement (Debtors)]

IN WITNESS WHEREOF, the parties hereto have duly executed this Security Agreement as of the day and year first above written.

**Debtors**:

**NAUP BROKERAGE, LLC**

By: _____
Name:  Joshua Campbell
Title:   Chief Executive Officer

STATE OF _____            )

                                                               )  SS.

COUNTY OF _____            )


The undersigned, a Notary Public in and for the said County, in the State aforesaid, DOES HEREBY CERTIFY that Joshua Campbell, the Chief Executive Officer of NAUP Brokerage, LLC, a Texas limited liability company, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that she signed and delivered the said instrument as her own free and voluntary act and as the free and voluntary act of said limited liability company, for the uses and purposes therein set forth.


GIVEN under my hand and notarial seal this _____ day of _____, 20____.

_____
Notary Public


My Commission Expires:

[Signature page to the Security Agreement (Debtors)]

IN WITNESS WHEREOF, the parties hereto have duly executed this Security Agreement as of the day and year first above written.

<u>**Debtors**</u>:

**ZENERGY LABS, LLC**

By: _____
Name: Joshua Campbell
Title:   Chief Executive Officer

STATE OF _____        )

                                                      )  SS.

COUNTY OF _____        )

The undersigned, a Notary Public in and for the said County, in the State aforesaid, DOES HEREBY CERTIFY that Joshua Campbell, the Chief Executive Officer of  Zenergy Labs, LLC, a Texas limited liability company, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that she signed and delivered the said instrument as her own free and voluntary act and as the free and voluntary act of said limited liability company, for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this _____ day of _____, 20_____.

_____

Notary Public

My Commission Expires:

[Signature page to the Security Agreement (Debtors)]

IN WITNESS WHEREOF, the parties hereto have duly executed this Security Agreement as of the day and year first above written.

**Debtors**:

**ZENERGY & ASSOCIATES, INC.**

By:  _____
Name:  Joshua Campbell
Title:    Chief Executive Officer

STATE OF _____        )

)  SS.

COUNTY OF _____        )

The undersigned, a Notary Public in and for the said County, in the State aforesaid, DOES HEREBY CERTIFY that Joshua Campbell, the Chief Executive Officer of  Zenergy & Associates, Inc., a Texas corporation, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that she signed and delivered the said instrument as her own free and voluntary act and as the free and voluntary act of said corporation, for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this _____ day of _____, 20_____.

_____

Notary Public

My Commission Expires:

[Signature page to the Security Agreement (Debtors)]

IN WITNESS WHEREOF, Debtor and Secured Party have executed this Security Agreement as of the date first above written.

Agreed and accepted:

**<u>Secured Party</u>:**

**TCA SPECIAL SITUATIONS CREDIT STRATEGIES ICAV**

By:_____
Name:
Title:

## Schedule 3.8

## Collateral Locations/Places of Business

# Exhibit F

# Form of Validity Certificates

## **VALIDITY CERTIFICATE**

This Validity Certificate, dated and effective as of October **____**, 2019 (the "Validity Certificate"), is made by JOSHUA CAMPBELL, an individual, (collectively, the "Undersigned"), for the benefit of **TCA SPECIAL SITUATIONS CREDIT STRATEGIES ICAV**, an Irish collective asset vehicle (the "Lender").

RECITALS

A.      Pursuant to a Senior Secured Revolving Credit Facility Agreement, dated and effective as of as of October **____**, 2019, by and between Zenergy Brands, Inc., a corporation organized and existing under the laws of the State of Nevada (the "Company"), the Lender and agreed and acknowledged by certain guarantors (the "Credit Agreement"), Lender has agreed to make certain loans available to the Company as more specifically set forth in the Credit Agreement;

B.      The Undersigned is an officer or director of the Company; and

C.      As a condition to entering into the Credit Agreement, Lender has required the execution and delivery of this Validity Certificate by the Undersigned.

NOW THEREFORE, the Undersigned, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby agrees as follows:

1.      Definitions. Capitalized terms used in this Validity Certificate shall have the meanings given to them in the Credit Agreement, unless otherwise defined herein.

2.      Guaranty. The Undersigned does hereby absolutely and unconditionally, guarantee, represent, warrant and certify to the Lender that, to the best of the Undersigned's knowledge after due inquiry and investigation:

(a)      All reports, schedules, certificates, and other information at any time and from time to time delivered or otherwise reported to Lender by the Company, including, without limitation, all due diligence information, financial statements, tax returns, and all supporting information or documentation delivered in connection therewith, shall be bona fide, complete, correct, and accurate in all material respects and shall accurately and completely report all matters purported to be covered or reported thereby provided however, that (i) any projections and other forward-looking information included in the due diligence information and provided by the Undersigned to the Lender (the "Information") have been prepared in good faith and are be based upon assumptions which, in light of the circumstances under which they were made, were reasonable at the time they were made, (ii) the Information may have been based on available from generally recognized sources without having been independently verified; (iii) the Undersigned does not assume responsibility for the accuracy or completeness of the Information; and (iv) the Information shall not be deemed to be an appraisal of any assets of the Company.

