THIS IS NOT A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN
ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE
MEANING OF BANKRUPTCY CODE SECTION 1126, 11 U.S.C. §§ 1125, 1126. THIS
DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY
COURT. THE DEBTORS INTEND TO SUBMIT THIS DISCLOSURE STATEMENT TO
THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING COMMENCEMENT OF
SOLICITATION AND THE DEBTORS' FILING FOR RELIEF UNDER CHAPTER 11 OF
THE BANKRUPTCY CODE. THE INFORMATION IN THIS DISCLOSURE STATEMENT
IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO
SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY
SECURITIES.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **ZENERGY BRANDS, INC.,** *et al.,*[1] | § | **Case No. 19-42886** |
| | § | |
| **Debtors.** | § | **(Jointly Administered)** |

## DISCLOSURE STATEMENT PURSUANT TO
## SECTION 1125 OF THE BANKRUPTCY CODE WITH
## RESPECT TO THE DEBTORS' CHAPTER 11 PLAN OF LIQUIDATION

---

### FOLEY & LARDNER LLP

| | |
|---|---|
| Marcus A. Helt (TX 24052187) | Jack G. Haake (*pro hac vice*) |
| 2021 McKinney Avenue, Suite 1600 | Washington Harbour |
| Dallas, Texas 75201 | 3000 K Street, N.W., Suite 600 |
| Telephone: (214) 999-3000 | Washington, D.C. 20007-5109 |
| Facsimile: (214) 999-4667 | Telephone: (202) 672-5300 |
| | Facsimile: (202) 672-5399 |

**ATTORNEYS FOR THE DEBTORS AND DEBTORS-IN-POSSESSION**

Dated:  November 19, 2020

---

[1] The Debtors in the above-captioned chapter 11 cases, along with the last four digits of each Debtor's federal tax
identification number, are: Zenergy Brands, Inc. (1686); NAUP Brokerage, LLC (7899); Zenergy Labs, LLC
(8045); Zenergy Power & Gas, Inc. (1963); Enertrade Electric, LLC; Zenergy & Associates, Inc. (4022); and Zen
Technologies, Inc. (7309).  The above-captioned Debtors' mailing address is 5700 Granite Pkwy, #200, Plano, TX
75024.

# **TABLE OF CONTENTS**

I. INTRODUCTION ............................................................................................................. 1
    A.    Background ....................................................................................... 1
    B.    The Purpose of this Disclosure Statement ............................................ 2
    C.    Recommendation of the Debtors to Approve the Plan ........................... 2

II. VOTING PROCEDURES AND REQUIREMENTS ....................................................... 2
    A.    Ballots and Voting Deadline .............................................................. 2
    B.    Claimants Solicited to Vote ............................................................... 3
    C.    Definition of Impairment .................................................................. 3
    D.    Classes Impaired Under the Plan ....................................................... 4
    E.    Vote Required for Class Acceptance ................................................... 5
    F.    Absolute Priority Rule ...................................................................... 5

III. CONFIRMATION OF THE PLAN ............................................................................... 5
    A.    Combined Disclosure Statement and Confirmation Hearing .................. 5
    B.    Requirements for Approval of the Disclosure Statement ....................... 6
    C.    Requirements for Confirmation of the Plan ......................................... 7
    D.    Cramdown ....................................................................................... 9

IV. PLAN OVERVIEW ..................................................................................................... 11

V. HISTORICAL AND BACKGROUND INFORMATION ............................................ 24
    A.    The Debtors' Business .................................................................... 24
    B.    Events Leading to Commencement of the Chapter 11 Cases ............... 27
    C.    Pre-Petition Indebtedness ............................................................... 27

VI. SIGNIFICANT EVENTS AND PLEADINGS FILED IN THE CHAPTER 11 CASE ........ 27
    A.    Commencement of Case .................................................................. 28
    B.    Employment of Professionals .......................................................... 28
    C.    Financing of Operations and Administration of the Estate .................. 29
    D.    TCA Plan and Receivership of TCA Global ...................................... 30
    E.    Alternative Financing and Negotiations ........................................... 30
    F.    SEC Settlement and Revocation of Registration ............................... 31
    G.    Bar Dates ...................................................................................... 31

VII. SUMMARY OF THE CLAIMS, CLASSIFICATION AND TREATMENT UNDER
    THE PLAN .................................................................................................. 32
    A.    Introduction .................................................................................. 32
    B.    Classification of Claims and Equity Interests .................................... 32
    C.    Treatment of Unclassified Claims Under the Plan ............................. 33
    D.    Treatment of Classified Claims and Equity Interests Under the Plan ................. 34

VIII. CLAIMS OBJECTION AND SUBORDINATION REQUEST ......................................... 36
    A.    TCA Global ................................................................................... 36
    B.    TCA Special Situations ................................................................... 36

IX. MEANS FOR IMPLEMENTATION OF THE PLAN ........................................................ 38
    A.    Plan Funding ................................................................................................... 38
    B.    Authorization to Take Necessary Actions ........................................................ 38
    C.    Corporate Existence Between the Confirmation Date and the Effective
        Date ................................................................................................................ 38
    D.    Eco Investment Transaction on the Closing Date ............................................ 38
    E.    Corporate Action............................................................................................. 39
    F.    Creation and Transfer of Assets to the Liquidation Trust................................. 40
    G.    Effectiveness of Securities, Instruments and Agreements ................................ 40
    H.    Approval of Agreements.................................................................................. 40
    I.    Deemed Consolidation .................................................................................... 40

X. EFFECT OF CONFIRMATION ................................................................................... 41
    A.    Administration After Effective Date................................................................ 41
    B.    No Change of Control ...................................................................................... 41
    C.    Effectiveness of Securities, Instruments and Agreements ................................ 41
    D.    Corporate Action............................................................................................. 41
    E.    Entry of Final Decree ...................................................................................... 42
    F.    Section 1146 Exemption .................................................................................. 42

XI. RETENTION OF RIGHTS TO PURSUE CAUSES OF ACTION AND
    EFFECTUATE SETOFFS, RECOUPMENT, ETC. ......................................................... 42

XII. THE LIQUIDATION TRUST ................................................................................... 43
    A.    Creation of the Liquidation Trust and Appointment of the Liquidation
        Trustee............................................................................................................ 43
    B.    Property of the Liquidation Trust .................................................................... 44
    C.    General Powers of the Liquidation Trust......................................................... 44
    D.    Purpose of the Liquidation Trust ..................................................................... 44
    E.    Powers of the Liquidation Trustee ................................................................... 45
    F.    Termination of the Liquidation Trust ............................................................... 45
    G.    Cooperation Between the Liquidation Trust and Joshua Bell ........................... 46

XIII. METHOD OF DISTRIBUTION UNDER THE PLAN ....................................................... 46
    A.    Payments Made by Liquidation Trustee ........................................................... 46
    B.    Payments Made in Cash and Rounding ........................................................... 46
    C.    Undeliverable Payments ................................................................................. 46
    D.    Claims Trading................................................................................................ 47

XIV. DISPUTED CLAIMS AND RESERVE FOR DISPUTED CLAIMS ................................. 47
    A.    Establishment and Maintenance of Reserve .................................................... 47
    B.    Property Held in Disputed Claims Reserve ..................................................... 47
    C.    Distributions Upon Allowance of Disputed Claims .......................................... 48
    D.    Expenses of Disputed Claims Reserve ............................................................ 48
    E.    Procedures for Allowance or Disallowance of Disputed Claims......................... 48
    F.    No Distribution Pending Allowance ................................................................ 49
    G.    Disallowed Claims .......................................................................................... 50

H.      Due Authorization by Claimants ......................................................... 50

XV. OTHER SIGNIFICANT PROVISIONS.................................................................. 50

A.      Treatment of Executory Contracts and Unexpired Leases .................................. 50
B.      Approval of Agreements..................................................................... 51
C.      Distributions under the Plan................................................................. 51
D.      Effects of Confirmation of the Plan; Injunction, Releases and Exculpation ........ 53

XVI. CONDITIONS PRECEDENT TO  EFFECTIVENESS OF THE PLAN .......................... 57

A.      Conditions to Effectiveness of the Plan ................................................. 57
B.      Effect of Failure of Conditions ........................................................... 58
C.      Waiver of Conditions....................................................................... 58

XVII. RETENTION OF JURISDICTION .................................................................. 58

A.      Retention of Jurisdiction................................................................... 58
B.      No New Requirements. .................................................................... 60

XVIII. MISCELLANEOUS PROVISIONS ................................................................. 60

A.      Effectuating Documents and Further Transactions................................. 60
B.      Exemption from Transfer Taxes .......................................................... 60
C.      Authorization to Request Prompt Tax Determinations.......................... 61
D.      Post-Effective Date Fees and Expenses ................................................. 61
E.      Payment of Statutory Fees ................................................................. 61
F.      Amendment or Modification of Plan .................................................... 61
G.      Severability ................................................................................... 61
H.      Revocation or Withdrawal of the Plan................................................... 62
I.      Binding Effect Notices...................................................................... 62
J.      Notices ....................................................................................... 62
K.      Governing Law .............................................................................. 63
L.      Withholding and Reporting Requirements ........................................... 63
M.      Section 1125(e) of the Code ............................................................. 64
N.      Filing of Additional Documents ......................................................... 64
O.      No Admissions............................................................................... 64
P.      Waiver of Bankruptcy Rule 3020(e) and 7062 ...................................... 64
Q.      Computation of Time....................................................................... 64
R.      Substantial Consummation ................................................................ 64
S.      Final Decree .................................................................................. 64
T.      Inconsistency................................................................................. 65
U.      No Interest or Attorneys' Fees ............................................................ 65
V.      The Dissolution and Release of the Committee....................................... 65
W.      Successors and Assigns..................................................................... 65
X.      Headings ...................................................................................... 65
Y.      No Penalty for Prepayment ................................................................ 65
Z.      Savings Clause ............................................................................... 66
AA.      Remedy of Defects.......................................................................... 66

XIX. LIQUIDATION ANALYSIS, FEASIBILITY, AND RISK FACTORS ............................ 66
    A.    Liquidation Analysis ............................................................................................ 66
    B.    Feasibility of the Plan ........................................................................................ 66
    C.    Risks Associated with the Plan .......................................................................... 67

XX. COMPARISON OF PLAN TO ALTERNATIVES ............................................................ 67
    A.    Chapter 7 Liquidation ........................................................................................ 67
    B.    Alternative Plans ................................................................................................ 68
    C.    Dismissal ............................................................................................................ 68

XXI. MATERIAL UNCERTAINTIES AND RISKS .................................................................. 69

XXII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ................... 69
    A.    Introduction ........................................................................................................ 69
    B.    Federal Income Tax Consequences to the Claimants ......................................... 70
    C.    Tax Withholding ................................................................................................ 70
    D.    Disclaimers ........................................................................................................ 70

XXIII. RECOMMENDATION AND CONCLUSION ................................................................ 71
    A.    Recommendation ................................................................................................ 71

## LIST OF EXHIBITS

**Exhibit A:**     Order Conditionally Approving Disclosure Statement

**Exhibit B:**     Chapter 11 Plan of Liquidation for Debtors

**Exhibit C:**     Liquidation Analysis

**Exhibit D:**     Combined Hearing Notice

## DISCLAIMER

THIS DISCLOSURE STATEMENT IS FILED IN SUPPORT OF THE DEBTORS' CHAPTER 11 PLAN OF LIQUIDATION (THE "**PLAN**") FOR ZENERGY BRANDS, INC.; NAUP BROKERAGE, LLC; ZENERGY LABS, LLC; ZENERGY POWER & GAS, INC.; ENERTRADE ELECTRIC, LLC; ZENERGY & ASSOCIATES, INC.; AND ZEN TECHNOLOGIES, INC., THE DEBTORS (COLLECTIVELY, THE "**DEBTORS**").

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF MATERIAL PROVISIONS OF THE PLAN, INCLUDING PROVISIONS RELATING TO THE PLAN'S TREATMENT OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS ADMINISTRATION OF ESTATE ASSETS AND THE MEANS OF IMPLEMENTATION OF THE PLAN.   THE DISCLOSURE STATEMENT ALSO SUMMARIZES CERTAIN FINANCIAL INFORMATION CONCERNING THE DEBTORS AND THE CLAIMS ASSERTED AGAINST THE DEBTORS IN THE CHAPTER 11 CASES.   WHILE THE DEBTORS BELIEVE THAT THE DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION WITH RESPECT TO THE DOCUMENTS AND INFORMATION SUMMARIZED, HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD REVIEW THE ENTIRE PLAN AND EACH OF THE DOCUMENTS REFERENCED THEREIN AND HEREIN, AND SHOULD SEEK THE ADVICE OF THEIR OWN COUNSEL AND OTHER ADVISORS BEFORE CASTING THEIR BALLOTS ON THE PLAN.

EXCEPT FOR THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO, NO REPRESENTATIONS CONCERNING THE DEBTORS, THE DEBTORS' ASSETS AND LIABILITIES, THE PAST OR FUTURE OPERATIONS OF THE DEBTORS, THE PLAN AND ITS TERMS, OR ALTERNATIVES TO THE PLAN ARE AUTHORIZED, NOR ARE ANY SUCH REPRESENTATIONS TO BE RELIED UPON IN ARRIVING AT A DECISION WITH RESPECT TO THE PLAN.   ANY INFORMATION WITH RESPECT TO SUCH TOPIC AREAS THAT IS PROVIDED TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN AND THAT IS NOT CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO IS UNAUTHORIZED AND SHOULD BE REPORTED IMMEDIATELY TO THE DEBTORS' COUNSEL.

STATEMENTS AND FINANCIAL INFORMATION HEREIN CONCERNING THE DEBTORS, INCLUDING, WITHOUT LIMITATION, HISTORICAL INFORMATION, INFORMATION REGARDING THE DEBTORS' ASSETS AND LIABILITIES, AND INFORMATION REGARDING CLAIMS AND INTERESTS ASSERTED OR OTHERWISE EVIDENCED IN THE DEBTORS' CHAPTER 11 CASES, HAVE BEEN DERIVED FROM NUMEROUS SOURCES INCLUDING, WITHOUT LIMITATION, THE DEBTORS, THE DEBTORS' BOOKS AND RECORDS, THE DEBTORS' SCHEDULES AND STATEMENT OF FINANCIAL AFFAIRS, AND COURT RECORDS.   ALTHOUGH THE DEBTORS REASONABLY BELIEVE THAT THE HISTORICAL AND FINANCIAL INFORMATION SET FORTH HEREIN IS ACCURATE, COMPLETE AND RELIABLE, THE DEBTORS AND THEIR PROFESSIONALS HAVE NOT TAKEN ANY INDEPENDENT ACTION TO VERIFY THE ACCURACY, COMPLETENESS OR RELIABILITY OF SUCH HISTORICAL INFORMATION AND THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL

INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. THEREFORE, NEITHER THE DEBTORS NOR THEIR PROFESSIONALS WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS COMPLETE, ACCURATE AND RELIABLE. HOWEVER, THE DEBTORS HAVE REVIEWED THE INFORMATION SET FORTH HEREIN AND, BASED UPON THE SOURCES OF INFORMATION AVAILABLE, GENERALLY BELIEVE SUCH INFORMATION TO BE COMPLETE.

UNLESS INDICATED OTHERWISE, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF NOVEMBER 5, 2020 AND NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE IN CONNECTION WITH THE PLAN SHALL, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE THE DATE THE DISCLOSURE STATEMENT AND THE MATERIALS RELIED UPON IN THE PREPARATION OF THE DISCLOSURE STATEMENT WERE COMPILED.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THIS DISCLOSURE STATEMENT CONTAINS PROJECTED FINANCIAL INFORMATION REGARDING THE DEBTORS, RECOVERIES UNDER THE PLAN, AND CERTAIN OTHER FORWARD-LOOKING STATEMENTS, ALL OF WHICH ARE BASED UPON VARIOUS ASSUMPTIONS AND ESTIMATES AS OF NOVEMBER 5, 2020, OR SUCH OTHER TIME AS IS SPECIFIED. SUCH INFORMATION WILL NOT BE UPDATED TO REFLECT EVENTS OCCURRING AFTER SAID DATE(S), AND SUCH INFORMATION IS SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE RISKS. CONSEQUENTLY, ACTUAL EVENTS, CIRCUMSTANCES, EFFECTS AND RESULTS MAY VARY SIGNIFICANTLY FROM THOSE INCLUDED IN OR CONTEMPLATED BY SUCH PROJECTED FINANCIAL INFORMATION AND SUCH OTHER FORWARD-LOOKING STATEMENTS. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT MAY NOT BE USED OR REPRODUCED IN ANY REPRESENTATION, DOCUMENT, PLEADING, EXHIBIT, DEMONSTRATIVE, OR OTHER MATTER IN CONNECTION WITH ANY LEGAL PROCEEDING OR OTHER DISPUTE.

ON _____, 2020, AFTER NOTICE AND HEARING, THE BANKRUPTCY COURT ENTERED AN ORDER CONDITIONALLY APPROVING THE DISCLOSURE STATEMENT AS CONTAINING INFORMATION OF THE KIND AND IN SUFFICIENT DETAIL TO ENABLE HOLDERS OF CLAIMS AND EQUITY INTERESTS WHOSE VOTES ON THE PLAN ARE BEING SOLICITED TO MAKE AN INFORMED JUDGMENT ON WHETHER TO ACCEPT OR REJECT THE PLAN. A TRUE AND CORRECT COPY OF THE ORDER APPROVING THE DISCLOSURE STATEMENT IS ATTACHED HERETO AS

EXHIBIT "A" AND IS INCORPORATED HEREIN FOR ALL PURPOSES. THE CONDITIONAL APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR A GUARANTEE OF THE ACCURACY AND COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT, EXPRESS OR IMPLIED, IS INTENDED TO GIVE RISE TO ANY COMMITMENT OR OBLIGATION OF THE DEBTORS, THE COMMITTEE, OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED AS CONFERRING UPON ANY PERSON ANY RIGHTS, BENEFITS OR REMEDIES OF ANY NATURE WHATSOEVER. THE DISCLOSURE STATEMENT IS INFORMATIONAL ONLY. ADDITIONALLY, HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. EACH HOLDER OF A CLAIM OR EQUITY INTEREST SHOULD CONSULT THEIR LEGAL, FINANCIAL, AND TAX ADVISORS, AS APPROPRIATE, AS TO ANY MATTER CONCERNING THE PLAN, THE EFFECTS OF IMPLEMENTATION OF THE PLAN AND THE VOTING PROCEDURES APPLICABLE TO THE PLAN.

## Disclosure Regarding Forward-Looking Statements

This Disclosure Statement contains forward-looking statements within the meaning of Section 27A of the Securities Act and Section 21E of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"). All statements, other than statements of historical facts, included in this Disclosure Statement that address activities, events or developments that the Debtors expect, project, believe or anticipate will or may occur in the future are forward-looking statements. These statements can be identified by the use of forward-looking terminology including "may," "believe," "anticipate," "estimate," "continue," "foresee," "project," "could," or other similar words. These forward-looking statements may include, but are not limited to, references to procedures in connection with the Debtors' Chapter 11 Cases and the distribution of the Debtors' assets pursuant to the Plan, the Debtors' financial projections and liquidation analysis, and the Debtors' future operating results. Forward-looking statements are not guarantees of performance. The Debtors have based these statements on the Debtors' assumptions and analyses in light of the Debtors' experience and perception of historical trends, current conditions, expected future developments, and other factors the Debtors believe are appropriate in the circumstances. No assurance can be given that these assumptions are accurate. Moreover, these statements are subject to a number of risks and uncertainties.

All subsequent written and oral forward looking information attributable to the Debtors are expressly qualified in their entirety by the foregoing. In light of these risks, uncertainties and assumptions, the events anticipated by the Debtors' forward-looking statements may not occur, and you should not place any undue reliance on any of the Debtors' forward-looking statements. The Debtors' forward-looking statements speak only as of the date made and the Debtors undertake no obligation to update or revise their forward-looking statements, whether as a result of new information, future events, or otherwise.

# I.
# INTRODUCTION

## A.    Background

On November 19, 2020, Zenergy Brands, Inc.; NAUP Brokerage, LLC; Zenergy Labs, LLC; Zenergy Power & Gas, Inc.; Enertrade Electric, LLC; Zenergy & Associates, Inc.; and Zen Technologies, Inc. (the "**Debtors**") filed the *Debtors' Plan of Liquidation* (the "**Plan**") with the United States Bankruptcy Court for the Eastern District of Texas, Sherman Division (the "**Bankruptcy Court**"), styled as Case Nos. 19-42886, 19-42887, 19-42888, 19-42889, 19-42891, 19-42892, and 19-42893, respectively (collectively, the "**Chapter 11 Cases**").  A copy of the Plan is attached hereto as **Exhibit B**.  The Debtors hereby submit this Disclosure Statement (the "**Disclosure Statement**"), pursuant to section 1125 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1330 (the "**Bankruptcy Code**"), in connection with the solicitation of acceptances or rejections of the Plan from certain holders of Claims against the Debtors.[2]

On October 24, 2019, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, initiating the Chapter 11 Cases. The Chapter 11 Cases are being jointly administered under Case No. 19-42886.  Pursuant to Bankruptcy Code sections 1107(a) and 1108, the Debtors are continuing to operate their businesses and to manage their financial affairs as debtors-in-possession. No trustee or examiner has been appointed in the Chapter 11 Cases.

On November 4, 2019, the United States Trustee for Region 6 (the "**UST**") filed its *Appointment of Official Unsecured Creditors' Committee*, appointing the Committee [ECF No. 69].

The Debtors submit this Disclosure Statement in connection with the solicitation of votes on the Plan. This Disclosure Statement is being mailed to each holder of a Claim against the Debtors. With respect to voting on the Plan, pursuant to the Bankruptcy Code, all holders of Claims in Impaired Classes 3, 4, and 5 under the Plan are entitled to vote.  Because Class 1 and Class 2 Claims are unimpaired under the Plan, pursuant to section 1126(f) of the Bankruptcy Code, the holders of Claims in Class 1 and 2 are conclusively presumed to accept the Plan.  Because Class 6 Claims and Class 7 Claims are impaired under the Plan and are not entitled to receive or retain any property under the Plan, pursuant to section 1126(g) of the Bankruptcy Code, the holders of Claims in Classes 6 and 7 are conclusively presumed to reject the Plan.