(b)      All representations and warranties made by the Company in the Credit Agreement, and any other Loan Documents, are complete, correct, and accurate in all material respects and do not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(c)      The Undersigned may, from time to time, sign and deliver reports (including, without limitation, those specifically mentioned above) or otherwise deliver any such information to Lender as Lender may request, and the Undersigned confirms that he is duly authorized to deliver same to Lender on behalf of the Company.

(d)      All Collateral (as defined in the Security Agreements): (i) is and will be owned, directly or indirectly, by the Company and will be possessed by the Company or its agent; (ii) will not be subject to any Lien, except as otherwise permitted by the Credit Agreement or other Loan Documents; and (iii) will be maintained only at the locations designated in the Credit Agreement or Security Agreement, unless the Company obtains Lender's prior written consent.

(e)      All proceeds of the Loans will only be used in strict accordance with the terms of the Credit Agreement.

3.      <u>Consideration for Certification</u>. The Undersigned acknowledges and agrees with Lender that, but for the execution and delivery of this Validity Certificate by the Undersigned, Lender would not have entered into the Credit Agreement. The Undersigned acknowledges and agrees that the loans and other extensions of credit made to the Company by Lender under the Credit Agreement will result in significant benefits to the Undersigned.

4.      <u>Cumulative Remedies</u>. Lender's rights and remedies hereunder are cumulative of all other rights and remedies which Lender may now or hereafter have with respect to the Undersigned, the Company, or any other Person.

5.      <u>Company's Financial Condition</u>.      The Undersigned acknowledges that he has reviewed and is familiar with the Credit Agreement and all other Loan Documents and is familiar with the operations and financial condition of the Company, and agrees that Lender shall not have any duty or obligation to communicate to the Undersigned any information regarding the Company's financial condition or affairs.

6.      <u>Assignability</u>. This Validity Certificate shall be binding upon the Undersigned and shall inure to the benefit of Lender and its successors or assigns. Lender may at any time assign Lender's rights in this Validity Certificate.

7.      <u>Continuing Obligation</u>. This is a continuing validity certification and shall remain in full force and effect until such date as all amounts owing by the Company to Lender under Credit Agreement or any other Loan Documents shall have been indefeasibly paid in full in cash and there shall be no further commitments to advance any funds by Lender to the Company under the Credit Agreement or any other Loan Agreement.

8.    <u>Further Assurances</u>**.** The Undersigned agrees that he will cooperate with Lender at all times in connection with any actions taken by Lender pursuant to Credit Agreement or any other Loan Documents, to monitor, administer, enforce, or collect upon Lender's rights and remedies thereunder. In the event the Company should cease or discontinue operating as a going concern in the ordinary course of business, then for so long as any obligations under the Credit Agreement or any other Loan Documents remain outstanding, the Undersigned agrees that he shall assist Lender in connection with any such action, as Lender may request.

9.    <u>Choice of Law and Venue Selection</u>. The  Undersigned irrevocably agrees that any dispute arising under, relating to, or in connection with, directly or indirectly, this Validity Certificate or related to any matter which is the subject of or incidental to this Validity Certificate (whether or not such claim is based upon breach of contract or tort) shall be subject to the exclusive jurisdiction and venue of the state and/or federal courts located in Broward County, Florida; provided, however, Lender may, at its sole option, elect to bring any action in any other jurisdiction. This provision is intended to be a "mandatory" forum selection clause and governed by and interpreted consistent with Florida law. The Undersigned hereby consents to the exclusive jurisdiction and venue of any state or federal court having its situs in said county, and each waives any objection based on forum non conveniens. The Undersigned hereby waives personal service of any and all process and consents that all such service of process may be made by certified mail, return receipt requested, directed to a borrower, as applicable, as set forth herein or in the manner provided by applicable statute, law, rule of court or otherwise. Except for the foregoing mandatory forum selection clause, all terms and provisions hereof and the rights and obligations of the Undersigned and Lender hereunder shall be governed, construed and interpreted in accordance with the laws of the State of Wyoming, without reference to conflict of laws principles.

10.    <u>WAIVER OF JURY TRIAL</u>. THE UNDERSIGNED AND LENDER HEREBY VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) BETWEEN THE UNDERSIGNED AND LENDER OR AMONG THE COMPANY, THE UNDERSIGNED, AND LENDER AND/OR LENDER'S AFFILIATES ARISING OUT OF OR IN ANY WAY RELATED TO THIS VALIDITY CERTIFICATE, ANY OTHER DOCUMENT OR ANY RELATIONSHIP AMONG LENDER, THE UNDERSIGNED, THE COMPANY, AND/OR ANY AFFILIATE OF LENDER THIS PROVISION IS A MATERIAL INDUCEMENT TO LENDER TO PROVIDE THE FINANCING DESCRIBED IN THE PURCHASE AGREEMENT.