The Debtors believe they have promulgated the Plan consistent with the provisions of the Bankruptcy Code. The Debtors believe that the Plan is fair and equitable to all Classes of Claims and Equity Interests under the Plan.

---

[2]   Any capitalized terms not defined herein shall have the meaning ascribed to them in Article 1 of the Plan or the Debtors' Motion for Entry of Order: (I) Conditionally Approving the Disclosure Statement; (II) Establishing Procedures for Solicitation and Tabulation of Votes on Plan; (III) Approving Certain Forms and Notices; and (IV) Scheduling a Combined Hearing on Approval of the Disclosure Statement and Confirmation of Plan, as applicable.

**B.      The Purpose of this Disclosure Statement**

The Bankruptcy Code generally requires the proponent of a chapter 11 plan to prepare and file with the bankruptcy court a "disclosure statement" that provides information of the kind, and in sufficient detail, that would enable a typical holder of claims or interests in a class impaired under the plan to make an informed judgment with respect to the plan.  This Disclosure Statement has been conditionally approved as providing such information, as well as information regarding certain deadlines with respect to confirmation of the Plan.

This Disclosure Statement is not intended to replace careful review and analysis of the Plan.  Rather, it is submitted as an aid and supplement in your review of the Plan, and attempts to explain the terms and implications of the Plan.  Every effort has been made to fully explain the various aspects of the Plan as it may affect holders of Claims and Equity Interests.  All Persons receiving this Disclosure Statement are urged to review all of the exhibits to this Disclosure Statement, in addition to reviewing the text of this Disclosure Statement.  If you have any questions, you may contact counsel for the Debtors.  Contact information for such counsel is set forth within this Disclosure Statement, as well as on the cover page hereof.

Holders of Claims and Equity Interests should read this Disclosure Statement in its entirety prior to voting on the Plan.  No solicitation of votes on the Plan may be made except pursuant to this Disclosure Statement, an Order of the Bankruptcy Court approving this Disclosure Statement, and section 1125 of the Bankruptcy Code.  No other party has been authorized to use any information concerning the Debtors or its operations, assets and liabilities, other than the information contained in this Disclosure Statement, to solicit votes on the Plan.

**C.      Recommendation of the Debtors to Approve the Plan**

The Debtors approve the solicitation of acceptances of the Plan and all of the transactions contemplated thereunder.  In light of the benefits to be attained by the holders of Claims against the Debtors contemplated under the Plan, the Debtors recommend that such holders of Claims vote to accept the Plan.  The Debtors reached this decision after considering the alternatives to the Plan that are available to the Debtors, including a liquidation under chapter 7 of the Bankruptcy Code. The Debtors determined, after consulting with their advisors, that the transactions contemplated in the Plan would likely result in a distribution of greater value to Creditors and stockholders than the alternatives.

THE DEBTORS BELIEVE THAT THE PLAN AND THE TREATMENT OF CLAIMS AND INTERESTS THEREUNDER IS IN THE BEST INTERESTS OF HOLDERS OF CLAIMS AND INTERESTS.

## II.
## VOTING PROCEDURES AND REQUIREMENTS

**A.      Ballots and Voting Deadline**

Each holder of a Claim in an Impaired Class that is entitled to vote on the Plan shall be provided access to a Ballot along with this Disclosure Statement.  If a holder holds Claims or Equity Interests in more than one impaired Class, such Claimant has been provided access to a

separate Ballot for each such Class.  The Ballot is to be used by the Claimant to accept or reject the Plan.  Ballots will be accessible to holders of Claims and Equity Interests as described in the solicitation package.  Each Ballot will contain information specific to each such holder; if a holder's Claim, as listed on the returned ballot, conflicts with the Debtors' schedules and/or books and records, the lower amount of the two shall be used for calculation.

Article XII of the Plan contain releases and injunctions that are described in detail in that article of the Plan and in the definitions of "Released Parties."  Parties should carefully review these release provisions.

To ensure that their ballot is deemed timely and considered, each Claimant must (a) carefully review the Ballot and the instructions set forth thereon, (b) provide all of the information requested on the Ballot, (c) sign the ballot and (d) submit the completed and signed Ballot to the address on the pre-addressed envelope or via email to zenergy@foley.com.

The "Voting Deadline" is **December 21, 2020 at 5:00 p.m**. (CDT).  Therefore, in order for a Ballot to be counted for voting purposes, the completed and signed Ballot must be received at the address specified on the pre-addressed envelope or electronically submitted by the Voting Deadline.

## B.    Claimants Solicited to Vote

Each holder of a Claim in Class 3, Class 4, and Class 5 are impaired and entitled to vote on the Plan.  Claims in Class 1 and Class 2 are unimpaired.  The holders of Allowed Claims in Class 1 and Class 2 are conclusively presumed to have accepted the Plan and the solicitation of acceptances with respect to such Class therefore is not required under section 1126(f) of the Bankruptcy Code.  Holders of Claims in Class 6 and Class 7 will not receive any distribution and are deemed not to have accepted the Plan under section 1126(g).  Class 6 and 7 also consist of Insider Claims and thus, their votes are not calculated when determining whether the Plan has been accepted or rejected.  Holders of Claims valued at an unknown amount, and holders of Disputed Claims, shall not be entitled to vote on the Plan, unless otherwise provided for in the Plan.

An Impaired Class of Claims will have accepted the Plan if:  (i) the holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept the Plan, and (ii) the holders of more than one-half in number of the Allowed Claims actually voting in the Class voted to accept the Plan, not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code.  An Impaired Class of Interest will have accepted the Plan if the holders of at least two-thirds in amount of the Allowed interests actually voting in the Class have voted to accept the Plan, not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code.  A vote may be disregarded if the Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Code.

## C.    Definition of Impairment

Pursuant to section 1124 of the Bankruptcy Code, except to the extent that the holder of a particular claim or equity interest within a class agrees to less favorable treatment of the holder's

claim or equity interest, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan does at least one of the following two (2) things:

1.    The plan leaves unaltered the legal, equitable and contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest; or

2.    Notwithstanding any contractual provision or applicable law that entitles the holder of such claim or equity interest to demand or receive accelerated payment of such claim or equity interest after the occurrence of a default, the plan:

    b.    cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured;

    c.    reinstates the maturity of such claim or equity interest as such maturity existed before such default;

    d.    compensates the holder of such claim or equity interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law;

    e.    if such claim or such equity interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensates the holder of such claim or equity interest (other than the debtors or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and

    f.    does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

## D.    Classes Impaired Under the Plan

The following Classes of Claims are or may be Impaired under the Plan and are entitled to vote on the Plan:

Class 3: Allowed TCA Global Credit Master Fund, LP Claim

Class 4: Allowed TCA Special Situations Claim

Class 5: Allowed Unsecured Claims

Acceptances of the Plan are being solicited only from those holders of Claims in impaired Classes that will or may receive a distribution under the Plan. Accordingly, the Debtors are soliciting acceptances only from holders of Claims in Classes 3, 4, and 5. Because Class 1 and Class 2 Claims are unimpaired under the Plan, pursuant to section 1126(f) of the Bankruptcy Code,

the holders of Claims in Class 1 and Class 2 are conclusively presumed to accept the Plan. Because Class 6 and Class 7 Claims are impaired under the Plan and are not entitled to receive or retain any property under the Plan, pursuant to section 1126(g) of the Bankruptcy Code, the holders of Claims in Class 6 and Class 7 are conclusively presumed to reject the Plan.

With respect to the foregoing, the Debtors specifically reserve the right to determine and contest, if necessary, (a) the Impaired or Unimpaired status of a Class under the Plan, and (b) whether any ballots cast by the holder of a Claim within such a Class should be counted for purposes of confirmation of the Plan.

### E.    Vote Required for Class Acceptance

Pursuant to section 1126(c) of the Bankruptcy Code, a Class of Claims under the Plan shall be deemed to have accepted the Plan if the Plan is accepted by claimants holding at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims within such Class held by claimants that have accepted or rejected the Plan.

Pursuant to section 1126(e) of the Bankruptcy Code, on request of a party in interest in the Chapter 11 Cases, and after notice and a hearing, the Bankruptcy Court may designate the vote of any Claimant whose acceptance or rejection of the Plan was not: (a) in good faith; (b) solicited or procured in good faith; or (c) made in accordance with the provisions of the Bankruptcy Code.

### F.    Absolute Priority Rule

Under the Bankruptcy Code, a plan must be fair and equitable with respect to each impaired, nonaccepting class of claims or interests. Often referred to as the "absolute priority rule," this concept generally provides that a nonaccepting class of holders of claims or interests cannot be compelled to accept less than full compensation while a more junior creditor or equity holder receives a distribution or retains its interest in the debtors.

### III.
### CONFIRMATION OF THE PLAN

### A.    Combined Disclosure Statement and Confirmation Hearing

Section 1125 of the Bankruptcy Code requires the Bankruptcy Court to determine whether the Disclosure Statement contains "adequate information." The Bankruptcy Court has already conditionally approved the Disclosure Statement. Any party in interest may object to the adequacy of the Disclosure Statement.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan. A hearing for approval of the solicited Disclosure Statement will be heard together with a hearing on confirmation of the plan (together, the "**Confirmation Hearing**").

The Confirmation Hearing has been requested to be scheduled to commence on **December 28, 2020 at 10:00 a.m. (CDT)**, before the Honorable Brenda T. Rhoades, United States

Bankruptcy Judge for the Eastern District of Texas, United States Bankruptcy Court, United States Courthouse, Suite 300B, 660 North Central Expressway, Plano, TX 75074. Any objection to confirmation of the Plan must be made in writing, and such written objection must be filed with the Bankruptcy Court and **received** by the following parties by not later than **December 21, 2020 at 5:00 p.m. (CDT)**:

|  |  |
|---|---|
| **Debtors:** | **With copies to:** |
| Zenergy Brands, Inc., *et al.*<br>c/o Joshua Campbell<br>5700 Granite Pkwy, #200<br>Plano, TX 75024 | Marcus A. Helt<br>Jack Haake<br>Foley & Lardner<br>2021 McKinney Avenue, Suite 1600<br>Dallas, TX 75201 |
| **Committee:** | Joseph Coleman<br>Kane Russell Coleman Logan PC<br>901 Main Street, Suite 5200<br>Dallas, TX 75202 |
| **United States Trustee:** | John Vardeman<br>Office of the United States Trustee<br>300 Plaza Tower<br>110 North College Avenue<br>Tyler, TX 75702 |

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY FILED AND SERVED, IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

**B.      Requirements for Approval of the Disclosure Statement**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Disclosure Statement contains "adequate information" such that section 1125 of the Bankruptcy Code has been satisfied.

"Adequate information" is defined within section 1125 of the Bankruptcy Code as: "[I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests[3] in the case, that would enable such a hypothetical investor of the relevant class to make an informed

---

[3]   Section 1125 further defines an "investor typical of holders of claims or interests of the relevant class" as an "investor having – (A) a claim or interest of the relevant class; (B) such a relationship with the debtor as the holders of other claims or interests of such class generally have; and (C) such ability to obtain such information from sources other than the disclosure required by [§ 1125] as holders of claims or interests in such class generally have." 11 U.S.C. § 1125(a)(2).

judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information." 11 U.S.C. § 1125(b).

The Debtors believe that the Disclosure Statement satisfies the applicable statutory requirements and provides information in a manner that provides holders of impaired claims that are entitled to vote to accept or reject the Plan with adequate information within the meaning of section 1125 of the bankruptcy Code.

## C.    Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements of section 1129(a) of the Bankruptcy Code have been satisfied. Only in the event that all of these requirements have been satisfied, and that all other conditions to confirmation set forth in the Plan have been met, will the Bankruptcy Court enter an Order confirming the Plan under section 1129(a). The requirements of section 1129(a) applicable to a corporate debtor are as follows:

1.    The plan complies with the applicable provisions of the Bankruptcy Code.

2.    The proponent of the plan complies with the applicable provisions of the Bankruptcy Code.

3.    The plan has been proposed in good faith and not by any means forbidden by law.

4.    Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

5.    The proponent of the plan has disclosed:

a.    the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer or voting trustee of the debtors, an affiliate of the debtors participating in a joint plan with the debtors, or a successor to the debtors under the plan, and the appointment to, or continuance in, such office of such individual, is consistent with the interests of Creditors and Equity Interest holders and with public policy; and

b.    the identity of any insider that will be employed or retained by the Debtor, and the nature of any compensation for such insider.

6.      Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtors have approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

7.      With respect to each impaired class of claims or interests:

   a.      each holder of a claim or equity interest of such class has accepted the plan or will receive or retain under the plan on account of such claim or equity interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code on such date; or

   b.      if section 1111(b)(2) of the Bankruptcy Code applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

8.      With respect to each class of claims or interests, such class has accepted the plan or such class is not impaired under the plan.

9.      Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that:

   a.      with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of the Bankruptcy Code, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

   b.      with respect to a class of claims of a kind specified in section 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code, each holder of a claim of such class will receive (i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim, or (ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim;

   c.      with respect to a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code, the holder of such claim will receive on account of such claim regular installment payments in cash (i) of a total value, as of the effective date of the plan, equal to the allowed amount of such claim, (ii) over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303 of the Bankruptcy Code, and (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of Creditors under section 1122(b) of the Bankruptcy Code); and

       d.      with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8) of the Bankruptcy Code, but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in paragraph 9(c) above.

10.      If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

11.      Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtors or any successor to the debtors under the plan, unless such liquidation or reorganization is proposed in the plan.

12.      All fees payable under section 1930 of Title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

13.      The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of the Bankruptcy Code, at any time prior to confirmation of the plan, for the duration of the period the Debtors have obligated themselves to provide such benefits.

14.      All transfers of property under the plan shall be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

If a sufficient number of claimants and amounts of Claims in impaired Classes under the Plan vote to accept the Plan, the Debtors believe that the Plan will satisfy all of the applicable statutory requirements of section 1129(a) of the Bankruptcy Code. As discussed below, however, the Debtors believe that the Plan may be confirmed under the "cramdown" provisions of section 1129(b) of the Bankruptcy Code.

**D.**    **Cramdown**

Pursuant to section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm the Plan at the request of the Debtors if: (a) all of the requirements of section 1129(a) of the Bankruptcy Code, with the exception of section 1129(a)(8), are met with respect to the Plan; (b) at least one Class of Claims that is impaired under the Plan has accepted the Plan (excluding the votes of insiders); and (c) with respect to each impaired Class that has not accepted the Plan, the Plan does not "discriminate unfairly" and is "fair and equitable."

A plan does not "discriminate unfairly" within the meaning of the Bankruptcy Code if the classification of claims under the plan complies with the Bankruptcy Code and no particular class will receive more than it is legally entitled to receive for its claims or interests.

"Fair and equitable," on the other hand, has a different meaning for classes of secured claims, classes of unsecured claims and classes of equity interests, as described below:

1.　　With respect to a class of secured claims that rejects the plan, to be "fair and equitable" the plan must, among other things, provide:

　　　a.　　that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

　　　b.　　for the realization of such holders of the indubitable equivalent of such claims; or

　　　c.　　for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under (a) or (b) above.

2.　　With respect to a class of unsecured claims that rejects the plan, to be "fair and equitable" the plan must, among other things, provide:

　　　a.　　that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

　　　b.　　that the holder of any claim or equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or equity interest any property.

3.　　With respect to a class of equity interests that rejects the plan, to be "fair and equitable" the plan must, among other things, provide:

　　　a.　　that each holder of an equity interest of such class receive or retain on account of such equity interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such equity interest; or

　　　b.　　that the holder of any equity interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior equity interest any property.

In the event that at least one impaired Class of Claims under the Plan accepts the Plan, the Debtors may request the Bankruptcy Court confirm the Plan in accordance with the cramdown provisions of section 1129(b) of the Bankruptcy Code. The Debtors believe that all of the requirements of section 1129(a) of the Bankruptcy Code (with the exception of section 1129(a)(8)) will be satisfied, that at least one Class of impaired Claims will accept the Plan (excluding the votes of insiders), and that the Plan does not unfairly discriminate against and is fair and equitable in relation to each of the Classes that may vote to reject the Plan.

## IV.
## PLAN OVERVIEW

In October 2019, after consulting with the Debtors' senior secured lender, TCA Global Credit Master Fund, LP ("**TCA Global**"), and after weighing various alternatives, the Debtors made the decision to commence the Chapter 11 Cases.

The goal in filing these Chapter 11 Cases was to maximize recoveries for all parties-in-interest. While a traditional restructuring is no longer possible, the goal of these Chapter 11 Cases has not changed—the Plan will maximize recoveries for all parties-in-interest.

The Plan will effect an orderly wind down of the Debtors' business operations, a controlled liquidation of all Collateral, including the transfer of certain assets to Eco Investments, LLC, and the transfer of all Causes of Action to the Liquidation Trust. Pursuant to the terms of the Plan:

1. The Plan is being provided for all of the Debtors and the Debtors are seeking that the Court approve Plan Consolidation such that voting and distributions each and every Claim filed or to be filed in the Chapter 11 Cases against any of the Consolidated Debtors shall be deemed filed against the Consolidated Debtors collectively and shall be one Claim against and, if and to the extent allowed, shall become one obligation of the Consolidated Debtors.

2. Pursuant to section 1123(a)(5) of the Bankruptcy Code, the Debtors shall sell and transfer the Transferred Assets to Eco Investments for (i) $500,000, (ii) issuance to holders of the Allowed Unsecured Claims membership interests totaling 9% of the issued and outstanding membership interests of Eco Investment as of the Closing Date, and (iii) Eco Investment fulfilling the servicing requirements in the Residual MESAs.

3. Eco Investments shall obtain the $500,000 that will be transferred to the Debtors' Estates by selling the Floresville ISD MESA, which shall be one of the assets included in the Transferred Assets, to the Floresville ISD MESA Purchaser. Each MESA has a financing and servicing obligation. Eco Investment shall undertake the servicing obligation of the Floresville ISD MESA to facilitate the sale and transfer of the Transferred Assets. Eco Investments shall also receive a portion of the sale price of the Floresville ISD MESA for undertaking this servicing obligation.

4. The Liquidation Trust will be established and a trustee of the Liquidation Trust will be appointed upon Confirmation.

5.      All Remaining Assets, including Causes of Action, all rights to challenge the extent, priority and validity of alleged liens, and all collateral not surrendered under the terms of this Plan will be transferred to the Liquidation Trust and the Liquidation Trustee.

6.      All holders of Allowed Administrative Claims will be paid from liquidation proceeds.

7.      The Liquidation Trust shall be solely obligated to object to, reconcile and resolve all Unsecured Claims such that all such claims shall become Allowed Unsecured Claims.   Upon completion of the Claims objections and reconciliation, the Liquidation Trust shall provide Eco Investments with a final list of all Allowed Unsecured Claims for purposes of pro rata distribution of the Creditor Membership Interests.

8.      All holders of Allowed Unsecured Claims will receive a beneficial interest in the Liquidation Trust equal to the pro rata amount of their Allowed Unsecured Claim, and the Liquidation Trustee will make distributions to all Allowed Unsecured Claims in Class 11 pursuant to the terms and conditions of this Plan and a Liquidation Trust Agreement.  The beneficial interests in the Creditors Trust shall be uncertificated and non-transferable.

9.      Eco Investments shall issue to holders of the Allowed Unsecured Claims membership interests totaling 9% of the issued and outstanding membership interests of Eco Investment as of the Closing Date.

10.     TCA Global's Unsecured Claim is a Disputed Claim.  To the extent Allowed, TCA Global's Claim shall be treated as a subordinated Claim pursuant to 11 U.S.C. § 510(c) to all unclassified Claims, including Allowed Administrative Claims, and Allowed Claims in Class 1, Class 2, and Class 5 and shall not receive any payment unless and until all unclassified Claims, including Allowed Administrative Claims, and Allowed Claims in Class 1, Class 2, and Class 5 are paid in full, at which time the Class 3 Claim shall be satisfied by a Pro Rata Share of Distributions from the remaining Liquidation Trust Assets.  All Causes of Action against TCA Global are reserved under this Plan.

11.     TCA Special Situations Claim shall be subordinated pursuant to 11 U.S.C. §510(c) to all unclassified Claims, including Allowed Administrative Claims, and Allowed Claims in Class 1, Class 2, and Class 5.  Holders of the TCA Special Situations Claim will receive no Distribution under the Plan on account of its subordinated claim unless and until all unclassified Claims, including Allowed Administrative Claims, and Allowed Claims in Class 1, Class 2, and Class 5 are paid in full, at which time the Class 3 Claim shall be satisfied by Pro Rata Share of Distributions from the remaining Liquidation Trust Assets.  All Causes of Action against TCA Special Situations are reserved under this Plan.

12.  All Equity Interests will be cancelled on the Effective Date, and no holder of an Equity Interest shall receive a Distribution on account of such Equity Interest unless and until all Allowed Claims in Classes 1-5 are paid in full.

All Causes of Action not otherwise compromised, settled and released pursuant to this Plan are hereby preserved.