11.    <u>ADVICE OF COUNSEL</u>. THE UNDERSIGNED ACKNOWLEDGES THAT HE HAS EITHER OBTAINED THE ADVICE OF COUNSEL OR HAS HAD THE OPPORTUNITY TO OBTAIN SUCH ADVICE IN CONNECTION WITH THE TERMS AND PROVISIONS OF THIS VALIDITY CERTIFICATE.

12.    <u>Electronic Signatures</u>. Lender is hereby authorized to rely upon and accept

as an original this Validity Certificate which is sent to Lender via facsimile, .pdf, or other electronic transmission.

[signature page follows]

The Undersigned has executed this Validity Certificate as of the date first above written.


_____
JOSHUA CAMPBELL

STATE OF _____          )
                                      ) SS.
COUNTY OF _____            )


      The undersigned, a Notary Public in and for the said County, in the State aforesaid, DOES HEREBY CERTIFY that Joshua Campbell, who is personally known to me to be the same person whose name is subscribed to the foregoing, appeared before me this day in person and acknowledged that he/she signed and delivered the said instrument as his/her own free and voluntary act and as the free and voluntary act for the uses and purposes therein set forth.

      GIVEN under my hand and notarial seal this _____ day of _____, 20_____.


_____
Notary Public

My Commission Expires:


_____

# Exhibit G

# Form of Budget

# Exhibit H

# Form of Interim DIP Order

**Exhibit I**

**Form of Weekly Draw Request**

FORM OF WEEKLY DRAW REQUEST

TCA Special Situations Credit Strategies ICAV
1315 S. Hwy 89, Suite 101
Jackson, Wyoming 83001
E-mail:  aschreiber@tcaglobalfund.com

> Re:    ZENERGY BRANDS, INC., a Nevada corporation (the "Borrower"), Covenant Compliance Certificate for the Period Ending on _____, 20__ (the "Reporting Date")

Dear Sir/Madam:

Reference is made to that certain Senior Secured Revolving Credit Facility Agreement, dated and effective as of October __, 2019 (the "Credit Agreement"), by and between the Borrower and TCA Special Situations Credit Strategies ICAV ("Lender"). Capitalized terms used, but not defined, herein shall have the respective meanings assigned to such terms in the Credit Agreement.

Pursuant to Section 2.1(e) of the Credit Agreement, the undersigned hereby confirms to Lender as of the date hereof that the Borrower is in compliance with Sections 9.12(a) through (g) of the Credit Agreement to Lender and requests that the Lender permit a Weekly Draw in the amount of $[_____] to be withdrawn on [DATE] [and disbursed to the following account:

Company:
Bank:
Account Name:
Bank Routing No:
Account No:]

The undersigned hereby confirms that immediately following the foregoing Weekly Draw the aggregate amount of cash in the Credit Parties' accounts shall equal $[_____].

[signature page follows]

IN WITNESS WHEREOF, the undersigned hereby certifies to the above.


_____
[●]

## Schedule 7.1

## Subsidiaries

Zenergy Power & Gas, Inc.
Zen Technologies, Inc.
Zenergy & Associates, Inc.
Zenergy Labs, LLC
NAUP Brokerage, LLC

# Schedule 7.4(a)

# Capitalization

## Schedule 7.4(b)

## Outstanding Options, Warrants, Scrip, Rights to Subscribe

## Schedule 7.18

## Real Property

## N/A

## Schedule 7.21

## IP Rights

1) All custom software used by the Company was created by and owned by Zenergy Labs, LLC.
2) The Company has an approved trademark for use of the term/phrase "Zero Cost Program™".



ZERO COST PROGRAM

| | |
|---|---|
| Reg. No. 5,268,236 | Zen Technologies, Inc. (TEXAS CORPORATION) |
| Registered Aug. 15, 2017 | 5851 Legacy Circle<br>Suite 600<br>Plano, TX 75024 |
| Int. Cl.: 35 | CLASS 35: Energy management services, namely, providing electricity management plan to reduce energy consumption through energy innovation by providing energy automation |
| Service Mark | controls and alternative energy products; Energy usage management information services, namely, providing customers with information to make and execute informed decisions about |
| Supplemental Register | their power consumption, power generation, and environmental impact |

FIRST USE 12-15-2016; IN COMMERCE 12-15-2016

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT STYLE, SIZE OR COLOR

No claim is made to the exclusive right to use the following apart from the mark as shown: "PROGRAM"

SER. NO. 87-362,939, FILED P.R. 03-08-2017; AM. S.R. 04-24-2017
LINDA B ORNDORFF, EXAMINING ATTORNEY



Joseph Matal

Performing the Functions and Duties of the
Under Secretary of Commerce for
Intellectual Property and Director of the
United States Patent and Trademark Office

**Schedule 7.28**

**Bank Accounts and Deposit Accounts**

Company:    Zenergy Brands, Inc.

Bank:    Texas Security Bank
3212 Belt Line
Farmers Branch, TX 75234

Account Name:    Zenergy
7700 Windrose Ave, G300
Plano, TX 75024

Bank Routing No:    111025877
Account No:    2027282

## Schedule 7.29

## Places of Business