### *Committee Settlement*

The Plan further provides for the settlement of claims against the Debtor by the Unsecured Creditor's Committee. The Committee has agreed to settle its claims against the Debtors, a summary of the material terms and conditions of the settlement are as follows:

| | |
|---|---|
| **Summary of Transaction**: | Debtor would sell and assign to Eco Investments all of its interest in the Transferred Assets. |
| **Purchase Price**: | On the Closing Date, Eco Investments would pay or enter into a transaction such that the Debtor is paid $500,000 in immediately available funds, subject to higher and better bids as required by Section 363 of the Bankruptcy Code in exchange for the Debtor selling and assigning the Transferred Assets, including the Floresville ISD MESA, to Eco Investments. |
| **Use of Proceeds**: | Upon Bankruptcy Court approval of the Transaction, Debtor would use the Purchase Price proceeds as follows: |
| | 1. The proceeds of the Purchase Price shall satisfy 100% of all Allowed Administrative Claims in the Bankruptcy Proceeding with all remaining funds, if any, distributed to the Liquidation Trust. |
| **Liquidation Trust**: | In connection with the Transaction, the Plan shall establish the Liquidation Trust.  The Liquidation Trust Assets shall include the following, without limitation, (i) the Residual MESAs; (ii) any and all of the Debtors' or the Estates' Causes of Action, Avoidance Actions, Retained Insurance Causes of Action, and insurance coverages and insurance proceeds related thereto (including without limitation coverage and/or proceeds under D&O Liability Insurance Policies); (iii) $10,000 Cash to be funded by Eco Investments at Confirmation in addition to the Additional Funds; and (iv) any Remaining Assets not listed in (i) through (iii). |
| **Servicing of Liquidation Trust Residual MESAs**: | On the Closing Date, Bridgeway Solutions, LLC ("**Bridgeway Solutions**"), a wholly owned subsidiary of Eco Investment, and the Liquidation Trust will enter into a servicing or subcontracting agreement pursuant to which Bridgeway Solutions will agree to |

perform all servicing obligations of the (i) Floresville ISD MESA and (ii) Residual MESA's on behalf of the Liquidation Trust.

**Creditors Member-Ship Interest**

On the Closing Date, or as soon as all Unsecured Claims are fully reconciled, objected to and otherwise deemed Allowed, as appropriate, Eco Investments shall issue each Creditor holding an Allowed Unsecured Claim their *Pro Rata* share of Creditor Membership Interests.[4]  In connection with the foregoing, the Liquidation Trust shall be solely obligated to object to, reconcile and resolve all Unsecured Claims to determine the final amount of Allowed Unsecured Claims.  Upon completion of the Claims objections and reconciliation, the Liquidation Trust shall provide Eco Investments with a final list of all Allowed Unsecured Claims for purposes of Pro Rata distribution of the Creditor Membership Interests.

**Other Obligations of Joshua Campbell to Liquidation Trust**:

Joshua Campbell will to his best ability fully cooperate with the Liquidation Trust.  Joshua Campbell will agree to fully support any litigation, against any party, including Alex Rodriguez or any of the Liquidation Trust's claim objections.

**Amendment and Restatement of Eco Investment LLC Agreement**:

On the Closing Date, Eco Investments will amend and restate its limited liability company agreement to include the following terms and conditions:

1. Eco Investment would be a "member-managed" LLC.

2. Eco Investment would have a single class of membership interests.

3. As discussed above, Eco Investments will issue the applicable creditors their Pro Rata share of the Creditor Membership Interests based upon such Creditors' Allowed Unsecured Claims.

4. At the discretion of the members and based on voting rights wherein a distribution is approved, distributions would be payable to the members, including Creditor Membership Interests, pro rata in proportion to their membership interests.  No distributions or dividends may be made to other managers, officers or members of Eco Investments unless same are also made to holders of Creditor Membership Interests.

5. The Eco Investments managers and members shall not amend the LLC Agreement or take any other actions that: (a) at any time would cause the Creditor Membership Interests to be less than 7% of the issued and outstanding membership interests of Eco Investments; (b) create a new class of interests superior to the Creditor Membership Interests; (c) change the distribution waterfall; (d) change the capital account of the creditors holding

---

[4] The Creditor Membership Interests are also referred to in the Plan as "**Units**" or "**Eco Investments Equity**."

the Creditor Membership Interests; or (e) are otherwise detrimental to the Creditor Membership Interests.

6. No holder of Creditor Membership Interests can transfer their interest without the written consent of a majority of the other members.

7. Beginning as of the fiscal year of Eco Investments ending December 31, 2024, and twenty-four months thereafter on December 31, 2026 (each a "**Valuation Period**"), unless the Creditor Membership Interests have all been redeemed in accordance with Section 8 below, Eco Investments shall commission a valuation by an independent third party appraiser reasonably acceptable to both Eco Investments and the Creditor Representative. Such valuation shall be completed within 60 days of the last day of the respective Valuation Period. The Valuation Period applicable to the close of business December 31, 2026 shall be referred to as the "**Final Valuation Period**."

8. On or before April 30 of the applicable Valuation Period, Eco Investments shall deliver Put Offer to the holders of the Creditor Membership Interests of the respective Valuation Periods, and such Persons shall have the right, but not the obligation, to put (in its sole and absolute discretion) their respective Creditor Membership Interests to Eco Investments in exchange for the Put Purchase Price. Notwithstanding the foregoing, Eco Investments shall be entitled, but not required, to submit a Put Offer to the holders of Creditor Membership Interests at any time prior to the Final Valuation Period where such Put Offer enables such holder to receive 60% or greater of their Allowed Unsecured Claim.

9. If any of the Creditors holding the Creditor Membership Interests elect to exercise their put and obtain payment for their Creditor Membership Interest, Eco Investments shall have the option to pay the Put Purchase Price in equal monthly installments pursuant to the terms of a promissory note with an 18 month term, at 0% interest unless there is a payment default, at which time interest shall accrue at 15% per annum. Such promissory note shall provide, among other terms, that: (i) Eco Investments, as maker, shall have a thirty (30) day grace period before Eco Investments is in default; and (ii) no payee of the Put Purchase Price promissory note shall be required to provide Eco Investments with any notice of default of any kind or character.

10. The original members of Eco Investments shall not sell or otherwise transfer their ownership interests in Eco Investments until after the Final Valuation Period and related Put Offer has been completed.

11. Joshua Campbell and other key personnel of Eco Investments shall sign a non-compete reasonably satisfactory to the Liquidation Trustee at the closing of the Transaction.

12. Until such time as the Final Valuation Period is complete, Creditor Membership Interest holders shall be entitled to a Creditor Representative to meet with Eco Investments quarterly to learn about Eco Investments' revenues, expenses, capital expenses, working capital and such other matters impacting the Creditor Membership Interests. Management for Eco Investments shall meet with the Creditor Representative on a quarterly basis. The initial Creditor Representative shall be Michael Ziegler, who shall be authorized to name a replacement therefore or otherwise the Liquidation Trustee shall constitute the Creditor Representative should Michael Ziegler refuse or be unable to serve and fails to name a replacement.

13. After the Final Valuation Period is complete, all holders of Creditor Membership Interests who did not accept a Put Offer, shall constitute members of Eco Investments, the same as all other members.

The Debtors believe that the terms of the Committee Settlement are fair and equitable and in the best interests of the Estates. As a result, the Debtors are requesting that the Committee Settlement be approved by the Bankruptcy Court in the Confirmation Order pursuant to Bankruptcy Rule 9019(b).

### *Eco Investments Transaction*

Pursuant to section 1123(a)(5) of the Bankruptcy Code, the Debtors shall (i) enter into an assumption and assignment agreement with Eco Investments to sell the Floresville ISD MESA to the Floresville ISD MESA Purchaser, free and clear of all liens and encumbrances, for the Purchase Price and (ii) enter into an asset purchase agreement with Eco Investments to sell the Transferred Assets to Eco Investments, free and clear of all liens and encumbrances, for a purchase price consisting of the issuance of membership interests in Eco Investments (representing 9% of the outstanding units of Eco Investments) (the "**Units**") and an agreement to service the Residual MESAs.

### *Liquidation Trust*

As noted above, the Plan also provides for the creation of the Liquidation Trust to hold the Liquidation Trust Assets, which include: all Assets of the Debtors, except for the Transferred Assets, including any Avoidance Actions and Causes of Action, transferred to the Liquidation Trust as of the Effective Date to be liquidated and proceeds therefrom distributed by the Liquidation Trustee for the benefit of Creditors pursuant to the terms of the Plan and Liquidation Trust Agreement. The Liquidation Trust will be governed by the Liquidation Trust Agreement, which will be filed as a supplement to the Plan. The Plan provides that Liquidation Trust will be funded with the Liquidation Trust assets.

The Debtors believe the provisions of the Plan and related Plan documents governing the establishment of the Liquidation Trust are reasonable and necessary in achieving the purposes of the Plan.  The Debtors believe the provisions of the Plan authorizing the retention of and payment to professionals by the Liquidation Trust and the reimbursement and compensation to the persons provided for in the Plan, will be relatively minimal in comparison to the expected recovery to holders of Claims against the Debtors.

The Liquidation Trustee will make Distributions to the holder of each Allowed Claims, if any, according to the Classes and treatment specified for such Class set forth in the Plan according to the priorities specified in the Bankruptcy Code.  Under the Plan, the Debtors will be "Deemed Consolidated" solely for the purpose of this Plan such that each and every Claim filed against any of the Debtors will be deemed filed against the Deemed Consolidated Debtors and so shall be one Claim against the Deemed Consolidated Debtors with right, upon allowance, to payment from the Deemed Consolidated Debtors in accordance with the terms provided in the Plan.

The Plan specifies the means for accomplishing these objectives, and pertinent provisions of the Plan in relation thereto are described in detail in this Disclosure Statement.  The Plan divides Claims against the Debtors into seven (7) separate Classes of Claims and Equity Interests, and then sets out the treatment to be provided to each such Class under the Plan.  Sections 1122 and 1123 of the Bankruptcy Code require such classification and mandate that each Class of Claims or Equity Interests contains Claims and Equity Interests that are substantially similar to one another.  The various Classes of Claims and Equity Interests and the treatment provided under the Plan to each such Class are discussed in greater detail in later sections of this Disclosure Statement.

The following table sets out the Debtors' estimate of the total Allowed amount of Claims and Equity Interests falling within each Class (as asserted or scheduled), and summary of the treatment afforded to each Class under the Plan.  The information set forth within the table is qualified in its entirety by the more detailed information regarding the Plan set forth in this Disclosure Statement, the exhibits hereto (including the Plan itself) and the additional disclosures which follow the table.

| SUMMARY OF TREATMENT OF CLASSES UNDER THE PLAN | | |
|---|---|---|
| **Class** | **Estimated Amounts** | **General Treatment Under Plan**[5] |
| Unclassified – Allowed Priority Tax Claims | Est. Allowable Claims: $10,000<br><br>Est. recovery: 100% | Except to the extent that a holder of an Allowed Priority Tax Claim has been paid prior to the Effective Date, and unless otherwise agreed to in writing by the Debtors and the holder of such Claim, each holder of an Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in § 1129(a)(9)(C) of the Bankruptcy Code after the later of (i) the Effective Date and (ii) the date on which such Priority Tax Claim is Allowed ("**Payment Trigger Date**"), with the maturity date by which all payments due to be no later than the last day of the twenty-fourth month after the Payment Trigger Date.  At the discretion of the Debtor, payment in full of the total balance due on any such Priority Tax Claim may be made without penalty. |

---

[5] Allowable Claims means Claims that are or may become Allowed Claims as defined by the Plan.

| SUMMARY OF TREATMENT OF CLASSES UNDER THE PLAN | | |
|---|---|---|
| **Class** | **Estimated Amounts** | **General Treatment Under Plan[5]** |
| Unclassified – Allowed Administrative Claims | Est. Allowable Claims :$30,000<br><br>Est. recovery: 100% | Allowed Administrative Claims arising in the ordinary course of the Debtors' Business shall be paid upon the date on which such Claims become due in the ordinary course, in accordance with the terms and conditions of any agreement relating thereto or upon such other dates and terms as may be agreed upon by the holders of such Allowed Administrative Claims.  All other holders of Allowed Administrative Claims (with the exception of the professionals who will be paid 100% of the amount allowed by the Court upon application to the Court and those Claims otherwise specifically dealt with in the Plan. Holders of Allowed Administrative Claims shall be paid 100% of their respective Allowed Administrative Claims in Cash, unless otherwise ordered by the Court or agreed to by the holder of such Claim, upon the latter of (i) the Effective Date, or, (ii) the date on which an order approving payment of such Allowed Administrative Claim becomes a Final Order.  Allowed Administrative Claims shall be paid, first, from retainers currently held by professionals and, second, to the extent said retainers are insufficient to satisfy the Allowed Administrative Claims, from paid from liquidation proceeds. |
| Class 1 – Priority Non-Tax Claims | Est. Unpaid and Allowable Claims (including Allowed Professional Compensation and Reimbursement Claims): $0<br><br>Est. recovery: 100% | Each Allowed Priority Non–Tax Claim shall be unimpaired under the Plan and, pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable and contractual rights to which such Claim entitles the holder in respect of such Claim shall be fully reinstated and retained, and such Allowed Priority Non–Tax Claim (including any amounts to which such holder is entitled pursuant to section 1124(2) of the Bankruptcy Code) shall be paid in full in accordance with such reinstated rights on the Effective Date |

| SUMMARY OF TREATMENT OF CLASSES UNDER THE PLAN | | |
|---|---|---|
| **Class** | **Estimated Amounts** | **General Treatment Under Plan**[5] |
| Class 2 – All Other Secured Claims | Est. Allowable Claims: $2,167.47<br><br>Est. recovery: 100% | Except to the extent that the holder of an Allowed Other Secured Claim agrees to less favorable treatment, each Allowed Other Secured Claim shall, on the Distribution Date, be reinstated or rendered unimpaired in accordance with section 1124 of the Bankruptcy Code as against the applicable Debtor or its successor in interest under the Plan, notwithstanding any contractual provisions or applicable non–bankruptcy law that entitles the holder of an Other Secured Claim to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of a default. All Allowed Other Secured Claims that are not due and payable on or before the Distribution Date shall, at the Debtors' option, be paid (a) in the ordinary course of business in accordance with the course of practice between the Debtors and such holder with respect to such Claims, or (b) by transfer of the collateral securing such Claim to the holder of such Claim, each in full and complete satisfaction, settlement and release of, and in exchange for, such Claim. |

| SUMMARY OF TREATMENT OF CLASSES UNDER THE PLAN | | |
|---|---|---|
| **Class** | **Estimated Amounts** | **General Treatment Under Plan**[5] |
| Class 3 –TCA Global Claim | Est. Allowable Claim: $0

Est. recovery: 0%

Class 3 consists of the disputed TCA Global Claim filed as Claim 21 against the Debtors in the amount of $5,686,755.91. The Debtors object to this Claim and have requested subordination of any Allowed amounts based on causes of action the Debtors have against TCA Global regarding certain business practices and failed funding promises relating to the Chapter 11 Cases. | To the extent the TCA Global Claim is Allowed, it will be subordinated pursuant to 11 U.S.C. §510(c) to Class 5 Claims. Holders of the TCA Global Claim will receive no Distribution under the Plan on account of its subordinated claim unless and until all unclassified Claims, Allowed Administrative Claims, and Allowed Claims in Class 1, Class 2, and Class 5 are paid in full, at which time the Class 3 Claim shall be satisfied by Pro Rata Share of Distributions from the remaining Liquidation Trust Assets. All Causes of Action against TCA Global are reserved under this Plan. |

| SUMMARY OF TREATMENT OF CLASSES UNDER THE PLAN | | |
|---|---|---|
| **Class** | **Estimated Amounts** | **General Treatment Under Plan**[5] |
| Class 4 – TCA Special Situations Claims | Est. Allowable Claims: $0<br><br>Est. Recovery: 0%<br><br>Class 4 consists of the TCA Special Situations' Claim arising from DIP Financing in the amount of $2,100,000. The Debtors object to this Claim and have requested subordination of any Allowed amounts based on causes of action the Debtors have against TCA Special Situations regarding TCA Special Situations' failure to perform under the Final DIP Order and failed funding promises relating to the Chapter 11 Cases. | To the extent the TCA Special Situations Claim is Allowed, it will be subordinated pursuant to 11 U.S.C. §510(c) to Class 5 Claims. Holders of the TCA Special Situations Claim will receive no Distribution under the Plan on account of its subordinated claim unless and until all unclassified Claims, Allowed Administrative Claims, and Allowed Claims in Class 1, Class 2, and Class 5 are paid in full, at which time the Class 3 Claim shall be satisfied by Pro Rata Share of Distributions from the remaining Liquidation Trust Assets. All Causes of Action against TCA Special Situations are reserved under this Plan. |

| SUMMARY OF TREATMENT OF CLASSES UNDER THE PLAN | | |
|---|---|---|
| **Class** | **Estimated Amounts** | **General Treatment Under Plan[5]** |
| Class 5 – Allowed Unsecured Claims | Est. Allowable Claims: $5.8 million<br><br>Est. Recovery: 0-30% plus membership interest in Eco Investments<br><br>The 30% recovery assumes that the Liquidation Trust is successful in asserting certain Causes of Action. | In full satisfaction, settlement, release, extinguishment and discharge of such Claim, the holder of the Allowed Unsecured Claim shall receive (i) a Pro Rata Liquidation Trust Interest equal to the Pro Rata amount of their Allowed Unsecured Claim, and the Liquidation Trustee will make distributions to all Allowed Unsecured Claims in Class 5 pursuant to the terms and conditions of this Plan and a Liquidation Trust Agreement, and (ii) issuance to holders of the Allowed Unsecured Claims membership interests totaling 9% of the issued and outstanding membership interests of Eco Investments as of the Closing Date pursuant to the terms set forth in the Committee Settlement. |
| Class 6 –Intercompany Claims | Est. Allowable Claims: $0<br><br>Est. Recovery: 0% | On the Effective Date, all Intercompany Claims shall be canceled, and the holders of such Intercompany Claims shall receive no distribution on account of such Claims |
| Class 7 – Allowed Equity Interest | Est. Allowable Claims: Unknown<br><br>Est. recovery: 0% | On the Effective Date, all Allowed Equity Interests in the Debtors shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and the holders of Allowed Equity Interests shall receive no distribution. |

### Factors and Assumptions Applied in Arriving at Estimates

The estimated Claims that may be an Allowed Claim (each an "**Allowable Claim**") per Class in the foregoing table have been derived from the Schedules for the Debtors' Estates prepared by the Debtors and their Professionals using information from the Debtors' books and records and other information available to them, as well as Proofs of Claims filed by claimants in the Chapter 11 Cases and Orders entered by the Bankruptcy Court.

Forty-three (43) Proofs of Claim have been filed in the Chapter 11 Cases, totaling approximately $8.7 million. The aggregate total of the amounts of claims scheduled by the Debtors is approximately $11.9 million and the Debtors received $2.1 million in DIP Financing. For those claimants listed on the Schedules who have also filed Proofs of Claim in the Chapter 11 Cases, applicable Bankruptcy Rules provide that the Proofs of Claim have superseded any amounts

reflected in the Schedules.  To the extent Claims scheduled by the Debtors have not been superseded by Proofs of Claim, the estimates in the foregoing table take into account Claims scheduled in a liquidated, non-contingent and undisputed amount.  As the Plan is on a consolidated basis, the same Claim that has been filed against multiple Debtors has only been counted once. Where duplicative or amended Claims appear to have been filed, including scheduled Claims, the foregoing estimates assume that duplicates and superseded Claims will be disallowed in favor of, at most, a single surviving Claim.  The estimates also include application of merit-based objections known to the Debtors and their counsel as of the date of this Disclosure Statement and, therefore, constitute their best estimate, as of the date of filing of this Disclosure Statement, of the ultimate allowable amount of Claims in each such Class.

The ultimate resolution of Claims is inherently uncertain.  Moreover, the Debtors have not completed their evaluation of all Claims and cannot presume the validity of merit-based disputes or objections thereto.  Any Claim that is a Disputed Claim may be disallowed or reduced in amount if an objection has been or is timely hereafter filed and sustained by the Bankruptcy Court. Because the resolution of Disputed Claims involves many factual and legal issues, which may or may not be resolved as anticipated, no assurance can be given that the anticipated amount of Allowable Claims in each Class would be achieved were these assumptions included in the foregoing estimates.  The Debtors believe that the ultimate universe of Allowed Claims will be substantially lower than the face amount of the filed Proofs of Claims, and that the current estimates of Allowable Claims shown herein above in each Class are reasonably precise given the particular circumstances.

Notwithstanding, the foregoing estimates contained herein shall not be deemed as any admission on the part of the Debtors, the Estates, or the Liquidation Trustee as to the validity of any Claim.  Similarly, the projected recovery levels reflected in the table above are estimates only, there is no guaranty that such levels of recovery will be achieved, and such estimates shall not constitute an admission on the part of the Debtors or the Estate to the validity of any Disputed Claims.  Any Claim that is not Allowed by an Order of the Bankruptcy Court or pursuant to a settlement approved by an Order of the Bankruptcy Court may be disallowed or reduced in amount if an objection has been, or is timely hereafter, filed and sustained by the Bankruptcy Court. Except as otherwise provided in the Plan, all objections and other defenses to Disputed Claims are preserved under the Plan.

## V.
## HISTORICAL AND BACKGROUND INFORMATION

**A.     The Debtors' Business**

Zenergy Brands is a next-generation energy and technology company engaged in the business of selling energy-conservation products and services to commercial, industrial, and municipal customers.  Zenergy Brands is a business-to-business company, whose business platform is a combined offering of energy services and smart controls.  Zenergy Brands offers a unique value proposition to commercial, industrial, and municipal customers whereby it offers a means to reduce their utility expenses anywhere from 20% up to 60% through energy-efficient and smart-control products and services. Zenergy Brands is a public company, fully reporting to the SEC and previously traded on the OTCQB.  On November 10, 2020 the Bankruptcy Court entered

an order granting the *Debtors' Motion Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedures for (1) Approval of a Consent Agreement with the Securities and Exchange Commission; (II) Limited Relief from the Automatic Stay; and (III) Authority to De-Register as a Public Company* (the "**De-Registration Motion**").

The foundation of Zenergy Brands business is its "Zero-Cost Program." This is a turnkey solution that enables its target customers to upgrade their older, inefficient equipment and assets, allowing for installation of energy-efficient retrofits such as HVAC and refrigeration motor controllers, load-factor improvement technologies, building-envelope-based technologies, weatherization-based technologies, smart controls, and LED lighting, all at no up-front cost to its customers.

The Zero-Cost Program is facilitated through an industry-standard agreement referred to as a Managed Energy Services Agreement (each a "**MESA**"). Under a MESA, Zenergy Brands is obligated to develop, arrange financing for, install, and maintain all energy-efficiency measures and equipment installed by Zenergy Brands. Zenergy Brands retains ownership of all installed equipment. The minimum term of a MESA is five years with an expected average of seven years. Under the terms of the MESA, Zenergy Brands' customers are obligated to pay Zenergy Brands a portion of their savings in utility costs following the installation of Zenergy Brand's equipment; these are referred to as "Service Payments." Service Payments are fixed payments made on a monthly basis over the term of the agreement from the customer to Zenergy Brands. These payments scale down over the term of the MESA, allowing the customer to reap more and more of the dollar savings from the respective utility company each year.

Zenergy Brands is a Nevada corporation that was publicly traded. Zenergy Brands has issued two classes of common stock, Class A Common Stock and Class B Common Stock, and one class of Preferred Series A stock. Class A Common Stock is publicly traded, and there are currently 5,513,577,153 shares outstanding. Class B Common Stock may be owned by Alex Rodriguez, Zenergy Brands' former chief executive officer, and is held as collateral by TCA Global, the Debtors' first-lien secured lender, or an affiliate of TCA Global. There are 10,000,000 outstanding shares of Class B Common Stock. Zenergy Brands has 600,000 outstanding Preferred Series A Shares. Each share of the Class A Common Stock has one vote per share, and each share of the Class B Common Stock has 500 votes per share.

Prior to August 2019, Alex Rodriguez was the chief executive officer of Zenergy Brands and its related affiliate debtors. Joshua Campbell was appointed as chief executive officer in August 2019.

Zenergy Brands holds an interest in several subsidiaries that were acquired or formed to accomplish its overarching goal of selling energy-conservation products and services to commercial, industrial, and municipal customers.

### *Enertrade Electric, LLC and Zenergy Power & Gas, Inc.*

On April 3, 2018, ZPGI, a Texas corporation formerly known as Zen Energy Inc., and a direct subsidiary of Zenergy Brands, consummated the purchase of 87.37% of the issued and outstanding Equity Interests of Enertrade, a Texas limited liability company, a retail electric

provider. Free and Free Enterprises LLC owns a 10.0% interest in both ZPGI and Enertrade.  ZPGI currently holds 77.37% ownership of Enertrade.

Following the acquisition, Zenergy Brands determined that the sellers of Enertrade made material misrepresentations and attempted to address and repair certain issues within Enertrade. Zenergy Brands ultimately concluded that it was in its best interest to cease its retail-electric operations.  In doing so, Zenergy Brands was able to avoid a mass customer-transition event, which the Texas Public Utility Commission regards as a negative event.  Had the Zenergy Brand's winding down of the Enertrade operation consisted of a mass customer-transition event to the provider of last resort, then such an event would have prevented Zenergy Brands from ever acquiring a license as a retail-energy provider in Texas, as well as other deregulated energy markets.

### Zenergy Labs, LLC

Zenergy Labs is a Texas limited liability company of which Zenergy Brands holds an 85% ownership interest.  Djailson Belieny, Jr. owns the remaining 15% ownership interest in Zenergy Labs.  Zenergy Labs develops proprietary software used by Zenergy Brands in its operations and to analyze the Zero-Cost Program.  Zenergy Labs also develops software for third-parties.

### NAUP Brokerage, LLC

NAUP specializes in brokering of electricity and natural gas for commercial, industrial, and municipal end-use customers.  Zenergy Brands owns 80% of the ownership interests in NAUP. NAUP Investments, LLC, a Texas limited liability company, owns the remaining 20% ownership interests in NAUP.

### Zenergy & Associates, Inc.

Zenergy & Associates is a wholly-owned subsidiary of Zenergy Brands that was formed to expand Zenergy Brand's sales through direct sales.

### Zen Technologies, Inc.

Zen Technologies is a wholly-owned subsidiary of Zenergy Brands that was formed to focus on smart controls and alarm licenses.  As of the Petition Date Zen Technologies was not actively engaged in any activity.

### Events Leading to the Debtors' Bankruptcy Filing

The Debtors commenced selling retail smart-home technologies in 2016 and shifted focus utilizing their smart controls platform for commercial customers in early 2017.  In focusing on commercial customers, the Debtors relied heavily on third-party financing entities to provide project and strategic financing.

The Debtors also expanded rapidly by entering into different segments of the deregulated energy market by acquiring Enertrade and entering into the retail electricity provider market. While the Debtors were able to attract customers and were successfully entering into MESAs with

customers, the Debtors did not receive returns on entering the retail electricity provider market. Furthermore, the Debtors' total debt load and servicing costs eroded their ability to market and expand their customer base. Under these conditions, the Debtors did not have sufficient capital to maintain and grow their businesses and they began to fall behind on their obligations to creditors in 2018-2019.

Zenergy Brands is a public company and is required to comply with the rules and regulations set forth by the SEC and the Securities Exchange Act of 1934. This includes filing necessary disclosures with the SEC. On July 22, 2019, the Debtors became aware that E&K, its prior independent registered public accounting firm, was not registered with the PCAOB. As a result, Zenergy Brands dismissed E&K and concluded that the Debtors' previously issued financial statements for the year ended December 31, 2018 and the quarters ended June 30, 2018, September 30, 2018, and March 31, 2019, which were audited and reviewed by E&K, respectively, could no longer be relied upon, because such financial statements were not audited or reviewed by a PCAOB registered auditing firm in accordance with SEC rules.

**B.      Events Leading to Commencement of the Chapter 11 Cases**

The Debtors filed the Chapter 11 Cases to reorganize their businesses. The Debtors diligently evaluated, in consultation with their professionals, a number of options to address the Debtors' financial issues. The Debtors initiated these Chapter 11 Cases to effectuate a value-maximizing reorganization. The Debtors commenced these Chapter 11 Cases to fully implement their restructuring effort. The Debtors sought to restructure through the Chapter 11 process to allow for a proper balance of (a) their capital structure and ongoing sales with (b) the expected demand for energy efficiency and conservation, and (c) provide a forum for a process that will benefit the Debtors' estates and creditors. However, as discussed in detail below, the Debtors' plan funders, TCA Global and TCA Special Situations, were unwilling or unable to finance a reorganizing plan thereby requiring the Debtors to pivot to a liquidating plan instead of their original plan of reorganization.

**C.      Pre-Petition Indebtedness**

As of the Petition Date, the Debtors are obligors (either as borrower or guarantor) on a principal amount of prepetition indebtedness of no less than $7.2 million. This pre-petition indebtedness included claims of TCA Global in the amount of approximately $2.6 million. TCA Global also entered into that certain "Investment Banking Services Agreement" with a face value of $3 million; however, services and obligations required of TCA Global under the Investment Banking Services Agreement were never provided. The Debtors also borrowed funds on an unsecured basis and, together with estimated trade debt, had outstanding unsecured debt estimated in an amount no less than $4.6 million.

**VI.**
**SIGNIFICANT EVENTS AND PLEADINGS FILED IN THE CHAPTER 11 CASE**

During the course of the Chapter 11 Cases, various pleadings have been filed with the Bankruptcy Court. The following is a description of the more significant pleadings filed during the pendency of the Chapter 11 Cases to the extent not discussed elsewhere in this Disclosure

Statement.  For a comprehensive listing of the pleadings that have been filed in the Chapter 11 Cases, the docket for the Chapter 11 Cases should be reviewed, and relevant pleadings referenced therein may be obtained from the Debtors' claim agent, Stretto via https://cases.stretto.com/zenergybrands/court-docket/, the Clerk's Office of the Bankruptcy Court, or via the online PACER system.

### A.    Commencement of Case

On October 24, 2019, the Debtors filed their voluntary petitions under chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtors have continued in the management and possession of their businesses and property as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed.  The Debtors commenced these Chapter 11 Cases with the intention of quickly exiting bankruptcy through a plan of reorganization.

On November 4, 2019, the United States Trustee formed the Committee in the Debtors' Chapter 11 Cases pursuant to 11 U.S.C. § 1102(a)(1).  The Committee consisted of: (i) Brett Rosen, RB Capital Partners, Inc.; (ii) Michael Ziegler; and (iii) Ashley Gee.

### B.    Employment of Professionals

#### 1.    Debtors' Counsel

On November 17, 2019, the Debtors filed their *Application for Entry of an Order Authorizing the Retention and Employment of Foley & Lardner LLP as Attorneys for the Debtors and Debtors in Possession Effective as of the Petition Date* [ECF No. 87], pursuant to which the Debtors sought authority to employ Foley & Lardner LLP as their general bankruptcy counsel, effective as of the Petition Date.  This application was approved by Order of the Bankruptcy Court [ECF No. 126] entered on December 11, 2019.

#### 2.    Other Professionals of the Debtors

On October 24, 2019, the Debtors filed their *Application for Entry of an Order, Pursuant to 28 U.S.C. § 156(c) Authorizing the Debtors to Employ and Retain Stretto as Claims, Noticing, and Solicitation Agent, Effective as of the Petition Date* [ECF No. 6].  This application was approved by Order of the Bankruptcy Court [ECF No. 59] entered on October 31, 2019.

#### 3.    Professionals for the Committee

On November 4, 2019, the United States Trustee appointed the Committee.  On November 12, 2019, the Committee filed its *Application to Employ Kane Russell Coleman Logan PC as Counsel for the Official Unsecured Creditors' Committee* [ECF No. 80].  On December 2, 2019, the Bankruptcy Court entered an order [ECF No. 115] approving the Committee's retention of Kane Russell Coleman Logan PC as of November 4, 2019.

C.      **Financing of Operations and Administration of the Estate**

1.      Employee Compensation and Benefits

On October 24, 2019, the Debtors filed their *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Contractor Fees, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Prepaid Card Program, and (II) Granting Related Relief* [ECF No. 9], pursuant to which the Debtors sought authority to pay certain prepetition wages and benefits through the pendency of the Chapter 11 Cases. This motion was granted by Order of the Bankruptcy Court [ECF No. 54] entered on October 31, 2019.

2.      Authorization to Use Cash Collateral and Post-Petition Financing

On October 27, 2019, the Debtors filed their *Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Post-Petition Financing, Granting Senior Postpetition Security Interest and According Superpriority Administrative Expense Status Pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code; (II) Authorizing the Use of Cash Collateral; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief* [ECF No. 19].

On October 31, 2019, the Court entered the *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Super Priority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief* [ECF No. 61].

On December 4, 2019, the Court entered the *Second Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Super Priority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief* [ECF No. 119].

On January 13, 2020, the Court entered the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Super Priority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief* [ECF No. 144] (the "**Final DIP Order**").

Pursuant to the post-petition financing orders, the Debtors have borrowed $2.1 million from TCA Special Situations during the course of these Chapter 11 Cases. As discussed below, the Debtors sought to borrow additional amounts under the $5,000,000 revolving line of credit, but TCA Special Situations refused to provide additional funding, causing the Debtors to lose certain opportunities to enter into MESAs and obtain additional funding. The Debtors were also unable to prosecute the TCA Plan, as discussed below.

D.     **TCA Plan and Receivership of TCA Global**

The Debtors worked collaboratively with TCA Global and TCA Special Situations and the Committee to draft the TCA Plan that encapsulated the agreement struck between TCA Global, TCA Special Situations and the Committee.  The Debtors filed the TCA Plan on March 16, 2020 [ECF No. 193] and filed the related disclosure statement on March 17, 2020 [ECF No. 194].  The Debtors solicited the TCA Plan and received acceptance of a voting class in favor of the plan of reorganization.

Beginning in April 2020, the Debtors requested that TCA Special Situations provide additional DIP Financing pursuant to the Final DIP Order and that certain $5 million revolving line of credit provided for under the Debtors' DIP Financing.  TCA Special Situations refused to provide additional funding and, therefore, was in breach of its DIP obligations.  The Debtors continued to request funding throughout May 2020.  TCA Special Situations and TCA Global rejected the requests and failed to perform under the DIP Order.  Accordingly, TCA Special Situations and TCA Global are in breach of the DIP Order.

On May 11, 2020, the United States District Court for the Southern District of Florida entered an order appointing a receiver over TCA Global and certain related entities (the "**Receivership**").  Upon information and belief, TCA Special Situations was not a party in the Receivership.  Because of the Receivership, TCA Global was unable or unwilling to provide funding for the proposed TCA Plan.  TCA Global did not advise the Debtors of this development and the Debtors learned of the Receivership shortly before the confirmation hearing for the TCA Plan.  TCA Special Situations was also unwilling to provide funding for the TCA Plan.  Upon information and belief, TCA Special Situations entered into a voluntary liquidation under the laws of the Republic of Ireland in August 2020.

The Debtors entered bankruptcy, proposed, and prosecuted the TCA Plan on reliance of TCA Global and TCA Special Situations repeated assurances of funding.  As a result of TCA Special Situations and TCA Global's failure to perform under the Final DIP Order in providing DIP Financing and to perform their obligations in financing the TCA Plan, the Debtors incurred significant damages, including the loss of certain MESAs and the inability to conclude the reorganizing plan that the Debtors prepared and filed relying on assurances and representations by TCA Special Situations and TCA Global that they would support and fund such plan.  The Debtors have also incurred significantly more administrative expenses in what was intended to be a short and straightforward bankruptcy process, and which has been pending for over a year while the Debtors sought alternative financing because of the failure of TCA Global and TCA Situations to provide financing and support the TCA Plan.

E.     **Alternative Financing and Negotiations**

After learning that TCA Global and TCA Special Situations were unable and/or unwilling to provide financing for the solicited TCA Plan, the Debtors immediately sought alternative financing to conclude the plan of reorganization or financing for an alternative process.  The Debtors spoke with approximately sixty (60) lenders, financial institutions, and strategic parties. Joshua Campbell conducted many telephonic and face-to-face meetings with financial and

strategic parties, but was unable to obtain sufficient financing to continue prosecuting the proposed plan of reorganization.

The Debtors received an expression of interest from two parties for an alternative process that included the sale of Floresville ISD MESA to fund this liquidating plan. However, each of the expressions of interest were conditioned upon the existence of an entity that would continue to provide servicing required by the terms of the Floresville ISD MESA. To provide the servicing requirements and facilitate the proposed transaction, Joshua Campbell and other members of Zenergy formed Eco Investments, LLC to serve as a vehicle for the continued servicing of the MESAs as part of the proposed transaction.

## F.    SEC Settlement and Revocation of Registration

On September 21, 2020, the staff of the SEC notified Zenergy that it intended to recommend that the SEC institute a public administrative proceeding against Zenergy to revoke the registration of its securities under Section 12(j) of the Exchange Act. Rather than proceed through the public administrative proceeding, the SEC offered a settlement revoking the registration of the Debtors' publicly traded securities pursuant to that certain "*Offer of Settlement of Zenergy Brands, Inc*." The Debtors, in their business judgment, determined that it was in the best interest of the Debtors' estates to enter into the settlement offered by the SEC and consent to revocation of their registration given the limited resources that the Debtors have and the limited material benefit from the defense of a public administrative proceeding, among others. The Debtors filed a motion seeking authority to enter into this settlement and an order authorizing the settlement was entered on November 10, 2020 [ECF No. 307]. The Debtors' registration will be revoked upon entry of the agreed order, which has been consented to by the Debtors.

## G.    Bar Dates

With respect to parties other than Governmental Units, the last date on which Proofs of Claim may be timely filed against the Debtors was February 21, 2020. With respect to Governmental Units, the last date on which Proofs of Claim may be timely filed against the Debtors was April 21, 2020. The Bankruptcy Court also entered an order [ECF No. 276] on August 26, 2020, setting September 30, 2020 as the administrative expense claim bar date for administrative claims incurred through and including September 1, 2020. The Bar Date for Administrative Claims not otherwise barred by another order entered in these Chapter 11 Cases shall be 30 days after the Confirmation Order has been entered.

The Plan proposes a bar date for filing proofs of claim relating to executory contracts and unexpired leases rejected pursuant to the Plan. The proposed bar date is no later than thirty (30) days after the later of: (i) notice of entry of an order approving the rejection of such executory contract or unexpired lease, (ii) notice of entry of the Confirmation Order, and (iii) notice of an amendment to the Assumption List.

**VII.**
**SUMMARY OF THE CLAIMS, CLASSIFICATION AND TREATMENT**
**UNDER THE PLAN**

**A.      Introduction**

The Plan constitutes a chapter 11 plan of liquidation for the Debtors.  The Plan provides for the creation of a Liquidation Trust to liquidate the Debtors' assets and to distribute the resulting Cash to holders of Claims in accordance with the terms of the Plan and the priority of claims provisions of the Bankruptcy Code.  Except as otherwise provided by order of the Bankruptcy Court, distributions will occur as is practicable after the Effective Date and at various intervals thereafter, as more fully described in the Plan and the Liquidation Trust Agreement.  From and after the Effective Date, the Debtors will continue to exist as a separate corporate entity or other business-entity form until dissolved by the Debtors pursuant to the Plan.

THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN.  THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN.

**B.      Classification of Claims and Equity Interests**

The Plan provides for the division of Claims against and Equity Interests in the Debtors (except Priority Tax Claims) into Classes.  A Claim is classified within a particular Class only to the extent that the Claim qualifies under the description of that Class.  A Proof of Claim asserting a Claim which is properly includable in more than one Class is only entitled to inclusion within a particular Class to the extent that it qualifies under the description of such Class, and shall be included within a different Class(es) to the extent that it qualifies under the description of such different Class(es).  The Plan classifies Claims and Equity Interests as follows:

**Unclassified Claims**

Allowed Administrative Claims
Professional Fee Claims
Allowed Priority Tax Claims
Statutory Fees and post-Petition Date Taxes

**Classified Claims and Equity Interests**

| Class | Claims and Interests |
|-------|---------------------|
| 1. | Priority Non–Tax Claims |
| 2. | Other Secured Claims |
| 3. | TCA Global Claim |
| 4. | TCA Special Situations Claim |
| 5. | Allowed Unsecured Claims |
| 6. | Intercompany Claims |
| 7. | Equity Interests |

**C.      Treatment of Unclassified Claims Under the Plan**

**1.      Treatment of Allowed Administrative Claims**

Allowed Administrative Claims arising in the ordinary course of the Debtors' Business shall be paid upon the date on which such Claims become due in the ordinary course, in accordance with the terms and conditions of any agreement relating thereto or upon such other dates and terms as may be agreed upon by the holders of such Allowed Administrative Claims.  All other holders of Allowed Administrative Claims (with the exception of the professionals who will be paid 100% of the amount allowed by the Court upon application to the Court and those Claims otherwise specifically dealt with in the Plan.  Holders of Allowed Administrative Claims shall be paid 100% of their respective Allowed Administrative Claims in Cash, unless otherwise ordered by the Court or agreed to by the holder of such Claim, upon the latter of (i) the Effective Date, or, (ii) the date on which an order approving payment of such Allowed Administrative Claim becomes a Final Order.   Allowed Administrative Claims shall be paid, first, from retainers currently held by professionals and, second, to the extent said retainers are insufficient to satisfy the Allowed Administrative Claims, from paid from liquidation proceeds.

Except as otherwise provided in this Plan or by Order of the Bankruptcy Court, all motions or applications for payment of Administrative Claims (other than Professional Fee Claims) incurred, accrued, or in existence prior to the Effective Date must have been filed by the Administrative Expense Claim Bar Date as defined in Article I. Any such Administrative Claim for which a motion or application was not filed by the Administrative Claim Bar Date is released and forever barred and shall not be entitled to any Distribution of any kind or character under this Plan.  The United States Trustee is not required to file an application for the allowance of an Administrative Expense Claim with regard to fees due in accordance with 28 U.S.C. § 1930(a)(6).

**2.      Treatment of Professional Compensation and Reimbursement Claims**

All requests for allowance and payment of Professional Fee Claims must be filed with the Bankruptcy Court and served on the Post-Confirmation Service List no later than the Professional Fee Claim Bar Date, i.e., sixty (60) days after the occurrence of the Effective Date.  Any such

Professional Fee Claim for which an application or request for payment is not filed with the Bankruptcy Court within that time period shall be released and forever barred and shall not be entitled to Distributions under the Plan. Objections to the payment of such Professional Fee Claims must be filed no later than the Professional Fee Claim Objection Bar Date, *i.e.*, (a) no later than twenty-one (21) days after the filing of such Professional Fee Claim or (b) on such other date as established by order of the Bankruptcy Court. No Professional Fee Claim shall be Allowed on account of services rendered or expenses incurred by a professional prior to the Effective Date unless payment for such services and expenses has been approved and Allowed by the Bankruptcy Court. All Allowed Professional Fee Claims shall be paid in accordance with the applicable provisions of this Plan, the Liquidation Trust Agreement, the Bankruptcy Code and Bankruptcy Rules, as well as any prior Orders entered by the Bankruptcy Court.

### 3.      Treatment of Allowed Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim has been paid prior to the Effective Date, and unless otherwise agreed to in writing by the Debtors and the holder of such Claim, each holder of an Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in § 1129(a)(9)(C) of the Bankruptcy Code after the later of (i) the Effective Date and (ii) the date on which such Priority Tax Claim is Allowed ("**Payment Trigger Date**"), with the maturity date by which all payments due to be no later than the last day of the twenty-fourth month after the Payment Trigger Date. At the Debtors' discretion, payment in full of the total balance due on any such Priority Tax Claim may be made without penalty.

### 4.      Treatment of Statutory Fees and Post-Petition Date Taxes

All fees payable pursuant to 28 U.S.C. § 1930 and all Claims of a Governmental Unit of the type described in § 503(b)(1)(B)-(C) of the Bankruptcy Code that were filed prior to the Administrative Claim Bar Date shall be treated as Allowed Administrative Claims when such amounts become due and payable by the Debtors or the Liquidation Trustee under applicable non-bankruptcy law. All fees payable pursuant to 28 U.S.C. § 1930 after the Effective Date shall be the sole responsibility of the Liquidation Trustee.

### D.      Treatment of Classified Claims and Equity Interests Under the Plan

### 1.      Treatment of Priority Non-Tax Claims

Each Allowed Priority Non–Tax Claim shall be unimpaired under the Plan and, pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable and contractual rights to which such Claim entitles the holder in respect of such Claim shall be fully reinstated and retained, and such Allowed Priority Non–Tax Claim (including any amounts to which such holder is entitled pursuant to section 1124(2) of the Bankruptcy Code) shall be paid in full in accordance with such reinstated rights on the Effective Date.

### 2.      Treatment of Other Secured Claims

Except to the extent that the holder of an Allowed Other Secured Claim agrees to less favorable treatment, each Allowed Other Secured Claim shall, on the Distribution Date, be reinstated or rendered unimpaired in accordance with section 1124 of the Bankruptcy Code as

against the applicable Debtor or its successor in interest under the Plan, notwithstanding any contractual provisions or applicable non–bankruptcy law that entitles the holder of an Other Secured Claim to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of a default.  All Allowed Other Secured Claims that are not due and payable on or before the Distribution Date shall, at the Debtors' option, be paid (a) in the ordinary course of business in accordance with the course of practice between the Debtors and such holder with respect to such Claims, or (b) by transfer of the collateral securing such Claim to the holder of such Claim, each in full and complete satisfaction, settlement and release of, and in exchange for, such Claim.

### 3.       Class 3.  TCA Global Claim

To the extent the TCA Global Claim is Allowed, it will be subordinated pursuant to 11 U.S.C. §510(c) to all unclassified Claims, including Allowed Administrative Claims, and Allowed Claims in Class 1, Class 2, and Class 5.  Holders of the TCA Global Claim will receive no Distribution under the Plan on account of its subordinated claim unless and until all unclassified Claims, including Allowed Administrative Claims, and Allowed Claims in Class 1, Class 2, and Class 5 are paid in full, at which time the Class 3 Claim shall be satisfied by Pro Rata Share of Distributions from the remaining Liquidation Trust Assets.  All Causes of Action against TCA Global are reserved under this Plan.

### 4.       Class 4.  TCA Special Situations Claims

To the extent the TCA Special Situations Claim is Allowed, it will be subordinated pursuant to 11 U.S.C. §510(c) to all unclassified Claims, including Allowed Administrative Claims, and Allowed Claims in Class 1, Class 2, and Class 5.  Holders of the TCA Special Situations Claim will receive no Distribution under the Plan on account of its subordinated claim unless and until all unclassified Claims, including Allowed Administrative Claims, and Allowed Claims in Class 1, Class 2, and Class 5 are paid in full, at which time the Class 3 Claim shall be satisfied by Pro Rata Share of Distributions from the remaining Liquidation Trust Assets.  All Causes of Action against TCA Special Situations are reserved under this Plan.

### 5.       Class 5.  Allowed Unsecured Claims

In full satisfaction, settlement, release, extinguishment and discharge of such Claim, the holder of the Allowed Unsecured Claim shall receive (i) a Pro Rata Liquidation Trust Interest equal to the Pro Rata amount of their Allowed Unsecured Claim, and the Liquidation Trustee will make distributions to all Allowed Unsecured Claims in Class 5 pursuant to the terms and conditions of this Plan and a Liquidation Trust Agreement, and (ii) issuance to holders of the Allowed Unsecured Claims membership interests totaling 9% of the issued and outstanding membership interests of Eco Investments as of the Closing Date pursuant to the terms set forth in the Committee Settlement.

### 6.       Class 6.  Intercompany Claims

On the Effective Date, all Intercompany Claims shall be canceled, and the holders of such Intercompany Claims shall receive no distribution on account of such Claims.

7.      **Class 7.  Allowed Equity Interests**

On the Effective Date, all Allowed Equity Interests in the Debtors shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and the holders of Allowed Equity Interests shall receive no distribution.

## VIII.
## CLAIMS OBJECTION AND SUBORDINATION REQUEST

**A.      TCA Global**

The Plan serves as an objection to TCA Global's Claim in the amount of $5,686,755.91. This Claim arises from that certain Securities Purchase Agreement (the "**Securities Purchase Agreement**") between Zenergy Brands, Inc. and TCA Global whereby TCA Global would purchase $10,000,000 of debentures from the Debtors.  In entering into the Securities Purchase Agreement, TCA Global required that the Debtors obtain financing exclusively from TCA.  TCA knew that the Debtors require financing to originate their MESAs.  TCA Global was unable or unwilling to provide financing in a predictable or consistent manner after entering into the Securities Purchase Agreement.  On several occasions, the Debtors lost customers who were prepared to enter into a MESA or who had already executed a MESA because TCA Global refused to provide financing to the Debtors.  The Debtors were also unable to seek financing from alternative sources.  This had a negative impact on the Debtors operations.  Additionally, TCA Global required that all funds that the Debtors received be swept from the Debtors' accounts such that the Debtors were required to borrow from TCA Global to fund their operations.  The Debtors issued Debentures in the amount of $2,622,468.41 to TCA Global.  TCA Global took substantial legal fees for its own counsel, origination and advisory fees from this amount.

TCA Global's Claim also includes a $3 million claim pursuant to that certain "Investment Banking Services Agreement" (the "**IBSA**") with a face value of $3 million.  TCA Global required the Debtors to enter into the IBSA as part of its initial financing.  The IBSA states that TCA Global or its affiliates or designates would, among other things, provide services including advising the Debtors on their finances, operations, and prepare and coordinate in the development of business plans and financial models, identify potential merger and acquisitions, and advise in connection with SEC reports.  TCA Global never provided the Debtors any of the services required under the IBSA.  According to the complaint filed by the SEC (the "**SEC Complaint**") that initiated the Receivership, TCA Global required borrowers to, including the Debtors, to enter into the IBSA and record it as an accounts payable as part of a scheme to inflate TCA Global's fee revenue.

Prior to the initiation of these Chapter 11 Cases, TCA picked and chose what would customers the Debtors could contract by selecting and declining which MESAs that TCA Global would fund, all while requiring that the Debtors exclusively obtain financing from TCA Global.

**B.      TCA Special Situations**

Prior to the initiation of these Chapter 11 Cases, Zenergy Brands, Inc. and Zenergy Energy Services, LLC and TCA Special Situations entered into a $5,000,000 revolving credit facility dated September 26, 2019, (the "**Revolving Credit Facility**").  Despite entering into the Revolving Credit Facility, TCA Special Situations refused to advance money under the Revolving Credit

Facility unless the Debtors entered into these Chapter 11 Cases.  TCA Special Situations and TCA Global stated that they would fund the process and would work towards an expeditious exit from the bankruptcy process.

After the Debtors entered into these Chapter 11 Cases at the request of TCA Global and TCA Special Situations, TCA Special Situations sought to provide DIP Financing to the Debtors and the Debtors sought and received Bankruptcy Court authorization to use cash collateral and obtain DIP Financing.  Pursuant to the post-petition financing orders, TCA Special Situations entered into that certain "Senior Secured Revolving Credit Facility Agreement in the Maximum Amount of US $5,000,000.00" (the "**DIP Note**").  The Debtors initially sought $2,000,000 of DIP Financing based on their projections of an exit from bankruptcy in or around December 2019.  However, TCA Special Situations only agreed to fund $1.7 million.

Although TCA Special Situations had agreed to fund the bankruptcy process and work towards an expeditious exit from the bankruptcy process, TCA Special Situations delayed to or ignored requests related to the bankruptcy process such that the Debtors were unable to prepare and file a plan of reorganization pursuant to the timeline that TCA Special Situations and TCA Global agreed to prior to initiating these Chapter 11 Cases.  When the bankruptcy process extended beyond the initial timeline contemplated by TCA Global and TCA Special situations, the Debtors requested additional funds to meet their operational and administrative needs through March 6, 2020 to allow for a plan solicitation process.  While the Debtors requested additional amounts, TCA Special Situations only funded an additional $400,000 in early February 2020.

Unbeknownst to the Debtors, sometime in January 2020, a whistleblower complaint was filed with the SEC against TCA Global.  During this period, the Debtors were working to negotiate and draft the TCA Plan, which encapsulated an agreement between TCA Global, TCA Special Situations, and the Committee.  At no time did TCA Special Situations or TCA Global advise the Debtors that they were unable or unwilling to fund a plan of reorganization.  Instead, TCA Special Situations and TCA Global requested that the Debtors undertake the TCA Plan, causing the Debtors to incur administrative fees and costs related to drafting, filing, and soliciting the TCA Plan.

At the end of April, management for the Debtors requested additional DIP Financing to meet its operational and administrative needs since the time period to exit these Chapter 11 Cases had extended beyond the contemplated timeline.  TCA Special Situations and TCA Global ignored the requests for additional DIP Financing and sought to continue, delay, or adjourn several milestones related to the solicited TCA Plan, including the voting deadline.  A week before the confirmation hearing on the TCA Plan, the Debtors learned about the whistleblower complaint and Receivership.   TCA Global and TCA Special Situations requested a continuance of the confirmation hearing on the TCA Plan.  The Debtors formally requested DIP Financing to meet their post-petition operating expenses while affording TCA Special Situations and TCA Global additional time.  The Debtors fulfilled, or were able to fulfill, all conditions precedent for additional DIP Financing under the Final DIP Order and related documents.  Despite TCA Special Situation's obligation to fund under the Final DIP Order, it failed to do so.

The Debtors were damaged as a direct result of TCA Global and Special Situations' failure to meet their obligations under the Final DIP Order and their actions and omissions in having the

Debtors prepare, prosecute, and solicit the TCA Plan. Specifically, the Debtors incurred administrative fees in prosecuting the TCA Plan, which TCA Global and Special Situations knew or should have known they would be unwilling or unable to fund. The Debtors also were required to expend significant administrative funds in seeking alternative financing and administering these Chapter 11 Cases for almost a year beyond the exit period agreed to by TCA Special Situations and TCA Global. As a direct result, the Debtors, Debtors' Estates, and the Professionals in these Chapter 11 Cases have been damaged. Additionally, the Debtors lost customers for its MESAs in an amount that exceeds $3 million.

## IX.
## MEANS FOR IMPLEMENTATION OF THE PLAN

**A.  Plan Funding**

The proceeds of the Purchase Price from the Transfer shall satisfy 100% of all allowed Administrative Claims in the Bankruptcy Proceeding with all remaining funds, if any, distributed to the Creditor Trust.

**B.  Authorization to Take Necessary Actions**

Upon confirmation of the Plan, and in accordance with the Confirmation Order, the Debtors and Liquidation Trustee will be authorized to take all necessary steps, and perform all necessary acts, to consummate the terms and conditions of the Plan. In addition to the provisions set forth elsewhere in the Plan, the following shall constitute the means for implementation of the Plan.

**C.  Corporate Existence Between the Confirmation Date and the Effective Date**

Through the Effective Date, the Debtors shall continue to operate their businesses as Debtors-in-Possession, subject to the oversight of the Court as provided in the Bankruptcy Code, the Bankruptcy Rules and all Orders of the Court that are then in full force and effect.

**D.  Eco Investment Transaction on the Closing Date** After unsuccessfully seeking alternative financing following the decision by TCA Global and TCA Special Situations to not fund the TCA Plan, the Debtors current management team, including Joshua Campbell, formed Eco Investments to facilitate a transaction to provide value to the Debtors' Estates. In speaking with approximately 60 potential investors, Mr. Campbell determined that, because of certain ongoing servicing obligations required under the terms of the MESAs, the Debtors were unlikely to obtain alternative financing without a company that could provide ongoing services to the Debtors' MESA customers. However, Mr. Campbell determined that potential investors were unwilling to undertake or readily locate an alternative for these servicing obligations. The lack of a viable servicing partner would likely result in a total loss of the value of the MESAs. Mr. Campbell formed Eco Investments to provide a viable company that could perform the required servicing obligations for the MESAs to preserve some value for the Debtors' Estates.

Mr. Campbell located two potential entities that were willing to finance against or purchase the Floresville ISD MESA so long as Eco Investments would perform the servicing obligations

and could demonstrate viability. The Debtors, the Committee, and Eco Investments negotiated a settlement that would serve as the foundation for a financially viable company that could facilitate the sale of the Floresville ISD MESA. Under the Committee Settlement, Eco Investments will acquire approximately half of the Debtors' MESAs, intellectual property, certain equipment, and work in process, including accounts receivable, in exchange for the issuance of nine percent (9%) of Eco Investments membership interests to Allowed Unsecured Creditors under the terms of the Committee Settlement and continued servicing to the Residual MESAs that will be transferred to the Liquidation Trust formed under the Plan.

The Debtors, in consultation with the Committee, Eco Investments, and the Floresville ISD MESA Purchaser have negotiated the sale of the Floresville ISD MESA to the Floresville ISD MESA Purchaser free and clear of all liens and encumbrances for the Purchase Price of $770,000 as part of the Transaction. In the event that the Floresville ISD MESA Purchaser is ICG Investment Vehicle, LLC, the Purchase Price shall be reduced on a dollar for dollar basis by any payments the Debtors receive under the Floresville ISD MESA after October 31, 2020. Pursuant to the Committee Settlement, the Debtors will receive $500,000 and Eco Investments will receive the remaining proceeds from the Transaction to provide operational funding. The Transaction will be a simultaneous closing with the Debtors transferring the Transferred Assets, including the Floresville ISD MESA, to Eco Investments, which will retain the servicing requirements under the Floresville ISD MESA and assign all other rights under the Floresville ISD MESA to the Floresville ISD MESA Purchaser if so required by the Floresville ISD MESA Purchaser, in exchange for (i) the Floresville ISD MESA Purchaser funding the Purchase Price to the Debtor on behalf of Eco Investments through a simultaneous closing with the Transaction and (ii) the Floresville ISD MESA Purchaser paying the remaining proceeds to Eco Investments as discussed above.

## E.    Corporate Action

The entry of the Confirmation Order shall constitute authorization for the Debtors to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Plan prior to, on and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation, including, without limitation, any action required by the officers, members, managers, or general or limited partners of the Debtors including, among other things, (i) the adoption or amendment of any organizational documents; (ii) the termination and cancellation of any outstanding instrument, document or agreement evidencing debt Claims as required by the Plan; (iii) all transfers of Assets that are to occur pursuant to the Plan; (iv) the incurrence of all obligations contemplated by the Plan and the making of all Plan Distributions; (v) the implementation of all settlements and compromises as set forth in or contemplated by the Plan; (vi) taking of all actions to preserve and provide for the prosecution of the Avoidance Actions; and (vii) entering into any and all transactions, contracts or arrangements permitted by applicable law, order, rule or regulation.

The officers of the Debtors are authorized and directed to do all things and to execute and deliver all agreements, documents, instruments, notices and certificates as are contemplated by the Plan and to take all necessary action required in connection therewith, in the name of and on behalf of the Debtors.

F.      **Creation and Transfer of Assets to the Liquidation Trust**

On the Effective Date, the Liquidation Trust shall be created, and all of the Remaining Assets of the Estates including, but not limited to, any and all Avoidance Actions and Causes of Action, Retained Causes of Action, Residual MESAs, Remaining Assets, and all other Liquidation Trust Assets, shall be conveyed through the Confirmation Order from the Debtors to the Liquidation Trust on the Effective Date to be liquidated and proceeds therefrom distributed by the Liquidation Trustee for the benefit of Creditors pursuant to the terms of the Plan and Liquidation Trust Agreement. The Liquidation Trust shall be governed by the Liquidation Trust Agreement, the Plan, and the Confirmation Order. Except as specifically set forth herein, holders of Allowed Claims shall look solely to the Liquidation Trust for the satisfaction of their Claims. For federal income-tax purposes, the transfer of the Liquidation Trust Assets pursuant to this Plan will be a taxable transaction and will be deemed to be a transfer to the holders of Allowed Claims as the Liquidation Trust Beneficiaries, followed by a deemed transfer by such beneficiaries to the Liquidation Trust.

G.      **Effectiveness of Securities, Instruments and Agreements**

On the Effective Date, the Debtors, Liquidation Trustee, Eco Investments, or Purchaser, as applicable, shall execute and deliver such further documents, instruments, and agreements as are necessary to effectuate and further evidence the terms and conditions of the Plan. On the Effective Date, all documents described in the Plan and all other agreements entered into or documents issued pursuant to the Plan and/or any agreement entered into or instrument or document issued in connection with any of the foregoing, as applicable, shall become effective and binding upon the parties thereto in accordance with their respective terms and conditions and shall be deemed to become effective simultaneously.

H.      **Approval of Agreements**

Entry of the Confirmation Order shall constitute approval of the Assumption List, Plan, and all such transactions, subject to the occurrence of the Effective Date.

I.      **Deemed Consolidation**

Solely for the purposes specified in the Plan (including voting, Confirmation, and Distributions), and subject to Section 3.02(b) of the Plan, (i) all Assets and liabilities of the Consolidated Debtors shall be consolidated and treated as though they were merged, (ii) all guarantees of any Consolidated Debtor of the obligations of any other Consolidated Debtor shall be eliminated so that any Claim against any Consolidated Debtor, any guarantee thereof executed by any other Consolidated Debtor and any joint or several liability of any of the Consolidated Debtors shall be one obligation of the Consolidated Debtors, and (iii) each and every Claim filed or to be filed in the Chapter 11 Cases against any of the Consolidated Debtors shall be deemed filed against the Consolidated Debtors collectively and shall be one Claim against and, if and to the extent allowed, shall become one obligation of the Consolidated Debtors.

The Plan Consolidation effected pursuant to Section 3.02(b) of the Plan shall not affect: (i) the legal or organizational structure of the Consolidated Debtors, (ii) pre- or post-Petition Date Liens or security interests, (iii) pre- or post-Petition Date guarantees that are required to be

maintained (x) in connection with executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been or will be assumed or (y) pursuant to the Plan, (iv) defenses to any Cause of Action, or (v) distributions out of any insurance policies or proceeds of such policies.

Except as set forth in Article III of the Plan with respect to the Plan Consolidation, nothing in the Plan is intended to substantively consolidate the Estates of the Debtors, and each such entity shall maintain its separate and distinct assets.

## X.
## EFFECT OF CONFIRMATION

### A.    Administration After Effective Date

All injunctions or stays provided for in these Chapter 11 Cases under sections 105 or 362 of the Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

### B.    No Change of Control

Except as provided in the Plan and Confirmation Order, any acceleration, vesting, or similar change of control rights of any Person under employment, benefit, loan, or other arrangements with the Debtors that could otherwise be triggered by the entry of the Confirmation Order or the consummation of the Plan or any of the transactions contemplated thereby shall be deemed to be waived and of no force or effect.

### C.    Effectiveness of Securities, Instruments and Agreements

On the Effective Date, the Debtors, Liquidation Trustee, or Eco Investments LLC, as applicable, shall execute and deliver such further documents, instruments, and agreements as are necessary to effectuate and further evidence the terms and conditions of the Plan.  On the Effective Date, all documents described in the Plan and all other agreements entered into or documents issued pursuant to the Plan and/or any agreement entered into or instrument or document issued in connection with any of the foregoing, as applicable, shall become effective and binding upon the parties thereto in accordance with their respective terms and conditions and shall be deemed to become effective simultaneously.

### D.    Corporate Action

On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the stockholders, directors, or members of the Debtors or the Debtor or its successors in interest under the Plan shall be deemed to have occurred and shall be in full force and effect from and after the Effective Date pursuant to applicable general business organization law, without any requirement of further action by the stockholders, directors, or members of the Debtors or the Debtor.

E.        **Entry of Final Decree**

As soon as is practicable after the Effective Date, the Liquidation Trustee shall File an application with the Clerk of the Court requesting the entry of a Final Decree closing the Chapter 11 Cases; *provided, however*, the Liquidation Trustee shall not file an application for Final Decree until and unless the conditions to the Plan becoming effective as set forth herein have been fully met, all pending Avoidance Actions and Causes of Action have been resolved by Final Order of a court of competent jurisdiction or agreement with the Liquidation Trustee, objections to Disputed Claims have been resolved by Final Order of the Court or agreement with the Liquidation Trustee, and the Final Distribution has been made.

F.        **Section 1146 Exemption**

Pursuant to section 1146(a) of the Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, including new common stock, creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, in connection with a transfer, or sale, including but not limited to the Debtors' cases, in furtherance of, or in connection with any agreements, deeds, bills of sale, or assignments, or any other documents executed in connection with any of the transactions contemplated by the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

## XI.
## <u>RETENTION OF RIGHTS TO PURSUE CAUSES OF ACTION AND EFFECTUATE SETOFFS, RECOUPMENT, ETC.</u>

Except as otherwise ordered by the Bankruptcy Court OR AS SPECIFICALLY AND EXPLICITLY PROVIDED in the Plan, ALL Causes of Action shall be preserved by the Debtors and the Liquidating Trustee, as applicable, under this Plan.  Pursuant to § 1123(b)(3) of the Bankruptcy Code, the Debtors and, if applicable, the Liquidation Trustee (as a representative of the Debtors) shall retain and have the exclusive authority and standing to prosecute, enforce, pursue, sue on, settle or compromise any and all Causes of Action (including Avoidance Actions), arose before the Effective Date, including all Causes of Action of a trustee and debtor-in-possession under the Bankruptcy Code, other than those expressly released or compromised as part of or pursuant to the Plan or by other order of the Bankruptcy Court entered prior to the Effective Date.  The Causes of Action retained include, without limitation, all Claims and Causes of Action listed or referenced in the Disclosure Statement or Plan Document.  ALL PARTIES SHOULD ALSO READ EXHIBIT A TO THE PLAN CONCERNING PRESERVED CAUSES OF ACTION.

The Debtors and, as applicable, the Liquidation Trustee (as the Debtors'/Estates' representative) shall also retain and may prosecute and enforce all defenses, counterclaims, and rights that have been asserted or could be asserted by the Debtors against or with respect to all Claims asserted against the Debtors or property of the Estate.  No claim, right, Cause of Action, or other Asset shall be deemed waived or otherwise forfeited by the Debtors' failure to identify such property in the Debtors' Schedules or the Disclosure Statement accompanying the Plan.  The

Debtors and the Liquidation Trustee will continue to review payments made by and transactions involving the Debtors prior to the Petition Date to determine whether actions to avoid such payments and transactions should be brought. Failure to specifically identify potential actions in the Plan shall not be deemed a waiver of any such action by the Debtors or any other party.

No Entity may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any Avoidance Action or Cause of Action against it as any indication that the Liquidation Trust will not pursue any and all available Causes of Action against it. The Liquidation Trust expressly reserves all rights to prosecute any and all Avoidance Action and Causes of Action against any Entity that constitutes property of the Estate, except as otherwise provided in this Plan. THE FAILURE TO LIST, DISCLOSE, DESCRIBE, IDENTIFY, OR REFER TO A RIGHT, CLAIM, CAUSE OF ACTION, DEFENSE, OR COUNTERCLAIM, OR POTENTIAL RIGHT, CLAIM, CAUSE OF ACTION, DEFENSE, OR COUNTERCLAIM, IN THE PLAN, THE SCHEDULES, OR ANY OTHER DOCUMENT FILED WITH THE BANKRUPTCY COURT SHALL IN NO MANNER WAIVE, ELIMINATE, MODIFY, RELEASE, OR ALTER ANY RIGHT OF THE LIQUIDATION TRUST TO COMMENCE, PROSECUTE, DEFEND AGAINST, SETTLE, AND REALIZE UPON ANY RIGHTS, CLAIMS, CAUSES OF ACTION, DEFENSES, OR COUNTERCLAIMS THAT THE DEBTORS HAVE OR MAY HAVE AS OF THE EFFECTIVE DATE.

Notwithstanding anything to the contrary herein, this Plan shall not be interpreted to (i) diminish, inhibit, or otherwise restrain the full and complete prosecution of any Cause of Action for the benefit of holders of Claims; (ii) provide substantive or procedural rights or benefits to the defendants of any Cause of Action that arise from or are related to Confirmation of the Plan; or (iii) negate or otherwise destroy any privilege possessed by the Debtors, all of which shall be extended from the Debtors to the Liquidation Trustee by operation of the Confirmation Order. All privileges and protections held by the Debtors prior to the Effective Date, including work-product, attorney-client, and other like privileges, are preserved and unaffected by entry of the Confirmation Order and are transferred.

## XII.
## THE LIQUIDATION TRUST

**A.      Creation of the Liquidation Trust and Appointment of the Liquidation Trustee**

On the Effective Date, the Liquidation Trust will be created pursuant to the Trust Agreement.

The Liquidation Trust shall be administered by the Liquidation Trustee, who shall be selected by the Committee and identified, together with terms of compensation, in the Plan Supplement. The appointment of the Liquidation Trustee and the terms of its compensation shall be subject to the approval of the Bankruptcy Court at the Confirmation Hearing.

On the Effective Date, all of the Remaining Assets of the Estates including, but not limited to, any Avoidance Actions and Causes of Action, shall be conveyed through the Confirmation Order from the Debtors to the Liquidation Trust on the Effective Date to be liquidated and proceeds therefrom distributed by the Liquidation Trustee for the benefit of Creditors pursuant to the terms

of the Plan and Liquidation Trust Agreement. The Liquidation Trust shall be governed by the Liquidation Trust Agreement, the Plan, and the Confirmation Order. Except as specifically set forth herein, holders of Allowed Claims shall look solely to the Liquidation Trust for the satisfaction of their Claims. For federal income-tax purposes, the transfer of the Liquidation Trust Assets pursuant to this Plan will be a taxable transaction and will be deemed to be a transfer to the holders of Allowed Claims as the Liquidation Trust Beneficiaries, followed by a deemed transfer by such beneficiaries to the Liquidation Trust.

Compensation owed to the Liquidation Trustee and the Liquidation Trust's counsel shall be paid from the Liquidation Trust Assets and not from the Debtor.

## B.      Property of the Liquidation Trust

The Liquidation Trust Assets includes all Assets of the Debtors, except for the Transferred Assets, including without limitation, any Avoidance Actions and Causes of Action, transferred to the Liquidation Trust as of the Effective Date to be liquidated and proceeds therefrom distributed by the Liquidation Trustee for the benefit of Creditors pursuant to the terms of the Plan and Liquidation Trust Agreement.

## C.      General Powers of the Liquidation Trust

Subject only to the limitations contained in this Plan or the Liquidation Trust Agreement, the Liquidation Trustee, on behalf of the Liquidation Trust, shall have all of the rights, powers and privileges set forth in this Plan, the Confirmation Order and the Liquidation Trust Agreement. The terms of the employment of the Liquidation Trustee shall be part of the Plan Supplement and approved as part of the Confirmation Hearing. For the avoidance of doubt, nothing herein shall be construed to restrict or limit the ability of the Liquidation Trustee to assert Avoidance Actions and Causes of Action transferred to the Liquidation Trust. The Liquidation Trustee is authorized without further Court approval to take all such actions that, in his or her judgment, are necessary and appropriate to effectuate the purposes of the Plan in accordance with the Liquidation Trust Agreement.

## D.      Purpose of the Liquidation Trust

On the Effective Date, the Liquidation Trust will be established and become effective for the benefit of the Liquidation Trust Beneficiaries and for the primary purpose of liquidating its assets in accordance with Treas. Reg. § 301.7701-4(d) with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidation Trust. The Debtors, all holders of Claims and Equity Interests shall be deemed to have adopted and approved the Liquidation Trust Agreement. The purpose of the Liquidation Trust is to (a) liquidate all Liquidation Trust Assets, including the investigation and prosecution of the Actions conveyed to the Liquidation Trust under the Plan, and (b) distribute the proceeds of the Liquidation Trust Assets to the Liquidation Trust Beneficiaries. The Liquidation Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Liquidation Trust Agreement. The Liquidation Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the holders of the Liquidation Trust Interests treated as grantors and owners of the Liquidation Trust. As soon

as practicable after the Effective Date, the Liquidation Trustee (to the extent that the Liquidation Trustee deems it necessary or appropriate in his or her sole discretion) shall value the assets of the Liquidation Trust based on the good faith determination of the Liquidation Trustee. The valuation shall be used consistently by all parties for all federal income tax purposes. The Court shall resolve any dispute regarding such valuation.

## E.     Powers of the Liquidation Trustee

The Liquidation Trustee shall have the power to administer the Liquidation Trust Assets in a manner consistent with the Liquidation Trust Agreement and the Liquidation Trustee shall be the estate representative designated to prosecute the Actions transferred to the Liquidation Trust as a representative of the Estate pursuant to § 1123(b)(3)(B) and otherwise. Without limiting the generality of the foregoing, the Liquidation Trustee shall (a) hold, administer, and prosecute the Liquidation Trust Assets and any proceeds thereof; (b) have the power and authority to retain, as an expense of the Liquidation Trust, attorneys, accountants, advisors, other professionals and employees as may be appropriate to perform the duties required of the Liquidation Trustee hereunder or in the Liquidation Trust Agreement; (c) make distributions to holders of Allowed Class 5 Claims, including Unsecured Claims, as provided in the Plan and Liquidation Trust Agreement; (d) provide periodic reports and updates regarding the status of the administration of the Liquidation Trust; (e) stand in the Debtors' shoes with respect to, and have standing to pursue, all claims and Causes of Action (including without limitation Avoidance Actions and Retained Insurance Causes of Action) and the Liquidation Trustee shall collect all proceeds of any such Causes of Action on behalf of the Liquidation Trust, including without limitation proceeds of any insurance policy; and (f) shall stand in the Debtors' shoes as the beneficiary of all applicable insurance policies of the Debtors. The Liquidation Trustee shall step into the shoes of the Debtors under the Plan when making distributions to the Liquidation Trust Beneficiaries pursuant to the Liquidation Trust Agreement. The Court shall retain jurisdiction to resolve any disputes and otherwise hear such additional matters brought by the Liquidation Trustee or otherwise related to the Liquidation Trust Assets and impacting the Liquidation Trust Beneficiaries towards the fulfillment of its duties pursuant to the Plan and the Liquidation Trust Agreement.

## F.     Termination of the Liquidation Trust

The Liquidation Trust shall continue to exist until the earlier of the (a) second (2nd) year anniversary of the Effective Date (as such date may be extended by Order of the Bankruptcy Court) and (b) the time the Liquidation Trustee has (i) administered all Liquidation Trust Assets and made a final distribution to holders of Allowed Class 5 Claims in accordance with the terms of the Plan, Confirmation Order and Liquidation Trust Agreement and (ii) performed all other duties required by the Plan, Confirmation Order and the Liquidation Trust Agreement. Multiple extensions of the termination of the Liquidation Trust may be obtained so long as Court approval is obtained prior to the expiration of each extended term. As soon as reasonably practicable after the final distribution, the Liquidation Trustee shall dissolve the Liquidation Trust pursuant to the Liquidation Trust Agreement. Upon dissolution, the Liquidation Trustee's duties under the Liquidation Trust Agreement and the Plan shall terminate and the Liquidation Trustee shall be discharged.

G.      **Cooperation Between the Liquidation Trust and Joshua Bell**

Joshua Campbell will to his best ability fully cooperate with the Creditor Trust. Joshua Campbell will agree to fully support any litigation, against any party, including Alex Rodriguez or any of the Liquidation Trust's claim objections.

## XIII.
## METHOD OF DISTRIBUTION UNDER THE PLAN

A.      **Payments Made by Liquidation Trustee**

Unless otherwise provided herein, all initial distributions and deliveries shall be made on the Effective Date.  Subject to Rule 9010, and except as otherwise provided in Section 9.04 of the Plan, all distributions under the Plan shall be made by the Liquidation Trustee to the holder of each Allowed Claim in the manner provided for in the Plan, at the address of such holder as listed on the schedules and/or Proof of Claim as of the Confirmation Date unless the Debtors or the Liquidation Trustee has been notified in writing of a change of address, including by the filing of a Proof of Claim by such holder that provides an address different from the address reflected on the schedules.

B.      **Payments Made in Cash and Rounding**

Except as otherwise provided for in the Plan and Confirmation Order, any payment of Cash made by the Liquidation Trustee pursuant to the Plan shall be made by check drawn on a domestic bank or by wire transfer.

When any distribution on account of an Allowed Claim pursuant to the Plan would otherwise result in a Distribution that is not a whole number, the actual distribution shall be rounded as follows:  fractions of ½ or greater shall be rounded to the next higher whole number and fractions of less than ½ shall be rounded to the next lower whole number.  Cash to be distributed pursuant to the Plan shall be adjusted as necessary to account for the rounding provided in Section 9.03 of the Plan.

C.      **Undeliverable Payments**

If any Distribution to any holder is returned as undeliverable, the Liquidation Trustee shall use reasonable efforts to determine the current address of such holder, but no Distribution to such holder shall be made unless and until the Liquidation Trustee has determined the then current address of such holder, at which time such Distribution shall be made to such holder without interest; provided that any Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of ninety (90) days from the Distribution Date, whichever shall apply, and any entitlement of any holder of any Claim to such distributions shall be extinguished and forever barred.

Subject to Bankruptcy Rule 9010, distributions to holders of Allowed Claims will be made by mail at (a) the address of each such holder as set forth on the Proofs of Claim filed by such holders or in the Debtors' records; (b) the address set forth in any written notice of address change filed with the Bankruptcy Court and delivered to the Debtors and the Liquidation Trustee in writing

after the date of any related Proof of Claim; (c) the address reflected in the schedules if no Proof of Claim is filed and the Debtors or the Liquidation Trustee have not received a written notice of address change; or (d) the address delivered by any claimant to the Debtor or the Liquidation Trustee, as applicable, within sixty (60) days after the Effective Date.  Any change of address shall be filed via ECF in the Debtors' Chapter 11 Cases and delivered to both (i) the Debtors and (ii) the Liquidation Trustee.  If any Distribution is returned as undeliverable, no further distributions to such holder will be made unless and until the Liquidation Trustee is notified in writing of such Claimant's then-current address within ninety (90) days of the date on which the attempted Distribution was mailed.  After ninety (90) days from the attempted Distribution, such holder of an Allowed Claim shall forfeit for all purposes and be barred from receiving any distributions from the Liquidation Trust.

### D.    Claims Trading

At the close of business on the date of the Confirmation Hearing, the claims register shall be closed for all purposes, and there shall be no further changes in the record holders of any Claims. Neither the Debtors nor the Liquidation Trust shall have any obligation to recognize any transfer of any Claims occurring after the date of the Confirmation Hearing; *provided, however,* that the foregoing will not be deemed to prohibit the sale or transfer of any Claim subsequent to the date of the Confirmation Hearing.  The Liquidation Trustee shall instead be entitled to recognize and deal for all purposes under the Plan and the Liquidation Trust with only those record holders as of the close of business on the date of the Confirmation Hearing. For avoidance of doubt, in the event a holder of an Allowed Claim sells its claim to a transferee after the Confirmation Hearing, then the holder of the Allowed Claim will be served with any claim objections, other pleadings and distributions.  It will be the sole responsibility of the holder of the Allowed Claim and the transferee thereof to communicate and coordinate any actions by the Liquidation Trustee, who both will only recognize and deal with the record owner of the claim per the claim register as of the Confirmation Hearing.

### XIV.
### DISPUTED CLAIMS AND RESERVE FOR DISPUTED CLAIMS

### A.    Establishment and Maintenance of Reserve

On the initial distribution date and each subsequent distribution date, the Liquidation Trustee shall reserve from the Distributions to be made on such dates to the holders of Allowed Claims, an amount equal to One Hundred Percent (100%) of the Distributions to which holders of Disputed Claims would be entitled under the Plan as of such dates if such Disputed Claims were Allowed Claims in their Disputed Claim Amounts, or as estimated by the Debtor or the Court in accordance with the Plan (the "**Disputed Claims Reserve**").

### B.    Property Held in Disputed Claims Reserve

Cash in the Disputed Claims Reserve shall (together with all dividends or other accretions or distributions thereon) be held in trust by the Liquidation Trustee for the benefit of the potential recipients of such Cash and shall not constitute property of the Liquidation Trustee.  In the event the Court subsequently disallows a Disputed Claim, Cash and any other consideration in the

Disputed Claims Reserve on account of such disallowed Disputed Claim, and any other consideration actually distributed on account of such Disputed Claim, be reallocated and redistributed to holders of Allowed Claims in accordance with this Plan.

## C.      Distributions Upon Allowance of Disputed Claims

The holder of a Disputed Claim that becomes an Allowed Claim subsequent to the Distribution Date shall receive distributions of Cash and any other consideration from the Disputed Claims Reserve from the Liquidation Trustee upon the subsequent distribution date following the date on which such Disputed Claim becomes an Allowed Claim pursuant to a Final Order.  Such Distributions shall be made in accordance with the Plan.

## D.      Expenses of Disputed Claims Reserve

Except as otherwise ordered by the Court, the amount of any reasonable expenses incurred by the Liquidation Trustee on or after the Effective Date with respect to the Disputed Claims Reserve shall be paid by the Liquidation Trust.

## E.      Procedures for Allowance or Disallowance of Disputed Claims

**1.      Objections to and Resolution of Claims, Administrative Claims and Unsecured Claims.**  Any and all objections to any claim must be filed within one hundred and twenty (120) days after the Effective Date (the "**Objection Deadline**"), or with respect to rejection claims, within thirty (30) Days from the entry of an order rejecting  such executory contract or unexpired lease (the "**Objection to Rejection Claims Deadline**").

If any Distribution by the Liquidation Trustee, as the case may be, to a holder of an Allowed Claim remains unclaimed for a period of one hundred and twenty (120) days after such Distribution has been delivered to the holder the Allowed Claim, the amount of the Claim upon which such Distribution was made shall be canceled and said Claimant shall not be entitled to any further distributions hereunder.  A distribution of funds is unclaimed, if, without limitation, the holder of an Allowed Claim does not cash a check, returns a check or if the check mailed to the holder at the address set forth in the schedules, the amended schedules or set forth in a proof of claim filed by such holder is returned by the United States Postal Service or any other country's postal service as undeliverable.  All claims for undeliverable Distributions must be made by the ninetieth (90th) day following the date on which delivery the Distribution was initially mailed.  The Claim on which an undelivered or unclaimed Distribution was made shall be treated as a Disputed Claim until such 90-day period has passed, and if no party contacts the Liquidation Trustee, as applicable, in writing to seek payment of such Claim within the 90-day period, then such Claim shall be treated as disallowed in full by Final Order of the Court.  After expiration of such 90-day period: (i) all unclaimed distributions will revert to the Liquidation Trust to be reallocated and distributed to the holders of Allowed Claims and (ii) or the Liquidation Trustee will be released for all purposes and shall have no obligation to make any distributions to the holder of such unclaimed Distribution, which holder shall be forever barred from asserting such Claim.  Checks issued in respect of other Allowed Claims will be null and void if not negotiated within ninety (90) days after the date of issuance thereof, and such holder will forfeit its right to such distribution.  In no event shall any funds escheat to the State of Texas.

Except as to applications for allowance of compensation and reimbursement of expenses under sections 330 and 503 of the Code, the Liquidation Trustee shall have the exclusive right to make and file objections to Administrative Claims and Unsecured Claims after the Effective Date. All objections shall be litigated to Final Order; *provided, however*, that following the Effective Date, the Liquidation Trustee shall have the authority to compromise, settle, otherwise resolve or withdraw any of their objections without approval of the Court. Unless otherwise ordered by the Court, the Liquidation Trustee shall file all objections to Claims and serve such objections upon the holder of the Claim as to which the objection is made as soon as is practicable, but in no event later than one hundred and twenty (120) days after the Effective Date or such later date as may be approved by the Court. The Debtors reserve the right to object to Administrative Claims as such claims arise in the ordinary course of business. The Liquidation Trust shall bear all costs and expenses relating to the investigation and prosecution of Disputed Claims from and after the Effective Date.

Subject to applicable law and as otherwise set forth herein, from and after the Effective Date, the Liquidation Trustee will have the authority to file, settle, compromise, withdraw, arbitrate or litigate to judgment objections to Claims pursuant to applicable procedures established by the Bankruptcy Code, the Bankruptcy Rules, and the Plan. Any and all objections to any Claim must be filed prior to the Objection Deadline, or as otherwise ordered by the Court, or with respect to rejection claims, prior to the Objection to Rejection Claims Deadline.

An objection to the allowance of a Claim will be in writing and may be filed with the Court by the Liquidation Trustee, at any time on or before the Claim Objection Deadline. The failure by the Debtors to object to any Claim for voting purposes will not be deemed a waiver of the Liquidation Trustee's right to object to, or re-examine, any such Claim in whole or in part.

**ANY CLAIM ARISING FROM THE REJECTION OF AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT IS NOT FILED WITHIN THE TIMES SET FORTH HEREIN WILL BE AUTOMATICALLY DISALLOWED, FOREVER BARRED FROM ASSERTION, AND SHALL NOT BE ENFORCEABLE AGAINST, AS APPLICABLE, THE DEBTORS, THE LIQUIDATION TRUST, THE ESTATE, OR PROPERTY OF THE FOREGOING PARTIES, WITHOUT THE NEED FOR ANY OBJECTION BY THE DEBTORS OR THE LIQUIDATION TRUSTEE, AS APPLICABLE, OR FURTHER NOTICE TO, OR ACTION, ORDER, OR APPROVAL OF THE COURT OR ANY OTHER ENTITY, AND ANY CLAIM ARISING OUT OF THE REJECTION OF THE EXECUTORY CONTRACT OR UNEXPIRED LEASE SHALL BE DEEMED FULLY SATISFIED, RELEASED, AND DISCHARGED.**

**F.      No Distribution Pending Allowance**

Notwithstanding any other provision of the Plan, if any portion of a Claim is disputed, the full amount of such Claim shall be treated as a Disputed Claim for purposes of this Plan, and no payment or distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim or Allowed Equity Interest (in whole or in part).

## G.      Disallowed Claims

All Claims held by Persons against whom the Debtors or Liquidation Trustee have commenced an Action under sections 542, 543, 544, 545, 547, 548, 549, and/or 550 of the Code, shall be deemed "disallowed" Claims pursuant to section 502(d) of the Code and holders of such Claims shall not be entitled to vote to accept or reject the Plan.  Claims that are deemed disallowed pursuant Section 9.05(c) of the Plan shall continue to be disallowed for all purposes until the Avoidance Action against such party has been settled or resolved by Final Order and any sums due to the Estate from such party have been paid.

## H.      Due Authorization by Claimants

Every claimant who elects to participate in the Distributions provided for herein warrants that the Claimant is authorized to accept in consideration of its Claim against the Debtors the Distributions provided for in the Plan and that there are no outstanding commitments, agreements, or understandings, express or implied, that may or can in any way defeat or modify the rights conveyed or obligations undertaken by the Claimant under the Plan.

<h2 style="text-align:center">XV.<br>OTHER SIGNIFICANT PROVISIONS</h2>

## A.      Treatment of Executory Contracts and Unexpired Leases

Section 365 of the Bankruptcy Code grants the Debtors the power, subject to the approval of the Court, to assume or reject executory contracts and unexpired leases.  If an executory contract or unexpired lease is rejected, the other party to the agreement may file a claim for damages incurred by reason of the rejection.  In the case of rejection of leases of real property, such damage claims are subject to certain limitations imposed by the Code.

Pursuant to sections 365(a) and 1123(b)(2) of the Code, all executory contracts and unexpired leases between the Debtor and any Person shall be deemed rejected by the Debtor as of the Effective Date, except for any executory contract or unexpired lease:  (i) which previously has been assumed or rejected pursuant to an order of the Court entered prior to the Effective Date, (ii) as to which a motion for approval of the assumption or rejection of such executory contract or unexpired lease has been filed and served prior to the Effective Date, or (iii) which is listed on the Assumption List which shall be filed with the Court and served on the affected parties by no later than twenty-one (21) days prior to the Confirmation Hearing; *provided, however,* that the Debtors or Debtor shall have the right, on or prior to the Confirmation Date, to amend the Assumption List to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) shall be deemed, respectively, assumed or rejected.  The Debtors or Debtor shall provide notice of any amendments to the Assumption List to the non-debtor parties to the executory contracts and unexpired leases affected thereby.  The listing of a document on the Assumption List shall not constitute an admission by the Debtors or the Debtor that such document is an executory contract or an unexpired lease, or that the Debtors or the Debtor have any liability thereunder.

To the extent that cure payments are due with respect to an executory contract or unexpired lease to be assumed pursuant to the Plan, the amount of such cure payment shall be listed in the

Assumption List.  To the extent that the non-debtor party to any executory contract or unexpired lease disagrees with the cure amount listed in the Assumption List, such party must file a notice of dispute with the Court and serve such notice on the Debtors no later than five (5) days prior to the Confirmation Hearing.  Except as may otherwise be agreed to by the parties or provided herein, within ninety (90) days after the Effective Date, the Liquidation Trustee shall cure any and all undisputed defaults under any executory contract or unexpired lease assumed pursuant to the Plan in accordance with section 365(b)(1) of the Code.  Except as otherwise provided herein, all disputed defaults that are required to be cured shall be cured either within ninety (90) days of the entry of a Final Order determining the amount, if any, of the Debtors' or Liquidation Trust's liability with respect thereto, or as may otherwise be agreed to by the parties.  If there are any objections filed, the Court shall hold a hearing.  In the event the Court determines that the cure amount is greater than the cure amount listed by the Debtors, the Liquidation Trust may elect to reject the contract or unexpired lease and not pay such greater cure amount.

The Plan further provides that any Claim for damages arising from the rejection of an executory contract or unexpired lease pursuant to the Plan must be filed with the Court and/or served upon the Debtors or Liquidation Trust or as otherwise may be provided in the Confirmation Order, by no later than thirty (30) days after the later of:  (i) notice of entry of an order approving the rejection of such executory contract or unexpired lease, (ii) notice of entry of the Confirmation Order, and (iii) notice of an amendment to the Assumption List.  Any Claim not filed within such time will be forever barred from assertion against the Debtors, the Estates, the Liquidation Trust, and their respective property.  Unless otherwise ordered by the Court, all Claims arising from the rejection of executory contracts and unexpired leases shall be treated as Unsecured Claims under the Plan.

## B.      Approval of Agreements

Entry of the Confirmation Order shall constitute approval of the Assumption List, Plan, the Committee Settlement, and all such transactions, subject to the occurrence of the Effective Date.

## C.      Distributions under the Plan

### 1.      Allowed Claims

Distributions under the Plan will only be made to claimants holding Allowed Claims.  A Claim or Interest is "Allowed" under the Plan to the extent it is with respect to a Claim: (a) the amount of a Claim that was listed in the Debtors' schedules as not disputed, contingent or unliquidated, if the holder of such Claim has not filed a proof of claim with the Court within the applicable period of limitation fixed by the Court pursuant to Rule 3003(c)(3) of the Rules, or (b) if a holder of a Claim has filed a proof of claim with the Court within the applicable period of limitation fixed by the Court pursuant to 3003(c)(3) of the Rules:  (i) the amount stated in such proof of claim or in the schedules if no objection to such proof of claim or amount listed in the schedules has been interposed within the applicable period of limitation fixed by the Code or Rules, or as otherwise fixed by the Court, or (ii) such amount as shall be fixed by an order of the Court which has become a Final Order, if an objection has been interposed within the applicable period of limitation fixed by the Code, the Rules, or the Court, or (c) with respect to a Fee Request, such amount as shall be fixed by an order of the Court which has become a Final Order.  In no event

shall the Allowed Amount of any Unsecured Claim include interest accrued on such Claim after the Petition Date.

### 2.     Delivery of Distributions

The Plan provides that, subject to Bankruptcy Rule 9010, distributions to holders of Allowed Claims will be made by mail at (a) the address of each such holder as set forth on the Proofs of Claim filed by such holders or in the Debtors' records; (b) the address set forth in any written notice of address change filed with the Bankruptcy Court and delivered to the Debtors and the Liquidation Trustee in writing after the date of any related Proof of Claim; (c) the address reflected in the schedules if no Proof of Claim is filed and the Debtors or the Liquidation Trustee have not received a written notice of address change; or (d) the address delivered by any claimant to the Debtor or the Liquidation Trustee, as applicable, within sixty (60) days after the Effective Date. Any change of address shall be filed via ECF in the Debtors' Chapter 11 Cases and delivered to both (i) the Debtors and (ii) the Liquidation Trustee. If any Distribution is returned as undeliverable, no further distributions to such holder will be made unless and until the Liquidation Trustee is notified in writing of such Claimant's then-current address within ninety (90) days of the date on which the attempted Distribution was mailed. After ninety (90) days from the attempted Distribution, such holder of an Allowed Claim shall forfeit for all purposes and be barred from receiving any distributions from the Liquidation Trust.

### 3.     Unclaimed Distributions and Uncashed Checks

In accordance with the terms of the Plan, if any Distribution by the Liquidation Trustee, as the case may be, to a holder of an Allowed Claim remains unclaimed for a period of one hundred and twenty (120) days after such Distribution has been delivered to the holder the Allowed Claim, the amount of the Claim upon which such Distribution was made shall be canceled and said Claimant shall not be entitled to any further distributions hereunder. A distribution of funds is unclaimed, if, without limitation, the holder of an Allowed Claim does not cash a check, returns a check or if the check mailed to the holder at the address set forth in the schedules, the amended schedules or set forth in a proof of claim filed by such holder is returned by the United States Postal Service or any other country's postal service as undeliverable. All claims for undeliverable Distributions must be made by the ninetieth (90th) day following the date on which delivery the Distribution was initially mailed. The Claim on which an undelivered or unclaimed Distribution was made shall be treated as a Disputed Claim until such 90-day period has passed, and if no party contacts the Liquidation Trustee, as applicable, in writing to seek payment of such Claim within the 90-day period, then such Claim shall be treated as disallowed in full by Final Order of the Court. After expiration of such 90-day period: (i) all unclaimed distributions will revert to the Liquidation Trust to be reallocated and distributed to the holders of Allowed Claims and (ii) or the Liquidation Trustee will be released for all purposes and shall have no obligation to make any distributions to the holder of such unclaimed Distribution, which holder shall be forever barred from asserting such Claim. Checks issued in respect of other Allowed Claims will be null and void if not negotiated within ninety (90) days after the date of issuance thereof, and such holder will forfeit its right to such distribution. In no event shall any funds escheat to the State of Texas.

### 4.      Due Authorization by Claimants

Pursuant to the Plan, every claimant who elects to participate in the Distributions provided for herein warrants that the Claimant is authorized to accept in consideration of its Claim against the Debtors the Distributions provided for in the Plan and that there are no outstanding commitments, agreements, or understandings, express or implied, that may or can in any way defeat or modify the rights conveyed or obligations undertaken by the Claimant under the Plan.

### 5.      Setoffs and Recoupment

The Debtors may, but shall not be required to, set off (pursuant to the provisions of sections 553 and 362 of the Code or other applicable law) against or recoup from any Claim or Equity Interest and the payments to be made pursuant to the Plan in respect of such Claim or Equity Interest, any Claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any setoff or recoupment right they may have against the holder of such Claim or Equity Interest.

### 6.      Liquidation Trustee

The Liquidation Trustee shall act as the disbursing agent under the Plan with respect to all distributions to holders of Claims and Equity Interests, and will make all Distributions required to be distributed under the applicable provisions of the Plan.  The Liquidation Trustee shall serve without bond and will receive, without further Court approval, reasonable compensation for services rendered pursuant to the Plan and Liquidation Trust Agreement solely from the Liquidation Trust Assets, including reimbursement of reasonable out-of-pocket expenses.

### D.      Effects of Confirmation of the Plan; Injunction, Releases and Exculpation

### 1.      Settlement, Release injunction and Related Provision

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest, or any distribution to be made on account of such Allowed Claim or Allowed Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and Holders of Claims and Interests and is fair, equitable and reasonable.  In accordance with the provisions of the Plan and except as otherwise provided herein, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Liquidating Trustee may compromise and settle Claims against the Debtors or their Estates and Causes of Action against other Entities.

2.        **Releases by the Debtors**

*Notwithstanding anything contained herein to the contrary, to the fullest extent permitted by applicable law and approved by the Bankruptcy Court, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, effective on and after the Effective Date, the Released Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever been released and discharged by the Debtors and the Estates from any and all past or present Claims, Interests, indebtedness and obligations, rights, suits, losses, damages, injuries, costs, expenses, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, asserted or unasserted, suspected or unsuspected, accrued or unaccrued, fixed, contingent, pending or threatened, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract violations of federal or state laws or otherwise, those Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability or otherwise that the Debtors, the Estates, or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other entity, based on or relating to any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date (collectively, "__Debtor Released Claims__") based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring efforts, the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or during the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Plan Supplement, the Liquidation Trust Agreement or any related agreements, instruments, or other documents, the pursuit of Confirmation, any action or actions taken in furtherance of or consistent with the administration or implementation of the Plan or the Distributions and related documents or other property under the Plan, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date arising from or relating to any of the foregoing; provided, however, that the foregoing "Debtor Releases" shall not operate to waive or release (i) any Causes of Action of any Debtor arising from any act or omission of a Released Party that constitutes fraud, gross negligence, or willful misconduct, (ii) any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement executed in connection with the Plan; (iii) any Causes of Action against any insurer arising out of or relating to matters for which the Debtors would otherwise be liable or suffer an insurable loss, including without limitation, any Causes of Action against any D&O Insurance Carrier; or (iv) any Retained Insurance Causes of Action; provided that (x) any such Retained Insurance Causes of Action may be pursued solely to recover any proceeds under any applicable insurance policies (including any D&O Liability Insurance Policies), (y) no Person or entity shall have any recourse against any Released Party for any Retained Insurance Causes of Action and (z) no Released Party shall have any liability to any Person or entity for any Retained Insurance Cause of Action other than the proceeds of any such insurance policies.*

### 3.    Release by Holders of Claims

*Notwithstanding anything contained herein to the contrary, to the fullest extent permitted by applicable law and approved by the Bankruptcy Court, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, effective on and after the Effective Date, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Debtors and the other Released Parties from any and all past or present Claims, Interests, indebtedness and obligations, rights, suits, losses, damages, injuries, costs, expenses, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, asserted or unasserted, suspected or unsuspected, accrued or unaccrued, fixed, contingent, pending or threatened, existing or hereafter arising, in law, equity, or otherwise, whether for tort, fraud, contract violations of federal or state laws or otherwise, those Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability or otherwise that such Releasing Party would have been legally entitled to assert (whether individually or collectively), based on or relating to any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date (collectively "Third Party Released Claims") based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring efforts, the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or any other Released Party, on one hand, and any Releasing Party, on the other hand, the restructuring of Claims and Interests prior to or during the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Plan Supplement, the Liquidation Trust Agreement or any related agreements, instruments, or other documents, the pursuit of Confirmation, any action or actions taken in furtherance of or consistent with the administration or implementation of the Plan or the Distributions and related documents or other property under the Plan, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date arising from or relating to any of the foregoing; provided, however, that the foregoing "Third Party Releases" shall not operate to waive or release (i) any Causes of Action of any Releasing Party arising from any act or omission of a Released Party that constitutes fraud, gross negligence, or willful misconduct, (ii) any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement executed in connection with the Plan; (iii) any Causes of Action against any insurer arising out of or relating to matters for which the Debtors would otherwise be liable or suffer an insurable loss, including without limitation, any Causes of Action against any D&O Insurance Carrier; (iv) any Professional Fee Claim or (v) any Retained Insurance Causes of Action; provided that (x) any such Retained Insurance Causes of Action may be pursued solely to recover any proceeds under any applicable insurance policies (including any D&O Liability Insurance Policies), (y) no Person or entity shall have any recourse against any Released Party for any Retained Insurance Causes of Action and (z) no Released Party shall have any liability to any Person for any Retained Insurance Cause of Action other than the proceeds of any such insurance policies. Notwithstanding any provision herein to the contrary, no provision of the Plan, or any order confirming the Plan, (i) releases any non-debtor person or entity (including any Released Party) from any Claim or cause of action of the SEC; or, (ii) enjoins, limits, impairs or delays the SEC*

*from commencing or continuing any Claims, causes of action, proceedings or investigations against any non-debtor person or entity (including any Released Party) in any forum.*

### 4.    Exculpation

*Subject to the occurrence of the Effective Date and the requirements of Section 1125(e) of the Bankruptcy Code, None of (a) the Debtors, including the Debtors' officers, (b) the Debtors' Professionals (including Foley & Lardner, LLP and its respective employees and officers and SamCo Holdings, LLC), (c) the Committee, Committee members, and the Committee's Professionals (including Kane Russell Coleman Logan PC and their respective employees and officers), or (d) the Liquidation Trustee, his Professionals (collectively, the "Exculpated Parties" and individually, an "Exculpated Party") shall have or incur any liability to each other or any Creditor or other Person for any act or omission in connection with, or arising out of, or related to, directly or indirectly, the Chapter 11 Cases, including, without limitation, the planning, filing or the administration of the Chapter 11 Cases, the formulation, preparation, dissemination, approval, confirmation, administration, or consummation of the Plan, the Disclosure Statement, the solicitation of votes for or confirmation of the Plan or consummation or administration of the Plan, except for actual fraud, willful misconduct, or gross negligence.*

### 5.    Permanent Injunction

*Except as otherwise expressly provided in the Plan or in the Confirmation Order, or for obligations issued pursuant to the Plan, from and after the Effective Date, all Persons who hold or may hold Claims or Interests and all Persons acting on behalf of such holders and the Releasing Parties are permanently enjoined from taking any of the following actions against the Debtors, the Released Parties, the Liquidating Trust and/or the Liquidation Trustee: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Persons on account of or in connection with or with respect to any Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Persons or the property or Estates of such Persons on account of or in connection with or with respect to any Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Persons or against the property or Estates of such Persons on account of or in connection with or with respect to any Claims or Interests unless such holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date; (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Claims, Interests and Causes of Action released, exculpated, waived, settled or barred pursuant to this Plan, which for the avoidance of doubt include the Third Party Releases, Debtor Releases and Exculpated Claims set forth herein, (6) commencing or continuing in any manner any action or other proceeding of any kind against any Released Party on account of or in connection with or with respect to any Retained Insurance Cause of Action (the injunction set forth in this clause (6), the "Insurance Injunction"); provided, however, that nothing contained in these provisions or in this Injunction shall affect the rights of holders that elect the Release Opt-Out on their respective ballots. Nothing in the Plan or the Confirmation Order shall preclude any entity from*

*pursuing an action against one or more of the Debtors in a nominal capacity to recover insurance proceeds so long as the Debtors or Liquidation Trustee, as applicable, and any such Person agree in writing that such Person will: (a) waive all Claims against the Debtors and the Estates related to such action and (b) enforce any judgment on account of such Claim solely against applicable insurance proceeds, if any.  If allowed by the Court, any beneficiary of this injunction injured by any willful violation of such injunction shall recover actual damages, including, without limitation, costs and attorneys' and experts' fees and disbursements and, in appropriate circumstances, may recover punitive damages.  Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays imposed by the Bankruptcy Code under §§ 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date, shall remain in full force and effect with respect to the Debtors until the Effective Date.*

**6.      Closing of the Chapter 11 Cases**

As soon as is practicable after the Effective Date, the Liquidation Trustee shall File an application with the Clerk of the Court requesting the entry of a Final Decree closing the Chapter 11 Cases; *provided, however*, the Liquidation Trustee shall not file an application for Final Decree until and unless the conditions to the Plan becoming effective as set forth herein have been fully met, all pending Avoidance Actions and Causes of Action have been resolved by Final Order of a court of competent jurisdiction or agreement with the Liquidation Trustee, objections to Disputed Claims have been resolved by Final Order of the Court or agreement with the Liquidation Trustee, and the Final Distribution has been made.

## XVI.
## CONDITIONS PRECEDENT TO
## EFFECTIVENESS OF THE PLAN

**A.      Conditions to Effectiveness of the Plan**

The Plan shall not be consummated, and the Effective Date shall not occur, unless and until the following conditions have occurred or been duly waived:

a.      The Court shall have approved the information contained in the Disclosure Statement as adequate;

b.      The Confirmation Order shall be in form and substance reasonably acceptable to the Debtors and include, among other things, a finding of fact that the Debtors and their respective present and former members, officers, directors, employees, advisors, attorneys, and agents acted in good faith within the meaning of and with respect to all of the actions described in section 1125(e) of the Code and are, therefore, not liable for the violation of any applicable law, rule, or regulation governing such actions;

c.      The Confirmation Order shall have been entered and shall be a Final Order (with no modification or amendment thereof), and there shall be no stay or injunction that would prevent the occurrence of the Effective Date;

d.      All conditions precedent to the obligations of the Debtors and the Liquidation Trust have occurred;

e.      The Court shall have entered an order (contemplated to be part of the Confirmation Order) authorizing and directing the Debtors to take all actions necessary or appropriate to enter into, implement, and consummate the documents created, amended, supplemented, modified or adopted in connection with the Plan;

f.      All other actions, authorizations, filings, consents, and regulatory approvals required (if any) shall have been obtained, effected or executed in a manner acceptable to the Debtors and remain in full force and effect or, if waivable, waived by the Person or Persons entitled to the benefit thereof;

g.      The Closing Date of the Transaction shall have occurred;

h.      No order of a court shall have been entered and shall remain in effect restraining the Debtors from consummating the Plan; and

i.      The statutory fees owing to the United States Trustee shall have been paid.

**B.      Effect of Failure of Conditions**

If the Confirmation Order is vacated, the Plan shall be deemed null and void in all respects, including without limitation the discharge of Claims pursuant to section 1141 of the Code and the assumptions or rejections of executory contracts and unexpired leases as provided by the Plan, and nothing contained herein shall (i) constitute a waiver or release of any Action by, or Claims against, the Debtor or (ii) prejudice in any manner the rights of the Debtors.

**C.      Waiver of Conditions**

The Debtors may waive one or more of the conditions precedent to effectiveness of the Plan set forth in Section 14.01 of the Plan.

**XVII.**
**RETENTION OF JURISDICTION**

**A.      Retention of Jurisdiction**

The Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Code and for, among other things, the following purposes:

(i)      to hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases, if any are pending, and the allowance of Claims resulting therefrom;

(ii)     to determine any and all adversary proceedings, motions, applications, and contested matters, and other litigated matters pending on the Confirmation Date;

(iii)     to hear and determine all Actions, including, without limitation, Avoidance Actions and any other Actions commenced by the Debtors, the Debtor, or any other party in interest with standing to do so, pursuant to sections 505, 542, 543, 544, 545, 547, 548, 549, 550, 551, and 553 of the Code, collection matters related thereto, and settlements thereof;

(iv)     to hear and determine any objections to or the allowance, classification, priority, compromise, estimation, or payments of any Administrative Claims, Claims, or Equity Interests;

(v)     to ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan;

(vi)     to enter and implement such Orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(vii)     to issue such Orders in aid of execution and consummation of the Plan, to the extent authorized by section 1142 of the Code;

(viii)     to consider any amendments to or modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in the Plan, the Assumption List, or any order of the Court, including, without limitation, the Confirmation Order;

(ix)     to hear and determine all applications for compensation and reimbursement of expenses of Professionals under sections 330, 331, and 503(b) of the Code;

(x)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan;

(xi)     to recover all Assets of the Debtors and Property of the Estates, wherever located;

(xii)     to determine any disputes, interpretation issues, reformation or other issues applicable to the Liquidation Trust Agreement, Liquidation Trust Assets, Liquidation Trustee, and the Liquidation Trustee's duties, rights, obligations and benefits and the Liquidation Trustee shall have standing and shall constitute a party in interest and may be heard on any and all matters related to the Liquidation Trust filed in the Cases, including any matter filed after the Effective Date;

(xiii)     to determine any Claim of or any liability to a governmental unit that may be asserted as a result of the transactions contemplated herein;

(xiv)     to enforce the Plan, the Confirmation Order, Liquidation Trust Agreement and any other order, judgment, injunction, or ruling entered or made in the Case, including, without limitation, the discharge, injunction, exculpation, and releases provided for in the Plan;

(xv)     to take any action and issue such Orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following consummation;

(xvi)     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Code (including, but not limited to, an expedited determination under section 505(b) of the Code of the tax liability of the Debtors for all taxable periods through the Effective Date and for all taxable periods of the Debtors through the liquidation and dissolution of such entity);

(xvii)   to enter and implement Orders and to take such other actions as may be necessary or appropriate to restrain interference by any Person or entity with the consummation or implementation of the Plan, including, without limitation, to issue, administer, and enforce injunctions, releases, assignments, or indemnity obligations contained in the Plan and the Confirmation Order;

(xviii)  to hear any other matter not inconsistent with the Code; and

(xix)    to enter a final decree closing the Case; *provided however*, that nothing in the Plan shall divest or deprive any other court or agency of any jurisdiction it may have over the Debtor under applicable environmental laws.

**B.       No New Requirements.**

The grant of jurisdiction to the Bankruptcy Court herein over a matter or issue does not mean that Bankruptcy Court approval is required for such matters or issues, nor does it otherwise affect the substantive legal requirements or the requirements in any agreement pertaining to such matters or issues.

**XVIII.**
**MISCELLANEOUS PROVISIONS**

**A.       Effectuating Documents and Further Transactions**

The Debtors or the Debtor, as the case may be, are authorized to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to implement, effectuate, and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan.

**B.       Exemption from Transfer Taxes**

Pursuant to section 1146(a) of the Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, including new common stock, creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, in connection with a transfer, or sale, including but not limited to the Debtors' cases, in furtherance of, or in connection with any agreements, deeds, bills of sale, or assignments, or any other documents executed in connection with any of the transactions

contemplated by the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

## C.    Authorization to Request Prompt Tax Determinations

The Debtor is authorized to request an expedited determination under section 505(b) of the Code of the tax liability of the Debtors, for all taxable periods through the Effective Date.

## D.    Post-Effective Date Fees and Expenses

From and after the Effective Date, the Debtor shall, in the ordinary course of business and without the necessity for any approval by the Court, pay the reasonable fees and expenses of professionals thereafter incurred by the Debtor, including, without limitation, those fees and expenses incurred in connection with the implementation and consummation of the Plan.

## E.    Payment of Statutory Fees

The Debtor shall be responsible for timely payment of unpaid, but accrued fees incurred on or before the Effective Date of the Plan pursuant to 28 U.S.C. § 1930(a)(6).  After confirmation, the Debtor shall file with the Court and serve on the United States Trustee a quarterly financial report regarding all income and disbursements, including all plan payments, for each quarter (or portion thereof) the Case remains open.

## F.    Amendment or Modification of Plan

Alterations, amendments, or modifications of the Plan may be proposed in writing by the Debtors at any time prior to the Confirmation Date in conformity with section 1127(a) of the Code, provided that the Plan, as altered, amended, or modified, satisfies the conditions of sections 1122, 1123 and 1129 of the Code, and the Debtors shall have complied with section 1125 of the Code. The Plan may be altered, amended, or modified by the Debtors at any time after the Confirmation Date in conformity with section 1127(b) of the Code, provided that the Plan, as altered, amended, or modified, satisfies the requirements of sections 1122 and 1123 of the Code, and the Court, after notice and a hearing, confirms the Plan, as altered, amended, or modified, under section 1129 of the Code, and the circumstances warrant such alterations, amendments, or modifications.  A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim of such holder.

Prior to the Effective Date, the Debtors, and without the approval of the Court, and without notice to all holders of Claims and Interests, insofar as it does not materially adversely affect the interests of holders of Claims and Interests, may correct any defect, omission, or inconsistency in this Plan in such manner and to such extent as may be necessary to expedite the execution of this Plan.

## G.    Severability

In the event that the Court determines, prior to the Confirmation Date, that any provision in the Plan is invalid, void, or unenforceable, such provision shall be invalid, void, or

unenforceable with respect to the holder or holders of such Claims or Equity Interests as to which the provision is determined to be invalid, void, or unenforceable. The invalidity, voidness, or unenforceability of any such provision shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan. The Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**H.    Revocation or Withdrawal of the Plan**

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Actions by or against the Debtors or any other Person, an admission against interests of the Debtors, nor shall it prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors.

**I.    Binding Effect Notices**

The Plan shall be binding upon and inure to the benefit of the Debtors, the holders of Claims and Equity Interests, and their respective successors and assigns, including, without limitation, the Debtor.

**J.    Notices**

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed. Unless and until otherwise directed, any pleading, notice or other document required or permitted by the Plan to be served on or delivered to the Debtors, or, if after the Effective Date, the Liquidation Trustee and the United States Trustee, shall be sent by U.S. first-class mail, postage prepaid to:

**To the Debtors:**

c/o Joshua Campbell,
President and Director
5700 Granite Pkwy, #200
Plano, TX 75024

**With a copy to:**

Marcus A. Helt (TX 24052187)
Jack G. Haake (*pro hac vice*)
FOLEY GARDERE
Foley & Lardner LLP
2021 McKinney Avenue
Suite 1600
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667
Email: mhelt@foley.com
           jhaake@foley.com

**To the Liquidation Trustee**

To the Person and Address identified in
the Plan Supplement

**To the United States Trustee:**

John Vardeman
Trial Attorney
Office of the United States Trustee
110 N. College, Suite 300
Email: John.M.Vardeman@usdoj.gov

## K.      Governing Law

Except to the extent the Code, Rules, or other federal law is applicable, or to the extent the Plan or any agreement entered into pursuant to the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas, without giving effect to the principles of conflicts of law of such jurisdiction.

## L.      Withholding and Reporting Requirements

In connection with the consummation of the Plan, the Debtors as the case may be, shall comply with all withholding and reporting requirements imposed by any federal, state, local, or

foreign taxing authority and all distributions hereunder shall be subject to any such withholding and reporting requirements.

**M.    Section 1125(e) of the Code**

As of the Confirmation Date, the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Code. As of the Confirmation Date, the Debtors and their respective members, officers, directors, agents, financial advisors, attorneys, employees, equity holders, partners, affiliates, and representatives shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Code in the offer and issuance of the new securities hereunder, and therefore are not, and on account of such offer, issuance, and solicitation shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections hereof or other offer and issuance of new securities under the Plan.

**N.    Filing of Additional Documents**

On or before Substantial Consummation of the Plan, the Debtors shall file with the Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**O.    No Admissions**

Notwithstanding anything in the Plan to the contrary, nothing contained in the Plan shall be deemed as an admission by any Person with respect to any matter set forth in the Plan or herein.

**P.    Waiver of Bankruptcy Rule 3020(e) and 7062**

The Debtors may request that the Confirmation Order include (i) a finding that Rules 3020(e) and 7062 shall not apply to the Confirmation Order; and (ii) authorization for the Debtors to consummate the Plan immediately after entry of the Confirmation Order.

**Q.    Computation of Time**

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Court, the provisions of Rule 9006 shall apply.

**R.    Substantial Consummation**

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Code.

**S.    Final Decree**

As soon as is practicable after the Effective Date, the Liquidation Trustee shall File an application with the Clerk of the Court requesting the entry of a Final Decree closing the Chapter 11 Cases; *provided, however*, the Liquidation Trustee shall not file an application for Final Decree until and unless the conditions to the Plan becoming effective as set forth herein have been fully

met, all pending Avoidance Actions and Causes of Action have been resolved by Final Order of a court of competent jurisdiction or agreement with the Liquidation Trustee, objections to Disputed Claims have been resolved by Final Order of the Court or agreement with the Liquidation Trustee and the Final Distribution has been made.

**T.** **Inconsistency**

In the event of any inconsistency between the Plan and any Exhibit to the Plan or any other instrument or document created or executed pursuant to the Plan, the Plan shall govern.  In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall govern.

**U.** **No Interest or Attorneys' Fees**

Except as otherwise provided under the Plan, or as ordered by the Court, no interest, penalty, or other charge, including any late charge, arising from and after the applicable petition date, and no award or reimbursement of any attorneys' fees or other related cost or disbursement, shall be allowed on, or in connection with, any Claim, unless otherwise provided under the Plan or awarded by the Court.

**V.** **The Dissolution and Release of the Committee**

On the Effective Date, the Committee shall be dissolved and the members, employees, agents,  advisors, affiliates, and representatives (including, without limitation, attorneys, financial advisors, and other Professionals) shall be released from any and all liabilities, damages, claims, causes of action, and rights incurred or otherwise relating to their role as Committee members by or from any party-in-interest, holder of a Claim, holder of an Equity Interest, and the Debtors and their current and former officers, directors, employees and agents, expressly excluding fraud, gross negligence and willful misconduct.  The Committee and its members, as of the Effective Date, shall be discharged of and from all further authority, duties, responsibilities, and obligations related to, arising from and in connection with the Chapter 11 Cases.

**W.** **Successors and Assigns**

The Plan and all the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

**X.** **Headings**

The headings of articles, paragraphs, and sub-paragraphs in the Plan are inserted for convenience only and shall not affect the interpretation of any provision of the Plan.

**Y.** **No Penalty for Prepayment**

Neither the Debtors nor the Debtor shall be liable for payment of any sum or interest in the form of a penalty relating to the prepayment of any claim treated under the Plan.

**Z.**     **Savings Clause**

Any minor defect or inconsistency in the Plan may be corrected or amended by the Confirmation Order.

**AA.**     **Remedy of Defects**

The Debtors reserve the right, in accordance with the Bankruptcy Code, to amend or modify the Plan prior to the Confirmation Date.  After the Effective Date, the Liquidation Trustee may, on order of the Bankruptcy Court, amend or modify the Plan in accordance with §1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purposes and intent of the Plan.

**XIX.**
**LIQUIDATION ANALYSIS, FEASIBILITY, AND RISK FACTORS**

**A.**     **Liquidation Analysis**

The Plan provides for the liquidation of the Debtors.  The recovery to holders of Claims in the Debtors is derived primarily from sale of certain of the Debtors' assets, return of collateral, and the potential success of the Liquidation Trust Assets.  Nonetheless, liquidation under chapter 11 is still preferable to liquidation under chapter 7.  A liquidation of the Debtors' Estates under chapter 7 of the Bankruptcy Code necessarily will result in less recovery to Unsecured Creditors than under the Plan because, under the Plan, distributions will include the Equity Interests in Eco Investments and the possibility of monetizing the Residual MESAs.  Furthermore, these distributions are made without incurring additional administrative expenses and statutory commissions of a chapter 7 trustee.  Using the statutory fee provided in Bankruptcy Code § 326, a chapter 7 trustee would be entitled to commission of approximately 3% of all moneys disbursed or turned over in the Chapter 11 Cases, plus the incurrence of attorneys' fees by a chapter 7 trustee.  Such fees are anticipated to be substantial for any chapter 7 trustee and trustee counsel to familiarize themselves with the Debtors, the Estates, the procedural history, and the terms of the Plan.  Attached hereto as **<u>Exhibit C</u>** is a Liquidation Analysis prepared by the Debtors and their professionals for use in projecting recoveries and distributions under the Plan.  The Liquidation Analysis, the figures reported therein, and the methodology used to create the Liquidation Analysis are subject to the "Disclaimer" provided in this Disclosure Statement.

For these reasons, holders of Claims against the Debtors under the Plan will be greater than they would receive under a liquidation pursuant to chapter 7 of the Bankruptcy Code.

**B.**     **Feasibility of the Plan**

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors unless such liquidation is proposed in the Plan.  The Plan proposes the sale and/or liquidation all of the Debtors' assets.  Therefore, the feasibility requirement is met.

## C.      Risks Associated with the Plan

Both the confirmation and consummation of the Plan are subject to a number of risks. There are certain risks inherent in the confirmation process under the Bankruptcy Code.  If certain standards set forth in the Bankruptcy Code are not met, the Bankruptcy Court will not confirm the Plan even if holders of Claims against the Debtors vote to accept the Plan.  Although the Debtors believe that the Plan meets such standards, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  If the Bankruptcy Court were to determine that such requirements were not met, it could require the Debtors to re-solicit acceptances, which could delay and/or jeopardize confirmation of the Plan.  The Debtors believe that the solicitation of votes on the Plan will comply with section 1126(b) and that the Bankruptcy Court will confirm the Plan.  The Debtors, however, can provide no assurance that modifications of the Plan will not be required to obtain confirmation of the Plan, or that such modifications will not require a re-solicitation of acceptances.

**XX.**
**COMPARISON OF PLAN TO ALTERNATIVES**

## A.      Chapter 7 Liquidation

The most realistic alternative to the Plan is conversion of the Chapter 11 Cases from a proceeding under chapter 11 of the Bankruptcy Code to a proceeding under chapter 7 of the Bankruptcy Code.  A chapter 7 case, sometimes referred to as a "straight liquidation," requires the liquidation of all of a Debtors' assets by a chapter 7 trustee.  The cash realized from liquidation is subject to distribution to Creditors in accordance with section 726 of the Bankruptcy Code. Whether a bankruptcy case is one under chapter 7 or chapter 11, allowed secured claims, allowed administrative claims and allowed priority claims, unless subordinated pursuant to section 510 of the Bankruptcy Code, are entitled to be paid in cash, in full, before unsecured Creditors and Equity Interests receive anything.  Thus, in a chapter 7 case, the recovery, if any, to Creditors holding non-priority unsecured claims will depend upon the net proceeds left in the estate after all of the Debtors' assets have been reduced to cash and all claims of higher priority have been satisfied in full.

The Plan preserves Causes of Action and provides that the Liquidation Trustee will assert such Causes of Action.  If the Chapter 11 Cases were converted to chapter 7, those same Causes of Action would be available for prosecution by the chapter 7 trustee as he deemed appropriate. Under either scenario, an estate representative or successor would have to expend funds to investigate Causes of Action, file Causes of Action, and litigate Causes of Action to settlement or judgment.  The Debtors are unable to value the recoveries from the Causes of Action, but do not believe that their value would change much whether prosecuted by the Liquidation Trustee or a chapter 7 trustee.  The Debtors believe, however, that the additional expense associated with a chapter 7 trustee administration, as detailed below, would be more expensive than the administration undertaken by the Liquidation Trustee.

Chapter 7 liquidation adds an additional layer of expenses.  As referenced above, conversion of a bankruptcy case to chapter 7 will trigger the appointment of a chapter 7 trustee having the responsibility of liquidating a Debtors' assets.  Pursuant to sections 326 and 330 of the

Bankruptcy Code, the chapter 7 trustee will be entitled to reasonable compensation in relation to the level of disbursements made to Creditors, as follows: (a) up to 25% of the first $5,000 disbursed; (b) up to 10% of the amount disbursed in excess of $5,000 but not in excess of $50,000; (c) up to 5% of any amount disbursed in excess of $50,000 but not in excess of $1,000,000; and (d) up to 3% of any amount disbursed in excess of $1,000,000.  Additionally, the chapter 7 trustee will be entitled to retain his or her own professionals to assist in the liquidation and administration of the estate.  The fees and expenses of such professionals, to the extent allowed, are also entitled to priority in payment as Administrative Claims.  Chapter 7 administrative costs are entitled to priority in payment over chapter 11 administrative costs.  Nevertheless, chapter 11 administrative costs continue to have priority over all other non-administrative priority claims and non-priority unsecured claims in the bankruptcy case.

The Debtors are opposed to conversion of the Chapter 11 Cases to chapter 7 for several reasons.  First, the conversion of the Chapter 11 Cases will re-open the Bar Date and enable additional and otherwise time-barred Claims to be asserted.  Second, the Debtors believe that conversion of the Chapter 11 Cases could lead to additional layers of fees and expenses for the reasons stated in the prior paragraph.  Third, conversion to chapter 7 could result in the appointment of a trustee having no experience or knowledge of the prior proceedings in the Chapter 11 Cases or of the Debtors' business, its books and records and its assets. Fourth, the ability to monetize the MESAs will be reduced.  A substantial amount of time would be required in order for the chapter 7 trustee and the trustee's professionals to become familiar with the Debtors, its business operations, its assets, and pending litigation in order to wind up the Chapter 11 Cases effectively.

With respect to the "best interest of creditors" test of section 1129(a)(7) of the Bankruptcy Code, the Debtors do not believe that claimants will achieve a greater recovery under chapter 7 than under the Plan.  Inasmuch as the Plan is a plan of liquidation and most hard assets have already been sold, any comparison of likely distributions to holders of Allowed Claims under the Plan to likely distributions to holders of Allowed Claims in a chapter 7 proceeding is similar, except that the Debtors contend that the Plan incorporates beneficial compromises which may not be available in a chapter 7 proceeding, and in a chapter 7 proceeding the potential for additional administrative expense and additional Claims demonstrates that the distributions under the Plan are likely to exceed, or at least be equal to, the distributions that would be made under chapter 7 of the Bankruptcy Code.

## B.    Alternative Plans

To date, no other proposed Chapter 11 plans have been filed by other party in interest in the Chapter 11 Cases, and the Debtors do not anticipate that any other Chapter 11 plan will be filed.  If the Plan is not confirmed, the Debtors, or any other party in interest in the Chapter 11 Cases, could propose a different plan or plans.

## C.    Dismissal

The most remote alternative possibility is dismissal of the Chapter 11 Cases.  If dismissal were to occur, the Debtors would no longer have the protection of the automatic stay and other applicable provisions of the Bankruptcy Code.  Dismissal would force a race among claimants to

take control and dispose of the Debtors' available assets, and unsecured claimants, on an aggregate basis, would very likely fail to realize any recovery on their Claims.

## XXI.
## MATERIAL UNCERTAINTIES AND RISKS

In considering whether to vote to accept or reject the Plan, claimants entitled to vote should consider the following risks associated with the Plan: (a) that all of the conditions to confirmation of the Plan are not satisfied or waived (as applicable); (b) that all of the conditions to the effectiveness of the Plan are not satisfied or waived (as applicable) or that such conditions are delayed by a significant period of time; (c) that estimations and projections may ultimately prove to be materially inaccurate; and (d) that the prosecution of Causes of Action does not result in significant recoveries.

There can also be no assurance that the Plan will not be modified up to and through the Confirmation Date, and the Debtors reserve the right to modify the Plan, subject to compliance with the Bankruptcy Code, in the event the modification becomes warranted or necessary in furtherance of confirmation.

## XXII.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**A.    Introduction**

Implementation of the Plan may have federal, state and local tax consequences to the Debtors and its Estates, as well as to claimants and Equity Interest holders of the Debtors. No tax opinion has been sought or will be obtained with respect to any tax consequences of the Plan, and the following disclosure does not constitute and is not intended to constitute either a tax opinion or tax advice to any Person.

This disclosure is provided for informational purposes only. Moreover, this disclosure summarizes only certain of the federal income tax consequences associated with the Plan's confirmation and implementation and does not attempt to comment on all such aspects. Similarly, this disclosure does not attempt to consider any facts or limitations applicable to any particular Claim or Equity Interest holder that may modify or alter the consequences described below. This disclosure does not address state, local or foreign tax consequences or the consequences of any federal tax other than the federal income tax.

This disclosure is based upon the provisions of the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), the regulations promulgated thereunder, existing judicial decisions, and administrative rulings. In light of the expansiveness of such authorities, no assurance can be given that legislative, judicial or administrative changes will not be forthcoming that would affect the accuracy of the discussion below. Any such changes could be material and could be retroactive with respect to the transactions entered into or completed prior to the enactment or promulgation thereof. Finally, the tax consequences of certain aspects of the Plan are uncertain due to a lack of applicable legal authority and may be subject to judicial or administrative interpretations that differ from the discussion below.

**CLAIMANTS AND EQUITY INTEREST HOLDERS, THEREFORE, ARE ADVISED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM AND TO THE DEBTORS OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.**

**B.      Federal Income Tax Consequences to the Claimants**

In general, a holder of a Claim should recognize gain or loss equal to the amount realized under the Plan in respect to its Claim less the amount of such holder's basis in its Claim.  Any gain or loss recognized in the exchange may be long-term or short-term capital gain or loss, or ordinary income or loss, depending upon the nature of the Claim and the holder, the length of time the holder held the Claim and whether the Claim was acquired at a discount.  If the holder realizes a capital loss, its deduction of the loss may be subject to limitations under the Tax Code.  The holder's aggregate tax basis for any Distribution received under the Plan generally will equal the amount realized.  The amount realized by a holder generally will equal the sum of the Distribution the holder received less the amount (if any) allocable to Claims for interest.

**C.      Tax Withholding**

The Plan provides for the Debtors and the Liquidation Trustee to comply with all tax withholding and reporting requirements validly imposed on them by any governmental authority. Accordingly, it provides that Distributions made pursuant thereto shall be subject to such withholding and reporting requirements, and authorizes the Liquidation Trustee to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including, without limitation, payment of applicable withholding taxes from a Claimant's Distribution, and conditioning a Person's Distributions upon receipt of necessary tax reporting information from a Claimant.

**D.      Disclaimers**

**PERSONS CONCERNED WITH THE TAX CONSEQUENCES OF THE PLAN SHOULD CONSULT THEIR OWN ACCOUNTANTS, ATTORNEYS AND/OR ADVISORS.    THE DEBTORS MAKE THE ABOVE-NOTED DISCLOSURE OF POSSIBLE TAX CONSEQUENCES FOR THE SOLE PURPOSE OF ALERTING READERS TO TAX ISSUES THAT THEY MAY WISH TO CONSIDER. THE DEBTORS CANNOT, AND DO NOT, REPRESENT THAT THE TAX CONSEQUENCES MENTIONED ABOVE ARE COMPLETELY ACCURATE BECAUSE, AMONG OTHER THINGS, THE TAX LAW EMBODIES MANY COMPLICATED RULES THAT MAKE IT DIFFICULT TO STATE ACCURATELY WHAT THE TAX IMPLICATIONS OF ANY ACTION MIGHT BE.**

**IRS CIRCULAR 230 NOTICE:    TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, THE DEBTORS INFORM ALL RECIPIENTS OF THIS DISCLOSURE STATEMENT THAT ANY U.S. TAX INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING THE EXHIBITS HERETO) IS NOT INTENDED OR WRITTEN TO BE**

**USED, AND CANNOT BE USED, FOR THE PURPOSE OF (A) AVOIDING PENALTIES UNDER THE INTERNAL REVENUE CODE, OR (B) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION OR MATTER ADDRESSED HEREIN.**

## XXIII.
## RECOMMENDATION AND CONCLUSION

**A.     Recommendation**

The Plan provides for an equitable distribution to holders of Claims against the Debtors. The Debtors believe that any alternative to confirmation of the Plan, such as attempt by another party in interest to file a plan or conversion to chapter 7, could result in significant delays, litigation, and costs.  Moreover, the Debtors believe that Creditors will receive greater and earlier recoveries under the Plan than those that would be achieved under an alternative plan.  The Debtors believe that the Plan complies with section 1129 of the Bankruptcy Code and is fair and equitable and in the best interests of the Debtors, the Estates and claimants.  Accordingly, the Debtors urge holders of Claims against the Debtors receiving Ballots to vote to accept the Plan.

DATED:          November 19, 2020

Respectfully submitted:

/s/ Jack G. Haake
Jack G. Haake

FOLEY & LARDNER LLP
Marcus A. Helt (TX 24052187)
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Telephone: 214.999.3000
Facsimile: 214.999.4667

Jack G. Haake (*pro hac vice*)
Washington Harbour
3000 K Street, N.W., Suite 600
Washington, D.C. 20007-5109
Telephone: 202.672.5300
Facsimile: 202.672.5399

**ATTORNEYS FOR DEBTORS AND DEBTORS-IN-POSSESSION**